1   Amber D. Abbasi [CSBN 240956]
    **CAUSE OF ACTION**
2   1919 Pennsylvania Ave. NW, Suite 650
    Washington, D.C. 20006
3   Phone: 202.499.4232
    Fax: 202.300.5842
4   E-mail: amber.abbasi@causeofaction.org

5   S. Wayne Rosenbaum [CSBN 182456]
    Ryan R. Waterman [CSBN 229485]
6   **STOEL RIVES** LLP
    12255 El Camino Real, Suite 100
7   San Diego, CA  92130
    Phone:  858.794.4100
8   Fax:  858.794.4101
    Email:  swrosenbaum@stoel.com; rrwaterman@stoel.com

9
    *Counsel list continues on next page*
10
    Attorneys for Plaintiffs DRAKES BAY OYSTER COMPANY and KEVIN LUNNY
11
                 UNITED STATES DISTRICT COURT
12             NORTHERN DISTRICT OF CALIFORNIA
                      OAKLAND DIVISION
13

14  **DRAKES BAY OYSTER COMPANY,**          Case No. 12-cv-06134-YGR
    17171 Sir Francis Drake Blvd
15  Inverness, CA 94937, and                **NOTICE OF MOTION AND MOTION
                                            FOR PRELIMINARY INJUNCTION**
16  **KEVIN LUNNY**,
    17171 Sir Francis Drake Blvd
17  Inverness, CA 94937

18              Plaintiffs,                  Date:  January 25, 2013

19          v.                              Time:  2:00 p.m.

20  **KENNETH L. SALAZAR,**                 Court:  Hon. Yvonne Gonzales Rogers,
    in his official capacity as Secretary, U.S.         Oakland Courthouse 5 – 2nd Floor
21  Department of the Interior,
    1849 C Street, NW, Washington, D.C., 20240;
22  **U.S. DEPARTMENT OF THE INTERIOR**
    1849 C Street, NW, Washington, D.C., 20240;
23  **U.S. NATIONAL PARK  SERVICE**
    1849 C Street, NW, Washington, D.C. 20240;
24  and
    **JONATHAN JARVIS,**
25  in his official capacity as Director, U.S. National
    Park Service,
26  1849 C Street, NW, Washington, D.C. 20240.

27              Defendants.

28

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

73053625.2 0099880-00856

NOTICE AND MOTION FOR PRELIM. INJ.,
12-CV-06134 YGR

1    **Counsel List Continued**

2    John Briscoe [CSBN 53223]
     Lawrence S. Bazel [CSBN 114641]
3    Peter S. Prows [CSBN 257819]
     **BRISCOE IVESTER & BAZEL LLP**
4    155 Sansome Street, Suite 700
     San Francisco, CA 94104
5    Phone: 415.402.2700
     Fax: 415.398.5630
6    E-mail: jbriscoe@briscoelaw.net; lbazel@briscoelaw.net;
     pprows@briscoelaw.net
7

8    Zachary Walton    [CSBN 181041]
     **SSL LAW FIRM LLP**
9    575 Market Street, Suite 2700
     San Francisco, CA 94105
10   Phone:  415.243.2685
     Email:   zack@ssllawfirm.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE AND MOTION FOR PRELIM. INJ.,
12-CV-06134 YGR

1   TO EACH PARTY AND TO THE ATTORNEY OF RECORD FOR EACH PARTY IN THIS
2   ACTION:

3       PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. Proc. 65, Civil L.R. 65-2, Civil
4   L.R. 7-2, 5 U.S.C. § 705, and 28 U.S.C. §§ 2201 and 2202, on January 25, 2013, in the United
5   States District Court for the Northern District of California, Oakland Division, Courtroom 5 – 2nd
6   Floor, 1301 Clay Street, Oakland, CA 94612, before the Honorable Yvonne Gonzalez Rogers,
7   Plaintiffs Drakes Bay Oyster Company (DBOC) and Mr. Kevin Lunny will and hereby do move
8   for a preliminary injunction in this action.

9       Plaintiffs respectfully request that this Court issue a preliminary injunction enjoining
10  named defendants, their officers, agents, servants, employees, and attorneys, and those persons in
11  active concert or participation with them, from enforcing or otherwise implementing Secretary
12  Salazar's November 29, 2012, Memorandum of Decision, the National Parks Service's November
13  29, 2012 Directive, and the December 4, 2012, Federal Register Notice (77 Fed. Reg. 71826,
14  71827), and from interfering with the continuing operations of Plaintiffs' oyster farm, pending
15  trial on the merits.

16      The grounds for this motion are that: (i) Plaintiffs are likely to prevail on the merits of
17  their claims that Defendants violated the Administrative Procedures Act by misinterpreting Pub.
18  L. No. 111-88, § 124, 123 Stat. 2932 (2009) (Section 124) and Pub. L. 95-625 § 318 (1978),
19  codified at 16 U.S.C. § 459c-5(a) (1978 Act), that Defendants committed scientific misconduct,
20  that Defendants violated NEPA, and that Defendants illegally published a false notice in the
21  Federal Register; (ii) Plaintiffs are likely to suffer irreparable harm caused by the destruction of
22  their business; (iii) the balance of equities tips in Plaintiffs' favor; and (iv) an injunction is in the
23  public interest to prevent harm to DBOC's employees and their families, to the environment, and
24  to the public.

25      Plaintiffs' Motion for a Preliminary Injunction is based on the accompanying
26  Memorandum of Points and Authorities in Support of Motion for a Preliminary Injunction; the
27  Declarations of Dr. Robert Abbott, William Bagley, Dr. Corey Goodman, Scott Luchessa, Kevin
28  Lunny, Laura Moran, James Patterson, Richard Steffel, and Ryan Waterman, and attached

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

-1-                    NOTICE AND MOTION FOR PRELIM. INJ.,
                                    12-CV-06134 YGR

73053625.2 0099880-00856

exhibits thereto; the complete records and files in this action; arguments and evidence to be presented on a hearing on this motion; and such other and further matters as the Court may properly consider.

DATED:  December 21, 2012                    Respectfully submitted,

CAUSE OF ACTION

By:   /s/ Amber Abbasi
       AMBER ABBASI
       Attorneys for Plaintiffs

DATED:  December 21, 2012

STOEL RIVES LLP

By:   /s/ Ryan R. Waterman
       RYAN R. WATERMAN
       Attorneys for Plaintiffs

DATED:  December 21, 2012

BRISCOE IVESTER & BAZEL LLP

By:   /s/ Peter Prows
       PETER PROWS
       Attorneys for Plaintiffs

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

-2-

NOTICE AND MOTION FOR PRELIM. INJ.,
12-CV-06134 YGR

73053625.2 0099880-00856

Amber D. Abbasi [CSBN 240956]
CAUSE OF ACTION
1919 Pennsylvania Ave. NW, Suite 650
Washington, D.C. 20006
Phone: 202.499.4232
Fax: 202.300.5842
E-mail: amber.abbasi@causeofaction.org

S. Wayne Rosenbaum [CSBN 182456]
Ryan R. Waterman [CSBN 229485]
STOEL RIVES LLP
12255 El Camino Real, Suite 100
San Diego, CA  92130
Phone:  858.794.4100
Fax:  858.794.4101
Email:  swrosenbaum@stoel.com; rrwaterman@stoel.com

*Counsel list continues on next page*

Attorneys for Plaintiffs DRAKES BAY OYSTER COMPANY and KEVIN LUNNY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| **DRAKES BAY OYSTER COMPANY,**<br>17171 Sir Francis Drake Blvd<br>Inverness, CA 94937, and<br><br>**KEVIN LUNNY**,<br>17171 Sir Francis Drake Blvd<br>Inverness, CA 94937<br><br>                    Plaintiffs,<br><br>        v.<br><br>**KENNETH L. SALAZAR**,<br>in his official capacity as Secretary, U.S.<br>Department of the Interior,<br>1849 C Street, NW, Washington, D.C., 20240;<br>**U.S. DEPARTMENT OF THE INTERIOR**<br>1849 C Street, NW, Washington, D.C., 20240;<br>**U.S. NATIONAL PARK  SERVICE**<br>1849 C Street, NW, Washington, D.C. 20240;<br>and<br>**JONATHAN JARVIS**,<br>in his official capacity as Director, U.S. National<br>Park Service,<br>1849 C Street, NW, Washington, D.C. 20240.<br><br>                    Defendants. | Case No. 12-cv-06134-YGR<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**<br><br><br>Date:  January 25, 2013<br><br>Time:  2:00 pm<br><br>Court: Hon. Yvonne Gonzales Rogers,<br>                Oakland Courthouse 5 – 2nd Floor |

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

73020962.4 0099880-00856

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

**Counsel List Continued**

John Briscoe [CSBN 53223]
Lawrence S. Bazel [CSBN 114641]
Peter S. Prows [CSBN 257819]
**BRISCOE IVESTER & BAZEL LLP**
155 Sansome Street, Suite 700
San Francisco, CA 94104
Phone: 415.402.2700
Fax: 415.398.5630
E-mail: jbriscoe@briscoelaw.net; lbazel@briscoelaw.net; pprows@briscoelaw.net


