1  Amber D. Abbasi [CSBN 240956]
   Cause of Action
2  1919 Pennsylvania Ave., NW, Suite 650
   Washington, D.C. 20006
3  Phone: 202.400.4232
   Fax: 202.300.5842
4  E-mail: amber.abbasi@causeofaction.org

5  S. Wayne Rosenbaum [CSBN 182456]
   Ryan R. Waterman [CSBN 229485]
6  Stoel Rives LLP
   12255 El Camino Real, Suite 100
7  San Diego, CA 92130
   Phone: (858) 794-4114
8  Fax: (858) 794-4101
   E-mail: swrosenbaum@stoel.com; rrwaterman@stoel.com
9
   *Counsel list continues on next page*
10
   Attorneys for Plaintiffs DRAKES BAY OYSTER COMPANY and KEVIN LUNNY
11
              IN THE UNITED STATES DISTRICT COURT
12            FOR THE NORTHERN DISTRICT OF CALIFORNIA
                      OAKLAND DIVISION
13

14 **DRAKES BAY OYSTER COMPANY,**                )
   17171 Sir Francis Drake Blvd                   )
15 Inverness, CA 94937, and                       )
   **KEVIN LUNNY**,                               )
16 17171 Sir Francis Drake Blvd                   )
   Inverness, CA 94937                            )
17                                                )   Case No. 12-cv-06134-YGR
                 Plaintiffs,                      )
18                                                )
   v.                                             )
19                                                )
   **KENNETH L. SALAZAR**,                        )   **FIRST AMENDED COMPLAINT FOR**
20 in his official capacity as Secretary, U.S.    )   **DECLARATORY AND INJUNCTIVE**
   Department of the Interior,                    )   **RELIEF**
21 1849 C Street, NW, Washington, D.C., 20240;    )
   **U.S. DEPARTMENT OF THE INTERIOR**            )   **(Administrative Procedure Act Case)**
22 1849 C Street, NW, Washington, D.C., 20240;    )
   **U.S. NATIONAL PARK SERVICE**                 )
23 1849 C Street, NW, Washington, D.C. 20240;     )
   **JONATHAN JARVIS**,                           )   Judge: Hon. Yvonne Gonzales Rogers
24 in his official capacity as Director, U.S.     )
   National Park Service,                         )
25 1849 C Street, NW, Washington, D.C. 20240.     )
                                                  )
26                                                )
                                                  )
27               Defendants.                      )

28

1

**Counsel List Continued**

2

John Briscoe [CSBN 53223]
Lawrence S. Bazel [CSBN 114641]

3

Peter S. Prows [CSBN 257819]
BRISCOE IVESTER & BAZEL LLP

4

155 Sansome Street, Suite 700
San Francisco, CA 94104

5

Phone: 415.402.2700
Fax: 415.398.5630

6

E-mail: jbriscoe@briscoelaw.net; lbazel@briscoelaw.net;
pprows@briscoelaw.net

7

8

ZacharyWalton  [CSBN 181041]
SSL LAW FIRM LLP

9

575 Market Street, Suite 2700
San Francisco, CA 94105

10

Phone:  415.243.2685
Email:   zack@ssllawfirm.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.  This civil action challenges Defendant Secretary of Interior Kenneth Salazar's decision to deny Plaintiffs Drakes Bay Oyster Company (DBOC) and Kevin Lunny a Special Use Permit (SUP) for the continued use of land and facilities on the shores of Drakes Estero in Point Reyes National Seashore. If allowed to stand, Secretary Salazar's decision will terminate thirty-one full-time jobs, deprive fifteen employees of affordable housing, and permanently tear the fabric of a rural community. Secretary Salazar's decision was a final agency action in violation of the National Environmental Policy Act of 1969 (NEPA), as amended, 42 U.S.C. §§ 4321 *et seq.*; the Data Quality Act (DQA), 44 U.S.C. § 3516 Note; the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706; and the United States Constitution.

2.  DBOC, a small, environmentally sustainable, family-owned oyster farm with thirty-one full-time employees, is located on the shores of Drakes Estero, in the Point Reyes National Seashore. Mr. Kevin Lunny and his wife Nancy Lunny are owners of DBOC, and Mr. Lunny serves as DBOC's President. DBOC carries on a cultural and historical legacy of cultivating oysters in Drakes Estero, where oysters have been continuously cultivated for approximately eighty years. DBOC currently produces approximately one-third of the oysters cultivated in the State of California, and it is the last remaining shellfish cannery in the state. Fifteen people (DBOC employees and their families) live in affordable housing on the farm.

3.  DBOC and Mr. and Mrs. Lunny purchased the farm from the Johnson Oyster Company (JOC) in December 2004. In the transaction, JOC transferred to DBOC and Mr. Lunny a renewable Reservation of Use and Occupancy (RUO) with the National Park Service (NPS) for a 1.5 acre area where onshore operations are conducted, and two State water bottom leases with the California Fish and Game Commission (CFGC) to cultivate oysters in approximately 1,060 acres of Drakes Estero. The RUO had an expiration date of November 30, 2012, with a renewal clause that grants NPS the right to issue a SUP at the end of the RUO.

4.  In 2005, Point Reyes National Seashore Superintendent Donald Neubacher notified Mr. Lunny that the RUO would not be renewed upon its expiration because the NPS

1    lacked jurisdiction to issue a SUP, in contradiction of ¶ 11 of the RUO, which expressly

2    contemplated that NPS could issue a SUP upon the expiration of the RUO.

3        5.    In 2009, in answer to NPS's claim that it lacked jurisdiction to grant a new SUP

4    to DBOC upon the expiration of the RUO, Congress enacted Section 124 of the Department of

5    the Interior, Environment, and Related Agencies Appropriations Act of 2010 (hereinafter

6    "Section 124"), Pub. L. No. 111-88, § 124, 123 Stat. 2904, 2932 (2009), which authorized the

7    Secretary of the Interior to issue DBOC a new SUP "with the same terms and conditions … for a

8    period of 10 years from November 30, 2012." Before modifying any of the terms and conditions,

9    Section 124 directed the Secretary to "take into consideration recommendations of the National

10   Academy of Sciences Report pertaining to shellfish mariculture in Point Reyes National

11   Seashore."

12       6.    Section 124 was promulgated in 2009, providing nearly three years for NPS and

13   DOI to prepare a NEPA-compliant environmental impact statement to enable the Secretary to

14   make the well-informed decision NEPA requires.

15       7.    Because the decision to deny DBOC a SUP constitutes a major federal action

16   under 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1508.18, and 43 C.F.R. § 46.100(a), Defendants were

17   required to comply with NEPA and prepare a NEPA-compliant environmental impact statement

18   to enable the Secretary to make an informed, reasoned decision on denying DBOC's SUP. NPS

19   initiated the NEPA environmental impact statement process in September 2010.

20       8.    NPS, with the assistance of a government contractor, Vanasse Hangen Brustlin,

21   Inc. (VHB), prepared and publicly released a NEPA-mandated draft environmental impact

22   statement, *Draft Environmental Impact Statement: Drakes Bay Oyster Company Special Use*

23   *Permit* (hereinafter "DEIS") in September 2011. NPS released a NEPA-mandated final

24   environmental impact statement, *Final Environmental Impact Statement: Drakes Bay Oyster*

25   *Company Special Use Permit* (hereinafter "FEIS") late on November 20, 2012. Neither of these

26   documents complied with NEPA's substantive and procedural requirements.

27       9.    In complete disregard for NEPA's public notice and comment process for FEIS

28   documents, NPS never provided written notice to interested parties that the FEIS had been

released; did not publish a Notice of Availability (NOA) for the FEIS in the Federal Register; and did not submit the FEIS to the U.S. Environmental Protection Agency (EPA). Accordingly, EPA never published a NOA for the FEIS to trigger an official public notice and comment process on the FEIS. NPS did not offer any explanation why it began the NEPA process and subsequently did not comply with NEPA's procedural requirements.

10.     Various NPS employees have represented that it is the intention of the Service to evict the Lunnys and convert Drakes Estero to a wilderness area in reliance on the Wilderness Act of 1964 and Point Reyes Wilderness Act of 1976—a result that neither of those statutes contemplate or require—without regard to the express intent of Congress as expressed in Section 124, thereby demonstrating that the conclusions in the DEIS and FEIS were tainted by the biases of these NPS employees.

