1  TRENT W. ORR, SB No. 77656
   GEORGE M. TORGUN, SB No. 222085
2  Earthjustice
   50 California Street, Ste. 500
3  San Francisco, CA  94111
   T:  415-217-2000 / F:  415-217-2040
4  torr@earthjustice.org / gtorgun@earthjustice.org

5  *Attorneys for Defendant-Intervenor Applicants*

6

7

8                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
9                            OAKLAND DIVISION

10

11  DRAKES BAY OYSTER COMPANY; and          )  Case No. C-12-6134 YGR
    KEVIN LUNNY,                            )
12                                          )
              Plaintiffs,                   )  ENVIRONMENTAL ACTION
13                                          )  COMMITTEE OF WEST MARIN, *et al.'s*
          v.                                )  [PROPOSED] OPPOSITION TO MOTION
14                                          )  FOR PRELIMINARY INJUNCTION
    KENNETH L. SALAZAR; U.S. DEPARTMENT     )
15  OF THE INTERIOR; U.S. NATIONAL PARK     )
    SERVICE; and JONATHAN JARVIS,           )
16                                          )
              Defendants,                   )  Date:    January 25, 2013
17                                          )  Time:    2:00 p.m.
    ENVIRONMENTAL ACTION COMMITTEE OF       )  Judge:   Hon. Yvonne Gonzalez Rogers
18  WEST MARIN; NATIONAL PARKS              )  Place:   Oakland Courthouse
    CONSERVATION ASSOCIATION; NATURAL       )
19  RESOURCES DEFENSE COUNCIL; and SAVE     )
    OUR SEASHORE, non-profit organizations, )
20                                          )
              Defendant-Intervenor Applicants. )
21                                          )
                                            )
22  _____ )

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................1

FACTUAL AND STATUTORY BACKGROUND ...............................................................1

ARGUMENT ...........................................................................................................................4

I.      DBOC IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS. ...................5

        A.      The Expiration of the RUO and SUP by Their Own Terms Is Not an
                Agency Action Reviewable Under the Administrative Procedure Act. ......................5

        B.      Even if DBOC's Claims Were Reviewable Under the Administrative
                Procedure Act, There is No Likelihood of Success on the Merits. ............................7

                1.      Section 124 and "Other Legislation." .............................................................7

                2.      Scientific Misconduct. ...................................................................................9

                3.      The Wilderness Designation for Drakes Estero. ..............................................10

II.     DBOC HAS FAILED TO DEMONSTRATE ANY LIKELIHOOD OF
        IRREPARABLE HARM. ............................................................................................12

III.    THE BALANCE OF EQUITIES TIPS SHARPLY IN FAVOR OF DENYING
        THE INJUNCTION. ..................................................................................................14

IV.     THE PUBLIC INTEREST SUPPORTS DENIAL OF THE INJUNCTION. .........................20

CONCLUSION .......................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. FAA*,
  1 F.3d 955 (9th Cir. 1993) ............................................................................................7

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) .....................................................................................20

*Alpine Lakes Prot. Soc'y v. Schlapfer*,
  518 F.2d 1089 (9th Cir. 1975) .......................................................................................9

*Am. Motorcyclist Ass'n v. Watt*,
  714 F.2d 962 (9th Cir. 1983) .........................................................................................9

*Am. Trucking Ass'ns v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) .......................................................................................5

*Amoco Prod. Co. v. Village of Gambell*,
  480 U.S. 531 (1987)......................................................................................................15

*Aniel v. GMAC Mortg., LLC*,
  2012 WL 5373388 (N.D. Cal. Oct. 30, 2012)..............................................................12

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
  563 F.3d 847 (9th Cir. 2009) .......................................................................................12

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ..................................................................................12, 14

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971)........................................................................................................6

*CRAssociates v. U.S.*,
  103 Fed. Cl. 23 (Fed. Cl. 2012) ...................................................................................13

*Defenders of Wildlife v. Andrus*,
  627 F.2d 1238 (D.C. Cir. 1980)..................................................................................5, 9

*E.J. Friedman Co. v. United States*,
  6 F.3d 1355 (9th Cir. 1993) ...........................................................................................6

*Firebaugh Canal Co. v. U.S. Dep't of the Interior*,
  203 F.3d 568 (9th Cir. 2000) .....................................................................................7, 8

*Fund for Animals v. Mainella*,
  294 F. Supp. 2d 46 (D.D.C. 2003) .................................................................................5

*Goldie's Bookstore v. Superior Court of State of Cal.*,
    739 F.2d 466 (9th Cir. 1984) ............................................................................13

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ..........................................................................................6

*High Sierra Hikers Ass'n v. Blackwell*,
    390 F.3d 630 (9th Cir. 2004) ............................................................................20

*Idaho Sporting Congress v. Alexander*,
    222 F.3d 562 (9th Cir. 2000) ............................................................................15

*Klein v. Boeing Co.*,
    847 F. Supp. 838 (W.D. Wash. 1994) ............................................................8, 10

*Los Angeles Memorial Coliseum Comm'n v. N.F.L.*,
    634 F.2d 1197 (9th Cir. 1980) ..........................................................................12

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ..........................................................................................5

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) ............................................................................15

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ............................................................................................6

*NRDC v. U.S. Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005) ............................................................................10

*Palomar Med. Ctr. v. Sebelius*,
    693 F.3d 1151 (9th Cir. 2012) ....................................................................10, 11

*Salt Lake Tribune Pub. Co. v. AT&T Corp.*,
    320 F.3d 1081 (10th Cir. 2003) ........................................................................13

*Save Our Ecosystems v. Clark*,
    747 F.2d 1240 (9th Cir. 1984) ..........................................................................9

*Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*,
    674 F.3d 97 (1st Cir. 2012) ............................................................................5, 6

*Second City Music, Inc. v. City of Chicago*,
    333 F.3d 846 (7th Cir. 2003) ............................................................................13

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ......................................................................................7, 8

*Western Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ......................................................................10

*Whaley v. Belleque*,
    520 F.3d 997 (9th Cir. 2008) .......................................................................9

*Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*,
    353 F.3d 1051 (9th Cir. 2003) .....................................................................7

*Williams v. Rodriguez*,
    2012 WL 1194160 (N.D. Cal. Apr. 10, 2012) ..............................................8

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008)................................................................................. passim


STATUTES

5 U.S.C. § 551(13) .............................................................................................5, 6

5 U.S.C. § 701 ...................................................................................................1, 6

5 U.S.C. § 702 ....................................................................................................10

5 U.S.C. § 704 ......................................................................................................5

5 U.S.C. § 706(1) .................................................................................................6

5 U.S.C. § 706(2)(C).............................................................................................10

16 U.S.C. § 459c ..........................................................................................1, 2, 21

16 U.S.C. §459c-2 .................................................................................................2

16 U.S.C. § 459c-5 ................................................................................................8

16 U.S.C. 459c-6a .................................................................................................2

16 U.S.C. § 459c-6a(b) ........................................................................................11

16 U.S.C. § 1133(c) .............................................................................................11

16 U.S.C. § 1133(d)(7) ........................................................................................11

42 U.S.C. § 4332(C) ..............................................................................................5

Pub. L. No. 94-544, 90 Stat. 2515 (1976).......................................................2, 21

Pub. L. No. 94-567, 90 Stat. 2692 (1976) .......................................................................3, 11

Pub. L. 95-625, 92 Stat. 3487 (1978) ..................................................................................8

