MELINDA L. HAAG (CSBN 132612)
United States Attorney
ALEX TSE (CSBN 152348)
Acting Chief, Civil Division
CHARLES O'CONNOR (CSBN 56320)
Assistant U.S. Attorney
Northern District of California
450 Golden Gate Avenue, 9th Floor
San Francisco, CA 94102
Telephone: (415) 436-7180
Fax: (415) 436-6748
Email: Charles.O'Connor@usdoj.gov

IGNACIA S. MORENO
Assistant Attorney General
STEPHEN M. MACFARLANE (N.Y. Bar No. 2456440)
Senior Attorney
JOSEPH T. MATHEWS (Colo. Bar No. 42865)
E. BARRETT ATWOOD (D.C. Bar. No.478539)
CHARLES R. SHOCKEY (D.C. Bar No. 914879)
Trial Attorneys, U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
501 "I" Street, Suite 9-700
Sacramento, CA 95814-2322
Telephone: (916) 930-2204
Facsimile: (916) 930-2210
Email: Stephen.Macfarlane@usdoj.gov
Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| DRAKES BAY OYSTER COMPANY, *et al.* ) | Case No. 4:12-cv-06134-YGR |
| ) | |
| Plaintiffs, ) | **FEDERAL DEFENDANTS'** |
| ) | **OPPOSITION TO PLAINTIFFS'** |
| v. ) | **MOTION FOR PRELIMINARY** |
| ) | **INJUNCTION** |
| KENNETH L. SALAZAR, in his official ) | |
| capacity as Secretary, U.S. Department of ) | Date: January 25, 2013 |
| the Interior, *et al.*, ) | Time: 2:00 p.m. |
| ) | Court: Courtroom 5 |
| Defendants. ) | |

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL AND LEGAL BACKGROUND ..........................................................2

      A.   Factual Background....................................................................................2

           1.   Setting and Land Ownership...........................................................2

           2.   Congress's Wilderness Designations in 1976................................3

           3.   The State Water Bottom Leases.......................................................4

           4.   The Company's Purchase of Johnson's Assets and the April 2008 Special Use Permit..........5

           5.   Section 124 of the 2009 Appropriations Act .................................6

           6.   Environmental Impact Statement.....................................................7

           7.   The Secretary's Memorandum Allowing the Permit to Expire, The Park Service's Letter Informing the Company, and the Formal Publication of the Wilderness ..............7

      B.   Statutory Background.................................................................................9

           1.   The Administrative Procedure Act .................................................9

           2.   The Wilderness Act......................................................................10

           3.   The National Environmental Policy Act.......................................10

      C.   Standard of Judicial Review for a Preliminary Injunction......................10

III.  ARGUMENT.........................................................................................................11

      A.   Plaintiffs Are Not Likely to Prevail on the Merits of Their Claims .............11

           1.   Plaintiffs Fail to State Cognizable Claims Under the APA..............11

           2.   Plaintiffs' Alleged Violations of Section 124 are Meritless ................15

           3.   Plaintiffs Are Not Likely to Succeed on the Merits of Their NEPA Claim ...........18

i

Federal Defendants' Opposition To Plaintiffs'               Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

a.   NEPA does not apply to agency inaction...........................................18

b.   Plaintiffs' claims of "scientific misconduct" are meritless and irrelevant.............19

4.   Plaintiffs Are Not Likely to Succeed on Their Claim that the Park Service "illegally published a false notice"...........................................................................21

D.   Plaintiffs Fail to Demonstrate Immediate and Irreparable Injury Caused by the  Secretary's Inaction........................................................................................................................23

E.   The Balance of Equities and Public Interest Favor Denial of the Requested Injunction................24

IV.   CONCLUSION........................................................................................................25

Federal Defendants' Opposition To Plaintiffs'                    Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

1

TABLE OF AUTHORITIES

America Trucking Associates v. City of Los Angeles,
559 F.3d 1046 (9th Cir. 2009) ........................................................................11

Amoco Prod. Co. v. Village of Gambell,
480 U.S. 531 (1987)........................................................................................11

Andrus v. Sierra Club,
442 U.S. 347 (1979).......................................................................................10

Bailey v. United States,
516 U.S. 137 (1995).......................................................................................13

Bennett v. Spear,
520 U.S. 154 (1997).......................................................................................17

Boise Cascade v. U.S. Env't Prot. Agency,
942 F.2d 1427 (9th Cir. 1991) .......................................................................17

Burbank Anti-Noise Group v. Goldschmidt,
623 F.2d 115 (9th Cir. 1980), *cert. denied*, 450 U.S. 965 (1981)................21

Camp v. Pitts,
411 U.S. 138 (1973).........................................................................................9

Churchill Cnty. v. Norton, ..............................................................................
276 F.3d 1060 (9th Cir.), *amended*, 282 F.3d 1055 (9th Cir. 2001).....................10, 18

Citizens to Preservation Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971).........................................................................................9

Clouser v. Espy,
42 F.3d 1522 (9th Cir. 1994) ....................................................................9, 11

Collins Music Co. v. United States,
21 F.3d 1330 (4th Cir. 1994) ........................................................................14

Confederated Salish and Kootenai Tribes v. United States,
343 F.3d 1193 (9th Cir. 2003) .................................................................13, 17

Cronin v. U.S. Dep't of Agric.,
919 F.2d 439 (7th Cir. 1990) ........................................................................10

iii

Ctr. for Policy Analysis v. Office of the U.S. Trade Rep.,
   540 F.3d 940 (9th Cir. 2008) ...................................................................14

Defenders of Wildlife v. Andrus,
   627 F.2d 1238 (D.C. Cir. 1980) ...........................................................18, 19

Earth Island Inst. v. Carlton,
   626 F.3d 462 (9th Cir. 2010), ..................................................................10

Family Farm Alliance v. Salazar,
   749 F. Supp. 2d 1083 (E.D. Cal. 2010)......................................................14

Firebaugh Canal Co. v. United States,
   203 F.3d 568 (9th Cir. 2000) ...................................................................17

Florida Power & Light Co. v. Lorion,
   470 U.S. 729 (1985)..................................................................................10

Ft. Funston Dog Walkers v. Babbitt,
   96 F. Supp. 2d 1021 (N.D.Cal. 2000) .......................................................22

Gallo Cattle Co. v. U.S. Dep't of Agric.,
   159 F.3d 1194 (9th Cir. 1998) .........................................................9, 11,12

Heckler v. Chaney,
   470 U.S. 821 (1985)..................................................................................14

Hells Canyon Pres. Council v. U.S. Forest Serv.,
   593 F.3d 923 (9th Cir. 2010) ...................................................................13

Kandra v. United States,
   145 F. Supp. 2d 1192 (D. Or. 2001) .........................................................11

Lujan v. Nat'l Wildlife Fed'n,
   497 U.S. 871 (1990).............................................................................9, 11

Minnesota Pesticide Info. and Educ. Inc. v. Espy,
   29 F.3d 442 (8th Cir. 1994) .....................................................................18

Monsanto Co. v. Geertson Seed Farms,
   130 S. Ct. 2743 (2010).............................................................................11

Montgomery County, Maryland v. Leavitt,
   445 F. Supp. 2d 505 (D. Md. 2006).........................................................14

iv

Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,
   463 U.S. 29 (1983) ........................................................................................9

Ness Investment Corp. v. U.S. Dep't of Agric.,
   512 F.2d 706 (9th Cir. 1975) .......................................................................15

Norton v. Southern Utah Wilderness Alliance ,
   542 U.S. 55 (2004) ......................................................................11, 12, 13,14

Olmsted Citizens For A Better Comty. v. U.S.,
   793 F.2d 201 (8th Cir. 1986) .......................................................................21

Rattlesnake Coalition v. U.S. Env't. Prot. Agency,
   509 F.3d 1095 (9th Cir. 2007) .....................................................................12

Robertson v. Methow Valley Citizens Council,
   490 U.S. 332 (1989) ................................................................................10, 18

San Francisco Baykeeper v. Whitman,
   297 F.3d 877 (9th Cir. 2002) .......................................................................10

Sierra Club v. Babbitt,
   65 F.3d 1502 (9th Cir. 1995) .......................................................................18

Sierra Club v. Hodel,
   848 F.2d 1068 (10th Cir. 1988) ...................................................................18

Sierra Club v. Jackson,
   648 F.3d 848 (D.C. Cir. 2011) .....................................................................14

State of Alaska v. Andrus,
   591 F.2d 537 (9th Cir. 1979) .......................................................................18

United States v. Mitchell,
   445 U.S. 535 (1980) .....................................................................................12

Weinberger v. Romero-Barcelo,
   456 U.S. 305 (1982) .....................................................................................11

Winter v. Natural Res. Def. Council,
   555 U.S. 7 (2008) .........................................................................................11

v

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# FEDERAL STATUTES

5 U.S.C. § 551(13) ..................................................................................12

5 U.S.C. § 701(a) ...................................................................................14

5 U.S.C. § 702 ....................................................................................9, 12

5 U.S.C. § 704 ..................................................................................11, 12

5 U.S.C. § 706 .........................................................................................9

5 U.S.C. §§ 701 ......................................................................................9

5 U.S.C. §§ 706(2)(A),(C), (D) ..............................................................9

16 U.S.C. § 1133(c) ...........................................................................10, 20

16 U.S.C. § 2805(d) ...............................................................................16

16 U.S.C. § 459c .....................................................................................2

16 U.S.C. § 459c-5 ..............................................................................4, 16

16 U.S.C. § 459c-6(a) ..............................................................................4

16 U.S.C. §§ 1131-1136 .........................................................................10

28 U.S.C. § 1331 .....................................................................................9

42 U.S.C. § 4321 .................................................................................7, 10

42 U.S.C. § 4332(2)(C) .......................................................................10, 18

Pub. L. No. 87-657 .................................................................................16

