1  MELINDA L. HAAG (CSBN 132612)
   United States Attorney
2  ALEX TSE (CSBN 152348)
   Acting Chief, Civil Division
3  CHARLES O'CONNOR (CSBN 56320)
   Assistant U.S. Attorney
4  Northern District of California
   450 Golden Gate Avenue, 9th Floor
5  San Francisco, CA 94102
   Telephone: (415) 436-7180
6  Fax: (415) 436-6748
   Email: Charles.O'Connor@usdoj.gov
7
8
   IGNACIA S. MORENO
9  Assistant Attorney General
   STEPHEN M. MACFARLANE (N.Y. Bar No. 2456440)
10 Senior Attorney
   JOSEPH T. MATHEWS (Colo. Bar No. 42865)
11 E. BARRETT ATWOOD (D.C. Bar. No.478539)
   CHARLES R. SHOCKEY (D.C. Bar No. 914879)
12 Trial Attorneys, U.S. Department of Justice
13 Environment and Natural Resources Division
   Natural Resources Section
14 501 "I" Street, Suite 9-700
   Sacramento, CA 95814-2322
15 Telephone: (916) 930-2204
   Facsimile: (916) 930-2210
16 Email: Stephen.Macfarlane@usdoj.gov
17 Attorneys for Defendants
18
              UNITED STATES DISTRICT COURT
19          NORTHERN DISTRICT OF CALIFORNIA
                    OAKLAND DIVISION
20
21 DRAKES BAY OYSTER COMPANY, *et al.* )   Case No. 4:12-cv-06134-YGR
                                      )
22        Plaintiffs,                 )   **DECLARATION OF**
                                      )   **CICELY MULDOON IN SUPPORT**
23           v.                       )   **OF FEDERAL DEFENDANTS'**
                                      )   **OPPOSITION TO PLAINTIFFS'**
24 KENNETH L. SALAZAR, in his official )   **MOTION FOR PRELIMINARY**
   capacity as Secretary, U.S. Department of )   **INJUNCTION**
25 the Interior, *et al.*,            )
                                      )   Date: January 25, 2013
26                                    )   Time: 2:00 p.m.
27        Defendants.                 )   Location: Courtroom 5
                                      )
28

   Declaration of Cicely Muldoon        Case No. 4:12-cv-06134-YGR

1    I, Cicely Muldoon, declare as follows:

2         1.      I am the Superintendent of Point Reyes National Seashore ("Seashore") and have

3    held this position since May 2010.  I have been employed with the National Park Service

4    ("NPS") since 1985 and have worked in the following locations: Sitka National Historical Park

5    (Alaska), Buffalo National River (Arkansas), Golden Gate National Recreation Area

6    (California), Office of the Director, NPS (Washington D.C.), Presidio of San Francisco

7    (California), San Juan Island National Historical Park (Washington), Pinnacles National

8    Monument (California), Pacific West Regional Office, NPS (California), and Point Reyes

9    National Seashore.  I have served as Superintendent at San Juan Island National Historical Park,

10   Pinnacles National Monument, and now at the Seashore.  I am responsible for all aspects of park

11   management and operations, including the management and oversight of Drakes Bay Oyster

12   Company's ("DBOC") commercial operation.

13        2.      I have read the Memorandum of Points and Authorities in Support of Plaintiffs'

14   Motion for a Preliminary Injunction, as well as the supporting declarations that Plaintiffs filed

15   with their motion and the Declaration of Barbara Goodyear filed concurrently herewith.  I

16   provide this declaration to respond to the Declarations of Kevin Lunny and William T. Bagley in

17   Support of Motion for Preliminary Injunction.  I have personal knowledge of the matters set forth

18   in my declaration, and would and could competently testify concerning them if called as a

19   witness.

20   **I.    STAYING THE FEDERAL REGISTER NOTICE DECLARING DRAKES**
21   **ESTERO TO BE WILDERNESS WILL HARM THE PUBLIC INTEREST**

22        3.      The Secretary's November 29, 2012 Memorandum cited his desire to honor

23   Congress's direction for the Estero, which provided that the NPS should "steadily continue to

24   remove all obstacles to the eventual conversion of these [potential wilderness] lands and waters

25   to wilderness status."  Declaration of Barbara Goodyear ("Goodyear Decl.") Ex. 1 at 7.  His

26   Memorandum further explained that issuance of a new SUP to DBOC would have violated NPS

27   policies relating to commercial uses in national parks and non-conforming uses in potential

28                                                    1

Declaration of Cicely Muldoon                          Case No. 4:12-cv-06134-YGR

1  wilderness or designated wilderness. *Id.* at 1. As explained in the Final Environmental Impact

2  Statement ("FEIS"), under the *NPS Management Policies 2006*, the NPS is required to manage

3  potential wilderness as wilderness to the extent that existing non-conforming uses allow. In

4  addition, the *NPS Management Policies* state that the NPS will engage the public as it determines

5  the most appropriate means of removing nonconforming uses that delay wilderness designation.

