1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

GOODYEAR DECLARATION     Case No. 4:12-cv-06134-YGR



THE SECRETARY OF THE INTERIOR
WASHINGTON

NOV 29 2012

To: Director, National Park Service

Through: Principal Deputy Assistant Secretary for Fish and Wildlife and Parks

From: Secretary *Ken Salazar*

Subject: Point Reyes National Seashore – Drakes Bay Oyster Company

After giving due consideration to the request of the Drakes Bay Oyster Company ("DBOC") to conduct commercial operations within Point Reyes National Seashore in the State of California ("Point Reyes"), I have directed the National Park Service (NPS) to allow the permit to expire at the end of its current term. This decision is based on matters of law and policy including:

1) The explicit terms of the 1972 conveyance from the Johnson Oyster Company to the United States of America. The Johnson Oyster Company received $79,200 for the property. The Johnson Oyster Company also reserved a 40 year right of use and occupancy expiring November 30, 2012. Under these terms and consideration paid, the United States purchased all the fee interest that housed the oyster operation. In 2004, DBOC acquired the business from Johnson Oyster Company, including the remaining term of the reservation of use and occupancy and was explicitly informed "no new permit will be issued" after the 2012 expiration date.

2) The continuation of the DBOC operation would violate the policies of NPS concerning commercial use within a unit of the National Park System and nonconforming uses within potential or designated wilderness, as well as specific wilderness legislation for Point Reyes National Seashore.

The area within Point Reyes that Congress identified as potential wilderness includes a biologically rich estuary known as Drakes Estero, consisting of several tidal inlets tributary to Drakes Bay, on the southern side of the Point Reyes peninsula. Drakes Estero encompasses approximately 2,500 acres of tidelands and submerged lands and is home to one of the largest harbor seal populations in California. In 1999 the eastern portion of Drakes Estero, known as the Estero de Limantour, was converted from potential to designated wilderness, becoming the first (and still the only) marine wilderness on the Pacific coast of the United States outside of Alaska. DBOC's commercial mariculture operation is the only use in the remaining portion of Drakes Estero preventing its conversion from potential to designated wilderness.

Therefore, I direct you to:

1) Notify DBOC that both the Reservation of Use and Occupancy ("RUO") and the Special Use Permit ("SUP") held by DBOC expire according to their terms on November 30, 2012.

2) Allow DBOC a period of 90 days after November 30, 2012, to remove its personal property, including shellfish and racks, from the lands and waters covered by the RUO and SUP in order for DBOC to minimize the loss of its personal property and to meet its obligations to vacate and restore all areas covered by the RUO and SUP. No commercial activities may take place in the waters of Drakes Estero after November 30, 2012. During this 90 day period, DBOC may conduct limited commercial activities onshore to the extent authorized in writing by NPS.

3) Effectuate the conversion of Drakes Estero from potential to designated wilderness.

Because of the importance of sustainable agriculture on the pastoral lands within Point Reyes, I direct that you pursue extending permits for the ranchers within those pastoral lands to 20-year terms.

Finally, I direct you to use all existing legal authorizations at your disposal to help DBOC workers who might be affected by this decision, including assisting with relocation, employment opportunities, and training.

I have taken this matter very seriously. I have personally traveled to Point Reyes National Seashore, visited DBOC, met with a wide variety of interested parties on all sides of this issue, and considered many letters, scientific reports, and other documents. The purpose of this memorandum is to document the reasons for my decision and to direct you to take all necessary and appropriate steps to implement it.

I. Factual and Legal Background

    A. Point Reyes National Seashore

Congress authorized the establishment of Point Reyes National Seashore in the Act of September 13, 1962, Pub. L. No. 87-657, 76 Stat. 538, codified as amended at 16 U.S.C. §§ 459c through 459c-7 (2012). The NPS subsequently began to acquire privately owned lands within Point Reyes's legislated boundaries. In 1965 the State of California granted the United States all of the State's right, title, and interest to the tide and submerged lands within the national seashore except for certain mineral rights. On October 20, 1972, the national seashore was formally established by publication of the required notice in the Federal Register. 37 Fed. Reg. 23,366 (1972). The legislation does authorize the Secretary of the Interior to lease agricultural ranch and dairy lands within Point Reyes' pastoral zone in keeping with the historic use of that land. The enabling legislation does not authorize mariculture.