Zachary Walton    [CSBN 181041]
**SSL LAW FIRM LLP**
575 Market Street, Suite 2700
San Francisco, CA 94105
Phone:  415.243.2685
Email:   zack@ssllawfirm.com

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................. 2

    A.   A History Of Sustainable Farming In Point Reyes ............................................ 2

    B.   The Denial Of Plaintiffs' Permits To Continue Oyster Farming ..................... 2

    C.   The Pattern Of Scientific Misconduct By The Federal Government ............... 6

    D.   The Consequences Of The Secretary's Decision ................................................ 8

III. LEGAL STANDARD ....................................................................................... 12

IV.  ANALYSIS ....................................................................................................... 12

    A.   Likelihood to Succeed on the Merits ................................................................ 12

        1.   Defendants Misinterpreted Section 124 and Other Legislation ............... 12

        2.   Defendants Committed Scientific Misconduct ......................................... 16

        3.   Defendants Violated NEPA ....................................................................... 20

        4.   Defendants Illegally Published A False Notice ....................................... 21

    B.   Imminent and Irreparable Harm ....................................................................... 22

    C.   The Balance of Equities Tips In Favor of Plaintiffs ........................................ 22

    D.   The Public Interest Supports Issuance of the Injunction ................................ 23

V.   CONCLUSION .................................................................................................. 23

Stoel Rives LLP
Attorneys At Law
San Diego

-i-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alcoa, Inc. v. Bonneville Power Admin.*,
  698 F.3d 774 (9th Cir. 2012)..................................................................... 20

*American Passage Media Corp. v. Cass Communications, Inc.*,
  750 F.2d 1470 (9th Cir. 1985)................................................................... 22

*Ass'n to Protect Hammersley v. Taylor Res.*,
  299 F.3d 1007 (9th Cir. 2002).................................................................. 14

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
  462 U.S. 87 (1983)..................................................................................... 20

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984)................................................................................... 13

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)................................................................................... 12

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  349 F.3d 1157 (9th Cir. 2003).................................................................. 20

*Earth Island Inst. v. Hogarth*,
  494 F.3d 757 (9th Cir. 2007).................................................................... 18

*FCC v. Fox TV Stations, Inc.*,
  556 U.S. 502 (2009)................................................................................... 16

*Ft. Funston Dog Walkers v. Babbitt*,
  96 F.Supp.2d 1021 (N.D. Cal. 2000) ...................................................... 21

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*,
  378 F.3d 1059 (9th Cir. 2004).................................................................. 16

*IBEW, Local Union No. 474 v. NLRB*,
  814 F.2d 697 (D.C. Cir. 1987).................................................................. 12

*Kelley v. Sec'y of HHS*,
  68 Fed. Cl. 84 (Fed. Cl. 2005).................................................................. 18

*Kouichi Taniguchi v. Kan Pac. Saipan, Ltd.*,
  132 S.Ct. 1997 (2012)............................................................................... 13

*Kudina v. Citimortgage, Inc.*,
  2011 U.S. Dist. LEXIS 123965 (W.D. Wash. 2011) .............................. 16

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008).................................................................... 16

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

-ii-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

**TABLE OF AUTHORITIES**
(continued)

Page

*Marsh v. Or. Natural Resources Council*,
490 U.S. 360 (1989) ................................................................................................... 16, 17

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., Inc.*,
463 U.S. 29 (1983) ........................................................................................................... 16

*NRDC v. U.S. Forest Service*,
421 F.3d 797 (9th Cir. 2005) ................................................................................... 16, 20

*Ransom v. FIA Card Servs., N.A.*,
131 S.Ct. 716 (2011) ....................................................................................................... 13

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ........................................................................................................... 12

*Shanks v. Dressel*,
540 F.3d 1082 (9th Cir. 2008) ....................................................................................... 16

*Sierra Club v. EPA*,
346 F.3d 955 (9th Cir. 2003) ......................................................................................... 16

*W. Watersheds Project v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) .............................................................................. 17, 18, 20

*Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*,
2003 U.S. App. LEXIS 27248 (9th Cir. 2004) ............................................................. 12

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................................................ 12

**Statutes**

16 U.S.C. §§ 1131 *et seq.* ................................................................................................... 3

1965 Cal. Stat. Ch. 983 ........................................................................................................ 3

1965 Cal. Stat. Ch. 1114 ...................................................................................................... 3

5 U.S.C. § 551 ...................................................................................................................... 12

5 U.S.C. § 706(2)(A) ........................................................................................................... 12

16 U.S.C. § 459c-5(a) ....................................................................................................... 4, 13

16 U.S.C. § 459c-5(b) .......................................................................................................... 13

16 U.S.C. § 2801 .................................................................................................................. 14

16 U.S.C. § 2805(d) ............................................................................................................. 14

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

73020962.4 0099880-00856

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

# TABLE OF AUTHORITIES
### (continued)

Page

28 U.S.C. § 1331 ................................................................................................................ 12

Cal. Pub. Res. Code § 30100.2 ......................................................................................... 14

Pub. L. 95-625 § 318 (1978) ............................................................................................... 4

Pub. L. No. 94-544, 90 Stat. 2515 ...................................................................................... 4

Pub. L. No. 111-88, § 124, 123 Stat. 2932 (2009) .................................................... passim

**Regulations**

36 C.F.R. § 1.5(b) ............................................................................................................. 21

36 C.F.R. § 1.6(d) ............................................................................................................. 16

40 C.F.R. § 1500.1(b) ....................................................................................................... 20

40 C.F.R. § 1506.9 ............................................................................................................ 20

40 C.F.R. § 1506.10(b)(2) ................................................................................................. 20

75 Fed. Reg. 65,373 (Oct. 22, 2010) ................................................................................... 5

77 Fed. Reg. 71826 ............................................................................................................. 9

77 Fed. Reg. 71827 ....................................................................................................... 9, 21

**Other Authorities**

H.R. Rep. No. 112-331 (2011) (Conf. Rep.) ................................................................... 5, 7

H.R. Rep. No. 94-1680 ....................................................................................................... 4

Webster's New International Dictionary of the English Language (2d ed. 1956) ........................ 14

*Wilderness Additions—National Park System, Hearing on S. 2472 Before the Senate
   Subcommittee on Parks and Recreation*, 94th Cong. 2d Session ............................................ 4

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

73020962.4 0099880-00856

-iv-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

**STATEMENT OF THE ISSUES**

1.     Section 124 (Pub. L. No. 111-88 § 124, 123 Stat. 2932) "authorized" Secretary Salazar "to issue" the permits necessary to allow Plaintiffs to continue operating their oyster farm, "notwithstanding any other provision of law." Are Plaintiffs likely to prevail on their claim that Secretary Salazar abused his discretion by misinterpreting the plain language of Section 124 as preventing him from issuing a Special Use Permit (SUP) to Plaintiffs because it would be a violation of other provisions of law?

2.     Are Plaintiffs likely to prevail on their claim that Secretary Salazar abused his discretion by misinterpreting his statutory authorization to extend leases for "agriculture" as prohibiting him from extending leases for Plaintiffs' oyster farm?

3.     Are Plaintiffs likely to prevail on their claim that Secretary Salazar abused his discretion by misinterpreting Congress's intent as favoring the conversion of Drakes Estero to wilderness, when Congress really intended to allow farming to continue there in perpetuity?

4.     Are Plaintiffs likely to prevail on their claim that Secretary Salazar abused his discretion by misinterpreting Section 124 as authorizing him to deny the permits notwithstanding some federal laws, like the National Environmental Policy Act (NEPA), even though nothing in Section 124 waived NEPA for a denial of the SUP?

5.     Are Plaintiffs likely to prevail on their claim that Secretary Salazar made a clear error in judgment by not ensuring that Defendants' pattern of scientific misconduct was corrected, and by relying on conclusions based on invalid data?

6.     Are Plaintiffs likely to prevail on their claim that Defendants acted in contravention of the procedural and substantive requirements of NEPA, including: (i) not filing the Final Environmental Impact Statement (FEIS) with the U.S. Environmental Protection Agency (EPA) as required by 40 C.F.R. § 1506.9, (ii) not waiting at least 30 days after EPA published a Notice of Availability in the Federal Register before relying on the FEIS, as required by 40 C.F.R. § 1506.10(b)(2), and (iii) not considering "every significant aspect of the environmental impact" to deny the permits as required by law?

Stoel Rives LLP
Attorneys At Law
San Diego

-v-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

7.      Are Plaintiffs likely to prevail on their claim that Defendants violated the APA by publishing a Federal Register notice based on two false statements of fact and without completing the formal rulemaking process that Defendants' regulations require?

8.      Does the complete destruction of Plaintiffs' business constitute irreparable harm?

9.      Does the balance of equities tip in favor of Plaintiffs, since Defendants will not be harmed by maintaining the status quo (which has existed for approximately eighty years of oyster farming in Drakes Estero), whereas Plaintiffs would suffer the complete destruction of their property and business before this case could ever be decided on the merits?

10.      Would an injunction serve the public interest, since it will help ensure that Defendants comply with NEPA and other environmental laws, stave off the destruction of a local landmark, prevent the loss of DBOC's thirty-one full-time jobs and affordable housing for fifteen people, and prevent immediate environmental harm to Drakes Estero?