11.     Despite NPS's failure to even minimally observe public notice and comment procedures on a FEIS, on November 29, 2012, the Secretary issued a memorandum of decision informing DBOC that it would not be issued another SUP. The Secretary stated that he was "informed" by the DEIS and FEIS and found them "helpful to me in making my decision." In fact, the DEIS and FEIS are the only environmental or scientific reports cited in the memorandum of decision. The NAS report explicitly referenced in Section 124 is not cited.

12.     The Secretary did not issue a NEPA-compliant Record of Decision (ROD) and did not affirm that his decision was based on a NEPA-compliant FEIS or DEIS.

13.     Despite maintaining that the NEPA process would inform his decision whether to issue DBOC a 10-year SUP for the 789-day period of NEPA review—from scoping, the beginning of the NEPA process, in September 2010 to the Secretary's decision on November 29, 2012—the Secretary asserted for the first time in the November 29, 2012, memorandum that his decision and NPS's actions regarding the DBOC SUP are not subject to any substantive or procedural legal requirements, including those prescribed by NEPA, on the basis of a clause in Section 124 that the Secretary was authorized to issue a SUP to DBOC, "notwithstanding any other provision of law … ."

1    14.    In his November 29, 2012, memorandum, the Secretary directed NPS to notify

2    DBOC that its existing RUO and SUP would expire one day later—on November 30, 2012—and

3    require DBOC to remove all of its personal property, including shellfish and racks, from Drakes

4    Estero within 90 days. The Secretary's memorandum of decision prohibits DBOC from engaging

5    in any "commercial activities … in the waters of Drakes Estero after November 30, 2012," in

6    contravention of DBOC's State water bottom leases. The memorandum of decision also prohibits

7    DBOC from engaging in even "limited commercial activities onshore" during this 90-day period

8    except "to the extent authorized in writing by NPS." The Secretary's memorandum of decision

9    also directed NPS to publish in the Federal Register a notice announcing the conversion of

10   Drakes Estero from potential to designated wilderness. That notice, published on December 4,

11   2012, is premised on two false statements and is thus void: that activities prohibited by the

12   Wilderness Act have ceased, when they have not, and that "Drakes Estero is entirely in federal

13   ownership," which it is not.

14    15.    The memorandum of decision will cause immediate irreparable pecuniary and

15   nonmonetary harm to DBOC, Mr. and Mrs. Lunny, and DBOC's employees, including but not

16   limited to lost customers and business reputation, damage to unique DBOC property, and stress

17   and emotional harm to Mr. and Mrs. Lunny and DBOC's employees as a result of the job losses

18   that will occur if DBOC is forced to abruptly cease all operations and remove all personal

19   property, shellfish and oyster racks, and structures, and to relinquish its valid State water bottom

20   leases in Drakes Estero.

21    16.    Plaintiffs seek declaratory and permanent injunctive relief preventing Defendants

22   and all persons and entities acting in active concert or participation with Defendants from taking

23   any action to implement the decision to deny DBOC the 10-year SUP contemplated by Section

24   124 or otherwise authorize or commence activities that would cause harm to DBOC pending

25   compliance with NEPA, APA, DQA, the United States Constitution, and other legal

26   requirements.

27

28

17.     Plaintiffs also seek preliminary injunctive relief during the pendency of this litigation to prevent irreparable nonmonetary harm to DBOC, Mr. and Mrs. Lunny, and DBOC's thirty-one full-time employees.

18.     Plaintiffs request that the memorandum of decision, DEIS, and FEIS be vacated.

19.     Plaintiffs further request that this Court order the issuance to DBOC of the 10-year SUP contemplated by Section 124 or, in the alternative, remand the matter nunc pro tunc and allow DBOC to continue its mariculture operations, so long as DBOC makes "annual payments to the United States based on the fair market value of the use of" the onshore RUO and SUP areas, as contemplated by Section 124, until Defendants prepare and publish a NEPA-compliant FEIS and a neutral decisionmaker is able to make an informed, reasoned decision in compliance with federal law as to whether to issue DBOC a SUP.

## JURISDICTION, VENUE, AND RELIEF

20.     This action arises under the APA, 5 U.S.C. §§ 701-706, NEPA, 42 U.S.C. §§ 4321 *et seq.*, DQA, 44 U.S.C. § 3516 Note, and the Due Process Clause and Takings Clause of the Fifth Amendment to the U.S. Constitution, U.S. CONST. amend. V. This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706.

21.     The Secretary's decision to deny DBOC a 10-year SUP and publication of the FEIS are final agency actions that are reviewable pursuant to 5 U.S.C. § 704. Plaintiffs timely submitted comments on the DEIS and FEIS and otherwise fully participated in the agency decisionmaking process regarding whether to issue DBOC a 10-year SUP, thereby exhausting all administrative remedies. Plaintiffs timely submitted a Complaint About Information Quality regarding the DEIS's contents pursuant to the DQA and Director's Order #11B and timely submitted an administrative appeal of NPS's response to the Complaint About Information Quality, thereby exhausting all administrative remedies.

22.     Venue properly lies in this Court under 28 U.S.C. § 1391(e), as the Defendants are officers and employees of the United States, a substantial part of the events and omissions giving rise to the Plaintiffs' claims occurred in this judicial district, and the property that is the subject of this action is situated in this judicial district.

23.     This Court is empowered to grant declaratory relief in this action pursuant to the Declaratory Judgment Act, 28 U.S.C §§ 2201-2202, 5 U.S.C. § 702, and Fed. R. Civ. P. 57.

24.     This Court is empowered to grant preliminary and permanent injunctive relief in this action pursuant to 28 U.S.C. § 2202, 5 U.S.C. §§ 705, 706, and Fed. R. Civ. P. 65.

25.     This Court is empowered to order the Secretary to grant DBOC the 10-year SUP authorized by Section 124 of the 2010 DOI Appropriations Act pursuant to 5 U.S.C. § 706(1), which authorizes this Court to "compel agency action unlawfully withheld."

26.     This Court is empowered to vacate the Secretary's memorandum of decision denying DBOC a 10-year SUP, and the DEIS and FEIS that informed the Secretary's decision, under 5 U.S.C. § 706(2), which authorizes this Court to "hold unlawful and set aside agency action, findings, and conclusions."

27.     This Court may allow Plaintiffs to recover reasonable costs they incur in connection with this action pursuant to 28 U.S.C. § 2412 and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## INTRADISTRICT ASSIGNMENT

28.     This action is assigned to the Oakland Division.

## PARTIES

29.     Plaintiff DBOC is a family-owned, environmentally conscious, sustainable oyster farm. DBOC is located in Drakes Estero, which is part of the Point Reyes National Seashore. DBOC has thirty-one full time employees and produces approximately 40 percent of the oysters harvested in California. DBOC continues a more than eighty-year-old tradition of oyster cultivation in Drakes Estero and is a cultural and historical part of Drakes Estero and the Point Reyes National Seashore.

30.     Plaintiff Kevin Lunny is an owner of DBOC and is its President. He is a third-generation rancher and resident in Point Reyes National Seashore.

31.     Defendant Kenneth L. Salazar is the Secretary of the U.S. Department of Interior (DOI), an Executive Branch agency of the United States. He is named as a defendant in his official capacity.

32.     Defendant U.S. Department of the Interior (DOI) is an Executive Branch department of the United States, an "agency" within the meaning of 5 U.S.C. § 701(b), charged with managing the public lands and resources in accordance and in compliance with federal laws and regulations.

33.     Defendant U.S. National Park Service is an Executive Branch agency of the United States DOI. NPS is responsible for the content of the DEIS and FEIS and for implementing and enforcing the Secretary's decision to deny DBOC a 10-year SUP.

34.     Defendant Jonathan Jarvis is the Director of the NPS. He is named as a defendant in his official capacity.

## FACTS

Background

35.     Since 1934, the State of California has continuously leased the water bottoms of Drakes Estero for the purpose of cultivating shellfish.