Pub. L. No. 111-88, § 124, 123 Stat. 2904, 2932 (2009) ............................................ passim


**RULES**

Fed. R. Civ. P. 8(a)(2) ........................................................................................................8


**FEDERAL REGULATIONS**

36 C.F.R. § 1.5(b) ............................................................................................................10

36 C.F.R. § 1.6(d) ............................................................................................................10


**FEDERAL REGISTER NOTICES**

77 Fed. Reg. 71,826 (Dec. 4, 2012) ...............................................................................4, 11


**LEGISLATIVE HISTORY**

H.R. Rep. No. 87-1628 (1962) .......................................................................................1, 21

H.R. Rep. No. 94-1680 (1976) .......................................................................................3, 12

S. Rep. No. 94−1357 (1976) ..............................................................................................3

H.R. Conf. Rep. No. 111-316 (2009) ...............................................................................4, 7


**STATE STATUTES**

1965 Cal. Stat. ch. 983 ......................................................................................................3

**INTRODUCTION**

Defendant-intervenor applicants Environmental Action Committee of West Marin, National Parks Conservation Association, Natural Resources Defense Council, and Save Our Seashore (collectively, "Proposed Intervenors"), having moved this Court for intervention as defendants, submit this Proposed Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction and supporting papers filed herewith for the Court's consideration should it determine to grant their intervention.

By their motion, Plaintiffs Drakes Bay Oyster Company, *et al*. (collectively, "DBOC") ask this Court to issue a preliminary injunction enjoining the decision by Defendants Kenneth L. Salazar, *et al*. (collectively, "Defendants") to allow DBOC's authorization to operate a commercial oyster facility at Drakes Estero, within Point Reyes National Seashore ("PRNS"), to expire on its own terms and to designate the Estero as wilderness. *See* Memo. of P&A ISO Mot. for Prelim. Inj. (Doc. 32) ("Motion") at vii. However, DBOC is unlikely to succeed on the merits of its claims because it has failed to set forth any arguments that are reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*. To the extent that any of DBOC's claims are reviewable, DBOC has failed to present an adequate basis for a ruling in its favor. Furthermore, DBOC has not demonstrated a likelihood of irreparable harm, and the balance of equities and public interest both tip strongly in favor of removing DBOC's commercial oyster operations so that Drakes Estero can receive the full wilderness protection that Congress intended when it passed the Point Reyes Wilderness Act in 1976. Thus, Proposed Intervenors urge the Court to reject DBOC's Motion.

**FACTUAL AND STATUTORY BACKGROUND**

In 1962, Congress created Point Reyes National Seashore "to save and preserve, for the purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains undeveloped." 16 U.S.C. § 459c. As the legislative history to this act recognized, the Point Reyes peninsula, "from its seashore to forest-covered Inverness Ridge, provides a combination of scenic, recreation, and biologic interests which can be found nowhere else in the country near a large center of population." H.R. Rep. No. 87-1628 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2500, 2502. Congress authorized the Secretary of the Interior "to take appropriate

action in the public interest toward the establishment of the national seashore," including a mandate to "acquire as rapidly as appropriated funds become available" the lands, waters, and other property located within the boundaries of PRNS.  16 U.S.C. §§ 459c, 459c-2.

Two years later, in 1964, Congress enacted the Wilderness Act to establish a system of protected "wilderness areas" to be administered "for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness."  16 U.S.C. §§ 1131-36.  A "wilderness" is defined as an "area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation," where "commercial enterprise" and motorized equipment are prohibited.  *Id*. §§ 1131(c), 1133(c).  The Wilderness Act required the Secretary of the Interior, within ten years of its enactment, to survey all contiguous roadless areas of 5,000 acres or more within the National Park System and to "report to the President his recommendation as to the suitability or nonsuitability of each such area…for preservation as wilderness."  *Id*. § 1132(c).  The President was then to relay to Congress a recommendation regarding which of the areas surveyed should be designated as wilderness.  *Id*.

This procedure was duly followed with respect to PRNS, and, in 1976, Congress enacted the Point Reyes Wilderness Act.  Pub. L. No. 94-544, 90 Stat. 2515 (1976) (codified as 16 U.S.C. § 1132 note).  The Act designated 25,370 acres of PRNS as wilderness, providing full Wilderness Act protection, and designated an additional 8,003 acres of PNRS as "potential wilderness" (depicted on a map that accompanied the act).  *Id*. § 1.  The potential wilderness area included Drakes Estero, at issue here, a large estuary in the heart of PRNS.  *Id*.[1]

The term "potential wilderness" is defined in the legislative history for the Point Reyes Wilderness Act and companion legislation accompanying the wilderness designations for PRNS and other areas as "a category of lands which are essentially of wilderness character, but retain sufficient non-conforming structures, activities, uses or private rights so as to preclude immediate wilderness

---

[1] Section 4 of the Point Reyes Wilderness Act also amended Section 6a of the authorizing legislation for PRNS to require that the Secretary of the Interior shall administer the area "without impairment of its natural values, in a manner which provides for such recreational, educational, historic preservation, interpretation, and scientific research opportunities as are consistent with, based upon, and supportive of the maximum protection, restoration, and preservation of the natural environment within the area."  16 U.S.C. 459c-6a.

classification." S. Rep. No. 94‑1357 at 3 (1976). This legislative history provides an explicit

statement of Congressional intent regarding the removal of all nonconforming uses from areas

designated as potential wilderness so that they can receive full wilderness status:

> As is well established, it is the intention that those lands and waters designated as
> potential wilderness additions will be essentially managed as wilderness, to the extent
> possible, with efforts to steadily continue to remove all obstacles to the eventual
> conversion of these lands and waters to wilderness status.

H.R. Rep. No. 94‑1680 at 3 (1976); *see also* S. Rep. No. 94‑1357 at 7 (potential wilderness "will

automatically gain wilderness status" when "non-conforming uses and/or structures are

eliminated").[2] Furthermore, the companion legislation specifically provided that "[a]ll lands which

represent potential wilderness additions, upon publication in the Federal Register of a notice by the

Secretary of the Interior that all uses thereon prohibited by the Wilderness Act have ceased, shall

thereby be designated wilderness." Pub. L. No. 94-567, § 3, 90 Stat. 2692, 2693 (1976) (codified as

16 U.S.C. § 1132 note); *see id*. § 1(k) (Point Reyes National Seashore wilderness designation).

Congress designated Drakes Estero as "potential wilderness" in 1976 because there was a

nonconforming use present, a commercial oyster operation then known as the Johnson Oyster

Company ("JOC"). *See* H.R. Rep. No. 94-1680 at 5-6; First Amended Complaint for Declaratory

and Injunctive Relief (Doc. 44) ("FAC"), ¶ 39. As part of its acquisition of lands designated for

inclusion in PRNS, Defendants had purchased the JOC property on the shores of Drakes Estero in

1972. FAC, ¶ 39.[3] However, as part of the exchange, JOC reserved a "terminable right to use and

occupy" the property ("RUO") to continue its commercial oyster operations "for a period of 40

years," expiring on November 30, 2012. *Id*. The RUO provided that "[u]pon expiration of the

reserved term, a special use permit may be issued for the continued occupancy of the property" for

the same purposes. Doc. 38-1 at 19 (RUO, ¶ 11). In December 2004, DBOC purchased JOC's

---

[2] National Park Service ("NPS") Management Policies (2006), § 6.3.1 provides that potential
wilderness shall "be managed as wilderness to the extent that existing nonconforming conditions
allow" and that NPS shall determine "the most appropriate means of removing the temporary,
nonconforming conditions that preclude wilderness designation from potential wilderness"); *see id*. §
6.2.2.1 ("Potential Wilderness"), *available at* http://www.nps.gov/policy/mp2006.pdf.