Pub. L. No. 94-544 ..............................................................................3, 21

Pub. L. No. 94-567 ..............................................................................3, 16

Pub. L. No. 95-625 ..................................................................................4

Pub. L. No. 111-88 ..................................................................................6

1

FEDERAL RULES AND REGULATIONS

2

36 C.F.R. § 1.5 ..................................................................................................22

3

40 C.F.R. §§ 1500.1-1508.28 .............................................................................10

4

5

40 C.F.R. § 1508.18(a) .......................................................................................19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Federal Defendants' Opposition To Plaintiffs'            Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

# I. INTRODUCTION

Drakes Estero is the ecological heart of the Point Reyes National Seashore.  Covering nearly 2,500 acres, the Estero is home to one of the largest population of harbor seals in California.  Recognizing the superlative values and beauty of the Estero, Congress designated it as potential wilderness in 1976 and directed that the Park Service convert it to full wilderness once uses incompatible with full wilderness designation ceased.  The only non-conforming use in the Estero that impeded full wilderness designation in 1976 was a commercial shellfish operation, then owned by the Johnson Oyster Company ("Johnson"), the predecessor to the current owner, Drakes Bay Oyster Company ("Company").  The Company purchased Johnson's assets in 2004 fully cognizant of the fact that the operation would terminate on November 30, 2012, the established expiration date of the reserved estate that Johnson had retained when it sold its upland property to the United States in 1972.

In 2009, Congress gave the Secretary of the Interior ("Secretary") discretionary authority to extend the lifespan of the Company's operation for an additional 10 years.  The Company requested a new permit.  Had the Secretary chosen this path, the conversion of the Estero to full wilderness status would have been postponed for 10 years. Instead, the Secretary declined to exercise his discretion and informed the Company on November 29, 2012 that its existing authorizations would be allowed to expire.  As provided under Congress's 1976 enactment regarding the wilderness status of Drakes Estero, the National Park Service ("Park Service") published a notice in the Federal Register on December 4, 2012, advising the public that the Company's commercial operations had ceased and that Drakes Estero was accorded full wilderness status by operation of law.

The Company and its owner Kevin Lunny ("plaintiffs") now challenge the Secretary's decision not to act to allow the Company to continue its commercial operations in Drakes Estero. Plaintiffs have moved for a preliminary injunction ("PI Motion") to allow the Company to continue such operations pending a final decision on the merits even though the Company no longer has authority to conduct its operations other than to wind them down.  Plaintiffs seek a preliminary injunction based on alleged statutory violations, but they have failed to state claims cognizable under the Administrative Procedure Act, the only waiver of federal sovereign immunity applicable to their statutory claims.  For the reasons set forth below, Plaintiffs' PI Motion should be denied.

Federal Defendants' Opposition To Plaintiffs'                          Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

## II.   FACTUAL AND LEGAL BACKGROUND

**A.   Factual Background**

    1.   <u>Setting and Land Ownership</u>

Point Reyes National Seashore ("Seashore") is a unit of the National Park System, authorized by Congress in 1962. 16 U.S.C. § 459c.  More than 2 million people visit the Seashore annually. Declaration of Cicely Muldoon ("Muldoon Decl.") ¶ 23.   The Company grows oysters and clams on the tide and submerged lands in Drakes Estero and processes the shellfish in facilities located on uplands adjacent to the Estero.  Both the onshore and offshore lands where the Company's activities occur are within the legislative boundaries of the Seashore and are owned by the United States.   Declaration of Barbara Goodyear ("Goodyear Decl.") Ex. 3 at Fig. ES-1, ES-2.

In 1965, the State of California conveyed all of its right, title, and interest in the tide and submerged lands within the boundaries of the Seashore, except the mineral estate, to the United States. Goodyear Decl. Ex. 4.  This conveyance included all of the tide and submerged lands in Drakes Estero where Johnson and later the Company cultivated shellfish.  The State reserved to the people of the State "the right to fish in the waters underlying the lands described in Section 1."  *Id.* § 3.  The California Department of Fish and Game ("DFG") and the State Lands Commission have publicly stated that the reservation of "the right to fish" applies only to the public's right to capture *wild* fish and does not apply to cultured products of commercial aquaculture operators like the Company. *See id.* Ex. 5, 6, and 7.

The United States also owns the beach and onshore lands where the Company has operated.  In 1972, Johnson sold approximately five acres of beach and onshore property adjacent to Drakes Estero to the United States.  Goodyear Decl. Ex. 8.  As a term of the sale to the United States, Johnson reserved a right of use and occupancy ("Reservation" or "RUO") over approximately 1.5 acres of the onshore area. *Id.* at [2]. The Reservation allowed Johnson to use this area for shellfish operations for 40 years. *Id.* ("The Grantor Reserves only the following rights and interests in the hereinabove described property: a reservation of the use and occupancy for a period of forty (40) years in accordance with the terms of the Offer to Sell Real Property…"); *see also* Ex. 3 at 19 (summarizing the federal acquisition of submerged lands in Drakes Estero).

/////

2

2.   <u>Congress's Wilderness Designations in 1976</u>

Congress designated distinct pastoral and wilderness areas within the Seashore. Muldoon Decl. ¶ 8. The Seashore's 1962 enabling legislation recognized a pastoral zone in the pasturelands surrounding Drakes Estero so that existing ranches and dairy farms could continue to operate, and where ranching and dairying continue to this day. Goodyear Decl. Ex. 9.  This pastoral zone did not include Drakes Estero or the beach and onshore area where Johnson conducted its oyster farming. *Id.* Ex. 3 at 16; Muldoon Decl. ¶¶ 30-33.

In 1976 Congress designated certain lands within the Seashore as wilderness under the Wilderness Act of 1964 and certain other lands as potential wilderness.  Goodyear Decl. Ex. 10 ("P.L. 94-544"); *id.* Ex.11 ("P.L. 94-567"); *see also* Declaration of Amy Meyer ¶¶ 4-7.[1]  Both statutes referenced and incorporated a map titled "Wilderness Plan Point Reyes National Seashore," numbered 612-90,000-B, which included Drakes Estero (although not the 1.5 acre uplands) in the area designated potential wilderness. *Id.* Ex. 12. The House Committee Report accompanying P.L. 94-544 states the following regarding the potential wilderness additions:

> As is well established, it is the intention that those lands and waters designated as potential wilderness additions will be essentially managed as wilderness, to the extent possible, with efforts to steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status.

*Id.* Ex. 13 at 3 (H.R. Rep. No. 94-1680).[2]  In P.L. 94-567, which plaintiffs ignore in their brief, Congress provided further direction regarding the status of lands and waters designated as "potential wilderness."  The statute provided that once uses prohibited under the Wilderness Act had ceased, potential wilderness areas would become designated wilderness "upon publication in the Federal Register of a notice by the Secretary of the Interior that all uses thereon prohibited by the Wilderness Act have ceased . . . ." *Id.* Ex. 11§ 3; *see also id.* Ex. 15 at 3 (S. Rep. No. 94-1357)  (reiterating "that such lands will automatically be designated as

---

[1] The Declaration of Amy Meyer is submitted by intervenor-applicants.

[2] On p. 4 of their PI Memo, plaintiffs quote testimony before the Congress from two California legislators that the oyster farm's operations could continue notwithstanding a wilderness designation covering Drakes Estero, but this testimony was provided on a Senate bill, S. 2472, 112th Cong., that was never enacted.  Muldoon Decl. ¶ 39 (*citing* Goodyear Decl. Ex. 41).

3

wilderness… by publication of notice to that effect in the Federal Register when non-conforming structures, activities, uses or private rights are terminated.").

Congress also amended the Seashore enabling legislation in 1976 by directing that the Seashore be administered "without impairment of its natural values, in a manner which provides for such recreational, educational, historic preservation, interpretation, and scientific research opportunities as are consistent with, based upon, and supportive of the maximum protection, restoration, and preservation of the natural environment within the area."   Goodyear Decl. Ex. 10 § 4(a); 16 U.S.C. § 459c-6(a).   Through this amendment, Congress emphasized the natural values of the Seashore rather than its recreational or other aspects.  In 2004, Interior's San Francisco Field Solicitor concluded that the Park Service was mandated by law to convert the potential wilderness in Drakes Estero to full wilderness status "as soon as the non conforming use can be eliminated."  Goodyear Decl. Ex. 14.   Because the Reservation was set to expire on November 30, 2012, this was the earliest date on which full wilderness status could occur.