6  Goodyear Decl. Ex. 3 at 56 and 462.

7      4.    Congress enacted the Wilderness Act in 1964 to ensure for present and future

8  generations of Americans an "enduring resource of wilderness." Now that Drakes Estero has

9  attained full wilderness status, the American public now can enjoy the only marine wilderness on

10  the West Coast outside of Alaska.

11      5.    The wilderness of Drakes Estero is unique because it is easily accessible to the

12  millions of people who call the Bay Area home and to the millions of visitors who come to the

13  Bay Area every year. Having a readily accessible and tangible example of the "enduring

14  resource of wilderness" that Congress envisioned is a priceless treasure that the NPS is honored

15  to protect.

16      6.    Designated wilderness is the highest level of conservation protection for federal

17  lands. As a wilderness unit within a national park, Drakes Estero will now be managed to the

18  highest conservation standards. It will be managed to preserve its wilderness character and

19  wilderness resources in an unimpaired condition. In accordance with the Wilderness Act, it will

20  be devoted to the public purposes of recreational, scenic, scientific, educational, conservation,

21  and historical use. Goodyear Decl. Ex. 35 at 78.

22      7.    In their brief, plaintiffs imply that most of the lands within the Seashore should be

23  dedicated to "perpetual use … for agriculture." Plaintiffs' Memorandum at 19, line 12. This

24  statement reveals a fundamental misunderstanding of the reasons that led Congress to create and

25  then expand the Seashore.

26      8.    Areas that make up the national park system such as Point Reyes National

27  Seashore are cumulative expressions of a single national heritage. Each park unit tells multiple

28          2

1   stories about our nation's heritage. As described below in paragraphs 11-14, the NPS interprets

2   the Seashore's rich cultural history and its superlative natural features.  The lands and resources

3   preserved by Congress on the Point Reyes peninsula are not dedicated to one single purpose.

4   Rather, Congress directed that these lands be "administered … without impairment of [their]

5   natural features, in a manner which provides for such recreational, educational, historic

6   preservation, interpretation, and scientific research opportunities as are consistent with, based

7   upon, and supportive of the maximum protection, restoration and preservation of the natural

8   environment." Goodyear Decl. Ex. 10.  (Act of October 18, 1976, Pub. L. No. 94-544, 90 Stat.

9   2515 (1976)).  Wilderness in Drakes Estero tells part of the Point Reyes story, just as the ranches

10  within the pastoral zone tell a different part of that story.  In the same day, visitors to the

11  Seashore can experience the proud history of northern California's dairy industry and the

12  untrammeled and natural qualities that made Drakes Estero worthy of wilderness designation.

13  The interests of the whole of the American public can only be realized at Point Reyes if the NPS

14  is allowed to implement all of the objectives set forth by Congress.

15
16  **II.     ONGOING NPS INTERPRETIVE PROGRAMS AT THE SEASHORE SERVE
          THOUSANDS OF VISITORS AND STUDENTS EACH YEAR**

17          9.      In his declaration, Mr. Lunny claims that DBOC conducts tours free of charge for

18  school groups (over 40 in 2012), local non-profit organizations, private organizations, and

19  government agencies, and that the termination of DBOC's operation will harm the public interest

20  in interpretive programs and education at the Seashore.  Lunny Decl. ¶ 81.

21          10.     The NPS has a professionally staffed and multi-faceted interpretive program that

22  serves all sectors of the visiting public at many different locations within the Seashore.  In 2012,

23  the three park visitor centers provided information, exhibits, audio visual programs and park

24  orientation to more than 273,000 visitors at the Bear Valley Visitor Center, more than 116,000

25  visitors at the Lighthouse Visitor Center, and more than 37,000 visitors at the Kenneth C Patrick

26  Visitor Center.

27

28                                                      3

Declaration of Cicely Muldoon                           Case No. 4:12-cv-06134-YGR

11.   In 2012, professional NPS interpretive staff conducted more than 4,000 formal walks and talks encompassing a broad range of natural and cultural history topics including the history of the Coast Miwok People, European exploration, the Point Reyes Lighthouse, the history of ranching at Point Reyes, shipwrecks and life saving, climate change, marine mammals, Tule elk, birds, wildflowers, earthquakes, and geology. The Seashore's formal education programs meet California State Curriculum Standards.