Point Reyes comprises approximately 71,067 acres, of which approximately 65,090 are federally owned. The National Seashore, located about an hour's drive north of San Francisco, currently attracts more than two million visitors per year. In 1976, Congress designated 25,370 acres of land within Point Reyes as wilderness and identified an additional 8,003 acres of land and water as potential wilderness. Act of October 18, 1976, Pub. L. No. 95-544, 90 Stat. 2515, and § 1(k)

of the Act of October 20, 1976, Pub. L. No. 94-567, 90 Stat. 2692, 2693.[1] With respect to the area identified as potential wilderness, Congress provided, "All lands which represent potential wilderness additions, upon publication in the Federal Register of a notice by the Secretary of the Interior that all uses thereon prohibited by the Wilderness Act have ceased, shall thereby be designated wilderness." Id. § 3.[2] The House of Representatives committee report accompanying the October 18, 1976, act states, "As is well established, it is the intention that those lands and waters designated as potential wilderness additions will be essentially managed as wilderness, to the extent possible, with efforts to steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status." H.R. REP. NO. 94-1680 at 3 (1976).[3] Sections 4(c) and 4(d)(5) of the Wilderness Act prohibit commercial activities such as mariculture in designated wilderness. 16 U.S.C. §§ 1133(c) and 1133(d)(5).

### B. Commercial Mariculture Operations within Point Reyes National Seashore

Since the 1930s commercial oyster operations have been conducted on lands and waters now included within Point Reyes. In 1958 Charles W. Johnson assumed control over state-issued water-bottom leases in Drakes Estero, and in 1961 he purchased five acres of uplands near the estero and expanded an existing oyster processing facility on it. In 1972 Mr. Johnson, dba Johnson Oyster Company (JOC), conveyed fee title to his property to the United States, reserving in the deed a 40-year right to use and occupy 1.5 acres of land, including the processing facility, "for the purpose of processing and selling wholesale and retail oysters, seafood and complimentary [sic; probably should read "complementary"] food items, the interpretation of oyster cultivation to the visiting public, and residential purposes reasonably incident thereto." The reservation indicated that possibility of a new permit after the RUO's expiration but in no way suggested that one would definitely be issued. The United States paid JOC fair market value for the interest the United States acquired, taking into consideration the value of the 40-year reserved use and occupancy. The deed of conveyance refers to the reservation as "a terminable right to use and occupy."

In 2004 DBOC purchased the assets of Johnson's Oyster Company, including the remaining term of the RUO, with full knowledge that the reserved use and occupancy would expire in 2012.

On March 28, 2005, then Superintendent of Point Reyes, Don Neubacher, sent a letter to DBOC "to ensure clarity and avoid any misunderstanding....[r]egarding the 2012 expiration date and the potential wilderness designation, based on our legal review, no new permits will be issued after that date."

---

[1] The official map referenced in both pieces of legislation indicated that Congress actually designated approximately 24,200 acres of land as wilderness and identified approximately 8,530 acres of additional land as potential wilderness.

[2] It is worth noting that under the statute's clear terms the conversion from potential to designated wilderness occurs automatically by operation of law when the required Federal Register notice is published.

[3] In 1999 approximately 1,752 acres of uplands, tidelands, and submerged lands within Point Reyes were converted from potential to designated wilderness. 64 Fed. Reg. 63,057 (1999).

The DBOC subsequently applied for, and was issued, an NPS special use permit authorizing it to use approximately 1,050 acres offshore and 3.1 additional acres onshore for its operations. Both authorizations—the RUO and the SUP— expire by their own terms on November 30, 2012.

### C. S<small>EC</small>. 124

In 2009 Congress enacted S<small>EC</small>. 124 of the Act of October 30, 2009, Pub. L. No. 111-88, 123 Stat. 2932, which provides in its entirety as follows:

> S<small>EC</small>. 124. Prior to the expiration on November 30, 2012, of the Drakes Bay Oyster Company's Reservation of Use and Occupancy and associated special use permit ("existing authorization") within Drake's (sic) Estero at Point Reyes National Seashore, notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit with the same terms and conditions as the existing authorization, except as provided herein, for a period of 10 years from November 30, 2012: Provided, That such extended authorization is subject to annual payments to the United States based on the fair market value of the use of the Federal property for the duration of such renewal. The Secretary shall take into consideration recommendations of the National Academy of Sciences Report pertaining to shellfish mariculture in Point Reyes National Seashore before modifying any terms and conditions of the extended authorization. Nothing in this section shall be construed to have any application to any location other than Point Reyes National Seashore; nor shall anything in this section be cited as precedent for management of any potential wilderness outside the Seashore.