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

-vi-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

**RELIEF REQUESTED**

A preliminary injunction restraining Defendants from implementing Secretary Salazar's November 29, 2012 Memorandum, the National Parks Service's November 29, 2012 Directive, and the December 4, 2012 Federal Register Notice, and from interfering with the continuing operations of Plaintiffs' oyster farm, pending trial on the merits.

Stoel Rives LLP
Attorneys At Law
San Diego

-vii-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

1  **I.      INTRODUCTION**

2          Drakes Bay Oyster Company (DBOC) is a small, family-run oyster farm and a model for

3  sustainable agriculture working in harmony with the environment.  On November 29, 2012,

4  Secretary Salazar announced his decision not to grant Plaintiffs DBOC and Mr. Kevin Lunny,

5  DBOC's President, a permit to allow for the continued operation of the oyster farm.

6          The Secretary's decision will cause immediate and irreparable harm to Plaintiffs, their

7  employees, the environment, and the public.  It will kill the farm's entire shellfish crop—

8  approximately 19 million immature oysters and 2 million immature clams—and destroy its

9  business.  It will leave the farm's thirty-one employees without jobs, and its 15 residents without

10  homes.  By killing the shellfish and removing oyster racks, it will cause environmental harm to

11  water quality, eelgrass, fish, birds, and harbor seals.  It may require Plaintiffs to violate other

12  laws.  It will deprive the public of a local landmark.  And it will reward Defendants' pattern of

13  scientific misconduct, which has been identified and criticized by Defendants themselves, by the

14  National Academy of Sciences, and by the press.

15          Plaintiffs will show that the Secretary denied the permit because of erroneous

16  interpretations of law and because he relied on scientific documents that misrepresented the

17  environmental impacts of the oyster farm and failed to consider its benefits.  In particular,

18  Secretary Salazar misinterpreted a 2009 federal law, Section 124, that authorized him "to issue"

19  the permit "notwithstanding any other provision of law."  Secretary Salazar nevertheless

20  interpreted other provisions of law as prohibiting him from issuing the permit, in contravention of

21  Section 124.  Plaintiffs will also show that he even misinterpreted those other provisions of law.

22  These and other actions violated the Administrative Procedure Act (APA) and the National

23  Environmental Policy Act (NEPA).

24          Plaintiffs seek a preliminary injunction because maintaining the status quo pending the

25  outcome of this litigation is necessary to prevent the irreparable harms Plaintiffs, their employees,

26  the environment, and the public will suffer if Defendants' orders are implemented.  Without an

27  injunction, this case will be over before it begins.

28

Stoel Rives LLP
Attorneys At Law
San Diego

73020962.4 0099880-00856

-1-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

II.     **BACKGROUND**

A.      **A History Of Sustainable Farming In Point Reyes**

Point Reyes has been a model farming community since at least the 1850s.[1]  Oyster farming began in Drakes Estero in the early 1930s, and has produced some of the world's best oysters ever since.  Declaration of Kevin Lunny (Lunny Dec.) ¶ 88.  Point Reyes National Seashore (PRNS) was created in 1962 to preserve from development pressures both the natural beauty of the area and the historic working landscape composed of ranches, dairies, and the oyster farm.  Plaintiff DBOC is the current owner of the oyster farm in Drakes Estero.  Lunny Dec.  ¶¶ 2, 5.  DBOC produces approximately one-third of the oysters grown in California.  Lunny Dec. ¶ 85.  It is California's only oyster cannery.  Lunny Dec. ¶ 83.  DBOC has 31 full-time employees, and it provides affordable on-site housing for 15 people—employees and their families.  Lunny Dec. ¶ 72.  DBOC is also the sole source of oyster shells used for the restoration of habitat for the Western Snowy Plover and the Least Tern, species listed as threatened or endangered under the Endangered Species Act, and the Olympia oyster in San Francisco Bay.  Lunny Dec. ¶ 84.

Large areas of the PRNS uplands are grazed by cattle and other livestock, producing world-class beef and dairy products.  These upland farms completely surround and drain into an adjacent marine lagoon known as Drakes Estero.  Lunny Dec. ¶ 90.  The farms within PRNS, including the oyster farm, have the well-deserved reputation of being a model for sustainable agriculture working in harmony with the environment.  Lunny Dec. ¶ 89.

DBOC is a local landmark.  Lunny Dec. ¶ 80.  It is the only farm in PRNS that is open to the public and attracts some 50,000 visitors a year, making it one of the most visited spots in the PRNS.  Lunny Dec. ¶¶ 80, 82. More than 84% of those responding to a poll by the local newspaper, the *Marin Independent Journal*, support DBOC's continued oyster farming.[2]

B.      **The Denial Of Plaintiffs' Permits To Continue Oyster Farming**

DBOC's oyster farm has two main components—one on land and the other under water.  The oysters, of course, grow in oyster beds in Drakes Estero.  When mature oysters are harvested,

---

[1] http://www.nps.gov/pore/historyculture/people_ranching.htm
[2] http://www.marinij.com/westmarin/ci_22102215/no-word-legal-action-by-west-marin-oyster

Stoel Rives LLP
Attorneys At Law
San Diego

-2-

73020962.4 0099880-00856

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

they are processed for distribution and sale in facilities on 1.5 acres along the shore of Drakes Estero. Lunny Dec. ¶ 2.

The two components of DBOC's oyster farm operate under different sets of rights. The State of California conveyed many of the rights to the water bottoms in Drakes Estero to the United States in 1965, but California retains "the right to fish in the waters underlying" Drakes Estero, including farming oysters. 1965 Cal. Stat. Ch. 983; Bagley Dec. ¶¶ 6-7 Ex. 1 § 3; *see also* 1965 Cal. Stat. Ch. 1114; Bagley Dec. ¶ 8 Ex. 2 (clarifying that the State's definition of "fish" includes oysters); Bagley Dec. Exs. 6 & 7 (Interior Department's contemporaneous confirmation that oyster farming in Drakes Estero remains under California's jurisdiction). In 2004, California gave DBOC's predecessor, the Johnson Oyster Company, exclusive leases to farm oysters in Drakes Estero until 2029, which were later transferred to DBOC. Lunny Dec. Exs. 2, 3.

DBOC's predecessor conveyed fee title to the 1.5-acre shore-side area to the U.S. Government in 1972. Lunny Dec. Ex. 1. That conveyance, however, was made subject to a renewable 40-year "Reservation Of Use And Occupancy" (RUO) "for the purpose of processing and selling wholesale and retail oysters, seafood and complimentary food items, the interpretation of oyster cultivation to the visiting public, and residential purposes reasonably incidental thereto . . . ." *Id.* Ex. 1, Exhibit "C." California's 2004 issuance of the exclusive water-bottom leases to DBOC were made "contingent" on the RUO being in effect as of that date (which it was). Lunny Dec. Ex. 2 at 3; Ex. 3 at 3. The RUO stated that, upon expiration of the initial 40-year term, the United States could issue the oyster farm a "special use permit" (SUP) to continue its operations. Lunny Dec. Ex. 1, Exhibit "C" ¶ 11. The 40-year RUO was set to expire on November 30, 2012. Furthermore, NPS issued a Special Use Permit (SUP) to DBOC in 2008 for 3.1 acres onshore and purported for the first time to cover the water bottoms in Drakes Estero. Lunny Dec. Ex. 4.

In 1976, Congress considered designating Drakes Estero, together with thousands of other acres of historic farming lands in PRNS, as "wilderness" under the 1964 Wilderness Act (16 U.S.C. § 1131 *et seq.*)—but it decided not to do so at the request of the Department of the Interior. In its report to Congress on the draft bill, Interior stated that Drakes Estero should *never* be designated as wilderness so long as California's "reserved rights" to fishing existed:

Stoel Rives LLP
Attorneys At Law
San Diego

-3-

73020962.4 0099880-00856

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

> Commercial oyster farming operations take place in [Drakes Estero] and the reserved rights by the State on tidelands in this area make this acreage inconsistent with wilderness.

H.R. Rep. No. 94-1680 at 5597 ("page 6"), copy provided at Waterman Dec. Ex. 8.  The Interior Department also argued that the wilderness designation should likewise be removed for the uplands historically used for cattle and dairy farming.  *Id.*

Congress apparently agreed.  Congress removed the wilderness designation for Drakes Estero in the final bill (the "1976 Act").  *Compare id.* at "page 5" (Interior Department's recommendation that wilderness area be reduced from 38,700 acres to 25,500 acres) *with* Pub. L. No. 94-544 (1976), 90 Stat. 2515 (final wilderness designation of only 25,370 acres), copy provided at Waterman Dec. Ex. 9.  The 1976 Act designated Drakes Estero as only "potential wilderness," and it removed all designations for the surrounding uplands (including the RUO area).  *Id.* § 1.  Although the House Report on the bill said that "potential wilderness" areas generally should be managed "to steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status," two of California's legislators did not see this as an obstacle to the oyster farm's continued operations:

> Established private rights of landowners and leaseholders will continue to be respected and protected.  The existing agricultural and acquacultural uses can continue.

*Wilderness Additions—National Park System, Hearing on S. 2472 Before the Senate Subcommittee on Parks and Recreation*, 94th Cong. 2d Session at 271 (statement of U.S. Senator John Tunney of California), copy provided at Waterman Dec. Ex. 10.