36.     In 1965, the State of California conveyed the water bottoms of Drakes Estero to the United States but reserved the right to fish, including the right to lease the State water bottoms for aquaculture. In an exchange of letters in March 1966, the Director of the California Department of Fish and Game (CDFG) confirmed with the Superintendent of Point Reyes National Seashore and the NPS Pacific Regional Office that the State's conveyance reserved the right to lease the water bottoms for aquaculture, as described below in the Director's letter:

> Upon reviewing this matter it becomes apparent that the legislation transferring the submerged lands at Point Reyes to the Federal Government specifically reserved the fishing rights to the State. (AB 1024 (Bagley) Ch. 983, Stats. of 1965.

> It thus appears that all State laws and regulations pertaining to shellfish cultivation remain in effect and are applicable to the operations of the Johnson Oyster Company. This would include annual rental, privilege taxes, planting requirements, etc. – in short all current sections of the Fish and Game Code, and of Title 14, California Administrative Code, which relate to shellfish cultivation.

37.     The April 1974 Environmental Impact Statement for the proposed Point Reyes Wilderness Area confirms the contemporaneous interpretation of the rights retained by the State

1  in 1965. It provides that "[c]ontrol of the lease from the California Department of Fish and

2  Game, with presumed renewal indefinitely, is within the rights reserved by the State on these

3  submerged lands."

4  38.    JOC held valid State water bottom leases in Drakes Estero from the 1950s until

5  December 2004 to cultivate oysters. In 2004, the CFGC granted JOC an extension of its two

6  State water bottom leases in Drakes Estero for twenty-five (25) years, until 2029.

7  39.    Effective November 30, 1972, JOC granted fee title to 1.5 acres on the shores of

8  Drakes Estero where the oyster farm was located to the United States in exchange for a forty (40)

9  year RUO, ending November 30, 2012. The RUO contained a renewal clause, which provided

10  that a SUP could issue at the end of the RUO period. This RUO was transferred to DBOC and

11  Mr. Lunny in December 2004.

12  Disputed Analysis of DBOC Impact

13  40.    Between 2007 and 2012, NPS scientists made public claims to elected officials

14  that DBOC's operations were causing harm to the environment at Drakes Estero, specifically to

15  harbor seals in Drakes Estero. These claims were criticized as being without scientific merit by

16  numerous commentators, including but not limited to Dr. Corey Goodman, Ph.D., an

17  independent scientist and elected member of the National Academy of Sciences, and Dr. Roberto

18  Anima, of the U.S. Geologic Service (USGS).

19  41.    These criticisms resulted in the official withdrawal of a 2007 NPS report, *Drakes*

20  *Estero: A Sheltered Wilderness Estuary*, from the NPS website.

21  42.    Between 2007 and 2010, the NPS operated a secret camera program in Drakes

22  Estero that ultimately took over 300,000 digital photographs.

23  43.    After the program came to light in 2010, complaints were filed over the NPS's

24  failure to disclose the secret camera program. In 2011, Gavin Frost, of the Office of the Solicitor

25  of the Department of the Interior, issued his report (hereinafter the "Frost Report") concluding

26  that NPS employees committed scientific errors and appeared to have acted improperly,

27  including "blurring the line between exploration and advocacy through research" and

28  withholding relevant, material, and necessary research and data from DBOC and the National

Academy of Sciences. The Frost Report found five NPS officials and scientists guilty of violating the NPS Code of Scientific and Scholarly Conduct, and concluded that "NPS, as an organization and through its employees, made mistakes which may have contributed to an erosion of public confidence."

44.     In 2007, the National Academy of Sciences was directed to study NPS science at Drakes Estero, pursuant to an agreement reached between Sen. Dianne Feinstein, DBOC, and Mary A. Bomar, then-Director of the NPS.

45.     The National Academy of Sciences, Ocean Studies Board, National Research Council, published two reports, entitled *Shellfish Mariculture in Drakes Estero, Point Reyes National Seashore, California* (2009) (hereinafter "2009 NAS Report"), and *Ecosystem Concepts for Sustainable Bivalve Mariculture* (2010), relevant in assessing DBOC's continued presence in Drakes Estero.

46.     The 2009 NAS Report concluded that "that there is a lack of strong scientific evidence that shellfish farming has major adverse ecological effects on Drakes Estero at the current (2008–2009) levels of production and under current (2008–2009) operational practices." The 2009 NAS Report also stated that NPS had "in some instances selectively presented, overinterpreted, or misrepresented the available scientific information on DBOC operations."

47.     In July 2010, DBOC applied for a SUP from NPS consistent with the terms found in Article 11 of the RUO, and Section 124.

48.     During a September 2010 meeting held in NPS's Oakland, California, regional headquarters regarding DBOC's SUP application, NPS Staff provided DBOC with a document entitled "Agenda for Meeting Between Drake's Bay Oyster Company and the National Park Service Regarding EIS for Special Use Permit Application by DBOC" and a document entitled, "Point Reyes National Seashore Drakes Bay Oyster Company Special Use Permit Environmental Impact Statement, Draft Schedule of Major Milestones, September 2010" (hereinafter "Draft NEPA Schedule"). A copy of the Draft NEPA Schedule is lodged with this First Amended Complaint as Exhibit A and incorporated by reference herein.

49.     The Draft NEPA Schedule's agenda items included "Scope and Timing of NEPA Process for DBOC's permit application," "Points of Contact during NEPA process," and "Composition of NPS NEPA Team."

50.     The Draft NEPA Schedule indicated that the NEPA-required "publication of notice of intent (NOI) in [the] Federal Register" and NEPA-required public meetings would occur within thirty days and provided a "Target Completion Date" of October 2010.

51.     The Draft NEPA Schedule stated that the NEPA-mandated publication of a NOA of the DEIS would be published in the Federal Register, a sixty-day public review of the DEIS would occur, and that public meetings would be held by a "Target Completion Date" of "August-September 2011."

52.     The Draft NEPA Schedule stated that a NOA of the FEIS would be published in the Federal Register by a "Target Completion Date" of June 2012 and that a 30-day waiting period would occur prior to the Secretary's decision whether to issue DBOC a SUP.

53.     The Draft NEPA Schedule stated that July 2012 was the "Target Completion Date" by which the Secretary was to issue a record of decision (ROD) regarding whether to issue DBOC a SUP, and that a NOA of that ROD would be published in the Federal Register.

54.     On October 22, 2010, NPS published a Notice of Intent to prepare an Environmental Impact Statement for the Drakes Bay Oyster Company Special Use Permit, Point Reyes National Seashore in the Federal Register stating that "[p]ursuant to the National Environmental Policy Act of 1969, 42 U.S.C. 4332(2)(C), the National Park Service is preparing an Environmental Impact Statement (EIS) for the Drakes Bay Oyster Company Special Use Permit, Point Reyes National Seashore, California." 75 Fed. Reg. 65,373.

55.     NPS's October 2010 Public Scoping Handout regarding the NEPA-required environmental impact statement concerning the DBOC SUP decision stated that NPS was beginning to prepare an environmental impact statement on this issue "in accordance with the National Environmental Policy Act (NEPA)."

56.     The October 2010 Public Scoping Handout stated that "[o]n behalf of the Secretary [of the Interior], the NPS will use the NEPA process" and that "[t]he results of the

NEPA process will be used to inform the decision of whether a new special use permit should be issued to DBOC for a period of 10 years."

57.     As required by NEPA, NPS and a government contractor, VHB, prepared the DEIS, which was released for public comment in September 2011. Public comment on the DEIS closed on December 9, 2011.

58.     The DEIS outlines four "alternatives." Under "Alternative A," denominated the "no action" alternative, DBOC would not be issued a 10-year SUP and would be forced to close and remove its buildings and structures in late 2012. The DEIS concludes that Alternative A is the "environmentally preferred alternative" based upon the agency's claims that continued DBOC operations will have long-term "major" and "moderate" adverse impacts on the environment in Drakes Estero. Alternatives B, C, and D were the "action" alternatives that contemplated granting a SUP to DBOC under a variety of operating conditions. The DEIS assessed DBOC's impact on the following categories: "wetlands," "eelgrass," "bethnic fauna," "fish," "harbor seals," "birds and bird habitat," "coastal flood zones," "water quality," "soundscapes," "wilderness," "visitor experience and recreation," "socioeconomic resources," and "NPS operations." In the DEIS, NPS claimed that renewing DBOC's SUP would have "major" long-term adverse impacts on Drakes Estero's environment for two of those fourteen categories: "soundscapes" and "wilderness." The DEIS also claimed that DBOC would have "moderate" long-term adverse impacts on Drakes Estero's "birds and bird habitat," "harbor seals," and "visitor and recreation experience."