[3] The State of California had previously granted to the United States "all of the tide and submerged
lands or other lands beneath navigable waters situated within the boundaries of the Point Reyes
National Seashore," while reserving to the public "the right to fish" in such waters, consistent with
article 1, section 25 of the California Constitution. *See* 1965 Cal. Stat. ch. 983.

operation in Drakes Estero and was informed by Defendants that no further permit for commercial oyster operations would be issued after the expiration of the RUO.  FAC, ¶¶ 3, 4.  In 2008, Defendants issued a separate Special Use Permit ("SUP") governing DBOC's operations with the same November 30, 2012 expiration date.  FAC, ¶ 138.

In November 2009, Congress passed a rider to an appropriations bill that gave the Secretary of the Interior discretionary authority to extend DBOC's lease for an additional ten years.  Pub. L. No. 111-88, § 124, 123 Stat. 2904, 2932 (2009) ("Section 124").  Specifically, Section 124 provided that "[p]rior to the expiration [of the RUO and SUP] on November 30, 2012" and "notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit with the same terms and conditions as the existing authorization…for a period of 10 years…."  *Id.* The legislative history stated that this section provided the Secretary with "discretion to issue a special use permit to [DBOC]."  H.R. Conf. Rep. No. 111-316 at 107 (2009).  Following the passage of Section 124, DBOC submitted a request to Defendants for the issuance of a new SUP upon expiration of the existing authorization.  FAC, ¶ 47.

On November 29, 2012, the Secretary of the Interior issued a memorandum directing the National Park Service to "[n]otify DBOC that both the [RUO and SUP] held by DBOC expire according to their terms on November 30, 2012."  Doc. 40-3 at 4.  The Secretary also directed NPS to provide DBOC with a period of 90 days after November 30, 2012 to remove its operations from the area, to effectuate the conversion of Drakes Estero from potential to designated wilderness, and to use all legal authorities to assist the DBOC workers affected by the expiration of the permits.  *Id.* at 5.  Drakes Estero was officially designated as wilderness, achieving the full protections of the Wilderness Act, on December 4, 2012.  77 Fed. Reg. 71,826 (Dec. 4, 2012).

## ARGUMENT

A preliminary injunction is an "extraordinary remedy" that should only be granted "upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22-24 (2008).  To prevail on a motion for preliminary injunctive relief, the moving party must establish four separate factors:  (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm absent a preliminary injunction; (3) that the balance of

equities tips in the moving party's favor; and (4) that an injunction is in the public interest.  *Am.*

*Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter*, 555 U.S.

at 22).  In considering the four factors, the court "must balance the competing claims of injury and

must consider the effect on each party of the granting or withholding of the requested relief."

*Winter*, 555 U.S. at 24.  As demonstrated below, DBOC fails to establish any of these factors.

## I.   DBOC IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

### A.   The Expiration of the RUO and SUP by Their Own Terms Is Not an Agency Action Reviewable Under the Administrative Procedure Act.

In its Motion, DBOC contends that Defendants' "decision not to grant [DBOC] a permit to

allow for the continued operation of the oyster farm" violated Section 706(2)(A) of the APA because

it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

Motion at 1, 12-22.  However, in order to obtain judicial review under the APA, a party must

challenge a "final agency action."  *See* 5 U.S.C. § 704; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871,

882 (1990).  Here, no action by Defendants was required for DBOC's authorization to expire on its

own terms on November 30, 2012, and the Secretary's memorandum directing Defendants to notify

DBOC that such expiration would occur is not an "agency action" for purposes of the APA.  *See* 5

U.S.C. § 551(13) (defining "agency action" as "the whole or a part of an agency rule, order, license,

sanction, relief, or the equivalent or denial thereof, or failure to act"); *Scarborough Citizens*

*Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 101 (1st Cir. 2012) (finding no

reviewable agency action where agency declined to exercise discretion to address easement dispute).

Moreover, it is well settled that there is no "major federal action" for purposes of the

National Environmental Policy Act ("NEPA") when a federal agency declines to exercise

discretionary authority granted to it by statute.  *See* 42 U.S.C. § 4332(C) (environmental review

requirements of NEPA triggered by "major Federal action [ ] significantly affecting the quality of

the human environment"); *Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1250 (D.C. Cir. 1980)

(finding no "major Federal action" or  "obligation to prepare an environmental impact statement

when [Secretary of Interior] declines to exercise" power granted by statute); *Fund for Animals v.*

*Mainella*, 294 F. Supp. 2d 46, 55-57 (D.D.C. 2003) ("Secretary's failure to exercise her discretion to

prohibit [black bear hunt] is not federal action, which is needed to trigger the duty to prepare an environmental impact statement under the NEPA").  Moreover, NEPA cannot make a discretionary decision reviewable "where the decision itself is not reviewable under the APA or the substantive statute." *Scarborough Citizens*, 674 F.3d at 102.  As such, Defendants' direction to allow the existing RUO and SUP to expire on their own terms and determination not to exercise the wholly discretionary authority granted in Section 124 are not agency action for APA purposes or a major federal action subject the requirements of NEPA.[4]

Furthermore, even if this Court were to accept DBOC's contention that such events amounted to Defendants' "denial of [DBOC's] permits to continue oyster farming" and constitute an agency action for purposes of the APA, *see* Motion at 2, the APA expressly precludes judicial review of agency actions "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Although section 701(a)(2) stakes out "a very narrow exception" to judicial review under the APA, *see Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971), "the Supreme Court has indicated that the § 701(a) hurdle must be cleared 'before any review at all may be had' under the APA." *E.J. Friedman Co. v. United States*, 6 F.3d 1355, 1359 (9th Cir. 1993) (quoting *Heckler v. Chaney*, 470 U.S. 821, 828 (1985)).

In *Heckler*, the Supreme Court established that review of agency actions is precluded under section 701(a)(2) where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830.  That is precisely the situation here.  As stated above, Section 124, a one-paragraph rider in an appropriations bill, provides that "notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit with the same terms and conditions as the existing authorization…for a period of 10 years…."  Pub. L. No. 111-88, § 124.  The one-sentence legislative history of this section explains that it provides the Secretary with "discretion to issue a special use

---

[4] DBOC has not argued that Defendants' actions constitute a "failure to act" under 5 U.S.C. § 551(13) or sought to "compel agency action unlawfully withheld" pursuant to 5 U.S.C. § 706(1).  To the extent that it does, any such claim should be rejected based on the U.S. Supreme Court's decision in *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (holding that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take").

permit to [DBOC]." H.R. Conf. Rep. No. 111-316 at 107. Section 124 neither specifies any circumstances under which the Secretary must or even should take a particular action regarding DBOC's permit nor provides substantive criteria to guide the Secretary's action. In such circumstances, there are no "judicially manageable standards," and no "law to apply," in evaluating the exercise of the Secretary's discretion. *See, e.g.*, *Adams v. FAA*, 1 F.3d 955, 956 (9th Cir. 1993). Accordingly, any alleged "denial" of DBOC's permit to continue its oyster operations is an action committed to agency discretion by law and is unreviewable under the APA.