Finally, in 1978, Congress authorized the Secretary to lease federal land within the Seashore that was agricultural land prior to its acquisition by the United States.  Goodyear Decl. Ex. 16 (Title III of Pub. L. No. 95-625) § 318[b] ("1978 Act"); 16 U.S.C. § 459c-5.  Congress defined "agricultural property" to mean "lands which were in regular use for, or were being converted to agricultural, ranching, or dairying purposes as of May 1, 1978, … together with the residential and other structures related to the above uses of the property."  *Id.* § 318[c]; 16 U.S.C. § 459c-5(b).

    3.    The State Water Bottom Leases

Even though the water bottoms in Drakes Estero were conveyed to the United States in 1965, the State continued to issue state water bottom leases for shellfish cultivation in Drakes Estero. Goodyear Decl. Ex. 3 at 19.   The California Fish and Game Commission ("CFGC") issued 25-year leases to Johnson in 1979, which contained an expiration date of May 31, 2004.[3]  In 2004, over the objection of the Park Service, the CFGC renewed Johnson's leases for a further 25-year term, expiring in 2029.  *Id.* Ex. 19, 20; Muldoon

---

[3] Johnson held two leases, one covering the majority of the Estero, Lease Number M-438-01, and the other, Number M-438-02, covering a one-acre area in the Estero. Goodyear Decl. Ex. 17, 18; *see also id.* Ex. 3 at 19-20.

4

Federal Defendants' Opposition To Plaintiffs'                    Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

1    Decl. ¶¶ 46-49.   However, the CFGC included in the lease renewals a provision that the leases were

2    "contingent on a concurrent federal Reservation of Use and Occupancy for fee land in the Point Reyes

3    National Seashore."  Goodyear Decl. Ex. 19 at 3-4; *id.* Ex. 20 at 3.  As part of the Company's purchase of

4    Johnson's assets, Johnson transferred these leases to the Company in 2005. *Id.* Ex. 21, 22.

5           Following the renewal of the state water bottom leases in 2004, and consultations with Interior,

6    DFG issued letters confirming the primary jurisdiction of the United States over aquaculture in Drakes

7    Estero.  In a May 15, 2007 letter, DFG wrote "that the mariculture operation in question is properly within

8    the primary management authority of the [Park Service], not the Department."  Goodyear Decl. Ex. 7 at 1.

9    In a subsequent letter, DFG reaffirmed its conclusion that "since fishing was distinct from aquaculture, it

10   was not subject to this tidelands grant reservation … [and] that 'primary management authority' for the

11   oyster farm lies with the [Seashore]." *Id.* Ex. 6 at 2.[4]   The State Lands Commission in 2007 concurred in the

12   conclusion that DFG has no jurisdiction over the bed of Drakes Estero. *Id.* Ex. 5.

13          4.    The Company's Purchase of Johnson's Assets and the April 2008 Special Use Permit

14          In December 2004, the Company acquired Johnson's assets through an asset purchase agreement.

15   Goodyear Decl. Ex. 23.  On January 25, 2005, the Park Service provided the Company with the 2004 Field

16   Solicitor's Opinion indicating that, having been designated potential wilderness, the Estero must be

17   converted to full wilderness once nonconforming uses ended. *Id.* Ex. 24.  On March 28, 2005, the Park

18   Service again wrote to the Company "to ensure clarity and avoid any misunderstanding … [r]egarding the

19   2012 expiration date and the potential wilderness designation, based on our legal review, no new permits

20   will be issued after that date." *Id.* Ex. 25.   In April 2008, the Company and the Park Service executed a

21   Special Use Permit that authorized the Company to conduct its operations in Drakes Estero and on

22   approximately 3.5 onshore areas adjacent to the Reservation area subject to specific terms and conditions.

23

24   _____

25   [4] Footnote 2 of this letter also discusses some early correspondence which Plaintiffs interpret as

26   stating a contrary view, explaining: "Much has been made of correspondence in 1965 and 1966 by

27   then-Department Director W.T. Shannon, stating that the oyster farm is covered by 'the right to fish'
     reservation.  The two letters are brief, general, and conclusory."  Goodyear Decl. Ex. 6 at 1-2 n.2.

28

Federal Defendants' Opposition To Plaintiffs'                Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

1   *Id.* Ex. 26 ("SUP" or "Permit").  Consistent with the 2004 Field Solicitor's Opinion, the SUP expressly

2   provides that it expired on November 30, 2012, the same expiration date as the Reservation.  *Id.*[5]

3        5.    Section 124 of the 2009 Appropriations Act

4       In 2009, Congress enacted the Department of the Interior, Environment and Related Agencies

5   Appropriations Act for Fiscal Year 2010.  Goodyear Decl. Ex. 27 (Pub. L. No. 111-88).  Section 124 of this

6   Act ("Section 124") authorized the Secretary, "[p]rior to the expiration on November 30, 2012 of the

7   [Company's] Reservation of Use and Occupancy and associated special use permit," and "notwithstanding

8   any other provision of law," to issue a Special Use Permit for a period of 10 years to the Company.

9   Specifically, the statute provides in full:

10-17

> Prior to the expiration on November 30, 2012 of the Drake's Bay Oyster Company's Reservation of Use and Occupancy and associated special use permit (''existing authorization'') within Drake's Estero at Point Reyes National Seashore, notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit with the same terms and conditions as the existing authorization, except as provided herein, for a period of 10 years from November 30, 2012: *Provided*, That such extended authorization is subject to annual payments to the United States based on the fair market value of the use of the Federal property for the duration of such renewal. The Secretary shall take into consideration recommendations of the National Academy of Sciences Report pertaining to shellfish mariculture in Point Reyes National Seashore before modifying any terms and conditions of the extended authorization.

18   Pub. L. No. 111-88, § 124, 123 Stat. 2904, 2932 (2009); Goodyear Decl. Ex. 27.

19       While Section 124 provided the Secretary the *discretion* to extend the Company's commercial

20   activity for a single 10-year period, nothing in the statute or its legislative history otherwise evinces any

21   congressional retreat from the objectives of the 1976 legislation "to remove all obstacles to the eventual

22   conversion of [Drake's estero from potential-wilderness to full] wilderness status."  Goodyear Decl. Ex. 13

23   at 3.  By letter dated July 6, 2010, the Company requested that the Park Service "provide a proposed special

24   use permit to [the Company] incorporating the same terms and conditions under which [the Company]

26-28   [5] The SUP further provides that "[t]his Permit shall terminate upon the Termination Date [November 30, 2012] and any holding over by Permittee after the Termination Date shall not constitute a renewal of this Permit or give Permittee any rights under this Permit or in or to the Premises." Goodyear Decl. Ex. 26 at 13.

Federal Defendants' Opposition To Plaintiffs'      Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

1   currently operates, including an appropriate annual fee." Waterman Decl. (Doc. #42-1) Ex. 1, Attach.1 at 8.

2         6.     Environmental Impact Statement

3         To assist the Secretary in determining whether to exercise the authority conferred on him by Section

4   124, the Park Service began a process consistent with the National Environmental Policy Act, 42 U.S.C. §

5   4321 *et seq.*  ("NEPA"), to engage the public and to evaluate the potential effects of issuing a new SUP. The

6   Park Service published the Draft Environmental Impact Statement ("DEIS") for public comment from

7   September 23, 2011 to December 9, 2011.Goodyear Decl. Ex. 28.  The Park Service subsequently released

8   the Final Environmental Impact Statement ("FEIS") to the public on November 20, 2012. *Id.* Ex. 3.  The

9   FEIS provides responses to public comments and made revisions to the DEIS.  Both the DEIS and the FEIS

10  explained that the "notwithstanding" clause in Section 124 rendered NEPA analysis unnecessary to the

11  Secretary's eventual decision.  The FEIS stated that "[a]lthough the Secretary's authority under section 124

12  is 'notwithstanding any other provision of law,' the Department has determined that it is helpful to generally

13  follow the procedures of NEPA." *Id.* Ex. 3 at 2.

14        7.     The Secretary's Memorandum Allowing the Permit to Expire, the Park Service's
15                 Letter Informing the Company, and the Formal Publication of the
               Wilderness Designation

16

17        On November 29, 2012, the Secretary "directed the [Park Service] to allow [the Company's] permit

18  to expire at the end of its current term."  Goodyear Decl. Ex. 1 at 1 ("Secretary's Memorandum").  The

19  Secretary's Memorandum explains that the decision to allow the Company's existing authorizations to

20  expire on their own terms was based on considerations of law and policy, including the terms of Johnson's

21  1972 conveyance to the Park Service, Park Service policies on commercial use within National Park units

22  and nonconforming uses within potential or designated wilderness, and the specific wilderness legislation

23  enacted for the Seashore.  *Id.*  The Secretary further directed the Park Service to:  (1) "[n]otify [the

24  Company] that both the Reservation ... and [Permit] held by [the Company] expire according to their terms

25  on November 30, 2012"; (2) "[a]llow [the Company] a period of 90 days ... to remove its personal property

26  ... and to meet its obligations to vacate and restore all areas covered by the RUO and SUP"; and (3)

27  "[e]ffectuate the conversion of Drakes Estero from potential to designated wilderness." *Id.* at 1-2.

28

Federal Defendants' Opposition To Plaintiffs'          Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

The Secretary's Memorandum discusses the factual and legal background including the preparation of the DEIS and FEIS.  Regarding Section 124 and NEPA, the Secretary stated:

> Sec. 124 does not require me (or the NPS) to prepare a DEIS or an FEIS or otherwise to comply with [NEPA] or any other law.  The 'notwithstanding any other provision of law' language in Sec. 124 expressly exempts my decision from any substantive or procedural legal requirements.