12.   In 2012, more than 6,300 3rd through 5th grade school children participated in park education programs. Seashore staff led 176 free education programs (on topics including Coast Miwok culture and traditions, lighthouses, gray whales, elephant seals, earthquakes, and hands-on monitoring of stream health), provided materials and assistance for teachers leading self-guiding walks, and developed materials for the Junior Ranger program.

13.   In addition, the NPS supports and oversees a volunteer program that provides interpretive services to the public. In 2012, NPS volunteers contributed more than 11,700 hours to support interpretive efforts in the park. Online visitation to the Seashore website exceeded 2.4 million page views in 2012. The Seashore's visitor centers and all of the interpretive programs offered by the NPS and NPS volunteers are free of charge. There is no entrance fee to enter the Seashore. These public outreach and education programs will continue unabated.

14.   The NPS's primary non-profit partner, the Point Reyes National Seashore Association, offers an array of environmental education programs that make Point Reyes' wilderness areas accessible for young people from around the Bay Area. Annually, the Association sponsors 40 weeks of residential natural history, marine science, and environmental education programs which serve 2,300 youth from the greater San Francisco Bay Area. Fifty-percent of participants receive financial assistance, offering fee waivers, scholarships, transportation assistance, equipment/gear loans, and ongoing support to ensure underserved and underrepresented youth are afforded an opportunity to experience wilderness in the Point Reyes National Seashore.

4

### III.   RELOCATION ASSISTANCE AND HOUSING SUPPORT SERVICES WILL BE AVAILABLE TO DBOC EMPLOYEES WHO LIVE ONSITE

15.   In paragraphs 72-74 of his declaration, Mr. Lunny states that the fifteen people (DBOC employees and their families) who live on site will be forced to move, pay more for housing, and will be forced to live in a more dangerous community.

16.   The DBOC employees and families who live onsite have been invited to apply for federal relocation assistance under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("Relocation Act"). For qualified tenants, the Act authorizes the NPS to pay moving expenses and provide replacement housing assistance either in the form of up to 42 months of rental differential assistance or mortgage payment assistance. This is a significant federal benefit that greatly reduces the long-term costs associated with new housing.

17.   The Relocation Act further requires the NPS to locate "decent, safe and sanitary housing" in an area of each tenant's choosing. This requirement ensures that tenants will not be relocated into substandard housing. The NPS is in the process of working with tenants to complete the application process.

18.   There are five residences onsite, two owned by the United States and three mobile homes owned by DBOC. Pursuant to the Stipulation Re: Briefing Schedule, filed December 14, 2012 (Doc. #29), NPS has agreed take on responsibility for removal of the three mobile homes that are DBOC's personal property. Because DBOC will not be required to remove these mobile homes at the close of the 90 day period, existing tenants who qualify for relocation benefits will be able to continue to occupy these residences until decent, safe and sanitary housing is found.

19.   Likewise, workers who occupy the two residences owned by the United States and who qualify for relocation benefits will be permitted to remain on site until suitable relocation housing is found.

20.   In Mr. Lunny's Declaration at Paragraphs 24 and 70 he states that DBOC will be forced to lay off thirty-one full time employees. However, based on information provided to me by Counsel to DBOC on December 4, 2012, DBOC has only identified twenty-two employees.

5

Declaration of Cicely Muldoon                    Case No. 4:12-cv-06134-YGR

## IV. THE CESSATION OF DBOC'S OPERATION WILL NOT HARM HISTORIC RESOURCES

21.     In Mr. Lunny's Declaration at Paragraph 80 he asserts that DBOC is a local landmark and that the loss of DBOC will deprive the public of the opportunity to learn about the long history of aquaculture in Drakes Estero. The NPS determined that DBOC's facilities do not qualify as historic resources under the National Historic Preservation Act. Goodyear Decl. Ex. 3, App. 3 at D-39. The California State Historic Preservation Officer (SHPO) concurred with this determination. *Id.* at D-40.

## V. THE CESSATION OF DBOC'S OPERATION WILL NOT HARM THE LOCAL ECONOMY

22.     In Mr. Lunny's Declaration, he asserts that DBOC is one of the most visited places in the Seashore, with more than 50,000 visits. Lunny Decl. ¶¶ 80-83.

23.     Point Reyes National Seashore receives more than 2 million visitors annually. For 2012, more than 2.2 million people visited the Seashore. Multiple locations within the park have documented visitation that exceeds 50,000 people annually including Bear Valley, Limantour, McClures Beach, Pierce Point Ranch, Mount Vision, South Beach, North Beach, Tomales Bay, Drakes Beach, Abbotts Lagoon, Headlands, Kehoe Beach, Lighthouse, and Palomarin. These extensive public visitation opportunities will continue unabated.

24.     In paragraph 87 of his declaration, Mr. Lunny claims that terminating DBOC's business will harm the local economy by removing income that otherwise would be generated by DBOC visitors.