### D. Preparation of Draft and Final Environmental Impact Statements

After S<small>EC</small>. 124 was enacted in 2009, the NPS initiated the process of preparing a draft environmental impact statement (DEIS) to analyze the environmental impacts associated with various alternatives related to a decision to permit or not to permit DBOC's continued commercial operations in Drakes Estero and to obtain robust public input into this matter. The NPS issued a scoping notice, hosted public scoping meetings, produced and released to the public a thousand-page-long DEIS, and invited and accepted public comments on the DEIS. As a result of that public process, the NPS prepared a final environmental impact statement (FEIS), which includes responses to public comments on the DEIS. The NPS released the FEIS to the public earlier this month.

S<small>EC</small>. 124 does not require me (or the NPS) to prepare a DEIS or an FEIS or otherwise to comply with the National Environmental Policy Act of 1969 (NEPA) or any other law. The "notwithstanding any other provision of law" language in S<small>EC</small>. 124 expressly exempts my decision from any substantive or procedural legal requirements. Nothing in the DEIS or FEIS that the NPS released to the public suggests otherwise. As the FEIS explained:

> Although the Secretary's authority under Section 124 is 'notwithstanding any other provision of law,' the Department has determined that it is helpful to

> generally follow the procedures of NEPA. The EIS provides decision-makers with sufficient information on potential environmental impacts, within the context of law and policy, to make an informed decision on whether or not to issue a new SUP. In addition, the EIS process provides the public with an opportunity to provide input to the decision-makers on the topics covered by this document.

FEIS at 2. The FEIS also stated, "The NEPA process will be used to inform the decision of whether a new [special use permit] should be issued to DBOC for a period of 10 years." *Id.* at 5. The NEPA process, like SEC. 124 itself, does not dictate a result or constrain my discretion in this matter.

II. Discussion

I understand and appreciate that the scientific methodology employed by the NPS in preparing the DEIS and FEIS and the scientific conclusions contained in those documents have generated much controversy and have been the subject of several reports. Collectively, those reports indicate that there is a level of debate with respect to the scientific analyses of the impacts of DBOC's commercial mariculture operations on the natural environment within Drakes Estero.

Although there is scientific uncertainty and a lack of consensus in the record regarding the precise nature and scope of the impacts that DBOC's operations have on wilderness resources, visitor experience and recreation, socioeconomic resources and NPS operations, the DEIS and FEIS support the proposition that the removal of DBOC's commercial operations in the estero would result in long-term beneficial impacts to the estero's natural environment.[4] Thus while the DEIS and FEIS do not resolve all the uncertainty surrounding the impacts of the mariculture operations on Drakes Estero, and while they are not material to the legal and policy factors that provide the central basis for my decision, they have informed me with respect to the complexities, subtleties, and uncertainties of this matter and have been helpful to me in making my decision.[5]

SEC. 124 grants me the authority and discretion to issue DBOC a new special use permit, but it does not direct me to do so. SEC. 124 also does not prescribe the factors on which I must base my decision. In addition to considering the documents described above, I gave great weight to matters of public policy, particularly the public policy inherent in the 1976 act of Congress that identified Drakes Estero as potential wilderness.

In enacting that provision, Congress clearly expressed its view that, but for the nonconforming uses, the estero possessed wilderness characteristics and was worthy of wilderness designation.

---

[4] While NEPA review was not legally required, NEPA as a general matter does not require absolute scientific certainty or the full resolution of any uncertainty regarding the impacts of the federal action. *See League of Wilderness Defenders-Blue Mountain Biodiversity Project v. U.S. Forest Service*, 689 F.3d 1060 (9th Cir. 2012) and *Lands Council v. McNair*, 537F.3d 981,988 *(9th Cir 2008) (en banc)* (overruled in part on other grounds by *Winter v. Natural Res. Def. Council,,* 555 U.S. 7 (2008).

[5] In a letter to me dated November 27, 2012, counsel for DBOC has asserted that the FEIS is "fatally flawed" and I should avoid any consideration "of the FEIS in its entirety." My decision today is based on the incompatibility of commercial activities in wilderness and not on the data that was asserted to be flawed.