> There are two areas proposed for wilderness which may be included as wilderness with "prior, non-conforming use" provisions.  One is Drakes Estero where there is a commercial oyster farm.

*Id.* at 273 (statement of U.S. Representative John Burton of California).

Two years later, Congress passed a further enabling act ("1978 Act") that gave the Secretary of the Interior the authority to lease federally-owned "agricultural land" within PRNS in perpetuity.  Pub. L. No. 95-625 § 318 (1978) (codified at 16 U.S.C. § 459c-5(a)).  This working landscape, composed of DBOC's oyster farm and the surrounding cattle and dairy farms, continue to characterize a unique part of the PRNS.  Lunny Dec. ¶¶ 89-90.

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

-4-

73020962.4 0099880-00856

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

In 2005, however, the Interior Department informed DBOC that it was prohibited from issuing the oyster farm an SUP to continue operating once the RUO expired in 2012.  Lunny Dec. ¶ 10.  Subsequent federal investigations found repeated instances of scientific misconduct, misrepresentations, and bias by Defendants against the oyster farm.  *See* section II.C below.

In 2009, Senator Dianne Feinstein authored a law, "Section 124," that expressly authorized the Secretary of the Interior "to issue" an SUP allowing DBOC to continue its existing operations "notwithstanding any other provision of law."  Pub. L. No. 111-88, § 124, 123 Stat. 2932 (2009), copy provided at Waterman Dec. Ex. 5.  Section 124 provides in full:

> Prior to the expiration on November 30, 2012 of the Drake's Bay Oyster Company's Reservation of Use and Occupancy and associated special use permit (''existing authorization'') within Drake's Estero at Point Reyes National Seashore, notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit with the same terms and conditions as the existing authorization, except as provided herein, for a period of 10 years from November 30, 2012: Provided, That such extended authorization is subject to annual payments to the United States based on the fair market value of the use of the Federal property for the duration of such renewal. The Secretary shall take into consideration recommendations of the National Academy of Sciences Report pertaining to shellfish mariculture in Point Reyes National Seashore before modifying any terms and conditions of the extended authorization. Nothing in this section shall be construed to have any application to any location other than Point Reyes National Seashore; nor shall anything in this section be cited as precedent for management of any potential wilderness outside the Seashore.

In July 2010, DBOC applied for an SUP.  Lunny Dec. ¶ 14.  In October 2010, the Interior Department, through the National Parks Service (NPS), formally began the NEPA process to analyze the environmental impacts of Plaintiffs' request.  *See* 75 Fed. Reg. 65,373 (Oct. 22, 2010) ("Pursuant to [NEPA], [NPS] is preparing an Environmental Impact Statement (EIS) for the Drakes Bay Oyster Company Special Use Permit . . . ."), copy provided at Waterman Dec. Ex. 12. In September 2011, NPS released a Draft EIS (DEIS) for public comment.  Lunny Dec. Ex. 9.

In December 2011, Congress directed the National Academy of Sciences (NAS) to assess the DEIS.  H.R. Rep. No. 112-331, at 1057 (2011) (Conf. Rep.), copy provided at Waterman Dec. Ex. 6.  In August 2012, NAS released its report.  Lunny Dec. Ex. 11.  Plaintiffs also submitted timely comments on the DEIS, and a timely Data Quality Complaint.  Lunny Dec. ¶ 17, Ex. 14.

On November 20, 2012—ten days before the end of the oyster farm lease—NPS released what it called a "Final" EIS (FEIS).  Lunny Dec. Ex. 12.  Plaintiffs also submitted comments on the FEIS, although NPS never started or completed a notice and comment period on the FEIS, as required by law.  Waterman Dec. Ex. 3.

On November 29, 2012—the day before the expiration of DBOC's authorizations— Secretary Salazar issued a memorandum of decision (Memorandum) to extend cattle ranching leases in PRNS, while singling out DBOC for a denial of the SUP.  Lunny Dec. Ex. 13.  Even though Section 124 was enacted to make clear that he had the authority to issue the SUP notwithstanding any other laws, the Memorandum stated that actually doing so "would violate . . . specific wilderness legislation," i.e., the 1976 Act.  Lunny Dec. Ex. 13 at 1.  He also reasoned that Congress gave him the authority "to lease agricultural ranch and dairy lands" only, and that it "[did] not authorize mariculture."  *Id.* at 2, 7 citing 1978 Act.  But the Memorandum also argued that "[t]he 'notwithstanding any other provision of law' language in [Section 124] expressly exempts my decision from any substantive or procedural requirements."  *Id.* at 4.  Nevertheless, Secretary Salazar cited the DEIS and FEIS for "the proposition that the removal of DBOC's commercial operations in the estero would result in long-term beneficial impacts to the estero's natural environment."  *Id.* at 5.

### C.      The Pattern Of Scientific Misconduct By The Federal Government

The FEIS was the culmination of several years of Defendants' scientific misconduct, misrepresentations, and bias against DBOC.  That misconduct is documented by the Interior Department's own Inspector General and Office of the Solicitor, by two reports from the NAS, and by many comments and letters written by Plaintiffs to Defendants.

In 2007, the Interior Department's Inspector General opened an investigation into allegations of "scientific misconduct" by Defendants in their dealings with DBOC.  Lunny Dec. Ex. 5 at 1.  In July 2008, the Inspector General issued an "Investigative Report" containing its findings.  *Id.*  It found that Defendants had "misrepresented research" in "concerted attempts" to find environmental harm from DBOC's operations.  *Id.* at 1.  For example, Defendants published a report saying that DBOC's oysters were "the primary source" of sedimentation in Drakes

Estero, when the study on which they relied had concluded merely that oysters "could" cause

sedimentation.  *Id.* at 12.  That same report also said that DBOC's oyster racks "severely

restricted" eelgrass growth, when the study cited had actually found that the racks have "no

pronounced impacts" on eelgrass.  *Id.* at 19.

A later investigation by the Office of the Solicitor did not find criminal activity by

Defendants, but agreed that Defendants' "misconduct arose from incomplete and biased

evaluation and from blurring the line between exploration and advocacy through research."

Lunny Dec. Ex. 8 at 35.

In response to this misconduct, Senator Feinstein urged NPS to contrast with NAS to

assess Defendants' science on the oyster farm.  Lunny Dec. Ex. 6 at 18-19.  In 2009, NAS

published its assessment, finding that Defendants had "selectively presented, over-interpreted, or

misrepresented the available scientific information on potential impacts of [DBOC]."  *Id.* at 72-

73.  In particular, they gave "an interpretation of the science that exaggerated the negative and

overlooked the potentially beneficial effects of [DBOC]."  *Id.* at 73.  They ignored the facts that

DBOC's oyster farm "will contribute to water filtration, the transfer of nutrients and carbon to the

sediments, and biogeochemical cycling"—as oysters had done "for millennia until human

exploitation eliminated them in the period from the mid 1800s to the early 1900s."  *Id.* at 3-4.

In 2011, Congress became concerned about "the validity of the science underlying the

DEIS," and directed NAS to review that science.  Conf. Rep. at 1057.  In August 2012, the NAS

issued its report on the DEIS.  Lunny Dec. Ex. 11.  This NAS report determined that Defendants'

scientific conclusions in seven of the eight "resource categories" reviewed had "moderate to high

levels of uncertainty and, for many of these an equally reasonable alternate conclusion of a lower

[environmental] impact intensity could be reached based on the available data and information."

*Id.* at 3.  NAS again found that Defendants had not adequately assessed the potentially

"significant" positive effect that DBOC's oysters have on water quality.  *Id.* at 36.

Plaintiffs also wrote Defendants in detail about the DEIS's shortcomings.  For example,

they criticized Defendants' conclusion that DBOC's operations had a "major" impact on the

"soundscape."  Lunny Dec. Ex. 14 at 2-4.  Instead of conducting any actual sound measurements

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

-7-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

1   in Drakes Estero, the DEIS relied on a study of high-horsepower jet skis, racing boats, and police

2   patrols operating at full throttle off the Jersey Shore as "representative" of the noise generated by

3   DBOC's small oyster skiffs.  *Id.*

4        The FEIS is no better.  Although the FEIS dropped the DEIS's reliance on the Jersey

5   Shore sound study, it continues to reach plainly erroneous conclusions.  For example, although

6   the FEIS claims to have "unambiguously" detected oyster boat noise from a Federal Aviation

7   Administration microphone overlooking Drakes Estero, this analysis is unreliable because at least

8   seven boat "detections" occurred on Sundays when no DBOC boats were operating.  Waterman

9   Dec. Ex. 3 at 3.  Furthermore, the FEIS assumes that DBOC's 12 volt, 1/4 horsepower plastic

10  oyster tumbler produces noise "comparable" to a metal "cement/mortar mixer" that can be heard

11  from almost two miles away.  Lunny Dec. Ex. 12 at 259, 448 (Table 4-2).  In fact, DBOC's oyster

12  tumbler can only be heard up to 140 feet away.  Lunny Dec. Ex. 14 at 19, 35-37.