59.     The DEIS stated that after the public comment period, "[a] final version of this document will then be released, and a 30-day no-action period will follow. Following the 30-day period, the alternative or actions constituting the approved plan will be documented in a record of decision that will be signed by the Regional Director of the Pacific West Region." This 30-day no-action period and ROD are both procedurally required by NEPA.

60.     During the DEIS public comment period, NPS received scores of public comments pointing out substantial procedural and substantive problems with the DEIS, including comments submitted by DBOC and a professional consulting firm, ENVIRON International.

61.     Among other things, DBOC's comment letter informed NPS that the DEIS uses an incorrect environmental baseline for the "action" alternatives in violation of NEPA. Specifically, NEPA requires that the "action" alternatives be analyzed with a baseline drawn from existing conditions, but the DEIS's Alternatives B, C, and D used an imaginary "expected future conditions" state that was undefined, could not be measured, and did not include the existing oyster farm.

62.     DBOC's comment letter also explained that the DEIS failed to define the proposed action as required by NEPA, and failed to comply with NEPA's requirement to adequately assess reasonable mitigation measures.

63.     ENVIRON International's December 9, 2011, comment letter (hereinafter "ENVIRON Comment") described in substantial detail why the DEIS's Soundscape environmental analysis was inadequate. For example, ENVIRON criticized NPS's failure to actually measure sound generated by DBOC's boats and equipment. ENVIRON submitted the noise measurements that it took onsite at DBOC and its analysis of that data, which found that the DEIS exaggerated the amount of noise generated by DBOC's boats and equipment and consistently underestimated the background noise level at Drakes Estero.

64.     The National Marine Fisheries Service (NMFS), the federal agency tasked with protecting marine mammals, commented on the inadequacy of the DEIS's analysis of DBOC's relationship with Drakes Estero. NMFS stated that "the harbor seal population in Drakes Estero appears stable and healthy"; "there is no indication of negative impacts to fish species of concern to NMFS, including ESA-listed salmonids and their critical habitat"; "[w]e have no records to indicate that DBOC is impacting eelgrass to the degree that eelgrass is not healthy or not providing adequate habitat values to the estero."

65.     In response to the substantial criticism of the validity of the science underlying the DEIS, in December 2011 Congress directed the National Academy of Sciences "to assess the data, analysis, and conclusions in the DEIS in order to ensure there is a solid scientific foundation for the Final Environmental Impact Statement expected in mid-2012." Conference Report, Consolidated Appropriations Act, 2012 (Dec. 2012), Pub. L. No. 112-74.

66.     Instead of immediately asking the National Academy of Sciences to perform the Congressionally-mandated review of the DEIS, NPS commissioned Atkins North America, Inc., to conduct a confidential peer review of the DEIS. In March 2012, DOI released a report by Atkins North America, Inc., entitled "Final Report on Peer Review of the Science Used in the National Park Service's Draft Environmental Impact Statement: Drakes Bay Oyster Company Special Use Permit" (hereinafter "Atkins Peer Review Report").

67.     The Atkins Peer Review Report essentially endorsed some of the DEIS's conclusions, but it did so based on a misunderstanding of the basic nature of the data the DEIS relied on to reach its conclusions regarding DBOC's impact on Drakes Estero's environment.

68.     After the Atkins Peer Review Report was released, Dr. Corey Goodman learned that the "soundscape" analysis in the DEIS not only did not rely on actual measurements of DBOC noise generation but also misrepresented data and contained gross inaccuracies, which were concealed using misleading short-form citations in the DEIS.

69.     Dr. Goodman also discovered that the peer reviewer who drafted the Soundscape section of the Atkins Peer Review Report had been deceived by these short-form citations into believing that NPS had actually measured sound levels of DBOC's two small oyster boats and equipment, when in fact NPS used proxies instead of taking onsite noise measurements.

70.     Dr. Goodman discovered flaws of similar magnitude in the "harbor seals," "wilderness," "eelgrass," "birds and bird habitat," and "special-status species" analysis.

71.     In April 2012, Dr. Goodman filed a formal misconduct complaint with DOI Acting Inspector General Mary Kendall, which remains pending as of the filing of this First Amended Complaint.

72.     In May 2012, NPS finally requested that the National Academy of Sciences begin the Congressionally-mandated review of the DEIS.

DBOC's and Dr. Corey Goodman's Data Quality Act Complaint

73.     On August 7, 2012, pursuant to the DQA and NPS's Director's Order #11B, Cause of Action, a nonprofit 501(c)(3), submitted a Complaint About Information Quality to

NPS on behalf of Mr. and Mrs. Lunny and Dr. Goodman detailing the reasons why many of the DEIS's claims are demonstrably incorrect and proposing specific corrections.

74.    The Complaint About Information Quality identified to NPS conclusions and analysis in the DEIS that were not accurate; not timely and based on the most current information available; not objective and unbiased in presentation and substance; not highly transparent about data, sources, and methods; not reproducible by qualified third parties; not generated using site-specific data and on-site measurements, where required by NEPA, binding NPS policy, and other applicable law; not based on reliable data and sound and well-accepted scientific practices for data collection and analysis; and not based on the best available science and supporting studies.

75.    The Complaint About Information Quality noted that NPS's information-quality guidelines in Director's Order #11B require that all information that NPS disseminates to the public in agency publications must meet all of these criteria, and that NPS's information-quality guidelines incorporate by reference DOI's information-quality guidelines, NPS Director's Order #12 and DO-12 Handbook, NPS's 2006 Management Policies, DOI and CEQ NEPA regulations, and many other sources of minimum information-quality standards.

76.    The Complaint About Information Quality stated that, although doing so would have been inexpensive, simple, and accurate, NPS did not take on-site measurements of noise generated by DBOC's equipment.

77.    The Complaint About Information Quality stated that the DEIS inappropriately relied on scientifically unsupportable proxies for DBOC's oyster boats. The DEIS used 1995 sound measurements from loud, fast, high-horsepower racing and police patrol boats and 70 HP jet skis operating at full throttle measured from two feet away as "representative" of noise generated by DBOC's slow-moving 20 HP and 40 HP oyster skiffs measured from a distance of fifty feet.

78.    As stated in the Complaint About Information Quality, the DEIS inappropriately used data from a 2006 study measuring sound generated by heavy highway construction

equipment such as jackhammers, concrete mixers, and drill rig trucks, claiming that it was "representative" of noise generated by DBOC's onshore equipment.

79.     As stated in the Complaint About Information Quality, actual on-site measurements of sound generated by DBOC boats and equipment taken by ENVIRON International in 2011 and reported to NPS reveal that the DEIS's conclusions concerning DBOC's noise profile are substantially exaggerated; and 2009 recordings of DBOC's oyster boats captured by a government microphone can be matched with GPS data from DBOC's oyster boats and NPS's own photographs of DBOC's oyster boats to independently confirm the accuracy of the ENVIRON data.

80.     As stated in the Complaint About Information Quality, the DEIS also used an inappropriate and nonstandard baseline for the ambient noise in Drakes Estero, thus overstating the relative amount of noise added to the environment by DBOC.

81.     As stated in the Complaint About Information Quality, the DEIS used the foregoing inaccurate, misrepresented ambient sound level data and inappropriate and overstated "representative" sound levels for DBOC's boats and equipment to dramatically overstate the distance at which sound from DBOC's boats and equipment can be detected.

82.     As stated in the Complaint About Information Quality, the DEIS's conclusion that DBOC's mariculture operations have a "major" long-term adverse impact on Drakes Estero's "soundscape" were based on misrepresented and inaccurate data.

83.     As stated in the Complaint About Information Quality, the conclusion that DBOC causes "major" adverse impacts on Drakes Estero's "wilderness" was driven not only by inaccurate soundscape data in the DEIS but also by on the use of vague, subjective, unbounded "Impact Intensity" definitions—allegedly used to scientifically measure DBOC's impact on Drakes Estero's "wilderness"—which are identical to or indistinguishable from those that federal courts have repeatedly rejected on the basis that they violate NEPA or are arbitrary and capricious.