**B.     Even if DBOC's Claims Were Reviewable Under the Administrative Procedure Act, There is No Likelihood of Success on the Merits.**

**1.     Section 124 and "Other Legislation."**

Even if the Court were to find that DBOC's claims are reviewable, there is no likelihood that DBOC will succeed on the merits of any of its arguments. Despite the discretionary language in Section 124, DBOC contends that Defendants "made at least four misinterpretations of law" regarding the determination not to exercise discretion to issue a new permit under that section and "other legislation." Motion at 12-15.[5] First, DBOC claims that the Secretary "erred by concluding that issuing the SUP would violate the 1976 Act." *Id.* at 13. However, the Secretary's decision to consider the public policy and Congressional intent behind the 1976 Point Reyes Wilderness Act in declining to exercise his discretion to issue a new permit is entirely consistent with the plain language of Section 124. *See* Doc. 40-3 at 4, 8-9. In particular, even though Section 124 contains the phrase "notwithstanding any other provision of law," such language would only serve to supersede conflicting statutes, given the well-established presumption against repeal by implication. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 189 (1978). In particular, "[t]he intention of the legislature to repeal must be clear and manifest," and "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Firebaugh Canal Co. v. U.S. Dep't of the Interior*, 203

---

[5] DBOC cites *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1067 (9th Cir. 2003), *amended by* 360 F.3d 1374 (9th Cir. 2004), for the proposition that "Defendants' interpretations of law made in the context of their decision about whether to issue a permit to [DBOC] are not entitled to deference." Motion at 13. But deference is not at issue here given the unambiguous language of Section 124 granting the Secretary complete discretion whether to issue a special use permit.

1    F.3d 568, 575 (9th Cir. 2000) (internal quotations and citations omitted).  This doctrine "applies with

2    full vigor" where, as here, "the subsequent legislation is an appropriations measure."  *Id*.  Section

3    124 must be read in harmony with existing laws to the maximum extent possible, and any finding of

4    implied repeal is strongly disfavored.  The Secretary made no error in considering the 1976 Act.

5        Second, DBOC claims that the Secretary misinterpreted a 1978 Act of Congress by claiming

6    that the enabling legislation for PRNS "does not authorize mariculture."  Motion at 13-14.  There are

7    several faults with this argument.  First, this argument is outside of the scope of DBOC's First

8    Amended Complaint and should not be considered by the Court.  *See, e.g., Klein v. Boeing Co*., 847

9    F. Supp. 838, 844 (W.D. Wash. 1994) ("Klein never asserted this claim prior to his opposition to

10   Boeing's motion for summary judgment, nor has he moved to amend his complaint to add such a

11   claim.  Thus, this claim is not properly before the court."); *Williams v. Rodriguez*, 2012 WL

12   1194160, *9 n.3 (N.D. Cal. Apr. 10, 2012) ("To the extent plaintiff's pleadings argue matters outside

13   the scope of his complaint, those arguments and supporting facts will not be considered"); Fed. R.

14   Civ. P. 8(a)(2) (complaint "must contain…a short and plain statement of the claim showing that the

15   pleader is entitled to relief").  Second, nowhere does the Secretary reference the 1978 Act when he

16   states that the "enabling legislation" for PRNS, passed in 1962, "does not authorize mariculture."

17   Doc. 40-3 at 5.  Furthermore, the 1978 legislation, which amended 16 U.S.C. § 459c-5 to provide for

18   the reservation of certain agricultural rights on land acquired by Defendants for inclusion in PRNS,

19   is completely irrelevant to the designation of Drakes Estero as wilderness or the expiration of an

20   RUO on property that had been acquired by Defendants prior to the 1978 legislation.  *See* Pub. L.

21   95-625, Title III, § 318(b) to (d), 92 Stat. 3487 (1978).

22       Third, DBOC claims that there is some dispute whether the 1976 Point Reyes Wilderness Act

23   actually intended to establish wilderness at Drakes Estero.  Motion at 14-15.  The statutory text and

24   legislative history of this Act refutes this absurd contention.  *See supra* at 2-3.  In addition, given that

25   the 1978 legislation does even not mention the 1976 Act or the term "wilderness," there is no merit

26   to DBOC's argument that "Congress expressed its intent that PRNS should not be converted to

27   wilderness."  Motion at 15; *see TVA v. Hill*, 437 U.S. at 189 (intention of legislature to repeal "must

28   be clear and manifest").

Finally, DBOC argues that the Secretary erred by concluding that Section 124 "waived NEPA for a denial of the SUP." Motion at 15. This argument fails for several reasons. First, as discussed above, the Secretary's determination not to exercise his discretion under Section 124 is not an action subject to NEPA. *See Defenders of Wildlife*, 627 F.2d at 1250. Second, DBOC itself has previously argued that no NEPA review was required to issue a permit under Section 124 and should be estopped from making the opposite argument here. *See* Decl. of George M. Torgun ISO Proposed Intervenors' Opp. to Pls.' Mot. for Prelim. Inj. ("Torgun. Decl.") (submitted herewith), Exh. 2 at 2 ("Section 124 includes a 'general repealing clause' that allows you [to] override conflicting provisions in other laws - including NEPA - to issue the SUP"); *Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008) ("Judicial estoppel…precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position."). DBOC attempts to escape its earlier position by claiming that, while Section 124 does authorize the Secretary "to issue" a permit without NEPA compliance, "the Secretary rewrote the statute" by applying the "notwithstanding" language to a denial. Motion at 15. Such a tortured reading of the statute, where NEPA review would be required to decline to issue, but not to issue, a permit for commercial operations in a Congressionally-designated wilderness area, must be rejected. In any case, DBOC's position that Section 124 "authorizes the Secretary 'to issue' the SUP – not 'to deny' the SUP," only confirms that the Secretary has not exercised his discretion under that statute.[6]

## 2. Scientific Misconduct.

DBOC next contends that Defendants violated the APA by committing "scientific misconduct." Motion at 16-20. However, it is entirely unclear from DBOC's motion and its First

---

[6] For all of these reasons, there is also no merit to DBOC's remaining claims regarding alleged procedural and substantive violations of NEPA. Motion at 20-21. Moreover, the Ninth Circuit has repeatedly held that an injunction should not be issued where "enjoining government action allegedly in violation of NEPA might actually jeopardize natural resources." *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1250 n.16 (9th Cir. 1984); *see Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 966 (9th Cir. 1983) (holding public interest does not favor granting injunction where "government action allegedly in violation of NEPA might actually jeopardize natural resources"); *Alpine Lakes Prot. Soc'y v. Schlapfer*, 518 F.2d 1089, 1090 (9th Cir. 1975) (denying injunctive relief in NEPA case where more harm could occur to forest from disease if injunction granted). As discussed below in Part III, the environmental harm resulting from continuing DBOC's commercial oyster operations greatly outweighs any harm from the removal of such operations.

1  Amended Complaint what such claims are based upon.  The APA "is not an independent grant of

2  subject-matter jurisdiction," *Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1167 (9th Cir. 2012), but

3  provides the framework for review when a party is "adversely affected or aggrieved by agency

4  action within the meaning of a relevant statute."  5 U.S.C. § 702; *see id.* § 706(2)(A) (reviewing

5  court shall hold unlawful agency action that is "not in accordance with law").  The APA, by itself,

6  provides no basis for deciding claims of scientific misconduct.