*Id.* at 4.  The Secretary explained that the DEIS and FEIS were not "material to the legal and policy factors that provide[d] the central basis for [his] decision."  *Id.* at 5.  The Secretary stated that his decision was instead "based on the incompatibility of commercial activities in wilderness and not on the data [in the FEIS] that was asserted to be flawed."  *Id.* at 5 n. 5.[6]  The Secretary noted that the Company's "commercial operations are the only use preventing the conversion of Drakes Estero to designated wilderness."  *Id.* at 6.  The Secretary also noted the discretionary nature of Section 124 and that it did "not prescribe the factors on which" he was to base his decision.  *Id.* at 5.

The Park Service notified the Company's owners in writing on November 29, 2012 that the Secretary "declined to exercise the discretionary permitting authority granted to him under Section 124."  Goodyear Decl. Ex. 2 at 1.  The Park Service further informed the Company that the Permit and Reservation would "expire by their own terms at midnight on November 30, 2012."  *Id.*  Because of the need to allow for a reasonable and orderly transition following the expiration of the SUP and Reservation, the Park Service provided a limited authorization to conduct certain wind-down actions over a period of 90 days, until February 28, 2013, including removing the Company's personal property and meeting its obligations to vacate and restore the affected areas.  The letter further provided that the Company would "be allowed to process and sell shellfish within the onshore RUO area and the upland portion of the SUP area for 90 days" as part of these wind-down activities.  *Id.* at 2.

On December 4, 2012, the Park Service published a Notice in the Federal Register stating that, "[p]ursuant to Section 3 of Public Law 94-567, publication of this notice hereby effects the change in status

---

[6] The Park Service received and responded to a number of comments on the DEIS challenging the analysis of potential environmental impacts, particularly with regard to impacts of the Company's operations on harbor seals and noise impacts. Goodyear Decl. Ex. 3 App. F at F-77-80, F-88-89.

8

Federal Defendants' Opposition To Plaintiffs'                     Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

1   of 1,363 acres of Drakes Estero, more or less, from potential wilderness to designated wilderness."

2   Goodyear Decl. Ex. 29 (7 Fed. Reg. 71826 (Dec. 4, 2012)) ("Notice").[7]

3   **B.    Statutory Background**

4       1.    <u>The Administrative Procedure Act</u>

5          The Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), provides that a "person suffering

6   legal wrong because of agency action, or adversely affected or aggrieved by agency action within the

7   meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Section 702 of the

8   APA waives federal sovereign immunity in suits for relief other than for money damages and seeking

9   judicial review of federal agency action under 28 U.S.C. § 1331.  *Gallo Cattle Co. v. U.S. Dep't of*

10  *Agric.*,159 F.3d 1194, 1198 (9th Cir. 1998).  The APA has been described as a "framework statute" that

11  provides "the sole means for testing the legality of federal agency action" when an agency is alleged to have

12  violated a federal law that confers no private right of action or whose citizen suit provision is not applicable

13  to the particular dispute.  *Clouser v. Espy*, 42 F.3d 1522, 1528 n.5 (9th Cir. 1994) (citing *Lujan v. Nat'l*

14  *Wildlife Fed'n*, 497 U.S. 871 (1990)).  The court may set aside agency action if it is "(A) arbitrary,

15  capricious, an abuse of discretion, or otherwise not in accordance with law; … (C) in excess of statutory

16  jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure

17  required by law."  5 U.S.C. §§ 706(2)(A), (C), (D).  The standard of review is narrow, as the court may not

18  substitute its judgment for that of the agency.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

19  463 U.S. 29, 43 (1983); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

20         The APA limits the scope of judicial review of agency action to the administrative record.  5 U.S.C.

21  § 706.  In so doing, the court does not take evidence or act as a trier of fact.  Rather, the focal point for

22  judicial review is "the administrative record *already in existence*, not some new record made initially in the

23  reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (emphasis added).  Thus, "[t]he task of the

24

---

25  [7]On December 3, 2012, the Company commenced this action to challenge the expiration of the Permit and
26  Reservation.  The Amended Complaint, filed December 21, 2012, alleges six separate causes of action,
    although the PI Motion only seeks injunctive relief on the basis of the claims purportedly brought under the
27  Administrative Procedure Act.

28

Federal Defendants' Opposition To Plaintiffs'                          Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

1  reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision

2  *based on the record the agency presents to the reviewing court.*" *Florida Power & Light Co. v. Lorion*, 470

3  U.S. 729, 743-44 (1985) (emphasis added); *San Francisco Baykeeper v. Whitman*, 297 F.3d 877, 886 (9th

4  Cir. 2002); *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 443-44 (7th Cir. 1990).

5            2.    The Wilderness Act

6            Congress enacted the Wilderness Act, 16 U.S.C. §§ 1131–1136, to preserve "wilderness areas" for

7  future generations "in such manner as will leave them unimpaired for future use and enjoyment as

8  wilderness." *Id.* § 1131(a).  The Act proscribes commercial enterprises in wilderness.  16 U.S.C. § 1133(c).

9            3.    The National Environmental Policy Act

10           The purpose of NEPA, 42 U.S.C. §§ 4321 *et seq.*, is to foster better decisionmaking and informed

11  public participation.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  To that end,

12  the statute does not mandate particular results, but simply establishes procedural requirements for assessing

13  the potential environmental impacts of an agency's decisions.  *Id.* at 350.  NEPA requires federal agencies

14  to prepare an environmental impact statement for "major Federal actions significantly affecting the quality

15  of the human environment."  42 U.S.C. § 4332(2)(C).  The Council on Environmental Quality ("CEQ") has

16  promulgated regulations that guide federal agencies' compliance with the statute, 40 C.F.R. §§ 1500.1-

17  1508.28, and these regulations are entitled to substantial deference.  *Andrus v. Sierra Club,* 442 U.S. 347,

18  358 (1979).  A federal agency's compliance with NEPA is reviewable only under the APA because NEPA

19  itself provides no private right of action.  *Churchill County v. Norton*, 276 F.3d 1060, 1070 (9th Cir.),

20  *amended*, 282 F.3d 1055 (9th Cir. 2001).

21  **C.    Standard of Judicial Review for a Preliminary Injunction**

22           A preliminary injunction "is a matter of equitable discretion" and is "an extraordinary remedy that

23  may only be awarded upon a clear showing that the [plaintiff] is entitled to such relief."  *Earth Island Inst. v.*

24  *Carlton*, 626 F.3d 462, 469 (9th Cir. 2010), *quoting Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24, 32

25  (2008).  The grant or denial of a preliminary injunction must follow the rule "succinctly stated" in *Winter*:

26  "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he

27  is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

28

Federal Defendants' Opposition To Plaintiffs'                    Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

favor, and that an injunction is in the public interest." *Am. Trucking Assocs v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). If likelihood of success on the merits cannot be demonstrated, a preliminary injunction should be denied even though there may be evidence of irreparable harm. *Kandra v. United States,* 145 F. Supp. 2d 1192, 1200-01 (D. Or. 2001). Moreover, even where success on the merits is likely or "serious questions" are raised, an injunction "is not a remedy which issues as of course," even in an environmental case. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545–46 (1987). Even in the extraordinary case where a court issues an injunction, the scope of relief should be limited, and relief should be granted only to the extent necessary. *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2758–60 (2010).

### III. ARGUMENT

**A.   Plaintiffs Are Not Likely to Prevail on the Merits of Their Claims**

Plaintiffs ground their PI Motion on four alleged violations of the APA: (1) an alleged misinterpretation of Section 124 and the 1978 Act; (2) alleged "scientific misconduct"; (3) alleged violations of NEPA; and (4) the publication of an allegedly "false notice" in the Federal Register. PI Memo at 12. Each of these alleged violations in turn rests on plaintiffs' mischaracterization of the Secretary's Memorandum as a "denial" of a permit application. The Secretary's Memorandum makes abundantly clear that the Secretary's "decision" was to allow the Reservation and SUP to expire according to their terms. Thus, the Secretary decided to take *no* "action" here. Moreover, the action the Secretary decided *not* to take was one committed to his discretion as a matter of law had he taken it. Thus, whether conceived as non-action or a decision not to act, the Secretary's decision is unreviewable under the APA.

1.   Plaintiffs Fail to State Cognizable Claims Under the APA

When Plaintiffs invoke the APA, they must satisfy all of its requirements unless they can point to a separate provision which grants them a private right of action. *Clouser*, 42 F.3d at 1527-28 n.5; *see also Gallo Cattle Co.* 159 F.3d at 1198. Section 704 of the APA limits judicial review to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *Lujan*, 497 U.S. at 882. In *Norton v. Southern Utah Wilderness Alliance*, a unanimous Supreme Court held that Section 702, as well as Sections 704 and 706(1), "all insist upon an 'agency action,' either as the action complained of (in §§ 702 and 704) or as the action to be compelled (in §

11

706(1)).” 542 U.S. 55, 63-64 (2004) (*SUWA*). The APA defines an “agency action” as “the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof.” 5 U.S.C. § 551(13). The Supreme Court explained:

> A ‘failure to act’ is not the same thing as a ‘denial. The latter is the agency’s act of saying no to a request; the former is simply the omission of an action without formally rejecting a request – for example, the failure to promulgate a rule or take some decision by a statutory deadline.