25.     As reported in the FEIS, Point Reyes National Seashore is a large contributor to the economy of Marin County. Goodyear Decl. Ex. 3 at 273-74. For example, in 2005, the Seashore generated $5.3 million in tax revenue for Marin and Sonoma counties and $2.9 million in tax revenue for the State of California. In 2010, the approximately 2 million recreational visitors to the Seashore contributed nearly $85 million in local spending, approximately $77 million of which was spent by non-local visitors. The non-local spending supported 981 jobs,

6

Declaration of Cicely Muldoon                    Case No. 4:12-cv-06134-YGR

approximately $41.2 million in labor income, and nearly $68 million in total value added for the local region (within 60 miles of the Seashore).  NPS payroll at the Seashore supported a total of 153 private sector and NPS jobs in 2010.  Maintaining these jobs resulted in approximately $10 million in labor income and approximately $12 million in value added for the region. This results in a total impact of approximately $51 million in labor income and $80 million in value added, approximately 0.5 percent of the county's total value added.

## VI.  DBOC'S NONCOMPLIANCE WITH THE CALIFORNIA COASTAL ACT AND OTHER PERMITTING REQUIREMENTS

26.     As part of my involvement in the oversight and management of DBOC's operations, I have become familiar with the various enforcement orders that the California Coastal Commission ("CCC") has issued to DBOC.  These orders include a 2007 Cease and Desist Order and a Notice of Intent to Commence Cease and Desist and Restoration Order Proceedings, dated October 24, 2012.

27.     The 2007 Cease and Desist Order cited DBOC for unpermitted development consisting of offshore aquaculture operations, onshore processing and retail facilities, and related residential use.  Goodyear Decl. Ex. 36 .  DBOC has not yet complied with the 2007 Cease and Desist Order.

28.     The CCC recently informed DBOC that it would be issuing a new Cease and Desist Order and a Restoration Order because of DBOC's failure to comply with the 2007 Cease and Desist Order and because of additional unpermitted development and activities consisting of the following: operating boats in the lateral channel in Drakes Estero during harbor seal breeding season; unpermitted discharge of marine debris; unpermitted backfilling of a long trench; placement of clam bags in protected harbor seal areas; and placement of concrete planters, picnic tables and refrigeration units in the coastal zone. Goodyear Decl. Ex. 34 at 1-2. Some of these same instances, including the placement of manila clams, consititute a violation of the NPS Special Use Permit ("SUP"). NPS sent a notice of this violation to DBOC on December 4, 2009.

7

Declaration of Cicely Muldoon                                    Case No. 4:12-cv-06134-YGR

29.     DBOC has also failed to obtain required permits from the U.S. Army Corps of Engineers.  On November 16, 2010, the U.S. Army Corps of Engineers ("Army Corps") notified the NPS that DBOC's aquaculture operation required both a Section 404 permit under the Clean Water Act and a Section 10 permit under the Rivers and Harbors Act.  Goodyear Decl. Ex. 37  The NPS forwarded the Army Corps letter to DBOC soon after it was received by the NPS.  Since that time, my staff has had ongoing discussions with the Army Corps to track whether DBOC has applied for either of these permits.  As recently as early January 2013, my staff confirmed that DBOC has not yet applied for either permit.

## VII.    DBOC'S OPERATION IS NOT PART OF THE PASTORAL ZONE AT THE SEASHORE

30.     In Mr. Lunny's Declaration, he asserts that DBOC's operation is part of the Seashore's "pastoral zone" and that the NPS had authority to allow DBOC's operation to continue as a result of a provision added to the Seashore's enabling legislation in 1978.  Lunny Decl. ¶¶ 89-90 and Ex. 13, and Plaintiff's Memorandum at 4 and 13-16.  DBOC's operation is not part of the Seashore's pastoral zone, and the 1978 Act does not apply to DBOC's operation.

31.     The Seashore's designated pastoral zone was created by statute.  In 1962, Congress enacted legislation establishing Point Reyes National Seashore "in order to save, and preserve, for purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains undeveloped." Goodyear Decl. Ex. 9.  (Act of September 13, 1962, Pub. L. No. 87-657, 76 Stat. 538 (1962).)   At the time of its establishment, most of the land within the boundaries of the Seashore was privately owned, and in the northern portion of the Seashore, most of the private land was owned by ranchers who raised beef and dairy cattle.