Congress also clearly expressed its intention that the estero become designated wilderness by operation of law when "all uses thereon prohibited by the Wilderness Act have ceased." The DBOC's commercial operations currently are the only use of the estero prohibited by the Wilderness Act. Therefore, DBOC's commercial operations are the only use preventing the conversion of Drakes Estero to designated wilderness. Since the RUO and SUP allowing DBOC's commercial operations in the estero will expire by their own terms, after November 30, 2012, DBOC no longer will have legal authorization to conduct those operations, and approximately 1,363 acres can become designated wilderness.

Although SEC. 124 grants me the authority to issue a new SUP and provides that such a decision would not be considered to establish any national precedent with respect to wilderness, it in no way overrides the intent of Congress as expressed in the 1976 act to establish wilderness at the estero. With that in mind, my decision effectuates that Congressional intent.

III. Implementation

Based on the foregoing, I hereby direct that you expeditiously take all necessary and appropriate steps to implement my decision. My decision means that, after November 30, 2012, DBOC no longer will be legally authorized to conduct commercial operations within Point Reyes. Accordingly, I direct that the NPS publish in the Federal Register the notice announcing the conversion of Drakes Estero from potential to designated wilderness. I direct that the NPS allow DBOC a period of 90 days after November 30, 2012, to remove its personal property, including shellfish and racks, from the lands and waters covered by the RUO and SUP in order for DBOC to minimize the loss of its personal property and to meet its obligations to vacate and restore all areas covered by the RUO and SUP. No commercial activities may take place in the waters of Drakes Estero after November 30, 2012. During this 90 day period, DBOC may conduct limited commercial activities onshore to the extent authorized in writing by NPS.

I am aware that allowing DBOC's existing authorizations to expire by their terms will result in dislocation of DBOC's business and may result in the loss of jobs for the approximately 30 people currently employed by DBOC. I therefore direct that you use existing legal authorities to ameliorate to the extent possible the economic and other impacts on DBOC's employees, including providing information and other assistance to those employees to the full extent authorized under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, codified as amended at 42 U.S.C. §§ 4601-4655. Additionally, I direct you to develop a plan for training and to work with the local community to identify job opportunities for DBOC employees..

Finally, the Department of the Interior and the NPS support the continued presence of dairy and beef ranching operations in Point Reyes' pastoral zone. I recognize that ranching has a long and important history on the Point Reyes peninsula, which began after centuries old Coast Miwok traditions were replaced by Spanish mission culture at the beginning of the 19th century. Long-term preservation of ranching was a central concern of local interests and members of Congress as they considered legislation to establish the Point Reyes National Seashore in the late 1950s and early 1960s. In establishing the pastoral zone (Point Reyes enabling legislation PL 87-657, Section 4) Congress limited the Government's power of eminent domain and recognized "the

value to the Government and the public of continuation of ranching activities, as presently practiced, in preserving the beauty of the area." (House Report No. 1628 at pages 2503-04). Congress amended the Point Reyes enabling legislation in 1978 to authorize the NPS to lease agricultural property that had been used for ranching or dairying purposes. (Section 318, Public Law 95-625, 92 Stat. 3487, 1978). The House Report explained that the "use of agricultural lease-backs is encouraged to maintain this compatible activity, and the Secretary is encouraged to utilize this authority to the fullest extent possible." (House Report 95-1165, page 344).

Accordingly, I direct that the Superintendent work with the operators of the cattle and dairy ranches within the pastoral zone to reaffirm my intention that, consistent with applicable laws and planning processes, recognition of the role of ranching be maintained and to pursue extending permits to 20-year terms for the dairy and cattle ranches within that pastoral zone. In addition, the values of multi-generational ranching and farming at Point Reyes should be fully considered in future planning efforts. These working ranches are a vibrant and compatible part of Point Reyes National Seashore, and both now and in the future represent an important contribution to the Point Reyes' superlative natural and cultural resources.

IV. Conclusion

My decision honors Congress's direction to "steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status" and thus ensures that these precious resources are preserved for the enjoyment of future generations of the American public, for whom Point Reyes National Seashore was created. As President Lyndon Johnson said on signing the Wilderness Act in 1964, "If future generations are to remember us with gratitude rather than contempt, we must leave them something more than the miracles of technology. We must leave them a glimpse of the world as it was in the beginning, not just after we got through with it."


cc: Regional Director, Pacific West Region, NPS
    Superintendent, Point Reyes National Seashore