13       The FEIS also misrepresents the conclusions reached by the Hubbs-SeaWorld Research

14  Institute harbor seal behaviorist who NPS consulted to analyze over 165,000 NPS photos of

15  harbor seal haul-out areas in Drakes Estero.  Although the seal expert concluded that there was no

16  evidence of disturbance to harbor seals caused by DBOC's oyster boats in the photos, the FEIS

17  attributed two harbor seal disturbances to DBOC oyster boats.  Declaration of Dr. Corey

18  Goodman (Goodman Dec.) ¶ 18, Ex. 7 at 1-2.

19       Defendants' scientific misconduct has attracted significant attention.  As the *New York

20  Times* reported, "flaws identified in the science may also have cost the National Park Service,

21  particularly the Point Reyes scientists and their defenders, a substantial loss of professional

22  credibility."[3]

23       **D.    The Consequences Of The Secretary's Decision**

24       Defendants issued a directive to Plaintiffs on November 29, 2012 (NPS Directive).  Lunny

25  Dec. Ex. 17.  The NPS Directive prohibits DBOC from placing any larvae or shellfish within

26  Drakes Estero.  It requires the DBOC employees who live onsite to leave within a "limited period

27

28  [3] http://green.blogs.nytimes.com/2012/12/04/a-park-an-oyster-farm-and-science-epilogue/

Stoel Rives LLP
Attorneys At Law
San Diego
73020962.4 0099880-00856
-8-
MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

1    of time." It also requires DBOC to remove all shellfish and oyster racks from Drakes Estero, as

2    well as all personal property from the shores of Drakes Estero, by February 28, 2013.[4]  Lunny

3    Dec. Ex. 17 at 1-2.  Until February 28, however, DBOC is permitted to plant existing oyster spat

4    and to "process and sell shellfish" onsite.  *Id.*; *see also* Docket 31 ¶ 1 (planting spat permitted).

5         On December 4, 2012, the Interior Department published a Federal Register notice ("FR

6    Notice") stating:  "all uses prohibited under the Wilderness Act within Drakes Estero have ceased

7    as of 11:59 p.m. on November 30, 2012. Drakes Estero is entirely in federal ownership."  77 Fed.

8    Reg. 71826, 71827, copy provided at Waterman Dec. Ex. 11.  The FR Notice purports to change

9    Drakes Estero to "designated wilderness" upon publication.  Nevertheless, California still retains

10   the fishing rights in Drakes Estero, and the NPS Directive still permits DBOC to plant oyster spat

11   and harvest and sell oysters.

12        The implementation of the Memorandum and NPS Directive will cause immediate and

13   irreparable harm to DBOC, the environment, and the public.  Implementation will harm DBOC

14   by causing the destruction of its entire crop—approximately 19 million immature oysters and 2

15   million immature clams—by requiring their premature removal from Drakes Estero.  Lunny Dec.

16   ¶¶ 34-36.  It will prevent DBOC from performing normal planting activities between April and

17   September, which will cause a gap in production and *de facto* shut down in approximately two

18   years when Plaintiffs have nothing to sell.  *Id.* ¶¶ 42-44.  It will force Plaintiffs to abandon, sell,

19   or destroy their infrastructure—including buildings, oyster racks, shellfish setting tanks, storage

20   sheds, septic systems, water well, and mobile residences—activities that will cost over $700,000.

21   *Id.* ¶¶ 45-49, 56, 67.  It will require DBOC to lay off all of its highly skilled and experienced

22   workers who have irreplaceable skills necessary for aquaculture.  *Id.* ¶¶ 70-71.  And it will sever

23   all of DBOC's ties with its customers.  *Id.* ¶ 69.

24        Implementing the Memorandum and NPS Directive by February 28, 2012, may also

25   require DBOC to violate the law because obtaining necessary permits and completing interagency

26   _____

27   [4] For the first time, NPS takes the position that the oyster racks in Drakes Estero are DBOC's
     personal property. Lunny Dec. Ex. 17 at 1-2.  Plaintiffs dispute that they have an obligation to

28   remove the racks, but describe the irreparable harm associated with removing the racks for the
     purposes of this motion.

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

73020962.4 0099880-00856

-9-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

coordination before beginning work will likely take much longer than the 90 days given by Defendants.  For example, dismantling DBOC's onshore and offshore infrastructure may require DBOC to acquire federal, state, and local permits before beginning work, including but not limited to permitting under the Clean Water Act, the Porter-Cologne Water Quality Act, the state and federal Endangered Species Acts, and the California Coastal Act.  Declaration of Laura Moran (Moran Dec.) ¶¶ 5-17; Lunny Dec. ¶¶ 49-50.  Additional environmental review may also be required pursuant to NEPA and the California Environmental Quality Act.  Moran Dec. ¶¶ 16, 18.  The time to perform initial interagency coordination and identify the issues takes approximately 120 days, with actual permitting and environmental review to follow.  *Id.* ¶ 18.

Implementation will also harm the environment.  Removing the oysters—a part of Drakes Estero for nearly a century—has the potential to adversely impact to water quality and the ecosystem.  For example, loss of the oysters' water filtration capacity increases the potential for significant impacts to water quality, including poor water clarity, hypoxia, habitat loss, toxic algal blooms, and reduction in biodiversity in Drakes Estero.  Declaration of Scott Luchessa (Luchessa Dec.) ¶¶ 4-19 (potential adverse impact to water quality, eelgrass, and fish, and danger of creating beneficial conditions for invasive species); *see also* Lunny Dec. Ex. 11 at 36 (2009 NAS report noting oysters could have a "significant" positive effect on water quality).  In turn, poor water clarity may harm eelgrass.  Luchessa Dec. ¶¶ 13-16, 19.

Furthermore, Defendants' order for Plaintiffs to remove the 95 oyster racks, which have been in place for over 50 years, is likely to harm the environment.  Lunny Dec. ¶¶ 58, 75.  Each oyster rack is 300 feet long and 12 feet wide on average, composed of posts connected to rails at top and bottom.  *Id.* ¶ 75.  The racks have become important and established habitat.  Not only has eelgrass recruited around approximately 85% of the oyster racks, but also the racks support a diverse range of fish and invertebrates, and are likely foraging areas for Drakes Estero's harbor seals.  Lunny Dec. ¶ 91; Luchessa Dec. ¶ 12; Abbott Dec. ¶ 8.

To remove the racks using only DBOC equipment, at low tide the racks would be dismantled using a chainsaw to cut the legs and rails into manageable units.  *Id.* ¶ 60.  Posts and bottom rails would be lifted out of the substrate using a hoist (powered by an electric motor and

Stoel Rives LLP
ATTORNEYS AT LAW
SAN DIEGO

-10-

73020962.4 0099880-00856

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

supplied by a generator) mounted on a barge towed by one of DBOC's two oyster skiffs.  *Id.*  The skiff would be anchored to the bottom substrate by two anchors during this effort.  *Id.*  All debris would be placed on the barge, towed to shore, unloaded by forklift and loaded onto trucks, and hauled to the landfill.  *Id.*  Accounting for weather conditions and tides, it will take approximately 285 work days over 665 calendar days to dismantle and remove all 95 oyster racks.  *Id.* ¶ 61.

Hoisting posts and bottom rails out of Drakes Estero will mobilize sediment into the water column, negatively impacting water clarity and quality, and tearing out eelgrass where it has recruited around approximately 85% of the racks.  Luchessa Dec. ¶¶ 6, 12, 14-15; Lunny Dec. ¶ 91.  Loss of habitat value provided by the racks is likely to impact fish and foraging harbor seals. Declaration of Robert Abbott (Abbott Dec.) ¶ 8.  Noise from chain saws and a generator to power the hoist over an extended period will negatively impact fish, birds, marine mammals, and humans using Drakes Estero, and could even cause the harbor seals to abandon Drakes Estero. Declaration of Robert Abbott (Abbott Dec.) ¶¶ 5-8, 13; Declaration of Richard Steffel (Steffel Dec.) ¶¶ 10, 12 (sound audible more than 7,500 feet away).  Using heavy equipment to perform oyster rack removal in a shorter time frame will have more severe impacts to the environment. Abbott Dec. ¶¶ 9-12; Steffel Dec. ¶¶ 11-12.

Implementation will also harm the public.  It will eliminate thirty-one full-time jobs, and force the fifteen people who live onsite—DBOC employees and their families, including seven children under the age of sixteen—out of their homes.  Lunny Dec. 70, ¶¶ 72-74.  It is likely to cause the twelve children of DBOC's employees to change schools as their families relocate to find new jobs and housing, which will negatively impact academic achievement of these children and their classmates.  Declaration of James Patterson ¶¶ 3-8.  It will take away a local landmark and a model for sustainable agriculture working in harmony with the environment that draws approximately 50,000 visitors every year and provides free interpretative and educational services.  Lunny Dec. ¶¶ 80-83, 87, 89.  It will eliminate the only remaining source of oyster shell in California, which is used for habitat restoration for threatened and endangered species like the Western Snowy Plover and the Least Tern, and for habitat restoration for the native Olympia oyster in San Francisco Bay.  *Id.* ¶ 84.  It will terminate one-third of the State's oyster production

Stoel Rives LLP
Attorneys At Law
San Diego

-11-

73020962.4 0099880-00856

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

and its last oyster cannery overnight, leading to local and state-wide impacts, including greater dependence on shellfish imports. *Id.* ¶¶ 85-87. And it will deprive the public of having its government make decisions based on quality science, rather than misrepresentations.