84.     The Complaint About Information Quality informed NPS that the DEIS analysis ignored highly credible, probative data that the government had in its possession or was actually

aware of, such as actual on-site measurements of DBOC's noise-generating activities, over 300,000 high-resolution photographs of harbor seals that were secretly taken between 2007 and 2010 by sophisticated cameras NPS installed and GPS data that is critical to analyzing the location, speed, noise generation, and frequency of DBOC boat trips.

85.     The Complaint About Information Quality informed NPS that the peer reviewer responsible for assessing the adequacy of the DEIS's "soundscape" analysis for the Atkins Peer Review Report, Dr. Christopher Clark, when informed of the origin of the data claimed to be representative of DBOC noise-generating activities, responded that he was unaware that NPS had not actually taken on-site measurements of DBOC's boats, 12 volt plastic oyster tumbler, and other mariculture-related equipment and essentially retracted his conclusion regarding the adequacy of the DEIS's soundscape analysis.

86.     Because the DEIS constitutes information disseminated to the public via agency publication, applicable law required NPS to make corrections to the DEIS to conform to minimum information-quality standards set forth in Director's Order #11B and other binding sources of minimum information-quality standards.

87.     On October 3, 2012, NPS responded to the Complaint About Information Quality, as required by Director's Order #11B and the DQA. In its decision letter, NPS stated that it considered the Complaint About Information Quality "as a matter of discretion," and was not required to treat the Complaint About Information Quality as a comment on the DEIS as described in Director's Order #11B.

88.     On October 16, 2012, Cause of Action submitted an Administrative Appeal Letter to NPS pursuant to Director's Order #11B, thereby exhausting administrative remedies.

The National Academy of Science's Review of the DEIS

89.     In response to NPS's May 2012 request, the National Research Council of the National Academy of Sciences organized a panel to assess the NPS science as presented in the DEIS. The NAS panel released its report on August 30, 2012, entitled *Scientific Review of the Draft Environmental Impact Statement Drakes Bay Oyster Company Special Use Permit*

1  (hereinafter "NAS DEIS Review"), which, although limited in scope, was highly critical of the

2  DEIS.

3        90.     In the NAS DEIS Review, NRC determined that many of the DEIS's Impact

4  Level conclusions are highly or moderately uncertain, exaggerated, or based on insufficient

5  information.

6        91.     The NAS DEIS Review echoed concerns raised by DBOC's and ENVIRON's

7  comment letters, and the Complaint About Information Quality, expressly concluding that

8  DBOC's "adverse impact" on Drakes Estero's "soundscape," "harbor seals," and many other

9  resource categories could be minor, negligible, or beneficial, even though the DEIS claimed that

10  they were "moderate" or, in the case of "soundscape," "major" adverse impacts.

11       92.     The NAS DEIS Review also echoed DBOC's comment regarding the

12  inappropriate baseline used for the "action" alternatives, stating that NPS should "segregate

13  impact assessments for alternative A from alternatives B, C, and D and indicate that the

14  assessments are not comparable due to use of different baselines" and that the FEIS should be

15  revised to "include additional mitigation options."

16       93.     The NAS DEIS Review's Suggestions for DEIS Revisions, at a minimum,

17  required major revisions to the DEIS's conclusions, methodology, and data:

18           The committee provides the following high priority suggestions for revising the
19      final EIS: (1) use definitions of impact intensities that demonstrably scale with
         their magnitude (e.g. , minor, moderate, major), and fully reflect the range of both
20      adverse and beneficial impacts including a category for negligible impacts; (2)
         provide a discussion of the levels of uncertainty for the impact intensities (e.g.,
21      Table 8.1); (3) specify all assumptions used in assessing impact and in scaling the
         intensity of impact; (4) describe potential alternate conclusions as appropriate
22      (e.g., Table 8.1); (5) segregate impact assessments for alternative A from
         alternatives B, C, and D and indicate that the assessments are not comparable due
23      to use of different baselines; (6) use all relevant and available information,
         especially for soundscapes and water quality (from research in Drakes Estero and
24      in other comparable systems) and; (7) include additional mitigation options as
         possible permit conditions for the action alternatives to reduce impacts, e.g. , an
25      option to discontinue the culture of Manila clams would address some concerns
         about the establishment of that nonindigenous species in Drakes Estero; impacts
26      of many DBOC practices (i.e., boat use, culture techniques, marine debris,
         soundscape disturbance) could potentially be reduced by the implementation of
27      appropriate mitigation measures.

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
DRAKES BAY OYSTER COMPANY v. SALAZAR ET AL. - CASE NO. 12-CV-06134-YGR

94. The NAS DEIS Review, which emphasized the high to moderate levels of uncertainty regarding the DEIS's conclusions, the inadequacy of the information and data it relied on, and the fundamental flaws with the DEIS's methodology, confirms that the DEIS was so inadequate as to preclude meaningfully analysis.

NPS's FEIS

95. Based on the NAS DEIS Review and other public comments, including those submitted by DBOC, ENVIRON International, and Mr. and Mrs. Lunny, NPS knew or should have known that, under 40 C.F.R. § 1502.9(a), it was required by NEPA to revise and recirculate a new Draft EIS for public review. Instead, NPS elected to publish the FEIS.

96. NPS was required by 40 C.F.R. § 1506.9, 40 C.F.R. § 1506.10(b)(2), and NPS's DO-12 Handbook, to submit the FEIS to EPA and provide at least a thirty-day notice-and-comment period from the time when EPA publishes a NOA for the FEIS in the Federal Register before a federal agency may issue a record of decision relying or based on a FEIS.

97. NPS posted the 800-page FEIS on the Internet late on Tuesday, November 20, 2012. The FEIS was posted the evening before Secretary Salazar's Wednesday, November 21, 2012, visit to DBOC to tour the farm and meet with Mr. and Mrs. Lunny, community leaders, and employees; one day before the Thanksgiving long holiday weekend; and only four business days before Secretary Salazar issued his memorandum of decision on November 29, 2012.

98. The FEIS stated that "[t]he NEPA process will be used to inform the decision of whether a new [SUP] should be issued to DBOC for a period of 10 years."

99. The Plaintiffs had scant opportunity to review the technical and substantive data and analysis presented in the FEIS before Secretary Salazar issued his memorandum of decision on November 29, 2012. Furthermore, by letter on November 26, 2012, DBOC requested certain new technical materials relied upon in the FEIS that were not included in the Appendix. NPS did not respond to this request.

100. The FEIS did not acknowledge the Complaint About Information Quality and its specific proposed corrections.

101.    The FEIS dismissed ENVIRON's on-site measurements of noise generated by DBOC's small oyster boats and equipment without explaining how or why NPS believed ENVIRON's Report was deficient. NPS did not take any of its own onsite noise measurements as mandated by NPS Policies 2006 and 40 C.F.R. § 1502.22(b).

102.    On November 27, 2012, ENVIRON prepared a new report analyzing the FEIS's Soundscapes analysis (hereinafter "ENVIRON FEIS Noise Report"). It concludes that the FEIS continues to use inappropriate proxies for DBOC's onshore equipment, including a metal concrete mixer for the plastic oyster tumbler. The ENVIRON FEIS Noise Report stated that the NPS comparison of the oyster tumbler to a concrete mixer was "ludicrous" and a comparison that "would be laughable were it not so dishonest." Furthermore, the ENVIRON FEIS Noise Report found that a new NPS noise analysis presented in Appendix I of the FEIS that claimed to "unambiguously" detect boat noise in Drakes Estero "reflect[s] so many false positives (i.e., incorrect identification of DBOC boats when none were present) and false negatives (i.e., failing to identify DBOC boats when they were present) that all of the boat noise data presented in FEIS Appendix I lack scientific validity." A copy of the ENVIRON FEIS Noise Report is lodged with this Complaint as Exhibit B and incorporated by reference herein.