7  Not surprisingly, the cases cited by DBOC in this section allege violations not simply of the

8  APA, but also of substantive statutes.  *See, e.g., NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 810-13

9  (9th Cir. 2005) (finding violation of NEPA requirements); *Western Watersheds Project v.*

10  *Kraayenbrink*, 632 F.3d 472, 492 (9th Cir. 2011) (same).  To the extent that DBOC's claims of

11  scientific misconduct are based on unspecified NEPA requirements, these arguments fail for the

12  reasons discussed above regarding the inapplicability of NEPA to this action.  In addition, any such

13  claims are outside of the scope of DBOC's First Amended Complaint and are not properly before

14  this Court.  *See, e.g., Klein*, 847 F. Supp. at 844.[7]

### 3.   The Wilderness Designation for Drakes Estero.

16  DBOC's final contention is that Defendants violated the APA when they published a Federal

17  Register notice designating Drakes Estero as wilderness.  Motion at 21-22.  Given that this argument

18  is outside the scope of DBOC's First Amended Complaint, it should not be considered by the Court.[8]

19  *See Klein*, 847 F. Supp. at 844.  However, even if the Court does consider such contentions,

20  DBOC's arguments fail.

21  First, DBOC contends that such notice was completed "without the regular rulemaking

22  procedures that Defendants' regulations require."  Motion at 21 (citing 36 C.F.R. § 1.5(b)).

---

[7] DBOC cites a National Park Service regulation at 36 C.F.R. § 1.6(d) regarding the findings required for the denial of a permit, although it does not allege that such regulation has been violated.  *See* Motion at 16.  To the extent that DBOC is making such an argument, no permit denial is at issue in this proceeding, and such a claim would also be outside the scope of DBOC's First Amended Complaint.

[8] The only reference to the wilderness designation in the Causes of Action of DBOC's First Amended Complaint falls under Count 3, "Violation of the APA and Section 124," which alleges that "[t]he Secretary exceeded his statutory jurisdiction and abused his discretion in violation of 5 U.S.C. § 706(2)(C), because he had no authority to order NPS to publish a notice in the Federal Register converting Drakes Estero from 'potential wilderness' to 'wilderness.'").  FAC, ¶ 171.

However, no such rulemaking was required. As the legislation establishing Drakes Estero as "potential wilderness" specifically provided, "All lands which represent potential wilderness additions, upon publication in the Federal Register of a notice by the Secretary of the Interior that all uses thereon prohibited by the Wilderness Act have ceased, shall thereby be designated wilderness." Pub. L. 94-567, § 3, 90 Stat. 2693. Given that the authorization for the only remaining nonconforming use in Drakes Estero expired on November 30, 2012, publication of notice in the Federal Register was all that was required to effectuate the wilderness designation.

DBOC also contends that the Federal Register notice is "premised on two false statements of fact," in particular, that (1) "all uses prohibited under the Wilderness Act within Drakes Estero have ceased," and (2) "Drakes Estero is entirely in federal ownership." Motion at 21 (quoting 77 Fed. Reg. at 71,827). As with DBOC's claims of "scientific misconduct," it is unclear what statute such allegations are based upon. *See Medical Center v. Sebelius*, 693 F.3d at 1167. To the extent that DBOC's first claim is based on an alleged violation of the Wilderness Act, DBOC fails to recognize that the Act allows for such prohibited activities to the extent "necessary to meet minimum requirements for the administration of the area for the purpose of this Act." 16 U.S.C. § 1133(c). DBOC has no basis to object to the reasonable period of time provided by Defendants "to minimize the loss of its personal property and to meet its obligations to vacate and restore all areas covered by the RUO and SUP." Doc. 40-3 at 5. If DBOC believes that it is engaging in activities that violate the Wilderness Act, the proper course of action would be to refrain from such illegal activities immediately.

Finally, there is no merit to DBOC's contention that Drakes Estero is not "entirely in federal ownership" because "California still retains the fishing rights in Drakes Estero." Motion at 21. DBOC provides no authority for the proposition that the 1965 state reservation of the public's "right to fish" prevents the subsequent designation of Drakes Estero as wilderness. In fact, such reservations are specifically recognized by, and consistent with, the Wilderness Act. *See* 16 U.S.C. § 1133(d)(7) ("Nothing in this chapter shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish in the national forests."); *see also* 16 U.S.C. § 459c-6a(b) (enabling legislation for PNRS recognizing the potential for state

jurisdiction over and regulation of fishing activities within the park). Even more significantly, when Congress designated Drakes Estero as potential wilderness in 1976 because of the nonconforming commercial oyster operations, it did so notwithstanding the fishing rights reserved by the State. *See* Motion at 3-4 (citing H.R. Rep. No. 94-1680 at 6).[9]

Consequently, since DBOC is unlikely to succeed on the merits of any of its claims, the Court should deny its Motion. *See Aniel v. GMAC Mortg., LLC*, 2012 WL 5373388, *8 n.4 (N.D. Cal. Oct. 30, 2012) ("Because the Court finds that Plaintiffs have not met their burden to establish a likelihood of success on the merits, it need not consider whether Plaintiffs established the other elements" required for injunctive relief under *Winter*).

## II.  DBOC HAS FAILED TO DEMONSTRATE ANY LIKELIHOOD OF IRREPARABLE HARM.

In order to prevail on its motion for a preliminary injunction, DBOC bears the burden of showing that "irreparable injury is *likely* in the absence of an injunction," not simply speculative or a mere possibility. *Winter*, 555 U.S. at 22 (emphasis in original); *see Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction"). Moreover, where money damages are available, the harm is not ordinarily irreparable such that preliminary injunctive relief is appropriate. *See Los Angeles Memorial Coliseum Comm'n v. N.F.L.*, 634 F.2d 1197, 1202 (9th Cir. 1980) (finding that "monetary injury is not normally considered irreparable"); *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) ("Economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award.").

In its Motion, DBOC claims it will suffer irreparable harm because the expiration of its RUO and SUP will cause the destruction of its oyster crop, force DBOC to abandon, sell, or destroy its

---

[9] To the extent that DBOC contends that its commercial oyster operations fall within this reservation, *see* Motion at 3 ("California retains 'the right to fish in the waters underlying' Drakes Estero, including farming oysters"), the California Coastal Commission, California State Lands Commission, and California Department of Fish and Game have all repeatedly rejected such assertions. *See, e.g.*, Torgun Decl., Exh. 1 (California Coastal Commission letter stating that "[e]quating 'fishing' with 'aquaculture' would contradict the definition of 'aquaculture'" in state law); Decl. of Barbara Goodyear ISO Fed. Defs.' Opp. to Pls.' Mot. for Prelim. Injun. ("Goodyear Decl."), Exs. 5-7 (submitted by Defendants) (letters from State Lands Commission and Department of Fish and Game).

infrastructure at a cost of $700,000, require DBOC to lay off its workers, and break DBOC's ties to its customers.  Motion at 22.  However, DBOC can hardly place blame on Defendants for such alleged harms given that it had no legal right to continue operating its commercial oyster facility in Drakes Estero beyond the expiration of its existing authority on November 30, 2012, a fact that DBOC has known since it acquired the remaining 8 years of the RUO in December 2004.  *See* FAC, ¶¶ 3-4.  To the extent that DBOC continued to ramp up its operations or failed to properly plan for the closure of its facility at the end of the stated permit term negotiated by DBOC and its predecessor, such "self-inflicted" harms are not irreparable for purposes of injunctive relief.[10]  *See CRAssociates v. U.S.*, 103 Fed. Cl. 23, 27 (Fed. Cl. 2012) (finding that "plaintiff has only itself to blame" for alleged irreparable harm resulting from lease provisions that it negotiated); *Second City Music, Inc. v. City of Chicago,* 333 F.3d 846, 850 (7th Cir. 2003) ("self-inflicted wounds are not irreparable injury"); *Salt Lake Tribune Pub. Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) (alleged harm resulting from contract plaintiff negotiated was "inflicted upon itself" and not irreparable); *see also* 11A Charles Alan Wright, Mary Kay Kane, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2948.1 (2d ed. 2011) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.").