*SUWA*, 542 U.S. at 63. Plaintiffs’ failure to challenge a final agency action precludes review under the APA and is fatal to plaintiffs’ PI Motion.[8]

The Secretary’s “decision” challenged in this action was to allow the Company’s existing authorizations to expire according to their terms without taking action to extend those authorizations by the deadline prescribed in Section 124. Mr. Lunny knew when the Company purchased Johnson’s assets that onshore oystering operations were authorized under a Reservation that expired on November 30, 2012. Lunny Decl. ¶ 2. And the Company also was aware that the 2008 SUP contained the same expiration date. *See* Goodyear Decl. Ex. 26 (SUP signed by Mr. Lunny). Thus, that expiration date was an express term of both the Reservation and SUP that the Company accepted in 2004 and 2008, respectively; indeed, the expiration date of the Reservation was part of the bargain to which the Park Service and Johnson agreed in 1972 when the Park Service purchased Johnson’s onshore property. As the Secretary’s Memorandum explains, the Secretary declined to take action to stop those authorizations from expiring on November 30, 2012. Plaintiffs’ lawsuit accordingly challenges *inaction* by the Secretary, rather than an exercise of discretionary authority conferred on the Secretary by Congress in Section 124. *See id.* Ex. 1 at 5 (“Sec. 124 grants me the authority and discretion to issue DBOC a new special use permit, but it does not direct me to

---

[8] In the Ninth Circuit, the requirement that a putative APA claim challenge agency action takes on jurisdictional significance because the waiver of sovereign immunity under 5 U.S.C. § 702 has been held to be subject to the limitation imposed by the “final agency action” requirement of 5 U.S.C. § 704. *Rattlesnake Coalition v. U.S. Envtl. Prot. Agency,* 509 F.3d 1095, 1103 (9th Cir. 2007); *Gallo Cattle Co.,* 159 F.3d at 1198. “The United States must waive its sovereign immunity before a federal court can adjudicate a claim brought against it.” *Rattlesnake Coalition,* 509 F.3d at 1103 (citing *United States v. Mitchell,* 445 U.S. 535, 538 (1980)). Section 702 of the APA provides the only applicable waiver of sovereign immunity of the United States for plaintiffs’ claims alleging violations of statutes. Because plaintiffs’ APA-based claims do not challenge any final agency action, they do not fall within the waiver of sovereign immunity under 5 U.S.C. § 702 and are subject to dismissal for a lack of jurisdiction.

Federal Defendants’ Opposition To Plaintiffs’          Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

do so."). The Secretary declined to take the action authorized by Section 124.  By standing aside and allowing the authorizations to expire, the Secretary did not take a final action that is reviewable under the APA.

To be sure, under certain circumstances, the failure to take an action may be reviewable under the APA, but those circumstances are not present here.  Section 706(1) of the APA authorizes judicial review of agency action unlawfully withheld or unreasonably delayed.  As the Supreme Court clarified, however, in order to be cognizable under Section 706(1) a claim must target a discrete action that the agency was *required* to take and failed to take. *SUWA*, 542 U.S. at 64.  As the Ninth Circuit elaborated in a decision following *Norton v. SUWA*, an action is "legally required" such that it may be compelled under Section 706(1) if "the agency's legal obligation is so clearly set forth that it could traditionally have been enforced through a writ of mandamus."  *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).  Most notably, plaintiffs' Amended Complaint contains no claim under APA § 706(1).

Here, Section 124 imposes no duties on the Secretary that are mandatory or ministerial in nature.  To the contrary, Congress's use of the term 'authorized' rather than "shall" evinces its intent that the Secretary exercise his judgment and discretion in determining whether to renew the existing authorization. *See Confederated Salish and Kootenai Tribes v. United States*, 343 F.3d 1193 (9th Cir. 2003). Congress only used "shall" in the proviso language in Section 124, to provide direction *if* the Secretary chose to renew the SUP.  "We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning." *Bailey v. United States*, 516 U.S. 137, 145 (1995).  The legislative history of Section 124 reinforces this point.  When the bill first reported out of the Senate Appropriations Committee, it provided that "the Secretary of the Interior *shall* extend the existing authorization [to the Company]…." H.R. 2996, at 179 (as reported by S. Comm. On Appropriations, July 7, 2009) (emphasis added).  The accompanying Senate Report noted that the Senate Appropriations Committee "has included language in … the bill which *directs* the Secretary of the Interior to extend the existing authorization…"  S. Rpt. No. 111-38, at 27-8 (2009) (emphasis added).  However, the bill actually passed by the Senate and sent to Conference with the House changed the language to the formulation that was enacted, (*i.e.*, "*is authorized* to issue a special use permit…").  H.R. Rep. No. 111-316, at 29 (2009) (Conf. Rep.) (emphasis added).  The House Conference Report on the final bill explained that the Conference Report "*modifies language*

13

included by the Senate providing the Secretary *discretion* to issue a special use permit." *Id.* at 107 (emphasis added).   Congress plainly knew what it was doing when it adopted the discretionary "is authorized to" formulation in the version of the bill that became law as Section 124.

By its plain terms, therefore, Section 124's grant of authority to the Secretary to issue a 10-year SUP to the Company was entirely permissive.   The only limitations in Section 124 applied only if the Secretary exercised his discretion to extend the SUP.[9]   But Section 124 does not *require* the Secretary to grant the permit or even to undertake a decision making process.   For example, the text of Section 124 does not say that the Secretary "shall decide whether to renew" the Company's SUP.   Under the APA, a court may not mandate that an agency take an action left entirely to the agency's discretion. *See SUWA*, 542 U.S. at 65.

It follows that even if the Secretary's inaction is construed as a "denial" of the Company's request for a new SUP, review under the APA is still precluded.   The APA expressly excludes from judicial review agency actions that are "committed to agency discretion by law."   5 U.S.C. § 701(a); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011).   While this exclusion is narrow, courts nevertheless have applied it consistently in two contexts. *Ctr. for Policy Analysis v. Office of the U.S. Trade Representative*, 540 F.3d 940, 944 (9th Cir. 2008).   The first is where "a court would have no meaningful standard against which to judge the agency's exercise of discretion and there thus is no law to apply." *Id.*; *Family Farm Alliance v. Salazar*, 749 F. Supp. 2d 1083, 1091-2 (E.D. Cal. 2010).   The second is where "the agency's action requires a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise, including the prioritization of agency resources, likelihood of success in fulfilling the agency's statutory mandate, and compatibility with the agency's overall policies." *Ctr. for Policy Analysis*, 540 F.3d at 944 (internal quotation marks and citations omitted).   Courts have also applied this exception to an agency's decision *not* to take an action for which the agency was granted discretion. *Sierra Club v. Jackson*, 648 F.3d at 305; *Collins Music Co. v. United States*, 21 F.3d 1330, 1336 (4th Cir. 1994); *Montgomery County, Maryland v. Leavitt,* 445 F. Supp. 2d 505, 513 (D. Md. 2006).

---

[9] Section 124 placed the following limits on the exercise of authority if the SUP was extended:  that it be exercised "prior to" November 30, 2012, that any extended permit be limited to a ten-year term, that the terms and conditions of any such permit be the same as the existing authorization (except with respect to payment of fair value), and that the Secretary consult the National Academy of Sciences ("NAS") report should he wish to modify the terms of any new permit. *See* Goodyear Decl. Ex. 27.

14

Federal Defendants' Opposition To Plaintiffs'                    Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

Here, Section 124 contains no meaningful standards for the Court to apply in reviewing a decision to not issue a new SUP to the Company. The Secretary's Memorandum observed that "Sec. 124 … does not prescribe the factors on which I must base my decision." Goodyear Decl. Ex. 1 at 5. Congress's use of the phrase "notwithstanding any other provision of law" underscores the absence of reviewable standards that could guide the Secretary's exercise of his discretion. When a statute is "drawn in such broad terms that there is no law to apply," courts have declined to review agency action thereunder. *Ness Investment Corp. v. U.S. Dep't of Agric.*, 512 F.2d 706, 715 (9th Cir. 1975). Here, the Secretary based his decision to allow the existing authorizations to lapse on "matters of law and policy" as discussed above. Goodyear Decl. Ex. 1 at 1. Nothing in Section 124 precluded the Secretary from so exercising his judgment or prescribed a different standard for him to follow.

       2.    <u>Plaintiffs' Alleged Violations of Section 124 are Meritless</u>

Against this backdrop, plaintiffs' allegations that the Secretary misinterpreted Section 124 in four ways must fail because they rest on "claims" that are not cognizable under the APA. But even considered on their own terms, these allegations are wholly without merit.

First, plaintiffs misconstrue the Secretary's Memorandum by asserting that it concludes that the issuance of a new SUP would violate the 1976 Act. PI Memo at 13. To the contrary, the Secretary acknowledges in the Memorandum that Section 124 "grants me the authority to issue a new SUP…." Goodyear Decl. Ex. 1 at 6. But the plain language of Section 124 did not require the Secretary to issue the SUP, and rather than prescribing any factors on which to base such a decision, made clear that the decision would be notwithstanding any other provision of law. In allowing the Company's authorizations to lapse, the Secretary's Memorandum shows that the Secretary considered the intent of Congress, reflected in the two 1976 enactments and their legislative history, that Drakes Estero achieve full wilderness status, as well as Park Service policies concerning commercial use within a national park and nonconforming uses within potential or designated wilderness areas. *Id.* at 1, 5; Muldoon Decl. ¶ 3; Goodyear Decl. ¶ 35. Plaintiffs fail to identify any language in Section 124 that precluded the Secretary from allowing the Company's authorizations to lapse based on these considerations.