32.     Local ranchers supported the creation of the Seashore out of concern that the increasing pressure to commercially develop the Point Reyes peninsula would bring an end their family-owned cattle ranches.  The 1962 enabling legislation therefore designated a "pastoral zone" comprising 26,000 acres and specifically recognized that dairying and ranching operations

8

Declaration of Cicely Muldoon                          Case No. 4:12-cv-06134-YGR

within this designated area could continue. The pastoral zone was depicted on map number NS-PR-7002, dated August 15, 1961. Goodyear Decl. Ex.38, also depicted on FEIS at 15. Congress ratified this map by specifically referring to it in section 4 of the 1962 legislation. Section 4 read as follows:

> No parcel of more than five hundred acres within the zone of approximately twenty-six thousand acres depicted on map number NS-PR-7002, dated August 15, 1961 . . . shall be acquired without the consent of the owner so long as it remains in its natural state, or is used exclusively for ranching and dairying purposes including housing directly incident thereto. The term 'ranching and dairying purposes', as used herein, means such ranching and dairying, primarily for the production of food, as is presently practiced in the area.

Goodyear Decl. Ex. 9. (Act of September 13, 1962, Pub. L. No. 87-657, section 4, 76 Stat. 538 (1962).)

33.    Map NS-PR-7002 shows that the pastoral zone includes most of the northern and western portions of the Point Reyes peninsula. The pastoral zone forms the core of where dairy and cattle ranching continue today. The map clearly shows that neither Drakes Estero nor the upland areas where DBOC's onshore facilities are located were included within the designated pastoral zone.

34.    In 1970, Congress repealed section 4 of the 1962 Act through section 2b of the act of April 3, 1970. Goodyear Decl. Ex. 39. (Act of April 3, 1970, Pub. L. No. 91-223, Section 2(b), 84 Stat. 90 (1970).) Section 4 of the 1962 enabling legislation had prohibited the use of eminent domain within the pastoral zone and only allowed the NPS to acquire ranch lands from willing sellers. Between 1962 and 1970, several ranchers in the pastoral zone sold their land to developers, and the NPS was powerless to stop these sales. The remaining ranchers were concerned that continuing land escalation prices and the high costs of ranching would lead to more ranchers selling their land to developers, rather than keeping it pastoral in character. *See* Goodyear Decl. Ex. 40 (Congressional Record – Senate, March 17, 1970.). With the repeal of Section 4, Congress enabled the NPS to prevent further subdivision of the Point Reyes peninsula.

9

35.     In 1978, Congress added language authorizing the leasing of federally owned land that was agricultural land prior to its acquisition. Section 318(b) of Public Law 95-625 (1978) states the following:

> Where appropriate in the discretion of the Secretary, he or she may lease federally owned land (or any interest therein) which has been acquired by the Secretary under this Act, and which was agricultural land prior to its acquisition. Such lease shall be subject to such restrictive covenants as may be necessary to carry out the purposes of this Act. Any land to be leased by the Secretary under this section shall be offered first for such lease to the person who owned such land or was a leaseholder thereon immediately before its acquisition by the United States.

Goodyear Decl. Ex.16.  (Act of November 10, 1978, Pub. L. No. 95-625, title III, section 318[b], 92 Stat. 3467, 3487, codified at 16 U.S.C. 459c-5(a).) Section 318(c) also defined "agricultural property" to mean "lands which were in regular use for, or were being converted to agricultural, ranching, or dairying purposes as of May 1, 1978, together with the residential and other structures related to the above uses of the property." *Id.* (Act of November 10, 1978, Pub. L. No. 95-625, title III, section 318[c], 92 Stat. 3487, codified as amended at 16 U.S.C. 459c-5(b).)

36.     The NPS has never interpreted the 1978 Act as an authorization to "lease" Drakes Estero or the adjacent uplands to Johnson or to DBOC.  As a starting point, the uplands were already subject to the terms of the 1972 Reservation of Use and Occupancy, reserved by Johnson Oyster Company ("JOC") when it sold its property to the United States, when the 1978 Act was enacted.  In addition, the submerged lands within the Estero had been designated potential wilderness by Congress in 1976.  As discussed in paragraphs 41-42 below, Congress directed that the Estero be converted to full wilderness status as soon as the nonconforming uses had ceased.  Further, the 1978 Act only authorized the leasing of "lands," not submerged lands or waters.  It would therefore have been inconsistent with Congressional direction to lease the submerged lands within the Estero for continued aquaculture operations.

## VIII.   THE PROCESS FOR WILDERNESS DESIGNATION AT THE SEASHORE

37.     In the early 1970s, the NPS began the process of evaluating which lands within the Seashore might qualify for wilderness designation.  The NPS published a Final

10

Declaration of Cicely Muldoon                          Case No. 4:12-cv-06134-YGR

1  Environmental Statement, Proposed Wilderness Point Reyes National Seashore, in which the

2  NPS recommended that the Estero not be designated as wilderness. (Excerpts attached to Bagley

3  Declaration as Exhibit 8.)

4       38.    The NPS's wilderness recommendation was forwarded by the Department of the

5  Interior to Congress.  Goodyear Decl. Ex. 13 (H.R. Rep. No. 94-1680, at 2, (September 24,

6  1976)).  During 1975 and 1976, there were several bills circulating in Congress regarding the

7  establishment of wilderness at the Seashore.  On September 8, 1976, the Department of the

8  Interior recommended that Congress enact H.R. 7198 which would have designated 24,730 acres

9  within the Seashore as wilderness and 770 acres as potential wilderness. *Id.* at 5.  Congress did

10  not enact H.R. 7198.