## III. LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of the preliminary injunction; (3) the balance of equities tips in their favor; and (4) the issuance of the preliminary injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## IV. ANALYSIS

### A. Likelihood to Succeed on the Merits

Agency action on a permit application is governed by the APA, which requires a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also* 5 U.S.C. §§ 551(13) (defining "agency action" to include the denial of a "license"), (8) (defining "license" to include an "agency permit"); 28 U.S.C. § 1331 (conferring federal question jurisdiction). Defendants violated the APA in at least four ways, any one of which would require their decision to be set aside: (1) Defendants misinterpreted Section 124 and the 1978 Act, (2) Defendants committed scientific misconduct, (3) Defendants violated NEPA, and (4) Defendants published a false notice.

#### 1. Defendants Misinterpreted Section 124 and Other Legislation

When an agency "action is based upon a determination of law … , an order may not stand if the agency has misconceived the law." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *accord IBEW, Local Union No. 474 v. NLRB*, 814 F.2d 697, 708 (D.C. Cir. 1987) (administrative decision cannot be enforced if it is "base[d] … on a standard that it unjustifiably believes was mandated by Congress," notwithstanding that it "might" be able to reach same decision based on consideration of relevant factors); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (agency action reviewable under APA whenever there is "no law to apply").

Stoel Rives LLP
Attorneys At Law
San Diego

-12-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

1    Defendants' interpretations of law made in the context of their decision about whether to

2    issue a permit to Plaintiffs are not entitled to deference.  *See Wilderness Soc'y v. U.S. Fish &*

3    *Wildlife Serv.*, 2003 U.S. App. LEXIS 27248, at *40 (9th Cir. Mar. 16, 2004) ("agency action is

4    not entitled to heightened *Chevron* deference . . . [in a case that] involves only an agency's

5    application of law in a particular permitting context, and not an interpretation of a statute that will

6    have the force of law generally . . . ."), referring to *Chevron, U.S.A., Inc. v. Natural Resources*

7    *Defense Council, Inc.*, 467 U.S. 837 (1984).

8    In his decision, the Secretary made at least four misinterpretations of law.  First, he erred

9    by concluding that issuing the SUP would violate the 1976 Act, even though Section 124

10   specifies that he had authority to issue the SUP notwithstanding any other law.  In his decision,

11   the Secretary stated that granting Plaintiffs a SUP "would violate . . . specific wilderness

12   legislation" for PRNS, i.e. the 1976 Act.  Lunny Dec. Ex. 13 at 1, 6.  The Secretary said, in effect,

13   that he had no discretion to do anything but deny the SUP because issuing it would violate the

14   law.  But Section 124 was enacted specifically to allow him to issue the SUP notwithstanding

15   Defendants' assertion that existing law prohibited issuance.  *See* section II.B, above.  Therefore,

16   Defendants misinterpreted Section 124.

17   Second, the Secretary erred by misinterpreting the 1978 Act, which he claimed "does not

18   authorize mariculture."  Lunny Dec. Ex. 13 at 2.  But although the word "mariculture" is not

19   used, the 1978 Act provides an authorization broad enough to cover oyster farming.  Specifically,

20   the legislation authorizes the Secretary "to lease federally owned land (or any interest therein) …

21   which was agricultural land prior to its acquisition," and it defines "agricultural land" as "lands

22   which were in regular use for … agricultural, ranching, or dairying purposes as of May 1, 1978."

23   16 U.S.C. § 459c-5(a), (b).

24   Because Congress referred broadly to "agricultural … purposes" in *addition* to ranching

25   and dairying purposes, Congress must have intended to cover more than just ranching and

26   dairying activities.  *See Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 724 (2011) (courts

27   should give every word in a statute meaning, if possible).  The word "agricultural," having not

28   been defined, should be interpreted according to ordinary usage.  *Taniguchi v. Kan Pac. Saipan,*

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

-13-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

1  *Ltd.*, 132 S. Ct. 1997, 2002 (2012) ("When a term goes undefined in a statute, we give the term its

2  ordinary meaning.").  Plaintiffs' operations are certainly "agricultural" in ordinary usage:

3  Plaintiffs operate an oyster farm that produces food, and nothing is more agricultural than food

4  production.  *See* Webster's New International Dictionary of the English Language 52 (2d ed.

5  1956) ("agriculture" is used broadly to refer to "the science and art of the production of plants and

6  animals useful to man"; *accord* section II.B above (Defendants refer to "oyster farming" in

7  Drakes Estero); *Ass'n to Protect Hammersley v. Taylor Res., Inc.*, 299 F.3d 1007, 1016 (9th Cir.

8  2002) (Ninth Circuit refers to "shellfish farming" in Puget Sound).  In California, "agriculture"

9  includes aquaculture.  Cal. Pub. Res. Code § 30100.2 ("Aquaculture products are agricultural

10  products . . . .").

11      Defendants should have read the 1978 Act together with the National Aquaculture Act of

12  1980, whose purpose is "to promote aquaculture," and whose "national policy" is "to encourage

13  the development of aquaculture."  16 U.S.C.  § 2801(b), (c).  The National Aquaculture Act

14  requires that "[e]ach Federal department and agency that has functions or responsibilities with

15  respect to aquaculture or has jurisdiction over any activity that affects, or that may affect, the

16  achievement of the purpose and policy of this Act . . . , shall, … to the maximum extent

17  practicable, perform such function, responsibility, or activity in a manner that is consistent with

18  the purpose and policy of this Act. . . ."  16 U.S.C. § 2805(d).  Here, consistent with the National

19  Aquaculture Act, Defendants should interpret the reference to "agricultural" purposes in the 1978

20  Act to include oyster farming.

21      Third, Defendants misinterpret the law when they refer to "the intent of Congress *as

22  expressed in the 1976 act* to establish wilderness at the estero."  Lunny Dec. Ex. 13 at 6, emphasis

23  added.  Defendants have not identified any intent *expressed in that act* to establish wilderness.

24  Defendants cite only to a House report.  *Id*. Ex. 13 at 3.  Defendants do not mention that they told

25  Congress, when it was considering the 1976 Act, that Drakes Estero could *never* be converted to

26  wilderness—and that Congress agreed.  *See* section II.B above.  Nor do Defendants explain why

27  this supposed intent should require the removal of the oyster farm's uplands facilities, since they

28  are not even on lands designated as *potential* wilderness.  *Id.*  Whatever Congress may have

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

-14-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

1   thought in 1976, by 1978 it had concluded that agricultural PRNS land could be leased for

2   "agricultural … purposes" forever.  (See discussion above.)  By authorizing the continuation of

3   commercial agricultural operations, Congress expressed its intent that PRNS *should not* be

4   converted to wilderness.

5         Fourth, the Secretary erred when he concluded that Defendants did not have to comply

6   with NEPA: "SEC. 124 does not require me (or the NPS) to prepare a DEIS or FEIS or otherwise

7   to comply with the National Environmental Policy Act of 1969 (NEPA) or any other law.  The

8   'notwithstanding any other provision of law' language in SEC. 124 expressly exempts my

9   decision from any substantive or procedural legal requirements."  Lunny Dec. Ex. 13. at 4.  This

10   assertion misreads the plain language of the statute, which authorizes the Secretary "to issue" the

11   SUP—not "to deny" the SUP, or "to decide whether to issue or deny" the SUP—notwithstanding

12   any other provision of law.  *Id*.; Waterman Dec. Ex. 5.  By concluding that the "notwithstanding"

13   language applied to a denial, rather than just to an issuance, the Secretary rewrote the statute.

14   Here Congress wanted to make it easy to issue the SUP by removing the obstructions that

15   (according to Defendants) prevented them from issuing the SUP.  *See* section II.B above.

16   Nothing suggests that Congress wanted to assist Defendants in *denying* the SUP by allowing them

17   not to comply with statutes they would otherwise be required to obey.

18         In short, Defendants made four major errors of law in the seven-page decision memo.

19   First, Defendants incorrectly concluded that they did not have authority to issue the SUP, even

20   though Section 124 plainly provided them with that authority notwithstanding any other law.

21   Second, Defendants mischaracterized the 1978 Act, which (contrary to Defendants' assertion)

22   specifically allows for the continuation of agricultural operations, including oyster farming, in

23   PRNS.  Third, Defendants incorrectly asserted that they were bound by Congressional intent as

24   expressed in a 1976 statute, but their citation was only to a House report and they ignored clear

25   Congressional intent as expressed in a 1978 statute.  Fourth, Defendants misread the plain

26   language of Section 124 when they asserted that it waived NEPA for a denial of the SUP.  These

27   misinterpretations were each an abuse of discretion and a violation of the APA.  Any one of them

28   is sufficient to invalidate the decision.

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

73020962.4 0099880-00856

-15-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

**2.      Defendants Committed Scientific Misconduct**

Although he said they were "not material" to the "central basis" for his decision, Secretary Salazar also suggested that his decision may have been based at least in part on the conclusions of the DEIS and FEIS that removal of the oyster farm "would result in long-term beneficial impacts to the estero's natural environment": "they have informed me … and have been helpful to me in making my decision." Lunny Dec. Ex. 13 at 5.