103.    The September 2011 DEIS cited a 2011 published paper by NPS scientists Dr. Ben Becker, Mr. David Press, and Dr. Sarah Allen for the claim that DBOC caused a spatial displacement of harbor seals out of Drakes Estero. In November 2011, after the DEIS was released, the Marine Mammal Commission (MMC) released a report that concluded that while the data are "scant and have been stretched to the limit," that the MMC review provided "some support for the conclusion that harbor seal habitat-use patterns and mariculture activities in Drakes Estero are at least correlated."

104.    The FEIS quoted this MMC report as supporting the NPS correlation presented by Becker et al., 2011. The FEIS failed to explain that the conclusion from the MMC report quoted in the FEIS had come under scientific criticism, that NPS had done further analysis (at the request of the MMC), and that based upon the further NPS analysis, on June 17, 2012, the MMC

1  Executive Director Dr. Tim Ragen wrote: "Given the uncertainty associated with the analyses,
2  the results are not proof of a correlation…."

3      105.    Point Reyes National Seashore Superintendent Cicely Muldoon was provided a
4  copy of Dr. Ragen's letter on June 18, 2012, yet the FEIS failed to cite this letter, and failed to
5  correctly note that the 2011 MMC Report no longer supported the NPS correlation.

6      106.    The FEIS presented an entirely new analysis performed by the United States
7  Geologic Service (USGS) of over 165,000 digital photographs from 2008, by Lellis, W.A., C.J.
8  Blakeslee, L.K. Allen, B.F. Molnia, S.D. Price, S. Bristol, and B. Stewart, entitled "Assessment
9  of Photographs from Wildlife Monitoring Cameras in Drakes Estero, Point Reyes National
10 Seashore, California: U.S. Geological Survey Open-File Report" (2012) (hereinafter "USGS Seal
11 Photo Report"). A copy of the USGS Seal Photo Report is lodged with this First Amended
12 Complaint as Exhibit C and incorporated by reference herein.

13     107.    The USGS Seal Photo Report, publicly released on November 26, 2012, did not
14 attribute any harbor seal disturbances to DBOC's oyster boats, and did not find any causal
15 connection between DBOC's use of its oyster boats and harbor seal flushing events (in which
16 seals quickly rush into the water). Instead, the report found that of the two flushing events
17 identified where a DBOC boat was visible, in one there was no visible connection between the
18 stimulus and seals flushing, since seals flushed into the water "just after boat leaves the area."
19 Furthermore, for the second event, the report noted that while "[m]inor flushing [occurred]
20 before boat arrival, [the] cause [is] unknown."

21     108.    In contrast to conclusions in the USGS Seal Photo Report, the FEIS
22 misrepresented the analysis, falsely stating that "[t]wo flushing disturbance events were
23 attributed to [DBOC] boat traffic at nearby sandbars" by the USGS assessment. Thus, where the
24 USGS review found some association (or correlation), the FEIS claimed that the USGS review
25 found attribution (or causation).

26     109.    The FEIS retained the DEIS's conclusions regarding DBOC's impact on Drakes
27 Estero's environment.

28

110.    The FEIS continued to use vague, unbounded Impact Intensity definitions in the "wilderness" resource category to support its conclusion that DBOC causes a "major" long-term adverse impact to Drakes Estero's wilderness.

111.    The FEIS included no changes to any of the DEIS's conclusions regarding DBOC's impact on Drakes Estero's environment in response to the NAS DEIS Review and did not acknowledge that the NAS had concluded that many of the DEIS's claims regarding "moderate" or "major" long-term adverse impacts on Drakes Estero's environment were highly uncertain and likely exaggerated.

112.    Even though an oyster farm has been continuously operating in Drakes Estero for eight decades, the FEIS used undefined "expected future conditions" in which no oyster farm was present as the baseline for its "action" alternatives, Alternative B, C, and D, in violation of 43 C.F.R. § 46.30. In the FEIS's Appendix, NPS claimed that it was authorized to use this baseline by 43 C.F.R. § 46.30(2), even though § 46.30(2) makes clear that a "no action" alternative can only be a "no project" alternative "in cases where a *new* project is proposed for implementation."

113.    The FEIS acknowledged that denying DBOC's SUP would result in adverse impacts on "visitor experience and recreation" for some visitors and local and regional socioeconomic resources and "could result in long-term major adverse impacts on California's shellfish market."

114.    The FEIS did not inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts, even though NPS was informed by the NRC DEIS Review and DBOC's comment of its obligation to do so.

115.    The FEIS failed to meaningfully discuss the NAS DEIS Review's criticisms and alternate conclusions.

116.    The FEIS's failed to discuss the Complaint About Information Quality and the NAS DEIS Review.

117.    The FEIS did not stress areas of controversy (including issues raised by agencies and the public).

118.    The FEIS failed to include NPS sound level measurements of DBOC's mariculture operations despite the fact that complete soundscape data is essential to a reasoned choice among alternatives and the costs of obtaining it would not have been exorbitant.

119.    The FEIS did not make clear that there was incomplete or inaccurate information regarding DBOC's impact on the environment in Drakes Estero.

120.    The FEIS failed to provide an adequate cost-benefit analysis.

121.    The FEIS did not identify a preferred alternative, and instead merely identified an "environmentally preferred alternative."

The Secretary's Decision

122.    On November 27, 2012, DBOC notified Secretary Salazar that he could not rely on the FEIS because it violated NEPA, and also provided him with Dr. Goodman's and ENVIRON's preliminary analysis of the FEIS's soundscape analysis explaining some of the ways in which the FEIS violated NEPA.

123.    The Secretary has not issued a NEPA-required ROD memorializing his decision whether to grant DBOC a SUP and the reasons for that decision; no NOA of a ROD in this matter has been published in the Federal Register.

124.    On November 29, 2012, the Secretary issued a memorandum of decision that noted that the DEIS and FEIS "informed" him and were "helpful to [him] in making [his] decision." The memorandum of decision claims that the Secretary's decision was not based on data asserted to be flawed in DBOC's November 27, 2012, letter.

125.    The memorandum of decision directed NPS to allow DBOC's existing RUO and SUP to expire; to publish a notice in the Federal Register to convert Drakes Estero from "potential wilderness" to "wilderness"; and to allow DBOC ninety days to terminate its operations.

126.    The November 29, 2012, memorandum expressly interpreted Section 124 to exempt the Secretary's decision from all NEPA and other legal requirements: "Sec. 124 does not require me (or the NPS) to prepare a DEIS or an [sic] FEIS or otherwise to comply with the

National Environmental Policy Act of 1969 (NEPA) or any other law. … Sec. 124 expressly exempts my decision from any substantive or procedural legal requirements."

127.    In contrast to the Secretary's memorandum, the DEIS published in September 2011 stated that "[a]lthough the Secretary's authority under Section 124 is 'notwithstanding any other provision of law,' the Department has determined that it is appropriate to prepare an EIS and otherwise follow the procedures of NEPA." When the FEIS was published on November 20, 2012, however, the sentence quoted above was amended as follows (underlining indicating addition / strikeout indicating deletion): "[a]lthough the Secretary's authority under ~~s~~Section 124 is 'notwithstanding any other provision of law,' the Department has determined that it is ~~appropriate~~ helpful to ~~prepare an EIS and otherwise~~ generally follow the procedures of NEPA."

128.    The November 29, 2012, memorandum does not discuss the 2009 NAS Report's assessment of the relationship between DBOC's mariculture operations and Drakes Estero's environment, as contemplated by Section 124.

129.    The Secretary did not issue a NEPA-compliant ROD, as required by 40 C.FR. § 1505.2, and did not discuss his analysis of the environmental impact of adopting the various alternatives and other required matters. The Secretary did not assert that his decision was based on a NEPA-compliant FEIS or DEIS.

130.    Instead, the Secretary stated that his decision was "based on the incompatibility of commercial activities in wilderness" and suggested that the legislative purpose of the Wilderness Act of 1964 and Point Reyes Wilderness Act of 1976 trumped the congressional intent and language in Section 124.

131.    The Secretary's memorandum stated that Section 124, which was enacted in 2009, "in no way overrides the intent of Congress as expressed in the 1976 [Point Reyes Wilderness Act] to establish wilderness at the estero. With that in mind, my decision effectuates that [1976] Congressional intent."