Moreover, to the extent that DBOC's alleged harm consists of monetary damages that could be remedied by a damage award, such harm is not irreparable.  *See Goldie's Bookstore v. Superior Court of State of Cal*., 739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury…will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation.").  In fact, in its First Amended Complaint, DBOC alleged that Defendants' actions "deprived DBOC of all economically beneficial use of its personal property" and "caused a regulatory and physical taking of DBOC's property without just compensation" in violation of the Fifth Amendment to the U.S. Constitution.  FAC, ¶¶ 182-85.  Since DBOC's alleged harm would be easily calculable and

---

[10] By contrast, Proposed Intervenor Environmental Action Committee of West Marin has been engaged in planning, outreach, and fundraising efforts over the past few months to assist the workers that would be displaced by the expiration of DBOC's authority to conduct commercial oyster operations in Drakes Estero.  *See* Second Declaration of Amy Elizabeth Trainer, ¶¶ 4-7 (submitted herewith).

compensable in damages if such takings claims are successful, this harm does not constitute irreparable injury.[11]

Finally, DBOC alleges that closure of its operations in the 90-day period provided by Defendants would violate unspecified provisions "likely required by federal, state, and local law." Motion at 22.  As an initial matter, such vague and speculative assertions cannot constitute a showing of irreparable harm.  *Caribbean Marine Servs.*, 844 F.2d at 674.  In fact, DBOC fails to mention that the existing oyster operations at Drakes Estero have been found to be in violation of the California Coastal Act, National Park Service permit conditions, and other legal requirements for many years.  *See* Decl. of Cicely Muldoon ISO Fed. Defs.' Opp. to Pls.' Mot. for Prelim. Injun., ¶¶ 26-29 (submitted by Defendants).  Moreover, the RUO specifically requires that, "upon expiration," DBOC "shall removal all structures and improvements placed upon the premises *during the period of its reservation*," and that any property remaining after 90 days "shall be presumed to have been abandoned and shall become the property of the United States of America" and "shall in no way relieve [DBOC] of liability for the cost of removal of such property from the reserved premises." Doc. 38-1 at 19-20 (RUO, ¶ 12).  Thus, DBOC has no basis for alleging any harm resulting from the removal of its oyster operations.

In sum, DBOC has failed to demonstrate any likelihood of irreparable harm.

**III.   THE BALANCE OF EQUITIES TIPS SHARPLY IN FAVOR OF DENYING THE INJUNCTION.**

In considering a motion for injunctive relief, courts "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).  As the Supreme Court has recognized, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*,

---

[11] With regard to DBOC's assertion that removal operations will cost over $700,000, Proposed Intervenors note that DBOC was required by state leasing requirements to submit an estimated cost for clean-up and removal of its operations and to maintain an escrow account to cover such amount, which was stated in the lease as $10,000.  *See* Doc. 38-1 at 28.

irreparable." *Amoco*, 480 U.S. at 545.  Consequently, when environmental injury is "sufficiently

likely," the "balance of harms will usually favor" protection of the environment.  *Id.*

Moreover, as the Ninth Circuit has often found, potential monetary damage either to an

agency or to a private litigant weighs only lightly, if at all, on the scales of equity in environmental

cases.  *See, e.g., Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001)

(loss of anticipated revenues to tour boat operator "does not outweigh the potential irreparable

damage to the environment"); *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 569 (9th Cir.

2000) (finding that although "a preliminary injunction could present a financial hardship to the

Forest Service, the appellee-intervenors, and the communities in and around [national forest], this

possible financial hardship is outweighed by the fact that '[t]he old growth forests plaintiffs seek to

protect would, if cut, take hundreds of years to reproduce'") (quoting *Portland Audubon Soc'y v.

Lujan*, 884 F.2d 1233, 1241 (9th Cir. 1989)).

Here, DBOC claims that "Defendants will not be harmed by following the law and

maintaining the status quo" because its operations represent "a model for sustainable agriculture

working in harmony with the environment," while removal of such operations "will cause

environmental harm" and the destruction of its business.  Motion at 1, 22-23.  However, as detailed

in the declarations submitted herewith and discussed below, the removal of DBOC's operations

would reduce detrimental noise impacts on a large harbor seal breeding colony, improve conditions

for a wide variety of native bird species that rely upon Drakes Estero throughout the year, curtail the

spread of an invasive species harmful to the Estero's natural biodiversity, and eliminate an ongoing

source of plastic waste that pollutes the waters and beaches of Point Reyes for miles around DBOC's

operations.  Moreover, far from being "a model for sustainable agriculture working in harmony with

the environment," DBOC has been continuously in violation of the California Coastal Act, National

Park Service permit conditions, and various other laws and regulations aimed at protecting the

environment.

**Noise disturbance of harbor seal colony:**  Drakes Estero hosts 20% of the mainland

breeding population of harbor seals in California.  Decl. of Amy Meyer ("Meyer Decl."), ¶ 4

(submitted herewith).  Noise from DBOC's daily use of motorboats in its shellfish cultivation is a

1   longstanding source of negative impacts to this important breeding colony.  Decl. of Dominique M.

2   Richard ("Richard Decl."), ¶ 14 (submitted herewith).

3       But DBOC asserts, through its Declarations of Richard Steffel (Doc. 37) ("Steffel Decl.")

4   and Robert Abbott (Doc. 48), that the removal of the oyster racks would "result in higher sound

5   levels than any associated with normal operation of the oyster farm."  Steffel Decl., ¶ 12.  Even if

6   this were true, it ignores the temporary duration of rack removal activities as opposed to the ten-year

7   extension of continuous daily operations DBOC desires.  Further, Dr. Dominique Richard, a Ph.D. in

8   systems engineering and an M.S. in engineering acoustics, has evaluated Mr. Steffel's and Dr.

9   Abbott's conclusions and found them to be erroneous.  Richard Decl., ¶¶ 5-15.  Regarding Mr.

10  Steffel's analysis of airborne noise, Dr. Richard observes that the modeling he did to reach his

11  conclusion failed to take into account "sound attenuation by absorption in the air as well as the

12  sound attenuation and fluctuations owing to wind and temperature gradient, to atmospheric

13  turbulences, and to the characteristics of the ground."  *Id.*, ¶ 6.  When such sound attenuation is

14  taken into account, neither the use of light equipment nor of heavy equipment in rack removal would

15  significantly disturb the seal colony.  *Id.*, ¶¶ 7-8.  Dr. Richard concludes that, while airborne

16  motorboat noise from DBOC operations would be perceived at the seal colony as 55 dBA "all year

17  long," the loudest airborne noise from the loudest rack removal activities would be perceived at the

18  colony as 37 dBA "for at most 24 hours," the maximum time it would take to remove the racks in

19  closest proximity to the colony.  *Id.,* ¶ 9.