Second, the Secretary did not misinterpret the 1978 Act by concluding that it authorized ranching and dairying but not mariculture. The Secretary's Memorandum actually refers to the 1962 enabling legislation establishing the Seashore which included a pastoral zone where ranching and dairying could

15

1   continue.  Goodyear Decl. Ex. 1 at 2 (citing and discussing the Act of September 13, 1962, Pub. L. No. 87-

2   657).   Congress's 1978 amendments to the 1962 enabling legislation authorized the Secretary to lease

3   federally owned land within the Seashore that was acquired by the United States and was "agricultural land

4   prior to its acquisition."  *Id.* Ex. 16 § 318(b); 16 U.S.C. § 459c-5(a).  The 1978 amendments further defined

5   "agricultural property" as "lands which were in regular use for, or were being converted to agricultural,

6   ranching, or dairying purposes as of May 1, 1978…" *Id.* § 318(c); 16 U.S.C. § 459c-5(b).  Plaintiffs now

7   argue that the Company's oyster farm falls within the meaning of "agriculture" as used in the 1978 Act, and

8   assert that the Secretary should have read the 1978 Act together with the National Aquaculture Act of 1980

9   to conclude that oyster farming was an agricultural purpose under the 1978 Act.  PI Memo at 14 (citing 16

10  U.S.C. § 2805(d)).  This argument fails because nothing in Section 124 required the Secretary to consider

11  the National Aquaculture Act in reviewing the Company's request for a new SUP; to the contrary, Section

12  124 authorized the Secretary to make his decision "notwithstanding any other provision of law."  Moreover,

13  plaintiffs ignore that, prior to the passage of the 1978 Act, Congress had designated Drakes Estero as

14  potential wilderness and nothing in the 1978 Act overturned that designation.  Indeed, the 1978 Act's grant

15  of leasing authority to the Secretary applied only to "land," not to submerged lands, and in any event was

16  wholly discretionary.  Goodyear Decl. Ex. 16 § 318(b); 16 U.S.C. § 459c-5(a) ("Where appropriate in the

17  discretion of the Secretary, he or she may lease federally owned land…").

18         Plaintiffs' third -- that Congress never intended Drakes Estero to become wilderness – is simply

19  wrong.  PI Memo at 14-15, 19.  This argument ignores P.L. 94-567 which not only designated Drakes

20  Estero as "potential wilderness,"  but which further provided that all lands designated as potential wilderness

21  (including Drakes Estero) "shall … be designated wilderness" upon the publication in the Federal Register

22  of a notice that all uses thereon prohibited by the Wilderness Act had ceased.  Goodyear Decl. Ex. 11.

23  Plaintiffs argue that Interior did not recommend to Congress that Drakes Estero be converted into

24  wilderness at the time the 1976 legislation was under consideration. *See* PI Memo at 14.  But that point is

25  irrelevant here.  Congress *rejected* Interior's recommendation and designated Drakes Estero as potential

26  wilderness with further direction in § 3 of P.L. 94-567 and in the accompanying House and Senate Reports

27  on how potential wilderness should be managed and attain full wilderness status.  Muldoon Decl. ¶¶ 37-38,

28  40.  Plaintiffs also argue that the 1978 Act evinced Congress's conclusion that agricultural land in the

Federal Defendants' Opposition To Plaintiffs'                                    Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

Seashore (including, as plaintiffs would have it, the oyster farm) could be leased for agricultural purposes forever.  PI Memo at 15.  Plaintiffs in effect argue that the 1978 Act repealed the designation of Drakes Estero as potential wilderness in the 1976 Acts, but provide no evidence that Congress intended this result; the 1978 Act does not mention Drakes Estero, oyster farming, or the designations of wilderness or potential wilderness.   Repeals of a statute by implication are disfavored, and plaintiffs fail to overcome the presumption against such repeals here.  *See Firebaugh Canal Co. v. United States*, 203 F.3d 568, 575-77 (9th Cir. 2000).

Finally, plaintiffs argue that the Secretary erred when he concluded that, under Section 124's "notwithstanding" clause, he was not required to comply with NEPA.  PI Memo at 15.  The crux of this argument appears to be that the "notwithstanding" clause of Section 124 applied only to the *issuance* of a new SUP, not to the denial of an SUP request; plainly, the use of "notwithstanding" applies to both.  Moreover, this interpretation of Section 124 also fails because it effectively reads Congress's use of the word "authorized" out of the statute.  Section 124 provides that "[p]rior to the expiration on November 30, 2012 of the Drake's Bay Oyster Company's Reservation of Use and Occupancy and associated special use permit…within Drake's Estero at Point Reyes National Seashore, notwithstanding any other provision of law, the Secretary of the Interior is *authorized* to issue a special use permit with the same terms and conditions as the existing authorization, except as provided herein, for a period of 10 years from November 30, 2012." Goodyear Decl. Ex. 27 (emphasis added).  Congress's use of "authorized" here connotes the conferral of discretion to exercise a power, and *includes* the power to act or not act.  *Confederated Salish and Kootenai Tribes*, 343 F.3d at 1196.  It is a "cardinal principle" of statutory interpretation to give effect to every word or clause in a statute, avoiding readings that would render words surplusage. *Bennett v. Spear*, 520 U.S. 154, 173 (1997); *Boise Cascade v. U.S. Envtl. Prot. Agency,* 942 F.2d 1427, 1432 (9th Cir. 1991).  While Congress's use of the "notwithstanding" clause is evidence of its intent to remove legal obstacles to the issuance of a new SUP, its use of the word "authorized" (instead of "shall") evinces the intent to leave the decision whether to issue the permit to the Secretary's discretion.

/////

/////

Federal Defendants' Opposition To Plaintiffs'                    Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

3.    Plaintiffs Are Not Likely to Succeed on the Merits of Their NEPA Claim

Plaintiffs' PI Motion contains an extensive attack on the substance of the FEIS prepared by the Park Service. Plaintiffs allege that Park Service employees committed "scientific misconduct" in the preparation of the FEIS and further argue that the Park Service committed other procedural and "substantive" violations of NEPA. PI Memo at 16-21.[10]   Since plaintiffs' NEPA claims are only reviewable under the APA, *Churchill County*, 276 F.3d at 1070, these claims are not likely to succeed on the merits because plaintiffs have failed to state any cognizable APA claim.  Moreover, allowing the authorizations to expire was not subject to NEPA in any event, and the allegations of scientific misconduct are baseless.

a.    NEPA does not apply to agency inaction

As a threshold matter, the Secretary took no action here that was subject to NEPA.  NEPA's environmental review requirements apply to federal agencies' "proposals for legislation and other major federal *actions* significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (emphasis added).  Thus, NEPA applies when an agency undertakes (or authorizes another party to undertake) some project or activity that may have significant environmental effects.  *See Sierra Club v. Hodel,* 848 F.2d 1068, 1090-91 (10th Cir. 1988) (agency's decision to allow road construction on federal lands subject to NEPA).  A proposed "action" by the agency is an indispensable prerequisite to NEPA's environmental analysis obligations.  *See, e.g., Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) ("case law is more forceful in excusing nondiscretionary agency action or agency 'inaction' from the operation of NEPA") .

As a matter of law, *inaction*, or a decision *not* to act, is not "major federal action" subject to NEPA's requirements. *State of Alaska v. Andrus*, 591 F.2d 537, 541-42 (9th Cir. 1979); *Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1243-44 (D.C. Cir. 1980); *Minnesota Pesticide Info. and Educ. Inc. v. Espy*, 29 F.3d 442, 443 (8th Cir. 1994).  In *State of Alaska v. Andrus*, for example, the Ninth Circuit held NEPA inapplicable to a state-authorized wolf kill on public lands, even though the Secretary acknowledged (and the court of appeals assumed) that he had the legal authority to block the program.  The court held that the Secretary's "nonexercise" of that authority "was at most, a nonuse of a power of supervision." 591 F.2d at

[10] Plaintiffs' use of the term "substantive" in regard to NEPA's requirements is a solecism: NEPA imposes only procedural requirements. *Robertson*, 490 U.S. at 350.

18

Federal Defendants' Opposition To Plaintiffs'                    Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

1  541.  The court held that the Secretary's "decision not to exercise" that power did not trigger NEPA.  *Id.* at

2  541-42; *accord Defenders of Wildlife,* 627 F.2d at 1243-44.