11       39.    In 1975, Senators Tunney and Cranston of California and Representative Burton

12  of California introduced companion wilderness bills in the Senate and House.  Goodyear Decl.

13  Ex. 41at 269, 271.  (Excerpts of Wilderness Additions – National Park System, Hearings before

14  the Subcommittee on Parks and Recreation, 94th Congress, February 5, 19 and March 2, 1976.)

15  As originally introduced, these bills (designated H.R. 8002 and S. 2472) would have created

16  three distinct wilderness units at Point Reyes totaling 38,700 acres. *Id.* at 250-253.

17  Congressman Burton explained that S. 2472 would designate Drakes Estero as wilderness (not

18  potential wilderness) because the "commercial oyster farm" would be classified as a "prior non-

19  conforming use." *Id.* at page 273.  Had this bill become law, the commercial aquaculture

20  operation would have been grandfathered into wilderness and would have been allowed to

21  continue for the long term.  S. 2472 was never enacted.

22       40.    Congress subsequently enacted a completely revised version of H.R. 8002 which

23  designated 25,370 acres as wilderness and 8,003 acres of land and water as potential wilderness.

24  The map accompanying the bill clearly depicted Drakes Estero as *potential* wilderness.

25  Goodyear Decl. Ex. 12.  The President signed H.R. 8002 into law on October 18, 1976.

26  Goodyear Decl. Ex. 10. (Act of October 18, 1976, Pub. L. No. 94-544, 90 Stat. 2515 (1976).)

27

28                      11

Declaration of Cicely Muldoon               Case No. 4:12-cv-06134-YGR

41.     The House Committee Report accompanying the final version of H.R. 8002 states the following about the potential wilderness additions at Point Reyes:

> As is well established, it is the intention that those lands and waters designated as potential wilderness additions will be essentially managed as wilderness, to the extent possible, with efforts to steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status.

Goodyear Decl. Ex. 13. (H.R. Rep. No. 94-1680, at 3, September 24, 1976.)

42.     While H.R. 8002 was making its way through the legislative process, Congress was also considering a bill, H.R. 13160, to establish wilderness at other national park units. Although Point Reyes wilderness was not initially included in H.R. 13160, the Senate voted to include Point Reyes wilderness designations in the bill in late September, 1976.  Goodyear Decl. Ex. 15.   (Senate Report No. 94-1357, September 29, 1976.)  The wilderness designations in H.R. 13160 mirrored those in H.R. 8002, designating 25,370 acres of the Seashore as wilderness and 8,003 acres as potential wilderness.   H.R. 13160 contained an additional provision regarding the mechanism for converting potential wilderness to designated wilderness.  Section 3 of the bill provided that "[a]ll lands which represent potential wilderness additions, upon publication in the Federal Register of a notice by the Secretary of the Interior that all uses thereon prohibited by the Wilderness Act have ceased, shall thereby be designated wilderness." Goodyear Decl. Ex. 11. (Act of October 20, 1976, Pub. L. No. 94-567, section 3, 90 Stat. 2692 (1970).)  The Senate Report explains the reason for this provision:

> National Park Service wilderness proposals have embodied the concept of 'potential wilderness addition' as a category of lands which are essentially of wilderness character, but retain sufficient non-conforming structures, activities, uses or private rights so as to preclude immediate wilderness classification.  It is intended that such lands will automatically be designated as wilderness by the Secretary by the publication of notice in the Federal Register when the non-conforming structures, activities, uses or private rights are terminated."

Goodyear Decl. Ex. 15.  (Senate Report No. 94-1357, September 29, 1976, at page 3.)