To the extent his decision was based on the FEIS and DEIS, the APA and NPS regulations required him to "'examine the relevant data and articulate a satisfactory explanation for [agency] action.'" *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co., Inc.*, 463 U.S. 29, 43 (1983)); *see also* 36 C.F.R. § 1.6(d) (requiring any denial of an NPS permit to be based on a written finding of "adverse[] impact[]" to specified factors).  A court considers whether the agency's decision was "based on 'a consideration of relevant factors'" and whether "there has been 'a clear error of judgment.'" *Natural Res. Def. Council v. U.S. Forest Service*, 421 F.3d 797, 806 (9th Cir. 2005) (*NRDC*) (quoting *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004)).  "A 'clear error of judgment' sufficient to be arbitrary and capricious agency action exists when 'the agency offer[s] an explanation that runs counter to the evidence before the agency.'" *Id.* (brackets in original) (quoting *Sierra Club v. EPA*, 346 F.3d 955, 961 (9th Cir. 2003)).

The Ninth Circuit, sitting en banc, has reaffirmed the "clear error of judgment rule" even while holding that courts should not make "fine-grained" assessments of scientific data:  "our proper role is simply to ensure that the [agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)), implicitly overruled on other grounds as explained in *Kudina v. Citimortgage, Inc.*, 2011 U.S. Dist. LEXIS 123965, at *5 (W.D. Wash. Oct. 26, 2011); *see also Shanks v. Dressel*, 540 F.3d 1082, 1088-89 (9th Cir. 2008) ("egregious official conduct" without any "reasonable justification" violates due process (internal quotations and citation omitted)).

In the *NRDC* case, the Ninth Circuit held that an agency's misinterpretation of the facts created a clear error of judgment. *NRDC*, 421 F.3d at 810.  Here Defendants have not merely misinterpreted the facts, but have consistently *misrepresented* the facts and engaged in scientific misconduct.  The pattern of scientific misconduct began before 2008, when Defendants' own investigation concluded that they had "misrepresented research" in "concerted attempts" to find environmental harm from DBOC's operations.  See section II.C above.  In 2009, the NAS found that Defendants had "selectively presented, over-interpreted, or misrepresented the available scientific information on potential impacts of [DBOC]" and had given "an interpretation of the science that exaggerated the negative and overlooked the potentially beneficial effects of [DBOC]."  Lunny Dec. Ex. 6 at 3.  In 2011, Defendants concluded that they had not engaged in criminal behavior, but had engaged in "misconduct" that "arose from incomplete and biased evaluation and from blurring the line between exploration and advocacy through research." Lunny Dec. Ex. 9 at 35.  In 2012, the NAS concluded that the DEIS still showed signs of bias. Lunny Dec. Ex. 11.  Despite all this criticism, Defendants have not changed their behavior.  The FEIS, which was issued in November 2012, relies on supposed measurements of sound from the oyster farm's boats—taken on days when the boats were not operating—and misrepresents the no-impact conclusions made by the Government's harbor seal expert.  Waterman Dec. Ex. 3 at 2.

An agency decision cannot be based on scientific misconduct.  *See Marsh*, 490 U.S. at 378 ("[C]ourts ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." (internal quotation marks omitted)).  Here, once Defendants became aware of their misconduct, they had an obligation to ensure that it did not infect their decision-making.  *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492 (9th Cir. 2011) (overturning agency decision when it "failed to address concerns raised by its own experts" and others).  In *W. Watersheds Project*, the Ninth Circuit was offended by the agency's attitude towards contrary evidence:  "Instead of a serious response … the Final EIS downplays the environmental impacts . . . ."  *Id*.  Here, Defendants cavalierly dismissed any criticism as "scientific uncertainty and lack of consensus."  Lunny Dec. Ex. 13 at 5.  But Defendants were not only criticized for *uncertainty*; they were criticized for *misconduct*.  Defendants committed misconduct by, among other things,

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

-17-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

making false statements about the evidence.  See section II.C above.  False statements should be corrected, whether or not Defendants intended to mislead.  Because the Secretary relied at least in part on false statements, and because he did not ensure that all previously identified misconduct had been corrected, the Secretary made a clear error of judgment.

Although courts "generally defer to an agency's expertise in the methodology of the agency's studies … a result that is not rationally connected to the best available scientific evidence receives no such deference." *W. Watersheds Project*, 632 F.3d at 493 (citing *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 763-64 (9th Cir. 2007)).  Here the result is not rationally connected to the best scientific evidence.  The evidence of misconduct comes not only from Plaintiffs, but from Defendants themselves, and from the National Academy of Sciences. Congress established the Academy in 1863 to "investigate, examine, experiment, and report upon any subject of science or art" whenever asked to do so by the Government.[5]  NAS's conclusions are entitled to deference. *See Kelley v. Sec'y of HHS*, 68 Fed. Cl. 84, 91 (2005) (report issued by branch of the National Academy of Sciences is "authoritative and subject to great deference" (internal quotations and citation omitted)).

The Secretary himself seems to recognize that at least some of the data in the FEIS are invalid.  In his Memorandum he notes that Plaintiffs provided evidence that the FEIS was "fatally flawed," and insists that his decision "is based on the incompatibility of commercial activities in wilderness and not on the data that was asserted to be flawed."  Lunny Dec. Ex. 13 at 5, n.5.  But he also makes two contrary assertions:  (1) that the EIS process "provides decision-makers with sufficient information … to make an informed decision," and (2) that the DEIS and FEIS "have informed me … and have been helpful to me in making my decision."  *Id*., Ex. 13 at 5.  If he truly did not rely on the data "asserted to be flawed," then he should not have relied on the conclusions based on those flawed data.

"Soundscape" was one of only two "major" impacts of the oyster farm identified in the FEIS.  Lunny Dec. Ex. 12 at lxviii-lxxi.  Plaintiffs asserted that this conclusion relied on invalid

---

[5] http://www.nasonline.org/about-nas/history/

data:  the supposed measurement of noise from DBOC's boats on days when the boats were not operating and on invalid comparisons between a small plastic oyster tumbler and a large metal cement mixer.  *See* section II.C above.  If the Secretary truly did not rely on these data, then he could not have relied on the conclusion that the soundscape suffered a major impact.

The other major impact identified in the FEIS is not an actual harm to the environment, but an ideological position.  Defendants assert that DBOC's presence prevents the area from becoming wilderness.  Lunny Dec. Ex. 12 at lxx-lxxi.  But Drakes Estero is surrounded by commercial farming operations.  Lunny Dec. ¶ 90.  These farming operations were sanctioned by Congress, and the Secretary has directed his staff to negotiate extensions of the ranching and dairy leases. Lunny Dec. Ex. 13 at 7.  Because of these commercial farming operations, greater Drakes Estero will not be wilderness for the foreseeable future.

By sanctioning the perpetual use of much of PRNS for agriculture, Congress expressed its intent *not* to convert PRNS back to a time when it was untouched by human hands.  Congress intended, instead, that PRNS could be a model of good agricultural practice—a place where the public could enjoy the close relationship of farming to the land.  In this context, the presence of an oyster farm is *not* an environmental harm.  On the contrary, by providing the same close relationship to the water that the ranching and dairy operations provide to the land, DBOC is an important part of the PRNS experience.

Nor should the Secretary have relied on the FEIS's conclusion that DBOC's operations have had and will continue to have a "moderate adverse impact" on harbor seals.  Lunny Dec. Ex. 12 at 376-377.  Plaintiffs have demonstrated that this conclusion misrepresented the work of the Government's harbor seal expert, who concluded the photos showed no seal disturbances caused by DBOC oyster boats.  Goodman Dec. Ex. 7 at 1-2.

Without valid data to support one of the two major impacts, with only ideology to support the other, and with only misrepresentations to support one of the moderate adverse impacts, the Secretary could not legitimately conclude that "the removal of DBOC's commercial operations in the estero would result in long-term beneficial impacts."  Lunny Dec. Ex. 13 at 5.

Stoel Rives LLP
Attorneys At Law
San Diego

-19-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

1    In short, Defendants made a clear error in judgment by refusing to eliminate well-

2    established scientific misconduct from the proceeding.  They made a clear error in judgment

3    when they took inconsistent positions on whether they were relying on the invalid data, and when

4    they relied on the FEIS, whose conclusions about major impacts are not supported by valid

5    scientific data.

6                    **3.        Defendants Violated NEPA**

7                    Plaintiffs are also likely to succeed on the merits because Defendants violated procedural

8    and substantive requirements imposed by NEPA.

9                    On the procedural side, NPS did not file the FEIS with EPA, as required by 40 C.F.R.

10   § 1506.9.  Because of this failure, EPA never published a notice of availability for the FEIS.  *Id.*;

11   Waterman Dec. ¶ 6.  NEPA regulations also specify that "[n]o decision on the proposed action

12   shall be made" until 30 days after the publication of the notice of availability.  40 C.F.R.

13   § 1506.10(b)(2).  By making their decision before this date, Defendants violated NEPA.