132.    The Secretary's memorandum, interpreting and relying on the 1976 Point Reyes Wilderness Act, reasoned that denying DBOC a SUP "honors Congress's direction to 'steadily

1    continue to remove all obstacles to the eventual conversion of the[] lands and waters [in the Point

2    Reyes National Sea Shore] to wilderness status."

3        133.    The Secretary's selective application of NPS policies and the 1964 Wilderness

4    Act and 1976 Point Reyes Wilderness Act as binding precedent to his decision, while excusing

5    compliance with NEPA, demonstrates the arbitrary and capricious nature of the Secretary's

6    decision and violated the plain language of NEPA and Section 124.

7    The Secretary's Decision Attempts to Seize the State's Retained Water Bottoms

8        134.    DBOC holds two water bottom leases from the State of California, issued by the

9    CFGC in 2004 and managed by the CDFG.

10       135.    DBOC's State water bottom leases—M-438-01 and M-438-02—are valid through

11   2029.

12       136.    As explained above, California conveyed fee title to the water bottoms in Drakes

13   Estero in 1965, but retained the rights to lease the water bottoms in Drakes Estero for

14   aquaculture.

15       137.    California has continuously exercised its right to lease the water bottoms in

16   Drakes Estero for aquaculture operations since 1965, including reissuing leases in 1979 and

17   2004. The CFGC has the authority to regulate aspects of these operations, including stocking,

18   disease control, and transportation of aquatic organisms. The CFGC collects from DBOC both an

19   annual lease fee, based on the number of acres in the lease, and a privilege use tax, based on the

20   number of gallons of shucked oyster meats produced each month. The State has continually

21   leased the water bottom in Drakes Estero to DBOC for as long as DBOC has been cultivating

22   oysters in the bay.

23       138.    In 2008, NPS issued a separate SUP to DBOC and Mr. Lunny covering

24   approximately 3.4 acres of onshore area, and purporting to cover the State water bottom lease

25   areas.

26       139.    The Secretary's November 29, 2012, memorandum's directing that DBOC must

27   cease all oyster farming 90 days after November 30, 2012, would deprive DBOC of all future use

28

and enjoyment of its water bottom leases and completely prevent DBOC from benefiting from them in any manner.

140.    The memorandum of decision directed the NPS to convert Drakes Estero from "potential wilderness" to "wilderness" by publishing a notice in the Federal Register. On December 4, 2012, Defendants published a Notice of Designation of Potential Wilderness as Wilderness, Point Reyes National Seashore (hereinafter "FR Notice"), in the Federal Register. 77 Fed. Reg. 71,826 (Dec. 4, 2012). The FR Notice stated that "all uses prohibited under the Wilderness Act [Pub. L. 88-577] within Drakes Estero have ceased as of 11:59 p.m. on November 30, 2012 [upon expiration of DBOC's existing SUP and RUO]. Drakes Estero is entirely in federal ownership." 77 Fed. Reg. 71,826, 71,827. The FR Notice claimed that "Drakes Estero is entirely in federal ownership," when Drakes Estero is not entirely in federal ownership. The FR Notice was not published pursuant to rulemaking procedures required by 36 C.F.R. § 1.5(b).

141.    DBOC currently has between 8 million and 10 million oysters in the waters of Drakes Estero in various stages of development, the last of which will not be ready to harvest for another two years. Those oysters currently have a market value of about $0.50 each.

## CAUSES OF ACTION

## COUNT 1:    VIOLATION OF NEPA AND THE APA

142.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-141.

143.    Plaintiffs' interests, including their environmental concerns, fall within the zone of interests protected by NEPA.

144.    Because the DEIS was "so inadequate as to preclude meaningful analysis," NPS's failure to "prepare and circulate a revised" DEIS to allow the public a meaningful opportunity to comment on it prior to preparing and releasing the FEIS violates 40 C.F.R. § 1502.9(a).

145.    The FEIS's length, content, and format violate 40 C.F.R. § 1502.1, 40 C.F.R. § 1502.2(c), 40 C.F.R. § 1502.15, and 40 C.F.R. § 1502.7.

146.    The FEIS's characterization of Alternative A (denial of permit) as the "no action" alternative violates 43 C.F.R. § 46.30, and its use of an "expected future conditions" environmental baseline for the "action" Alternatives B, C, and D violates NEPA.

147.    NPS did not objectively and rigorously consider and meaningfully evaluate all reasonable alternatives in violation of 40 C.F.R. § 1502.14(a).

148.    The FEIS violates NEPA because it does not contain a "full and fair" discussion of environmental impacts as required by 40 C.F.R. § 1502.1.

149.    In violation of 40 C.F.R. § 1502.1, the FEIS did not "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts."

150.    The FEIS does not contain a summary that stresses "areas of controversy (including issues raised by agencies and the public)," as required by 40 C.F.R. § 1502.12.

151.    In violation of 40 C.F.R. § 1502.2, the FEIS failed to use data that was essential to a reasoned choice among alternatives.

152.    In violation of 40 C.F.R. § 1502.9(b), the FEIS failed to "respond to comments" and "discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised."

153.    In violation of 40 C.F.R. § 1506.10(b)(2) and 40 C.F.R. § 1506.9, NPS did not submit the FEIS to EPA, EPA did not publish a NOA for the FEIS in the Federal Register and no public notice and comment period was initiated, much less completed, at least thirty days prior to the Secretary's November 29, 2012, decision to deny the SUP, depriving the public of a meaningful opportunity to comment on the FEIS.

154.    The FEIS did not adequately analyze and discuss potential mitigation measures, in violation of 43 C.F.R. § 46.130; 40 C.F.R. § 1502.16(h).

155.    The FEIS did not include adequate cost-benefit analysis as required by 40 C.F.R. § 1502.2 and did not make clear that it was based on incomplete, inaccurate, or unavailable information, in violation of 40 C.F.R. § 1502.22; 43 C.F.R. § 46.125.

156. NPS failed to ensure the scientific integrity of discussions and analysis in the FEIS, in violation of 40 C.F.R. § 1502.24.

157. Secretary Salazar did not issue a ROD that complies with 40 C.F.R. § 1505.2, in violation of NEPA.

158. Secretary Salazar's decision to interpret Section 124 as relieving him of his NEPA and other substantive and procedural legal obligations in denying the SUP violated NEPA's plain language and was arbitrary and capricious and otherwise unlawful under 5 U.S.C. § 706(2).

159. Defendants' noncompliance with NEPA is reviewable under the APA. 5 U.S.C. §§ 704, 706(2).

160. Defendants' failure to comply with NEPA requirements established by the NEPA statute and Council of Environmental Quality (CEQ), DOI, and NPS regulations implementing NEPA, as well as other sources of binding NEPA standards, including but not limited to Director's Order #12, NPS's DO-12 Handbook, and NPS's 2006 Management Policies was arbitrary and capricious; in excess of statutory authority, jurisdiction, or limitations and short of statutory right; an abuse of discretion; and otherwise not in accordance with law. 5 U.S.C. § 706(2).

161. The Secretary's unreasoned, arbitrary decision to suddenly reverse course—after maintaining for the 789-day period between the scoping in September 2010 and November 29, 2012, that the NEPA process would inform his decision whether to issue DBOC a SUP—and claim for the first time in the November 29, 2012, decision memorandum that his decision to deny a SUP was not subject to NEPA or any other substantive or procedural requirements was arbitrary and capricious and an abuse of discretion.

162. The DEIS and FEIS were issued by Defendants and used and relied upon by Defendant Salazar and other decisionmakers in violation of NEPA.

163. The Secretary's November 29, 2012, decision to deny DBOC a 10-year SUP was made in violation of NEPA.

**COUNT 2:     VIOLATION OF DQA AND THE APA**

164.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-163.

165.    The DEIS, FEIS, and Atkins Peer Review Report are "information" that was "disseminated" by NPS, within the meaning of the DQA, Director's Order #11B, DOI's Information Quality Guidelines, the Office of Management and Budget's (OMB) Information Quality Guidelines, and subject to binding minimum information-quality standards established therein.

166.    Defendants' failure to correct the FEIS to reflect the proposed corrections outlined in the Complaint About Information Quality violated the DQA, Director's Order #11B, and other binding minimum standards for information-quality, including but not limited to DOI's Information Quality Guidelines; Director's Order #47; Director's Order #12; NPS's DO-12 Handbook; NPS's 2006 Management Policies; and all other applicable laws, regulations, and binding policies and procedures.