20      Regarding waterborne noise, Dr. Abbott concluded that rack removal with light equipment

21  would have no impact on the seal colony.  *Id.*, ¶¶ 10-11.  With respect to the use of heavy equipment

22  for rack removal, Dr. Abbott reached the absurd conclusion that the waterborne noise produced

23  would disturb seals within a 39-mile radius of the noise source, *i.e.*, at least as far away as Ocean

24  Beach in San Francisco.  *Id.*, ¶ 12.  Dr. Richard opines that this obvious error may be due to

25  overestimation of the level of source noise or use of an inappropriate model, noting that the model

26  employed was designed to analyze the effects of pile driving, not rack removal.  *Id.,* ¶ 13.  Using an

27  appropriate model that accounts for underwater noise attenuation shows that heavy equipment use

28  for rack removal would not disturb the seal colony.  *Id.*, ¶ 14.  Dr. Richard concludes that "removal

1   of the racks would not cause disturbance to harbor seals, but that the continued normal DBOC

2   operations do make enough noise from motorized boats to have negative impacts to harbor seals."

3   *Id.*, ¶ 16.

4           **Disturbance of birds by DBOC operations:**  Dr. John Kelly holds a Ph.D. in integrative

5   ecology, is the Director of Conservation Science at Audubon Canyon Ranch near Point Reyes, and

6   has lived and worked as a biologist in the Point Reyes area for over 25 years.  Decl. of Dr. John P.

7   Kelly ("Kelly Decl."), ¶ 3, Ex. 1.  In his declaration, Dr. Kelly addresses the effects of DBOC's

8   motorboats on the bird species that rely upon Drakes Estero:  "[M]otorized boat activity introduces a

9   level of disturbance that is incompatible with migratory and resident waterbirds that use the Estero's

10  natural resources for sustenance, rest, and protection."  *Id.*, ¶ 4.  As Dr. Kelly states:

11              Drakes Estero…is an important foraging and resting place for migrating and
12              seasonally resident seabirds, shorebirds, and waterbirds [generically, waterbirds
                herein].  Large numbers of waterbirds winter in the Estero, and many waterbirds that
13              migrate along the Pacific Flyway between wintering grounds to the south and summer
                breeding areas in the Arctic depend on Drakes Estero for migratory support.
14
    *Id.*, ¶ 5.
15
            The negative effects on birds from DBOC's motorboats include "at least 7488 potential
16
    disturbance events each year, to each waterbird feeding area along the daily routes used by oyster
17
    boats," energy loss from being flushed, abandonment of feeding areas following disturbance, and
18
    lower reproductive success for declining species such as the black brant (a sea goose).  *Id.*, ¶¶ 7-9,
19
    12-13.  Dr. Kelly concludes that continued DBOC operations would have long-term adverse impacts
20
    on birds and bird habitat through noise disturbance and habitat loss to oyster racks and bags.  *Id.,* ¶
21
    14.  He further opines "that the removal of oyster-growing structures and cessation of motorized boat
22
    operations in Drakes Estero is likely to have immediate and long-term beneficial impacts to resident
23
    and migrating waterbirds because substantial adverse effects on local habitat values would be
24
    removed."  *Id.*, ¶ 6.
25
            **Invasive species:**  Julia Stalker is a Bay Area biologist who is an expert in the identification
26
    and removal of harmful invasive species.  Decl. of Julia "Jude" Stalker ("Stalker Decl."), ¶ 3.  Ms.
27
    Stalker has personally observed the presence and spread of a highly invasive colonial organism,
28

*Didemnum vexillum* ("Dvex"), also known as "marine vomit" because of its appearance, in Drakes Estero. *Id.*, ¶¶ 5-7. This organism has gained its foothold in the Estero via DBOC's oyster racks, other infrastructure, and the oysters themselves. *Id.* "Fragments of Dvex broken off from an existing colony can spread and form new colonies within the Estero." *Id.*, ¶ 8. DBOC is known to have employed the practice of scraping Dvex from oyster shells and disposing of the fragments in Estero waters, increasing the risk of further spread of Dvex. *Id.* Dvex can blanket large areas of native habitat at an alarming rate. *Id.*, ¶ 10. Indeed, Ms. Stalker has observed Dvex colonies that have spread from DBOC infrastructure to eelgrass beds at least 20 meters from the nearest oyster racks. *Id.* Eelgrass, a habitat type that is a key component of the Drakes Estero ecosystem, and the species that rely upon it are at risk of impairment from Dvex. *Id.*, ¶ 11. Indeed, the entire Estero ecosystem could be significantly altered by the unchecked spread of Dvex. *Id.*, ¶ 12.

In Ms. Stalker's professional opinion, to protect the Estero ecosystem, the National Park Service should take immediate action to control Dvex, including requiring "the removal of all of DBOC's…oysters and oyster racks, that provide habitat for Dvex." *Id.*, ¶ 13. This is precisely what will occur with the cessation of DBOC's commercial oyster operations.

**Plastic debris:** Thomas Baty is a retiree who lives in Inverness on Point Reyes and spends substantial time in the park and on its waters. Decl. of Thomas Baty ("Baty Decl."), ¶ 3-4. Mr. Baty has surveyed beaches throughout the Seashore and has "picked up thousands of pieces of black plastic spacer tubes…unique to [DBOC's] mariculture operations," as well as DBOC's mesh bags, styrofoam floats, and plastic milk crates. *Id.*, ¶ 4. To document the problem, in July 2011, Mr. Baty spent ten days walking nearly all of the major PRNS beaches, using a GPS receiver to plot where he found 726 pieces of DBOC-specific debris. *Id.*, ¶ 7. He repeated this exercise in February 2012, when he found 524 pieces of plastic debris from DBOC. *Id.*, ¶ 8. The maps of the locations where this debris was found demonstrate that DBOC plastic litters beaches for miles in either direction from Drakes Estero along the Pacific coastline of PRNS, rounding Point Reyes proper and reaching nearly to Tomales Point, the northern extremity of the Point Reyes peninsula. *Id.,* Exs. 2, 4. While the flood of plastic already produced by DBOC will not instantly disappear, the cessation of

1   DBOC's operations would end the constant release of more plastic debris into PRNS waters and

2   onto its beaches.

3       **Water quality in Drakes Estero:**  Through the Declaration of Scott Luchessa (Doc. 24),

4   DBOC attempts to argue that its oysters, a non-native species not part of the natural ecosystem of

5   Drakes Estero, are essential to preserving the water quality of the Estero by removing nitrogen and

6   other nutrients from Estero waters.  *See* Decl. of Peter R. Baye, Ph.D. ("Baye Decl."), ¶ 6.  Dr. Peter

7   Baye, a coastal ecologist specializing in management and restoration of coastal wetlands, lagoons,

8   and estuaries in central and northern California, examined Mr. Luchessa's declaration and the

9   references cited there and concluded that Mr. Luchessa was entirely wrong to conclude that DBOC's

10  oysters were the only – or even a significant – vehicle for the removal of excess nitrogen and other

11  nutrients from Drakes Estero.  *Id.*, ¶¶ 3, 7-9.  As Dr. Baye points out, Drakes Estero is a marine

12  lagoon, with a large, permanently open tidal inlet that promotes extensive rapid daily tidal flushing

13  of the lagoon with clear marine-salinity water.  *Id.*, ¶ 4.