3      The CEQ regulations reinforce the common sense conclusion that the Secretary's decision to allow

4  the Reservation and SUP to expire is not a "Federal action" for purposes of NEPA.  The CEQ regulations

5  provide that "[a]ctions" encompass "new and continuing activities, including projects and programs entirely

6  or partly *financed, assisted, conducted, regulated,* or *approved* by federal agencies." 40 C.F.R. § 1508.18(a)

7  (emphasis added).  "Federal actions" typically consist of the promulgation of "official policy" through

8  regulations, "[a]doption of formal plans" and "programs," as well as the "[a]pproval of specific projects,

9  such as construction or management activities located in a defined geographic area." *Id.* § 1508.18(b). But a

10  federal agency's *rejection* of a non-federal party's request for a permit, or other request for an exemption

11  from general regulatory prohibitions, or inaction that allows an existing authorization to expire, is not an

12  "action" for purposes of NEPA.

13          b.      Plaintiffs' claims of "scientific misconduct" are meritless and irrelevant

14      Plaintiffs also offer a theory that the Secretary's Memorandum depended on flawed scientific data

15  and analysis of the Company's environmental impacts in the DEIS and FEIS. PI Memo at 16 (arguing the

16  Secretary "*suggested* that his decision *may* have been based *at least in part*" on the DEIS and FEIS)

17  (emphases added).   This argument attempts to recast the Secretary's legal- and policy-based decision as one

18  based on contested scientific conclusions.  Accordingly, the argument is irrelevant.

19      The Secretary's Memorandum explained at the outset, "[t]his decision is based on matters of law

20  and policy," including the fact that (1) the Company had been on notice since 2004 that no new permit

21  would issue, and (2) extending the Company's operations would violate Park Service policies concerning

22  commercial use within designated or potential wilderness. Goodyear Decl. Ex. 1 at 1. The Secretary plainly

23  did not allow the Company's existing authorizations to expire based on the contested environmental

24  analyses in the DEIS and FEIS. Rather, he specifically recognized "scientific uncertainty and lack of

25  consensus in the record" regarding the environmental consequences of the Company's operations, noted

26  that the DEIS and FEIS "are not material to the legal and policy factors that provide the central basis for my

27  decision," and explained, "[m]y decision today is based on the incompatibility of commercial activities in

28  wilderness and not on the [FEIS] data that was asserted to be flawed." *Id.* at 5.  Whether or not the FEIS

19

actually contains scientific flaws, the Company's operations remain a commercial enterprise and the legal and policy rationale the Secretary articulated for his decision remains valid. *See id.* Ex. 31 at 82 (". . . extension of the RUO hinges on the legal interpretation of the legislative mandate rather than a scientific analysis of the impacts of [the Company] on the Drakes Estero ecosystem."). Section 4(c) of the Wilderness Act prohibits commercial enterprises in wilderness. 16 U.S.C. § 1133(c). Allowing the existing authorizations to expire on their own terms removed the obstacle to the Drakes Estero achieving full wilderness status. The Secretary was clear that his decision was not based on any scientific conclusions drawn from the contested analyses, but rather on a legal and policy rationale.

Nevertheless, plaintiffs isolate two sentences in the Memorandum which, they posit, prove that the Secretary adopted allegedly flawed data, analyses, and conclusions: (1) "the EIS provides decision-makers with sufficient information . . . to make an informed decision," and (2) "the DEIS and FEIS support the proposition that the removal of DBOC's commercial operations in the estero would result in long-term beneficial impacts to the estero's natural environment." PI Mem. at 18. Plaintiffs attribute too much significance to these two sentences. The first sentence is simply part of an explanatory block quote from the introduction to the FEIS itself, and is therefore immaterial to the Secretary's decision not to take an action. Goodyear Decl. Ex. 1 at 4-5. The second sentence is a factual characterization of the DEIS and FEIS, and certainly does not reflect the Secretary's adoption of every conclusion in those documents. In explaining the manner in which he considered the DEIS and FEIS, the Secretary emphasized that "the DEIS and FEIS do not resolve all the uncertainty surrounding the impacts of the mariculture operations," but nonetheless "have informed me with respect to the complexities, subtleties, and uncertainties of this matter ..." *Id.* Thus, the Secretary suggested the value of the DEIS and FEIS in this context arose from the environmental complexities they illuminated, not from any of the specific conclusions they reached. Accordingly, the record belies plaintiffs' argument that the Secretary's decision relied on flawed scientific data and analyses.

Furthermore, plaintiffs' accusations of "scientific misconduct" themselves lack merit. Plaintiffs rest their accusations on four reports concerning the Park Service's research and regulation of the Company's operations over the years: (1) a 2008 report from the Interior Office of Inspector General ("OIG"); (2) a 2009 report from the National Academy of Sciences ("NAS"); (3) a 2011 report from the DOI Solicitor's Office; and (4) a second NAS report from 2012. Of these reports, only the 2012 NAS Report addressed the

20

DEIS or FEIS.  And none of the reports found evidence of "scientific misconduct"—which by definition involves an element of intent to defraud, deceive, mislead, or recklessly disregard the truth.  *See* Goodyear Decl. Ex. 32 at 29.  Although the 2008 OIG Report found that NPS personnel "could have exercised better judgment and expressed NPS' position with greater clarity and transparency," neither it nor the 2011 DOI Solicitor's Report found evidence of scientific misconduct.  *Id.* Ex. 30 at 6; *id.* Ex.32.  The 2012 NAS Report merely evaluated the analyses in the DEIS to determine the level of uncertainty for each impact but included absolutely no allegation or finding of misconduct.  *Id.* Ex. 33 at 42 (noting "all scientific information contains some level of uncertainty"),72.   Plaintiffs' selective quotation and inaccurate characterization of these reports as "scientific misconduct" overstates mistakes made by Park Service personnel and is irrelevant to Secretary Salazar's decision "based on considerations of law and policy."

Finally, because there was no federal "action" triggering NEPA, the Park Service's analysis of the potential environmental impacts of a possible SUP extension was unnecessary. Accordingly, the alleged inadequacy of such analysis cannot be a basis for finding a NEPA violation. *See Olmsted Citizens For A Better Comty. v. U.S.*, 793 F.2d 201, 208 n.9 (8th Cir. 1986)("[The] government's preparation here of a putative environmental impact statement means that environmental factors were given even greater consideration . . . than required by the NEPA."); *Burbank Anti-Noise Group v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir. 1980), *cert. denied*, 450 U.S. 965 (1981) ("Because we hold that no EIS was necessary, we need not consider whether the EIS actually prepared by the FAA was adequate . . . .").

   4.   Plaintiffs Are Not Likely to Succeed on Their Claim that the Park Service "illegally published a false notice"

Plaintiffs erroneously assert that the Secretary and Park Service violated the APA by publishing a "false notice" in the Federal Register classifying Drakes Estero as "designated wilderness" under the Wilderness Act and Section 3 of P.L. 94-544.  They also contend that the Park Service should have conducted a rulemaking proceeding before publishing the Notice.  PI Memo at 21.  These claims are devoid of merit for three reasons.

First, Congress expressly directed the Secretary to issue a Federal Register Notice -- not a rulemaking -- once the non-conforming commercial use ended.  The Notice accurately describes the factual and legal status resulting from expiration of the Company's Reservation and SUP.  Goodyear Decl. Ex. 29.

Federal Defendants' Opposition To Plaintiffs'                    Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

1    After designating portions of the Seashore as wilderness in 1976, Congress prescribed that "[a]ll lands

2    which represent potential wilderness additions, *upon publication in the Federal Register of a notice by the*

3    *Secretary* of the Interior that all uses thereon prohibited by the Wilderness Act have ceased, shall thereby be

4    designated as wilderness." *Id.* Ex. 11 § 3 (emphasis added).  The Park Service notified the Company on

5    November 29 that "your existing authorizations will expire, and you are not authorized to conduct

6    commercial activities in the waters of Drakes Estero after November 30, 2012." *Id.* Ex. 2 at 1.  The Notice

7    correctly stated that "all uses prohibited under the Wilderness Act within Drakes Estero have ceased" as of

8    that date, when the Reservation and SUP expired by their own terms. *Id.* Ex. 29.  The Company's objection

9    is based on language in the Park Service's November 29 Letter allowing it to "process and sell shellfish

10   within the onshore RUO area and upland portion of the SUP for 90 days (until February 28, 2013)." *Id.* Ex.

11   2 at 1.   But that limited authorization for onshore activities to minimize loss of the Company's personal

12   property in no way constitutes continuing commercial operations in the waters of Drakes Estero, which is

13   the portion of the Seashore converted from potential to designated wilderness as a result of the expiration of

14   authorizations and publication of the Notice.  The Notice accurately reflects these factual findings and the

15   required change in legal status.

16            Second, plaintiffs claim that the Notice erroneously stated that "Drakes Estero is entirely in federal

17   ownership."  As explained above (supra at II.A.3, III.A.2), the State's reservation of public fishing rights in

18   Drakes Estero does not include the Company's private commercial mariculture operations.  *See* Goodyear

19   Decl. Ex. 6; Muldoon Decl. ¶¶ 51-54.  Moreover, the State's reservation of a public fishing right does not

20   impugn the United States' undisputed ownership of the tied and submerged lands in the Estero.  Finally,

21   even if the statement in the Notice is subject to some legal interpretation and therefore is a matter of law for

22   a Court to decide, it is not a "false statement" of fact that warrants setting aside the Notice.