43.     On December 4, 2012, the Department of the Interior published a Federal Register notice informing the public that all uses prohibited by the Wilderness Act had ceased in Drakes

12

Declaration of Cicely Muldoon                         Case No. 4:12-cv-06134-YGR

1   Estero as of November 30, 2012 and that the area had converted to wilderness status.  Goodyear

2   Decl. Ex. 29.  The Department had used this same procedure before to notify the public about the

3   conversion of potential wilderness to designated wilderness.  On November 18, 1999, the

4   Department published a Federal Register notice advising the public that uses prohibited by the

5   Wilderness Act had ceased on 1,752 acres of land located elsewhere within Point Reyes.  Like

6   the Estero, these areas had also been designated as potential wilderness by Congress in 1976. (64

7   Fed. Reg. 63057 (November 18, 1999).)

8   **IX.    THE "RIGHT TO FISH" RETAINED BY THE STATE IN THE 1965**

9   **         SUBMERGED LAND CONVEYANCE ACT DOES NOT GIVE THE STATE**
    **         LEASING AUTHORITY OVER DBOC'S OFFSHORE OPERATIONS**

10         44.     Mr. Lunny claims that the two leases issued by the California Fish and Game

11  Commission for his operation are "valid" and give him the "right to conduct oyster cultivation

12  operations" in the Estero.  Lunny Decl. ¶¶ 5-8 and ¶¶77-79.  Mr. Bagley's Declaration claims

13  that correspondence from the California Fish and Game Commission ("CFGC") and the

14  California Department of Fish and Game ("CDFG") confirm that the state retains leasing

15  authority over DBOC's offshore operations.

16         45.     The leases that DBOC claims are "valid" are lease numbers M-438-01 an M-438-

17  02.  As described below, the leases were issued to JOC by the CFGC on June 25, 2004 over the

18  objection of the NPS.

19         46.     Early in 2004, the park communicated its objections to CDFG regarding a 25 year

20  lease renewal.  CDFG thereafter transmitted a letter to JOC indicating that "the Department [of

21  Fish and Game] would require that a federal/National Park Service (NPS) lease be in effect

22  concurrently with the state water bottom lease."  Goodyear Decl. Ex. 42 at 2.  On March 15,

23  2004, NPS sent CDFG copies of legal opinions from the Department of the Interior Solicitor's

24  Office which concluded that the NPS was obligated to convert the Estero to wilderness at the end

25  of 2012 when the existing Reservation of Use and Occupancy expired.  Goodyear Decl. Ex. 43.

26

27                                              13

28

47.     On June 14, 2004, CDFG recommended approval of the lease renewals to the CFGC "for a period of twenty-five years, contingent on there being a Federal Reservation for the land use within the Point Reyes National Seashore." Goodyear Decl. Ex. 44.

48.     On June 18, 2004, the NPS wrote a letter to the CFGC explaining that the submerged leased lands proposed for renewal were ceded to the federal government by the state, that Drakes Estero is a major natural resource of the Seashore, and that the "Estero is also Congressionally-designated potential Wilderness and will convert to full Wilderness status in 2012." Goodyear Decl. Ex. 45.

49.     Although the CFGC issued the leases to Johnson, it included a provision in each lease stating that the lease was "contingent on a concurrent federal Reservation of Use and Occupancy for fee land in the Point Reyes National Seashore." Goodyear Decl. Ex. 19 and Ex. 20. The Commission approved the transfer of the two state water bottom leases to DBOC on March 18, 2005. Goodyear Decl. Ex. 21 and Ex. 22.

50.     Since 2010, I have had several conversations and exchanged letters with the Director of the CDFG and the Executive Director of the CFGC regarding the division of responsibility between the state and the United States over DBOC's operations. In relation to these communications, I have reviewed and discussed the past correspondence from the CFGC and CDFG to the NPS regarding jurisdiction over JOC's and now DBOC's operations. In particular, I am familiar with the correspondence concerning whether the "right to fish" as retained by the State of California in the 1965 Conveyance Act gives the state authority to issue state water bottom leases for DBOC's mariculture operation.

51.     The most detailed letters on the "right to fish" issue were issued by the CDFG Director in 2007 and 2008. On May 15, 2007, CDFG wrote to the Seashore and explained "that the mariculture operation in question is properly within the primary management authority of the [Seashore], not the Department." CDFG's letter analyzes the 1965 Conveyance Act's reservation of the "right to fish" as follows:

14

Consistent with Article 1, Section 25 of the California Constitution, this conveyance carried a reservation of the right to fish in the waters overlying these lands. Although the right to fish extends to both commercial and sport fishing, it does not extend to aquaculture operations. Regardless of whether its purpose is commercial or recreational, *fishing* involves the take of public trust resources and is therefore distinct from aquaculture, which is an agricultural activity involving the cultivation and harvest of private property.