14                   On the substantive side, Defendants relied on the invalid data and scientific misconduct

15   described in section II.C above.  NEPA requires agencies to take a "hard look" that "must be

16   taken objectively and in good faith, not as an exercise in form over substance, and not as a

17   subterfuge designed to rationalize a decision already made."  *W. Watersheds Project*, 632 F.3d at

18   491.  "'Accurate scientific analysis, expert agency comments, and public scrutiny are essential to

19   implementing NEPA.'"  *Id.* (quoting 40 C.F.R. § 1500.1(b)).  NEPA's purpose is "to ensure

20   informed decision making to the end that the agency will not act on incomplete information, only

21   to regret its decision after it is too late to correct."  *Ctr. for Biological Diversity v. U.S. Forest

22   Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (internal quotations and citations omitted).  It requires

23   "that an agency has 'consider[ed] every significant aspect of the environmental impact of a

24   proposed action' and has 'inform[ed] the public that it has indeed considered environmental

25   concerns in its decisionmaking process.'"  *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774,

26   795 (9th Cir. 2012) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462

27   U.S. 87, 97 (1983)).  Here at least one essential element was missing:  the scientific analysis was

28

Stoel Rives LLP
Attorneys At Law
San Diego

73020962.4 0099880-00856

-20-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

1    not accurate.  Defendants have been repeatedly criticized for bias, making false statements, and

2    exaggerating the evidence.  See section II.C above.  Defendants therefore violated NEPA.

3                    **4.        Defendants Illegally Published A False Notice**

4            Defendants also violated the APA in two ways when they published the FR Notice

5    purporting to change Drakes Estero to "designated wilderness."  The first violation was their

6    publication of an FR Notice premised on two false statements of fact.  *See NRDC*, 421 F.3d at

7    806 (an "explanation that runs counter to the evidence" is an abuse of discretion) (internal

8    quotation and citation omitted).  The first false statement is that "all uses prohibited under the

9    Wilderness Act within Drakes Estero have ceased as of 11:59 p.m. on November 30, 2012."  77

10   Fed. Reg. at 71827.  This statement is false because not all uses that Defendants assert are

11   prohibited by the Wilderness Act ceased on November 30.  *See* Lunny Dec., Ex. 13 at 3

12   (Defendants assert that the Wilderness Act prohibits "commercial activities such as mariculture"

13   in wilderness-designated areas).  Commercial activities continue (as specifically authorized by

14   Defendants) including planting spat, and processing and selling oysters.  *See* section II.D above.

15           The second false statement is that "Drakes Estero is entirely in federal ownership."  77

16   Fed. Reg. at 71827.  This statement is also false because California still retains the fishing rights

17   in Drakes Estero—the same rights that Defendants told Congress prohibited the area from *ever*

18   being converted to full wilderness.  *See* section II.B above.

19           The second violation was to publish the FR Notice without the regular rulemaking

20   procedures that Defendants' regulations require.  Those regulations require that any "closure,

21   designation, use or activity restriction or condition" that significantly changes a park's public

22   uses, or that is "highly controversial," "shall be published as rulemaking in the Federal Register."

23   36 C.F.R. § 1.5(b).  This regulation applies here because the FR Notice was the result of

24   Defendants' highly controversial decision to change the designation of Drakes Estero to

25   wilderness and thereby restrict its uses.  *See* sections II.B and II.C above.  The failure to complete

26   a formal rulemaking process before publishing the FR Notice violates the law and is grounds to

27   issue an injunction and vacate the notice.  *See Ft. Funston Dog Walkers v. Babbitt*, 96 F. Supp. 2d

28   1021, 1040 (N.D. Cal. 2000) (granting motion for preliminary injunction to remedy NPS's failure

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

73020962.4 0099880-00856

-21-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

1   to complete formal rulemaking before highly controversial decision to remove off-leash

2   designation for area of Golden Gate National Recreation Area).

3        For these reasons—(1) Defendants misinterpreted Section 124 and the 1978 Act,

4   (2) Defendants committed scientific misconduct, (3) Defendants violated NEPA, and

5   (4) Defendants illegally published a false notice—Plaintiffs are likely to prevail on the merits.

6        **B.**     **Imminent and Irreparable Harm**

7        The implementation of the Memorandum and NPS Directive will cause immediate and

8   irreparable harm to Plaintiffs.  It will harm DBOC by causing the destruction of its entire crop—

9   approximately 19 million immature oysters and 2 million immature clams—by requiring their

10  premature removal from Drakes Estero.  *See* section II.D above.  It will prevent Plaintiffs from

11  performing normal planting activities between April and September, triggering a *de facto* shut

12  down in two years time even if Plaintiffs prevail in this litigation.  *Id.*  It will force Plaintiffs to

13  abandon, sell, or destroy their infrastructure—including buildings, oyster racks, shellfish setting

14  tanks, storage sheds, septic systems, water well, and mobile residences—an exercise that will cost

15  over $700,000 that Plaintiffs do not have.  *Id.*  It will require DBOC to lay off all of its highly

16  skilled and experienced workers who have irreplaceable skills necessary for aquaculture.  *Id*.

17  And they will break Plaintiffs' ties with all of their customers.  *Id.*  This destruction of Plaintiffs'

18  business constitutes irreparable harm.  *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750

19  F.2d 1470, 1474 (9th Cir. 1985) ("The threat of being driven out of business is sufficient to

20  establish irreparable harm.").

21       Implementing the Memorandum and NPS Directive may also require DBOC to violate the

22  law because it is not possible to perform the initial interagency coordination, much less

23  environmental review and permitting, likely required by federal, state, and local law, in the 90-

24  day period provided by Defendants.  *See* section II.D above.

25       **C.**     **The Balance of Equities Tips In Favor of Plaintiffs**

26       The balance of equities favors Plaintiffs because Defendants will not be harmed by

27  following the law and maintaining the status quo—which has existed for approximately eighty

28  years in Drakes Estero—but Plaintiffs will suffer the total destruction of their business, would be

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

-22-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

73020962.4 0099880-00856

1    required to expend over $700,000 and a large amount of time to implement the decision, and may

2    require Plaintiffs to violate the law.  Lunny Dec. ¶¶ 49-672.

3         Furthermore, Defendants have demonstrated that there is no exigency in removing the

4    oyster farm.  In 2004, NPS had the right to eliminate the oyster farm by exercising its right of first

5    refusal to block the transfer of the RUO to Plaintiffs, but it chose not to do so.  Lunny Dec. ¶ 4.  If

6    NPS judged it sufficient to wait at least until the end of the RUO, it cannot claim imminent harm

7    from waiting a short while longer to allow Plaintiffs' claims to be heard by this Court.

8         **D.    The Public Interest Supports Issuance of the Injunction**

9         It is in the public interest to preserve the status quo during the pendency of Plaintiffs' suit.

10   First, compliance with NEPA and other environmental law is in the public interest.

11        Second, the public interest will be served by avoiding the immediate loss of thirty-one

12   full-time jobs, the loss of affordable housing for fifteen people, and educational impacts to the

13   twelve children of DBOC's employees.  *See* section II.D above.

14        Third, implementing Defendants' orders will also harm the environment.  *Id.*  It is in the

15   public interest to avoid adverse impacts to water quality and the ecosystem associated with

16   removing the shellfish from Drakes Estero.  *Id.*  It is also in the public interest to avoid adverse

17   impacts to fish, birds, marine mammals, and the public associated with the removal activities

18   required by Defendants' orders.  *Id.*

19        Fourth, it is in the public interest to avoid removing a local landmark and a model for

20   sustainable agriculture working in harmony with the environment, terminating one-third of

21   California's oyster production and last remaining oyster cannery, eliminating the only remaining

22   source of oyster shell for habitat restoration in California, and depriving the public of having its

23   government make decisions based on quality science, rather than misrepresentations.  *Id.*

24   **V.    CONCLUSION**

25        Defendants are in a hurry to bury DBOC.  It is within the Court's power to stop the rush

26   and act deliberately.  Plaintiffs present serious legal issues and evidence of the irreparable harm

27   that implementing Defendants' orders will cause to Plaintiffs, the environment, and the public.

28

Stoel Rives LLP
Attorneys At Law
San Diego

73020962.4 0099880-00856

-23-

MEMORANDUM RE: PRELIMINARY
INJUNCTION, 12-CV-06134 YGR

1   The equities and public interest tip heavily in favor of enjoining Defendants.  Plaintiffs

2   respectfully request the Court grant their motion for a preliminary injunction.

3   DATED:  December 21, 2012                    Respectfully submitted,

4                                                CAUSE OF ACTION

5

6                                                By:   /s/ Amber Abbasi
                                                     AMBER ABBASI
7                                                    Attorneys for Plaintiffs

8

9
    DATED:  December 21, 2012
10
                                                 STOEL RIVES LLP
11

12
                                                 By:   /s/ Ryan R. Waterman
13                                                   RYAN R. WATERMAN
                                                     Attorneys for Plaintiffs
14

15  DATED:  December 21, 2012

16                                               BRISCOE IVESTER & BAZEL LLP

17

18                                               By:   /s/ Peter Prows
                                                     PETER PROWS
19                                                   Attorneys for Plaintiffs

20

21

22

23

24

25

26

27

28

STOEL RIVES LLP
ATTORNEYS AT LAW
SAN DIEGO

73020962.4 0099880-00856

-24-                    MEMORANDUM RE: PRELIMINARY
                        INJUNCTION, 12-CV-06134 YGR