167.    NPS's failure to treat the Complaint About Information Quality as a comment on the DEIS to which it was obligated to respond violated Director's Order #11B.

168.    NPS failed to ensure that information it disseminated to the public met the accuracy, transparency, objectivity, reliability, timeliness, and other minimum information-quality standards established by the DQA, Director's Order #11B, OMB Information Quality Guidelines, and other sources of binding minimum information-quality standards.

169.    NPS's failure to comply with the DQA, Director's Order #11B, and related binding information-quality-related standards was arbitrary and capricious; in excess of statutory authority, jurisdiction, or limitations and short of statutory right; an abuse of discretion; and otherwise not in accordance with law. 5 U.S.C. § 706(2).

**COUNT 3:     VIOLATION OF THE APA AND SECTION 124**

170.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-169.

171.    The Secretary exceeded his statutory jurisdiction and abused his discretion in violation of 5 U.S.C. § 706(2)(C), because he had no authority to order NPS to publish a notice in the Federal Register converting Drakes Estero from "potential wilderness" to "wilderness."

172.    The Secretary's failure to consider NAS reports regarding DBOC and mariculture in Drakes Estero as contemplated by Section 124 was arbitrary and capricious, in excess of statutory authority, and otherwise unlawful under 5 U.S.C. § 706(2).

173.    The Secretary's selective application of some federal laws, such as the 1965 Wilderness Act and the 1976 Point Reyes Wilderness Act, while waiving others, such as NEPA, was arbitrary, capricious, and otherwise not in accordance with law.

174.    The Secretary's decision was arbitrary and capricious, an abuse of discretion, and contrary to Section 124's plain language.

175.    The Secretary's decision to deny DBOC a SUP was arbitrary and capricious; in excess of statutory authority, jurisdiction, or limitations and short of statutory right; an abuse of discretion; without observance of procedure required by law, and otherwise not in accordance with law. 5 U.S.C. § 706(2).

**COUNT 4:    VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT**

176.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-175.

177.    The Secretary's decision to deny DBOC a SUP expressly authorized by Section 124 deprived DBOC of property interests protected by the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

178.    DBOC was not afforded a constitutionally adequate hearing to present its case for extension of the SUP.

179.    Defendants failed to comply with the procedural requirements of NEPA, the APA, the DQA, and other applicable federal law that would have given DBOC a meaningful opportunity to respond to the FEIS, explain why the FEIS was flawed, and present evidence negating the FEIS's claims.

180.     Because the Secretary's decision was made in reliance upon these procedurally deficient and unlawful processes, DBOC was directly and proximately deprived of its property absent procedural due process of law, in violation of the Fifth Amendment to the U.S. Constitution.

181.     Because the Secretary's decision was made in reliance upon an arbitrary and capricious interpretation of the 1976 Point Reyes Wilderness Act, the 1972 Grant Deed and RUO held by DBOC, and/or the flawed and inadequate data in the DEIS and FEIS, DBOC was directly and proximately deprived of its property absent substantive due process of law, in violation of the Fifth Amendment to the U.S. Constitution.

## COUNT 5:   VIOLATION   OF   THE   TAKINGS   CLAUSE   OF   THE   FIFTH AMENDMENT

182.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-181.

183.     The Secretary's November 29, 2012, memorandum directing NPS to order DBOC to cease all "commercial shellfish activities … in the waters of Drakes Estero after November 30, 2012" deprived DBOC of all economically beneficial use of its personal property (immature oysters in Drakes Bay) without just compensation.

184.     The Secretary's November 29, 2012, memorandum directing NPS to order DBOC to cease all "commercial shellfish activities … in the waters of Drakes Estero after November 30, 2012" deprived DBOC of economically beneficial use of the valid State water-bottom leases without just compensation.

185.     The Secretary's November 29, 2021, memorandum caused a regulatory and physical taking of DBOC's property without just compensation in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution.

## COUNT 6: UNLAWFUL INTERFERENCE WITH AGENCY FUNCTIONS

186.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-185.

187.   NPS employees are prohibited from "[t]hreatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty." 36 C.F.R. § 2.32(a)(1).

188.   NPS employees are prohibited from "[k]nowingly giving a false or fictitious report or other false information … on an application for a permit." 36 C.F.R. § 2.32(a)(3)(ii).

189.   NPS employees are prohibited from "[k]nowingly giving a false report for the purpose of misleading a government employee or agent in the conduct of official duties, or making a false report that causes a response by the United States to a fictitious event." 36 C.F.R. § 2.32(a)(4).

190.   On information and belief, as yet unknown NPS employees, intentionally interfered with government employees and agents engaged in their official duties, knowingly gave false and fictitious information on an application for a permit, and knowingly gave false reports for the purpose of misleading government employees and agents engaging in the conduct of official duties, and made false reports causing responses by the United States to fictitious events, in violation of 36 C.F.R. § 2.32(a) and the APA. 5 U.S.C. § 702(2)(A).

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.   Issue a declaratory judgment with the following:

     A.    Declaration that Secretary Salazar's November 29, 2012, decision is null and void, of no effect, as:

        i.    unconstitutional under the Fifth Amendment;

        ii.    arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA;

        iii.    contrary to constitutional right, power, privilege, or immunity in violation of the APA;

        iv.    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right in violation of the APA.

     B.    Declaration that issuance of the DEIS and FEIS violated NEPA and the DQA.

2.    Set aside and hold unlawful Secretary Salazar's November 29, 2012, decision.

3.    Order Secretary Salazar or his successor to direct NPS to issue DBOC a 10-year SUP.

4.    Alternatively, vacate the decision remand this matter nunc pro tunc to Defendants with instructions to make a new decision consistent with the law as it existed as of November 29, 2012.

5.    Permanently enjoin Defendants and all persons and entities in active concert or participation with Defendants from relying on the DEIS or FEIS in any decisionmaking process.

6.    Permanently enjoin Defendants and all persons and entities in active concert or participation with Defendants from relying on a DEIS or FEIS unless it is issued in accordance with all procedural and substantive due process requirements of NEPA and the APA.

7.    Permanently enjoin NPS from evicting DBOC or its employees until NPS, DOI, and/or an alternative decisionmaker consider the DBOC application for a SUP in accordance with due process.

8.    Permanently enjoin all NPS employees and contractors involved in the previous NEPA process from participating in the NEPA process, including VHB.

1    9.    Order NPS to publish a corrected notice in the Federal Register to invalidate the

2 December 4, 2012, notice converting Drakes Estero from "potential wilderness" to "wilderness."

3    10.    Issue a preliminary injunction preventing NPS from enforcing or implementing

4 the Secretary's decision, and allowing Plaintiffs to continue operating their oyster farm, until this

5 Court decides the merits of this lawsuit.

6    11.    Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action;

7 and

8    12.    Grant all other such relief as the Court may deem just and proper.

9

10 DATED: December 21, 2012                    Respectfully submitted,

11

12                              /s/ Amber D. Abbasi_____
                                Amber D. Abbasi [CSBN 240956]
13                              Cause of Action
                                1919 Pennsylvania Ave., NW, Suite 650
14                              Washington, D.C. 20006
                                Phone: 202.400.4232
15                              Fax: 202.300.5842

16 DATED: December 21, 2012

17

18                              /s/ Ryan R. Waterman_____
                                Ryan R. Waterman [CSBN 229485]
19                              Stoel Rives LLP
                                12255 El Camino Real, Suite 100
20                              San Diego, CA 92130
                                Phone: (858) 794-4114
21                              Fax: (858) 794-4101

22

23 DATED: December 21, 2012

24                              /s/ Peter S. Prows_____
                                Peter S. Prows [CSBN 257819]
25                              Lawrence S. Bazel [CSBN 114641]
                                BRISCOE IVESTER & BAZEL LLP
26                              155 Sansome Street, Suite 700
                                San Francisco, CA 94104
27                              Phone: 415.402.2700
                                Fax: 415.398.5630

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
DRAKES BAY OYSTER COMPANY V. SALAZAR ET AL. - CASE NO. 12-CV-06134-YGR
33