14      Put plainly, Mr. Luchessa is addressing a problem that does not exist – alleged excess

15  nitrogen and other nutrients in Drakes Estero – since tidal cycles replace and refresh the Estero's

16  waters daily.  As Dr. Baye concludes, "water quality in Drakes Estero will not suffer or decline with

17  the removal of DBOC's non-native oysters and oyster infrastructure because of the overwhelming

18  influence on marine tidal water flux on water quality in the fully tidal lagoon of Drakes and

19  Limantour Esteros."  *Id.*, ¶ 10.

20      **DBOC's ongoing violations of environmental laws and regulations:**  While DBOC asserts

21  that it is "a model for sustainable agriculture working in harmony with the environment," this is

22  demonstrably wrong.  Since its assumption of the remainder of the RUO in 2004, DBOC has been

23  subject to the terms of a cease and desist order from the California Coastal Commission ("CCC"),

24  the state agency charged with protecting the coastal environment, that sought to remedy violations of

25  various environmental laws, regulations, and permit conditions by JOC, the prior operator.

26  Goodyear Decl., Ex. 34 at 1-2 (letter from CCC Executive Director to DBOC (Oct. 24, 2012)).

27  DBOC is subject to a further CCC cease and desist order for such violations issued directly against it

28  in 2007, and the CCC is currently seeking yet another cease and desist order against DBOC.  *Id.*

1      Among the ongoing violations sought to be remedied by these cease and desist orders are

2  operation of DBOC motorboats in wildlife protection zones where such operation is prohibited, in

3  violation of National Park Service permit conditions; unpermitted discharge of marine debris, such

4  as the plastic debris discussed above, for which removal is required; and unpermitted development

5  both onshore and offshore, including the unauthorized placement and removal of clam bags within

6  the harbor seal protection area, in violation of the California Coastal Act.  *Id.* at 2.  The CCC letter

7  states that these and other violations threaten to degrade the ecologically significant resources of

8  Drakes Estero.  *Id.* at 3.  As the CCC states, "this formal enforcement action is necessitated by the

9  DBOC's failure to comply with the terms of the 2007 Order and the Johnson Order and the various

10  delays in permit proceedings that have perpetuated *the overall state of noncompliance of DBOC's*

11  *operations with the Coastal Act*."  *Id.* (emphasis added).  DBOC's bald assertions that it is an

12  environmentally sustainable business simply do not comport with the facts about its operations.

13      Consequently, there is no merit to DBOC's assertions that the short-term environmental harm

14  resulting from the removal of its operations outweighs the significant harms that would result from

15  continuation of its commercial activities for the next decade.  Rather, the environmental harm

16  resulting from continuing commercial mariculture operations in Drakes Estero would far outweigh

17  any temporary harms alleged by DBOC and supports denial of the injunction.

18  **IV.    THE PUBLIC INTEREST SUPPORTS DENIAL OF THE INJUNCTION.**

19      The final requirement for injunctive relief requires DBOC to demonstrate that an injunction

20  is in the public interest.  *Winter*, 555 U.S. at 22.  As with the balancing of harms, the Ninth Circuit

21  has often found that the "public interest in preserving nature and avoiding irreparable environmental

22  injury" outweighs harm to local economy and job loss.  *See, e.g., Alliance for the Wild Rockies v.*

23  *Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011).  Moreover, the public interest in environmental

24  protection is even greater where a wilderness area is at issue.  *See, e.g., High Sierra Hikers Ass'n v.*

25  *Blackwell*, 390 F.3d 630, 643 (9th Cir. 2004) (holding that with regard to alleged impacts to two

26  wilderness areas, "the public interest weighs in favor of equitable relief" because "Congress has

27  recognized through passage of the Wilderness Act…that there is a strong public interest in

28  maintaining pristine wild areas unimpaired by man for future use and enjoyment").

Here, the public interest favors the removal of the nonconforming commercial oyster operations from Drakes Estero so that the estuary can achieve the wilderness protection that Congress intended when it passed the Point Reyes Wilderness Act in 1976 and the public can experience this historic conservation achievement.  *See* Pub. L. 94-544; *see also* 16 U.S.C. § 459c (enabling legislation creating PRNS "to save and preserve, for the purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains undeveloped"); H.R. Rep. No. 87-1628, *reprinted in* 1962 U.S.C.C.A.N. at 2502 (noting PRNS's combination of "scenic, recreation, and biologic interests which can be found nowhere else in the country near a large center of population").  As discussed in the Declaration of Dr. Sylvia A. Earle ("Earle Decl.") (submitted herewith), the continued existence of a commercial oyster operation in Drakes Estero, an area "well known as having exceptional natural resource qualities," is "in direct conflict with the Seashore's mandate of natural systems management as well as wilderness laws and national park management policies."  Earle Decl., ¶¶ 4-9; *see supra* Part III (describing environmental harm from oyster operations).  On the other hand, the removal of mariculture activities and protection of Drakes Estero as wilderness "will facilitate varied and numerous environmental benefits" and "will beneficially impact the greater marine environment and the wildlife species that depend on it."  Earle Decl., ¶¶ 9-10.

As further described in the Declaration of Amy Meyer, the wilderness areas of Point Reyes National Seashore are unique in their ability to provide public access to wilderness near a major metropolitan area.  Meyer Decl., ¶¶ 2-4.  As vice-chair of the federal advisory commission for the Golden Gate National Recreation Area ("GGNRA") and PRNS, Ms. Meyer was involved in the designation of wilderness in these parks and recalls the public support for "having the largest possible wilderness" area, which the commission adopted and recommended to Congress.  *Id.*, ¶ 5.  At the time, there was no suggestion by the commission or Congress that the existing non-conforming use in Drakes Estero, the commercial oyster operation, would continue after its operating rights expired and prevent the area from achieving full wilderness protection.  *Id.*, ¶¶ 6-7.  More recently, over 90% of the more than 52,000 public comments on DBOC's application for a new special use permit supported wilderness status for Drakes Estero.  *Id.*, ¶ 8.  Given that the

1    owners of Drakes Estero "are the people of the United States, not the Drakes Bay Oyster Company,"

2    allowing the continuation of commercial oyster operations would overturn the historic achievement

3    of protecting the "ecological heart" of PRNS as wilderness and set a dangerous policy precedent for

4    the national park and wilderness system in the United States.  *Id*., ¶¶ 4, 9-10.

5         For all of these reasons, the public interest supports the protection of Drakes Estero as

6    wilderness.

7                                        **CONCLUSION**

8         For all of the forgoing reasons, Proposed Intervenors respectfully urge the Court to deny

9    DBOC's motion for a preliminary injunction.

10                                       Respectfully submitted,

11

12   DATED:  January 9, 2013              /s/ George M. Torgun
                                          TRENT W. ORR, SB No. 77656
13                                        GEORGE M. TORGUN, SB No. 222085
                                          Earthjustice
14                                        50 California Street, Ste. 500
                                          San Francisco, CA  94111
15                                        Telephone:  415-217-2000
                                          Facsimile:  415-217-2040
16

17                                        Attorneys for Defendant-Intervenor Applicants

18

19

20

21

22

23

24

25

26

27

28