23            Third, Congress's express direction to the Secretary to publish a "Notice" in the Federal Register

24   trumps any other administrative procedure.  The Park Service's rulemaking procedure under 36 C.F.R. §

25   1.5, which pertains to certain "closures and public use limits," simply has no application here. *Ft. Funston*

26   *Dog Walkers v. Babbitt*, 96 F.Supp.2d 1021 (N.D.Cal. 2000), cited by plaintiffs, is entirely distinguishable,

27   as the court found that the Park Service made a purely discretionary change in policy impacting recreational

28   access and use, which triggered the rulemaking procedures under that regulation.  Here, in contrast,

Federal Defendants' Opposition To Plaintiffs'                              Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

publishing notice of the designation of the Drakes Estero as wilderness was based on the expiration of the Reservation and SUP and thus reflected a ministerial implementation of a congressionally directed change in status from "potential" to "designated" wilderness. The Notice simply and accurately reflects the basis for the Secretary's decision.

**D.      Plaintiffs Fail to Demonstrate Immediate and Irreparable Injury Caused by the Secretary's Inaction**

Plaintiffs have been aware for a number of years that the Reservation and SUP would not necessarily be extended beyond their November 30, 2012 expiration. *See, e.g.,* Goodyear Decl. Ex. 14, 24, 25. Yet plaintiffs now assert that the expiration of the Company's Reservation and SUP, and the directive to wind down their operations within 90 days, will irreparably harm the Company, and its oyster farming operations, infrastructure, employees, and business relationships. But the terms of the Reservation acquired by the Company *in 2004* included the provisions of which it now complains: the Reservation in the Grant Deed was expressly "in accordance with the terms of the Offer to Sell Real Property, assigned Contract No. CX800032073" which Johnson signed on October 13, 1972 and the Park Service accepted three days later. And Exhibit C to the Offer to Sell expressly provided that, upon the Reservation's expiration, the "Vendor" had both the obligation to remove all structures and improvements placed upon the premises during the period of the Reservation and, if not removed within 90 days, the property would also be deemed abandoned to the United States. Goodyear Decl. Ex. 8 at 19; *id.* Ex. 3, App. A at A-45-46. The irreparable harm it complains of today was a foreseeable consequence of its acquisition of Johnson's assets in 2004 and not the result of some new action by the Secretary or the Park Service.

Plaintiffs also complain about the regulatory burdens associated with permitting the removal of their oyster beds and other property.[11] It is ironic that plaintiffs should now seek refuge in such "burdens," having engaged in commercial oyster farming since 2008 without permits required by the California Coastal

---

[11] By stipulation approved by the Court on December 17, 2012, Federal Defendants waived the responsibility of the Company to remove mobile residential units located on site and currently inhabited by the Company's employees, and further allowed the Company until March 15, 2013 to remove all other personal property within the onshore area, in the event the Court denies the PI Motion. Stipulation Re: Briefing Schedule and Order (Doc. #31).

Federal Defendants' Opposition To Plaintiffs'                    Case No. 4:12-cv-06134-YGR
Motion for Preliminary Injunction

Commission or the U.S. Army Corps of Engineers.  Muldoon Decl. ¶¶ 27-29.  Plaintiffs' allegations regarding regulatory burdens and the time needed to remove their property are all greatly exaggerated. *See* Declaration of Brannon Ketcham ¶¶ 19-25, 29-32 (discussing the property that would be removed).

Plaintiffs fail to identify irreparable harm to the environment from the removal of oysters and oyster racks.  PI Memo at 10-11, 23.  While there will be noise impacts associated with removal of oyster racks, those impacts will be short term and will not result in irreparable harm. Declaration of Dr. Kurt M. Fristrup ¶¶ 3-7; Ketcham Decl. ¶ 38.  With regard to water quality, Drakes Estero is not listed as impaired or limited by sediment, nutrients or pathogens by any state or federal agency, which indicates that upland pollutant discharges are not perceived as a problem in the watershed. Ketcham Decl. ¶¶ 4-5.  Plaintiffs' declarant, Mr. Luchessa, fails to take into account that conditions that would promote eutrophication are not generally present in the Estero, which experiences high tidal exchange, windy, cold, and foggy summer conditions. *Id.* ¶ 6-8; Goodyear Decl. Ex. 3 at 211-13.  Plaintiffs overstate the filtration capacity of oysters and potential resulting benefits to water quality in the Estero because only 47% of the Company's oyster racks are in use and because the Company places mature oysters, which have greatest filtration capacity, on tidally exposed sandbars where any filtration benefits are limited.  Ketcham Decl. ¶¶ 9-14.  In short, any environmental impacts from the cessation of oyster farming in Drakes Estero are minor and likely to be short-lived, and are offset by the benefits of full wilderness protection.

**E.      The Balance of Equities and Public Interest Favor Denial of the Requested Injunction**

In considering the balance of equities, the Company's claims of being a sustainable farming operation in harmony with the environment are undermined by enforcement proceedings commenced by the Coastal Commission.  These enforcement proceedings are based not only on the Company's failure to secure a permit under the California Coastal Act and its failure to comply with prior cease and desist orders issued by the Coastal Commission, but also for violations alleged by the Coastal Commission of the Coastal Act including the cultivation of Manila clams in harbor seal protected areas, boat transit in restricted areas, unpermitted discharge of marine debris, and other alleged violations set forth in an October 24, 2012 notice from the Coastal Commission to the Company.  Muldoon Decl. ¶ 28; Goodyear Decl. Ex. 34 at 3-5.  Similar adverse impacts on the environment of Drakes Estero have been noted by members of the public who visit

24

the area for its wilderness values. Declaration of Thomas Baty ¶¶ 4-9; Declaration of Dr. John P. Kelly ¶¶ 6-13.[12]   The Company's oyster racks, bags, and shells are habitat for the invasive colonial tunicate (*Didemnum vexillum*), whose proliferation risks smothering eelgrass and habitat for native benthic fauna. Ketcham Decl.¶ 15, 18. The Company's cultivation of Manila clams also risks the proliferation of this non-native species in the Estero's ecosystem. *Id.* ¶¶ 15-18. Conversion of Drakes Estero to full wilderness in no way impairs educational opportunities for children or other groups, who will continue to benefit from the many  interpretive programs sponsored by the Park Service. Muldoon Decl. ¶¶ 10-14. Nor will it adversely affect the local economy in any significant way. *Id.* ¶¶ 23-25. Finally, the Park Service has already taken steps to make significant financial benefits available to Company employees who live onsite. *Id.* ¶¶ 16-20.

On the other side of the equities scale, denial of an injunction is consistent with promoting Congress's plan that Drakes Estero attain full wilderness status. Congress's legislation on wilderness in Point Reyes is compelling evidence that denial of the injunction is in the public interest. Drakes Estero is a key part of a unique National Park: it is now the only marine wilderness on the West Coast outside of Alaska. Muldoon Decl. ¶¶ 4-5; Declaration of Dr. Sylvia A. Earle ¶ 5; Declaration of Amy Meyer ¶¶ 4, 8-10.[13] It has attained the highest level of protection afforded federal lands. Muldoon Decl. ¶¶3, 6. And this unique marine wilderness area is easily accessible to millions of Bay Area residents and visitors to the Bay Area. *Id.* ¶¶ 5, 23. Moreover, the wilderness designation for Drakes Estero is fully consistent with management objectives for the Seashore, where wilderness and working agricultural areas exist side by side. *Id.*¶ 8. Drakes Estero will now be managed according to Park Service policies implementing the Wilderness Act that will protect the untrammeled, natural, and undeveloped character of the Estero and promote solitude and primitive recreation. *Id.* ¶6; Goodyear Decl. Ex. 3 at 462-63; Ex. 35. In short, the achievement of full wilderness status for Drakes Estero fulfills a principal goal for the Seashore that Congress defined over 36 years ago, and is therefore manifestly in the public interest.

## IV.    CONCLUSION

For the reasons set forth above, the PI Motion should be denied.

---

[12] The Baty and Kelly declarations are submitted by intervenor-applicants.

[13] The Earle declaration is submitted by intervenor-applicants.

25

1     Respectfully submitted  this 9th day of January, 2013.

2     MELINDA L. HAAG (CSBN 132612)
      United States Attorney
3     ALEX TSE (CSBN 152348)
      Acting Chief, Civil Division
4     CHARLES O'CONNOR (CSBN 56320)
      Assistant U.S. Attorney
5     Northern District of California
      450 Golden Gate Avenue, 9th Floor
6     San Francisco, CA 94102
      Telephone: (415) 436-7180
7     Fax: (415) 436-6748
      Email:  Charles.OConnor@usdoj.gov
8

9

10    IGNACIA S. MORENO
      Assistant Attorney General
11

12    /s/ Stephen M. Macfarlane
      STEPHEN M. MACFARLANE (N.Y. Bar No. 2456440)
13    Senior Attorney
      JOSEPH T. MATHEWS (Colo. Bar No. 42865)
14    E. BARRETT ATWOOD (D.C. Bar. No. 478539)
      CHARLES R. SHOCKEY (D.C. Bar No. 914879)
15    Trial Attorneys, U.S. Department of Justice
      Environment & Natural Resources Division
16    Natural Resources Section
      501 "I" Street, Suite 9-700
17    Sacramento, CA 95814-2322
      Tel:     916-930-2203
18    Fax:    916-930-2210
      Email: Stephen.Macfarlane@usdoj.gov
19    Attorney for Federal Defendants

20

21

22

23

24

25

26

27

28

26