Goodyear Decl. Ex. 7. On March 25, 2008, CDFG wrote to the California Assemblyman Jared Huffman about this issue. CDFG reaffirmed the conclusion reached in its 2007 letter and provided more in depth analysis for the Assemblyman:

Three considerations are evident here. First, the Fish and Game Code expressly designates aquaculture as a form of agriculture and distinguishes it from commercial fishing. Such a distinction is apparent in statutes predating the 1965 grant [referring to the 1965 statute that conveyed the submerged lands in Drakes Estero to the United States]. Further, aquaculture involves the culture and harvesting of animals that are private property while fishing involves the permitted take of fish that are part of the public trust. A corollary to this second consideration is that "the right to fish" over tidelands is a *public right* and cannot be exclusive. By contrast, a state water bottom lease confers on a person the *private right* to exclusively cultivate and harvest aquatic organisms in the leased area. While the Fish and Game Code guarantees the right of public access over the leased area for reasonable public trust uses, including fishing, we do not believe aquaculturists would agree that "the right to fish" authorizes the public to take their cultivated products. Finally, while "the right to fish" secures public access to state lands that are compatible with fishing, *it does not authorize fishing* on those lands and confers on the public no right they did not already have. The provision is properly read in connection with (now) article 4, section 20 of the California Constitution, which allows the Legislature to delegate to the Commission such powers relating to the protection and propagation of fish and game as it sees fit. It is this provision, not 'the public right to fish,' which authorizes the leasing of state water bottoms for aquaculture.

Goodyear Decl. Ex. 6 (emphasis in original; internal footnotes omitted). Footnote 2 of this letter also discusses some of the early correspondence, stating: "Much has been made of correspondence in 1965 and 1966 by then-Department Director W.T. Shannon, stating that the oyster farm is covered by 'the right to fish' reservation. The two letters are brief, general, and conclusory." *Id.*

52.     Mr. Bagley places great weight on this early correspondence and on a 1965 Opinion by the Attorney General of California. Bagley Decl. ¶ 9. The 1965 Opinion fails to

15

Declaration of Cicely Muldoon                                    Case No. 4:12-cv-06134-YGR

1    make mention an important point: that the state's definition of the term "fish" in the Fish and

2    Game Code applies only to "wild" fish, not the private products of an aquaculture operation. Cal.

3    F&G Code § 45.

4        53.    CDFG reviewed and provided input on the FEIS's discussion of jurisdiction over

5    the Estero and the "right to fish" issue.  On the basis of that input, the FEIS explained as follows

6    that the California Fish and Game Code defines "fish" as "*wild* fish, mollusks, crustaceans,

7    invertebrates, or amphibians, including any part, spawn or ova thereof." Goodyear Decl. Ex. 3 at

8    7 (citing Cal. F&G Code § 45 (emphasis added)).  In contrast to the "wild" organisms included

9    in the definition of "fish," the California Fish and Game Code establishes that the products of an

10   aquaculture operation are the private property of the operator of that facility. Under the

11   California Fish and Game Code provisions on aquaculture, "the cultured progeny of wild plants

12   and animals . . . are the exclusive property of that person who cultured them or that person's

13   successor in interest" (California Fish and Game Code section 15001). *Id.*

14       54.    The California State Lands Commission ("CSLC") agrees with CDFG's opinion

15   that the right to fish does not encompass aquaculture. In addition, the CSLC's letter also explains

16   that the state does not have leasing authority to issue aquaculture leases for the submerged lands

17   in the Estero.  Goodyear Decl. Ex. 5.

18       55.    DBOC has made two recent attempts to petition the California Fish and Game

19   Commission to take action to assert state jurisdiction over the Estero.  The CFGC rejected both

20   of these requests.

21       56.    At the CFGC hearing in April 12, 2012, DBOC's lawyers along with former

22   Assemblyman Bagley urged the CFGC to adopt a resolution declaring that the "right to fish" as

23   retained by the state in the 1965 Conveyance Act meant that the state, not the NPS, had authority

24   over DBOC's in-water operations.  The CFGC refused to take the action requested by DBOC.

25       57.    Several months later, on July 11, 2012, I received a letter from the CFGC wherein

26   the Commission stated that it had issued state water bottom leases to DBOC in the "proper

27   exercise of its jurisdiction."  The Commission then requested that the NPS issue DBOC a permit

28                                              16

Declaration of Cicely Muldoon                    Case No. 4:12-cv-06134-YGR

for continued use of upland areas within Point Reyes. This letter must be looked at in the context of the CFGC's action at its most recent hearing.   Goodyear Decl. Ex. 46.

58.     After the Secretary advised DBOC that its existing authorizations would be allowed to expire, DBOC, at the CFGC's December 12, 2012 hearing, requested the removal of the "contingency" clauses described above from its state water bottom leases.  The CFGC, knowing that the Secretary had declined to issue a 10 year SUP to DBOC, refused to take the action requested by DBOC.

I declare under penalty of perjury that the foregoing is true and correct.

Signed January  9 , 2013 in  POINT REYES   , California.

Cicely Muldoon

17

Declaration of Cicely Muldoon                              Case No. 4:12-cv-06134-YGR