

**North**

0        5 Miles

Source: ESRI Data & Maps (CD-ROM v. 10-2010) and United States Census Data (2010)

| | |
|---|---|
| Point Reyes National Seashore | |
| Project Area Boundary | |
| County Boundaries | |
| Inverness Census Designated Place (CDP) | |
| Roads | |

**Minority Blocks**

Census blocks with a minority population at or exceeding threshold of 50% (United States Census Data 2010)

Census Block Boundaries

| MAP ID | BLOCK ID | Total Population | Percent Minority |
|---|---|---|---|
| A | 060411321002000 | 4 | 75% |
| B | 060411321002004 | 1 | 100% |
| C | 060411321002054 | 2 | 50% |
| D | 060411322002029 | 4 | 50% |
| E | 060411322003004 | 2 | 50% |
| F | 060411322003019 | 23 | 52% |
| G | 060411322003024 | 1 | 100% |
| H | 060411322003039 | 4 | 100% |
| I | 060411322003044 | 22 | 64% |
| J | 060411322003045 | 3 | 100% |
| K | 060411322003117 | 1 | 100% |
| L | 060411330004009 | 4 | 100% |
| M | 060411330004012 | 7 | 57% |
| N | 060411330004019 | 10 | 70% |

**Drakes Bay Oyster Company Special Use Permit Environmental Impact Statement**

National Park Service
U.S. Department of the Interior

Point Reyes National Seashore

FIGURE 1-5
**Minority Areas within Marin County**



Source: ESRI Data & Maps (CD-ROM v. 10-2010) and United States Census Data (2010)

Drakes Bay Oyster Company Special Use Permit
Environmental Impact Statement

National Park Service
U.S. Department of the Interior

Point Reyes National Seashore

FIGURE 1-6

**Low Income Areas within Marin County**

Pursuant to the third factor, NPS recognizes that there are some cultural, social, occupational, historical, or economic factors that may amplify environmental impacts of the project, such as current economic conditions. However, because the impacts to minority and low-income populations would be limited to DBOC employees and not surrounding minority populations, this is not a relevant factor for environmental justice consideration. However, where applicable, these factors are considered as part of the cumulative impact analysis for Socioeconomic Resources in chapter 4.

In accordance with the fourth factor, NPS encouraged public participation throughout the NEPA process. The public scoping period was open between October 8, 2010 and November 26, 2010. The Draft EIS was made available for public review and comment beginning on September 23, 2011 and ending December 9, 2011. Both of these comment periods were extended beyond the standard 30 and 60 days, respectively, to accommodate any interested parties who may have been adversely affected by a power outage in 2010 that disrupted the NPS PEPC system, and in 2011 to consider additional comments in light of the Marine Mammal Commission's November 2011 report (MMC 2011b). Comments were accepted online, in park forms available at the public meetings, as well as by mail. NPS also held three public scoping meetings in 2010 and three public meetings in 2011 during the public review of the Draft EIS. NPS included Spanish-language interpreters at all public meetings to accommodate parties of limited-English, and the fact sheet available at the 2011 public meetings was also available in Spanish.

As noted previously, because potentially disproportionate impacts to minority and low-income populations would be limited to DBOC employees, the fifth environmental justice factor identified in Executive Order 12898 is not relevant to the proposed action. However, as explained under the fourth factor, NPS provided public participation opportunities that were available to interested parties who individually qualify as low-income or minority.

Sixth, NPS consulted with The Federated Indians of Graton Rancheria inviting the tribe to provide information on features of cultural or religious significance. The correspondence is provided in appendix D of the Final EIS.

Based on the information provided above, the impact topic of environmental justice is considered but dismissed from further analysis in the EIS. As noted previously, impacts of the proposed action on DBOC employees is evaluated in the socioeconomic resources sections of this EIS.

## RELATED LAWS, POLICIES, AND PLANS

The following section describes various laws, policies, and plans that have informed this EIS and the alternatives considered herein. The alternatives proposed in this EIS exist within a unique legal framework because of the interplay between section 124 of the Department of the Interior, Environment, and Related Agencies Appropriations Act of 2010 (PL 111-88, section 124, 123 Stat. 2904 [2009]), on the one hand, and the numerous laws and policies that normally guide NPS decision making, on the other.

Section 124 vests the Secretary with discretion in the decision as to whether to issue a permit, because the phrase "is authorized" is permissive rather than prescriptive. The legislative history of section 124 confirms this interpretation. When the bill was reported out of the Senate Appropriations Committee, it provided that "the Secretary of the Interior *shall* extend the existing authorization [to Drakes Bay Oyster Company]"

(emphasis added) (see Department of the Interior, Environment, and Related Agencies Appropriations Act, 2010, H.R. 2996, 111th Congress, section 120 [as reported by Senate Committee on Appropriations, July 7, 2009]). This provision was later amended on the Senate floor, and the mandatory language was changed to the current discretionary language (see 155 Congressional Record Section 9769 [September 24, 2009]). The House Conference Report on the final bill summarizes the amendment from the Senate, explaining that it "*modifie[d] language* included by the Senate providing the Secretary *discretion* to issue a special use permit" (emphasis added) (H.R. Report No. 111-316, at 107 [2009] [Conference Report]).

Although the Secretary's authority under section 124 is "notwithstanding any other provision of law," the Department has determined that it is helpful to generally follow the procedures of NEPA. The EIS will provide decision-makers with sufficient information on potential environmental impacts, within the context of law and policy, to make an informed decision on whether or not to issue a new SUP. Below are the primary laws that are being considered for this analysis.

## OTHER PROVISIONS OF SECTION 124

There are two other provisions of section 124 that apply should a new 10-year permit be issued to DBOC. First, section 124 requires that the United States receive annual payments based on the "fair market value" of DBOC's use of the federal property for this new 10-year period. The DOI Office of Valuation Services has conducted an appraisal to determine the fair market rental value of the use of the federal property. By terminating the state water bottom lease, DBOC would avoid any obligation to make lease payments to the state. Second, the terms and conditions of the existing authorizations for DBOC may be modified after considering the recommendations of the NAS report. This EIS identifies, where appropriate, possible changes to permit terms.

## RELEVANT FEDERAL LAWS AND POLICIES

### National Park Service Organic Act

In the NPS Organic Act of 1916 (Organic Act), Congress created the NPS and directed it to manage units of the national park system, "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations" (16 U.S.C. 1). The 1978 Redwood Amendment reiterates this mandate by stating that the NPS must conduct its actions in a manner that will ensure no "derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress" (16 U.S.C. 1a-1). The legislative history of the Redwood Amendment further clarified that all units of the national park system, whether designated as parks, recreation areas, seashores, or lakeshores, were to be managed to the same high standard unless Congress specifically provided otherwise.

Although the Organic Act and the Redwood Amendment use different wording ("unimpaired" and "derogation") to describe what NPS must avoid, both acts define a single standard for the management of the national park system—not two different standards. For simplicity, NPS *Management Policies 2006* uses "impairment," not both statutory phrases, to refer to that single standard.

Based on its authority under the Organic Act, the NPS has promulgated a series of regulations contained in title 36 of the Code of Federal Regulations (CFR). The provisions in title 36 provide a comprehensive suite of regulations that govern activities within units of the national park system.

## Wilderness Act of 1964, Point Reyes Wilderness Act of 1976, and Directors Order 41: Wilderness Preservation and Management

The Wilderness Act establishes the national wilderness preservation system, consisting of federal lands designated by Congress as wilderness. Wilderness is defined as "an area where earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." An area of wilderness is further defined as "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation which is protected and managed so as to preserve its natural conditions" (16 U.S.C. 1132).

According to section 4(c) of the Wilderness Act, there shall be no commercial enterprise and no permanent road within any wilderness area and, except as necessary to meet minimum requirements for the administration of the area (including measures required in emergencies involving the health and safety of people within the area), there shall be no temporary road; no use of motor vehicles, motorized equipment, or motorboats; no landing of aircraft; no other form of mechanical transport; and no structure or installation within any such area.

In the Point Reyes Wilderness Act of 1976, Congress designated the waters within Drakes Estero (approximately 1,363 acres within the project area) as "potential wilderness." Drakes Estero was designated as potential wilderness rather than full wilderness due to the presence of the commercial oyster operation, a nonconforming use. The House Committee Report accompanying the 1976 Point Reyes Wilderness Act states: "As is well established, it is the intention that those . . . waters designated as potential wilderness additions will be essentially managed as wilderness, to the extent possible, with efforts to steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status" (H. Rep. No. 94-1680 [1976]).

In 2004, the Solicitor's Office issued an opinion interpreting the 1976 Point Reyes Wilderness Act. Based on the language of the law and its legislative history, the opinion concluded that NPS was mandated to convert the potential wilderness in Drakes Estero to full wilderness as soon as the nonconforming use could be eliminated. The oyster operation in Drakes Estero was dependent on the 40-year RUO that Charles Johnson had retained when he sold his 5-acre parcel to the NPS in 1972. The RUO expires on November 30, 2012, making this date the earliest date on which the nonconforming use would cease. In order to affect Congress's intent that Drakes Estero be converted to full wilderness, the Solicitor's Office advised the NPS that it lacked discretion to allow the oyster operation to continue beyond November 30, 2012.

Section 124 now gives the Secretary the discretion to issue a 10 year permit notwithstanding the 1976 Point Reyes Wilderness Act.

## Endangered Species Act

Under section 7 of the Endangered Species Act of 1973, as amended, the NPS is required to coordinate with the USFWS and NMFS to ensure that its actions affecting federally listed species do not jeopardize their continued existence or result in the destruction or adverse modification of their critical habitat. Consultation is required whenever such species or habitat may be affected by a proposed project. Through the consultation process, the agencies develop a biological opinion setting forth their assessment of the impact of the project on listed species and on any critical habitat that may exist within the area of effect. The biological opinion may contain conservation recommendations and reasonable and prudent measures for the agency or applicant to follow.

Several federally designated threatened and endangered species and/or their critical habitat exist in the project area. As described in the special status species section of this EIS, NPS has determined that some of the actions proposed in this EIS have the potential to impact these listed species and/or their critical habitat. In order to fully understand the possible effects of the actions proposed in this EIS on listed species and their critical habitat, the NPS has initiated consultation with the USFWS and NMFS.

## Migratory Bird Treaty Act

The Migratory Bird Treaty Act (MBTA) of 1918 implements several treaties protecting birds that migrate across national borders. MBTA makes it unlawful to take, possess, or sell protected species, or any product or parts thereof (eggs, nests, feathers, plumes, etc.), except as permitted by the Secretary. Take is defined as "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or any attempt to carry out these activities." It does not necessarily include destruction or alteration of habitat, unless there is a direct taking of birds, nests, eggs, or other such parts. All waterfowl, shorebirds, hawks, owls, eagles, native doves and pigeons, swifts, common native songbirds, and other species are protected under the act. A complete list of protected species is found at 50 CFR 10.13. Several species of migratory birds, such as the brant goose, have been identified within the project area.

## NPS Management Policies 2006

NPS *Management Policies 2006* (NPS 2006d) sets the framework and provides the direction for actions of the NPS. Adherence to policies is mandatory unless allowed by enabling legislation, or waived or modified by the Secretary, Assistant Secretary, or the Director, or if a law directly and specifically directs an action contrary to NPS policy. *Management Policies 2006* also contains guidance applicable to the alternatives contained in this document.

This EIS assesses the effects of the alternatives on park resources and values and provides information used in determining if these effects would cause impairment or unacceptable impacts. NPS *Management Policies 2006* require an analysis of potential effects to determine whether or not actions would impair park resources (NPS 2006d). To assess the impacts of the proposed action, policies relating to resource protection were considered during EIS preparation, including biological resource management (4.4), native plants and animals (section 4.4.2), water quality (section 4.6.3), floodplains (section 4.6.4), wetlands (section 4.6.5), protection of geologic processes (section 4.8.1), soundscape management

(section 4.9), protection and preservation of cultural resources (section 5.3.1), treatment of cultural resources (section 5.3.5), wilderness resource management (section 6.3), and wilderness use management (section 6.4). For example, NPS *Management Policies 2006* instructs park units to maintain, as parts of the natural ecosystems of parks, all plants and animals native to the park ecosystems, in part by minimizing human impacts on native plants, animals, populations, communities, and ecosystems, and the processes that sustain them (NPS 2006d, section 4.4.1). NPS *Management Policies 2006* direct park units to determine all management actions for the protection and perpetuation of federally, state-, or locally listed species through the park management planning process, and to include consultation with lead federal and state agencies as appropriate.

NPS *Management Policies 2006*, section 1.4.7.1 also apply a standard that avoids impacts it determines to be unacceptable. Managers must not allow uses that would cause unacceptable impacts, such as those which "impede the attainment of a park's desired future condition for natural and cultural resources." Furthermore, section 1.4.3.1 of NPS *Management Policies 2006* gives park managers the authority to manage and regulate uses to ensure that impacts from the uses are acceptable (NPS 2006d).

Potential wilderness is congressionally designated and the management policies starting with 6.3 and beyond address management of designated wilderness. Pursuant to NPS *Management Policies 2006* section 6.3.1, the NPS will take no action to diminish potential wilderness qualities and will ensure that potential wilderness is "managed as wilderness to the extent that existing nonconforming conditions allow." Section 6.3.1 also directs the NPS to "apply the principles of civic engagement and cooperative conservation as it determines the most appropriate means of removing the temporary, nonconforming conditions that preclude wilderness designation from potential wilderness. All management decisions affecting wilderness will further apply the concept of 'minimum requirement' for the administration of the area regardless of wilderness category" (NPS 2006d, section 6.3.1).

## National Historic Preservation Act

The NHPA, as amended, is legislation intended to preserve historical and archaeological sites. The act created the National Register of Historic Places, the list of National Historic Landmarks, and the State Historic Preservation Offices (SHPO). Under Section 106 of the NHPA and implementing regulations 36 CFR 800, federal agencies must take into account the effects of their undertakings on significant historic properties and afford SHPO and the Advisory Council on Historic Preservation an opportunity to comment as appropriate. The agency must seek ways to avoid, minimize or mitigate any adverse effects on historic properties. Historic properties include districts, sites (both historic and prehistoric), buildings, structures, and objects that are included in or eligible for inclusion in the National Register. For a discussion of NHPA applicability to this EIS, see the "Cultural Resources" section above under "Issues and Impact Topics Considered but Dismissed."

## Marine Mammal Protection Act

The Marine Mammal Protection Act (MMPA) of 1972 establishes a national policy to prevent marine mammal populations from declining and to protect marine mammals. Under MMPA, the Secretary of Commerce has the responsibility to protect cetaceans (whales, porpoises, and dolphins) and pinnipeds

(seals and sea lions) except walruses. Section 101(a)(5)(A–D) of MMPA prohibits, with certain exceptions, the taking of marine mammals in the waters of the United States and on the high seas. Congress defines "take" as "harass, hunt, capture, or attempt to harass, hunt, capture or kill any marine mammal." In 1986, Congress amended MMPA to authorize takings of depleted stocks of marine mammals, again provided that the number of mammals taken (killed, injured, or harassed) was small and the taking had a negligible impact on marine mammals. In 1994, MMPA section 101(a)(5) was further amended to establish an expedited process by which citizens of the United States can apply for an authorization to incidentally take small numbers of marine mammals by "harassment" pursuant to Incidental Harassment Authorizations. The term harassment means, "any act of pursuit, torment, or annoyance that (i) has the potential to injure a marine mammal or marine mammal stock in the wild; or (ii) has the potential to disturb…by causing disruption of behavioral patterns, including but not limited to migration, breathing, nursing, breeding, feeding, or shelter" (16 U.S.C.1362[18]).

## Coastal Zone Management Act

Congress passed the Coastal Zone Management Act (CZMA) in 1972 to "preserve, protect, develop, and where possible, restore and enhance the resources of the nation's coastal zone." The act encourages coastal states to develop and implement comprehensive programs to manage and balance competing coastal resource uses (e.g., balancing resource protection with economic growth and development). CZMA allows states with approved plans to review federal actions that have a reasonably foreseeable effect on any land or water use or natural resources of the state's coastal zone. The CZMA provides states with the ability to review federal activities and federally permitted activities, and ensure that such activities are consistent, to the maximum extent practicable, with their coastal zone management plans. The processes used to implement this requirement are called "consistency determinations" and "consistency certifications." If a proposed action is inconsistent with the requirements of the state's approved program, the applicant and federal agency are prohibited from conducting the activity unless certain significant additional procedures are followed.

The NOAA Office of Ocean and Coastal Resource Management (OCRM) oversees the state implementation of CZMA. At the state level, CCC implements the CZMA as it applies to federal activities, development projects, permits, and licenses within the project area. CZMA consistency certifications are reviewed in accordance with the California Coastal Act and the state's coastal plan. CCC made a request to NOAA-OCRM to review the new DBOC SUP application. NOAA-OCRM granted the request because it determined that the activity had the potential to have a "foreseeable effect" on coastal resources (NOAA-OCRM 2011b). Furthermore, NOAA-OCRM determined that DBOC must prepare and submit to CCC a certification that the activities undertaken will be conducted in a consistent fashion with the federally approved enforceable policies of the California Coastal Management Program. This would include submission of necessary data and information, as required by 15 CFR 930.58. Within their letter to CCC, NOAA-OCRM stated that NPS may not issue an SUP until CCC concurs with the consistency certification or that concurrence is presumed based on a lack of response within regulated timeframes (NOAA-OCRM 2011b).

## Clean Water Act

The Clean Water Act of 1972 (33 U.S.C. 1344 et seq.), as amended, is the primary federal law in the United States governing water integrity. The goal of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the nation's water." Waters of the United States generally include tidal waters, lakes, ponds, rivers, streams (including intermittent streams), and wetlands.

Section 404 of the CWA authorizes USACE to issue permits to project applicants for the "discharge of dredged and/or fill material in waters of the U.S." and is the primary federal authority for the protection of wetlands. USACE jurisdiction for waters of the United States is based on the definitions and limits contained in 33 CFR 328, which encompasses all navigable waters, their tributaries, and adjacent wetlands, and includes ocean waters within 3 nautical miles of the coastline. Projects involving the discharge of dredged and/or fill material into waters of the United States require authorization from USACE.

Under section 404, USACE has established a nationwide permit (USACE 2007) for existing commercial shellfish aquaculture operations that "authorizes the installation of structures necessary for the continued operation" as well as "discharges of dredged or fill material necessary for shellfish seeding, rearing, cultivating, transplanting, and harvesting activities." However, the nationwide permit does not apply to new operations or expansions; to cultivation of additional species; to the construction of attendant features such as docks, piers, boat ramps, stockpiles, or staging areas; or to the deposition of shell material into the water as waste (USACE 2007). The purpose of this nationwide permit is to reduce permitting timeframes and simplify continued operation of existing shellfish mariculture projects. State and local authorities may require a separate certification or waiver for authorization of continued operations. It is possible, however, that DBOC would be considered a "new operation" for purposes of permitting, as DBOC does not have an existing permit.

Projects resulting in discharges of dredged or fill material into waters of the United States must comply with the guidelines promulgated by the Administrator of the Environmental Protection Agency (EPA) under section 404(b) of the CWA (33 U.S.C. 1344[b]). Under these guidelines, USACE may only permit discharges of dredged or fill material into waters of the United States that represent the least environmentally damaging practicable alternative, provided that the alternative does not have other significant adverse environmental consequences. Practical alternatives must be presented and evaluated during the permit process so USACE can determine which alternative will have a less adverse impact on aquatic ecosystems. On November 16, 2010, USACE stated that "aquaculture activities are within our jurisdiction and a permit is required" (USACE 2010, see relevant correspondence in appendix D). USACE also reiterated the need for DBOC to obtain a permit for impacts on waters of the U.S., including wetlands, vegetated shallows, and open waters pursuant to section 404 of the CWA in their comment letter on the Draft EIS (USACE 2011a, see relevant correspondence in appendix D). It would be the responsibility of DBOC to obtain all relevant permits.

Section 401 of the CWA requires that any applicant for a section 404 permit also obtain a water quality certification from the state. The purpose of the certification is to confirm that the discharge of fill materials will comply with the state's applicable water quality standards. Section 401 gives the authority to the State of California either to concur with USACE approval of a section 404 permit or to place special conditions on the approval, or deny the activity by not issuing a 401 certification. States were granted this authority to ensure that federally approved projects are in the best interests of the state. The

section 404 permit is not valid without a section 401 certification or waiver of the certification by the state. The 401 certification also applies to any application for a federal license or permit that might result in discharge of any type, including gray-water disposal, into waters of the United States. Section 401 certifications are issued by the San Francisco Bay Regional Water Quality Control Board.

Routine operations associated with DBOC commercial shellfish operations, such as the placement of oyster racks on the floor of Drakes Estero, placement of culture bags near the surface, and discharge of wash from the operations into Drakes Estero, may require both a section 404 permit and section 401 certification. DBOC also proposes to dredge the area around the boat ramp. Section 124 of PL 111-88 does not relieve DBOC of its obligations to comply with the Clean Water Act.

## Rivers and Harbors Act

Section 10 of the Rivers and Harbors Act of 1899, as amended (33 U.S.C. 403 et seq.) prohibits the unauthorized obstruction or alteration of any navigable water of the United States. This section provides that the construction of any structure in or over any navigable water of the United States, or the accomplishment of any other work affecting the course, location, condition, or physical capacity of such waters, is unlawful unless the work is approved by USACE. On November 16, 2010, USACE stated that, "aquaculture activities are within our jurisdiction and a permit is required" (USACE 2010, see relevant correspondence in appendix D). USACE also reiterated the need for DBOC to obtain a permit for impacts on waters of the U.S., including wetlands, vegetated shallows, and open waters pursuant to section 10 of the Rivers and Harbors Act in their comment letter on the Draft EIS (USACE 2011a, see relevant correspondence in appendix D). The Rivers and Harbors Act also requires section 401 certification from the state (as described above). It would be the responsibility of DBOC to obtain all relevant permits.

# RELEVANT STATE LAWS AND POLICIES

## California Coastal Act

This state law regulates all state and private actions affecting the California coastal zone. As discussed above, CCC is the state agency responsible for CZMA determinations. The regulatory authority also extends to federal actions affecting the coastal zone, as the California Coastal Act is part of the NOAA-approved California Coastal Management Program under the CZMA. The California Coastal Act addresses issues such as shoreline public access and recreation, lower cost visitor accommodations, terrestrial and marine habitat protection, visual resources, landform alteration, agricultural lands, commercial fisheries, industrial uses, water quality, offshore oil and gas development, transportation, development design, power plants, ports, and public works.

The California Coastal Act also imposes obligations on entities that conduct commercial businesses in the state's coastal zone. DBOC's commercial shellfish operation is located in the state coastal zone and is thus subject to CCC oversight and permitting requirements. CCC has issued two Cease and Desist Orders regarding the shellfish operation, one in 2003 to JOC and one in 2007 to DBOC (CCC 2003, 2007b). The 2003 Cease and Desist Order (No. CCC-03-CD-12) to JOC required the removal of some unpermitted development from the property (the shucking room and the retail counter, two houses, and two of the four

mobile homes), improvement of the wastewater system (which was draining into Drakes Estero), remediation related to the storage of oyster cultivation equipment and disposal of refuse in Drakes Estero and along the shore, and the submittal of a coastal development permit application for after-the-fact authorization for other unpermitted development that included construction of several commercial buildings and a horse paddock; additions to pre-Coastal Act buildings; and permanent placement of a mobile home, three metal storage/refrigeration containers, and an aboveground diesel fuel tank and concrete containment structure (CCC 2003).

When DBOC purchased the assets of JOC, it also assumed the compliance obligations arising from the CCC Consent Cease and Desist Order issued to JOC (CCC 2003). In 2005 and 2006, DBOC removed some of the unpermitted development identified in the 2003 Cease and Desist Order, including the removal of the western portion and the second-floor addition to the processing plant and retail facility, two storage containers, a refrigerated trailer, the seed setting area, the western portion of the storage facility, and a mobile home. However, not all of the unpermitted development had been removed when DBOC completed additional development without a coastal development permit, including placement of two large containers for shucking/packing/storage and a temporary construction trailer, construction of a processing facility and second leach field, grading and paving within the onshore portions, and placement of oyster culture apparatus (seed setting tanks and water intake) in Drakes Estero (CCC 2007b). DBOC also established unauthorized practices on the property (e.g., boat transit outside established channels). Between 2005 and 2007, CCC alerted DBOC to these violations, and DBOC agreed to submit a coastal development permit application for all "onshore and offshore" development on the property that required a permit.

A second Consent Cease and Desist Order (No. CCC-07-CD-11/CCC-07-CD-04) was issued as a short-term order to allow DBOC operations to continue while DBOC met the remaining requirements for documented violations. The 2007 Cease and Desist Order set time frames for submittal of the coastal development permit application, established agreed-upon conditions of the operations, and identified activities to be avoided until CCC received and approved the application. The consent order furthermore directed DBOC to take actions and implement protective measures to ensure protection of coastal resources. These protective measures included the following conditions:

- Onshore Conditions (Section 3.1)
    - additional structures prohibited pending CDP or de minimis waiver
    - submittal of a hazardous materials/discharge management plan
    - maximum temperature of released water must be less than 20 degrees more than receiving waters; seawater intake structures shall not exceed an intake velocity of 0.5 ft/s
- Offshore conditions (Section 3.2)
    - additional structures prohibited pending CDP
    - removal of equipment not being used within 30 days (including permanent structures such as racks)
    - submittal of a debris removal plan to NPS and CCC
    - import shellfish in the form of larvae or seed, certified by CDFG to be free of pathogens
    - boat transit limited to established channels that do not violate the protective measures set forth in the consent order. Submit a vessel transit plan to NPS and CCC. Include proposed access lanes (distinguishing between commonly used channels and channels only used when

certain racks/bags are active) and mooring areas for maintenance and harvesting of oysters, clams, and scallops.

- maintain the harbor seal protection areas as incorporated into SUP
- remove any Pacific and European flat oysters outside the approved cultivation areas
- clams and scallops shall only occur where currently cultivated and no additional non-oyster species shall be cultivated
- bottom bags shall only be placed in intertidal areas devoid of eelgrass
- provide documentation of "current production level" (including last year and next year's projection); the maximum annual production limit shall be capped at this level
- cultivation area defined as areas that are included in the current CDFG leases; consistent with CDH, FDA, and National Shellfish Sanitation Program; and specified as oyster beds or primary water quality sites

On November 29, 2007, DBOC signed the consent order to work with CCC and NPS to resolve the violations (CCC 2007b). Even though the 2007 Cease and Desist Order was issued as a short-term order, it currently remains in effect.

On September 29, 2011, CCC notified DBOC regarding potential noncompliance with several of the stipulations in the 2007 Consent Cease and Desist Order: "1) marine debris in Drakes Estero and on nearby coastal beaches, especially from abandoned, discarded, or fugitive plastic aquaculture materials; and 2) motorized vessel transit in the lateral sandbar channel near the mouth of the Estero during the seasonal restriction period established for harbor seal pupping sites in this area" (CCC 2011). CCC reaffirmed these continued violations and requested additional information from and meetings with DBOC in a subsequent letter on February 1, 2012 (CCC 2012a[li]).

On February 17, 2012, DBOC submitted an updated coastal development permit application to CCC for review and approval to resolve some of the violations cited in the orders (DBOC 2012a[lii]). In addition to previously requested items in the 2010 application, the current application includes portions of the work approved as part of the emergency storm repair of the damage caused in March 2011 and a request for 12 barbecue grills and 6 additional picnic tables. CCC informed DBOC on March 16, 2012 that this coastal development permit application was "incomplete because there is no evidence of landowner approval of the proposed work, a portion of the permit fee has not been submitted, and you [DBOC] have not provided sufficient detail regarding the additional work" (CCC 2012d). DBOC informed NPS in a letter dated May 7, 2012 that it would limit its current coastal development permit application to existing activities and would apply to CCC for a coastal development permit amendment in the future prior to future development (DBOC 2012d[liii]). DBOC also responded to the NPS's previous request for additional information related to consistency with the SUP and provided an updated project description.

In a letter dated July 30, 2012, CCC informed DBOC of its continued noncompliance with several of the stipulations in the 2007 Consent Cease and Desist Order, including unauthorized boat use of the lateral channel during the seasonal closure for harbor seal pupping, unauthorized boat use of the lateral channel to obtain water sampling data, the collection and disposal of marine debris as a result of JOC and DBOC operations, and development within the coastal zone without an approved coastal development permit. CCC notified DBOC that a new Cease and Desist Order is being considered, "Considering the current uncertainty of a new lease and SUP permit being granted to DBOC, the delays in the various proceedings,

your [DBOC] apparent confusion over certain terms of the Order, and the continuing difficulties in bringing DBOC operations into compliance with the Coastal Act" (CCC 2012b). On October 24, 2012, CCC notified DBOC that CCC was commencing proceedings for issuance of cease and desist and restoration orders (CCC 2012e[liv]). The letter summarized the violation as follows:

> As you know, your facility remains unpermitted under the Coastal Act; the 2007 Order was intended to provide a short-term means to protect coastal resources while such a permit was being sought, but in no way purported to authorize the facility under the Coastal Act, nor serve as a long term solution. In addition, unpermitted development since the 2007 order has occurred and includes, but may not be limited to: (1) operation of boats in the lateral channel (From footnote in letter: Defined as "the entire channel between the Main Channel and West Channel" in correspondence from the National Park Service to DBOC dated January 23, 2012) in violation [of] the National Park Service (NPS) Special Use Permit (SUP) issued in April, 2008, and therefore additionally in violation of Section 7.0 of the 2007 Order, which specifically anticipates and requires compliance with all permits; (2) unpermitted discharge of marine debris in the form of abandoned, discarded, or fugitive mariculture materials in violation of Section 3.2.2 of the 2007 Order, which requires removal of abandoned equipment, and Section 1.0( c) of Cease and Desist Order No. CCC-03-CD-12 (the 'Johnson Order'), which mandates a removal plan to address submerged oyster cultivation equipment and materials in the estuary; and (3) new unpermitted development, including but not limited to, construction and backfill of a 12" by 18" by 80' long electrical trench, placement and removal of clam cultivation bags within a harbor seal protection area and associated vessel use and worker operations, placement of three 4' diameter concrete planters, removal and replacement of six picnic tables and placement of six additional picnic tables and installation of an 8' by 40' refrigeration unit within the last month, in violation of Sections 2.0, 3.1.2 and 3.2.1 of the 2007 Order, which expressly prohibit the performance of any new development including onshore or offshore structures, without some sort of Coastal Act authorization. (CCC 2012e)

Coordination between CCC and DBOC is ongoing to resolve the remaining violations.

Section 124 of PL 111-88 does not relieve DBOC of its legal obligations under the California Coastal Act.

## California Fish and Game Code

Under the California Fish and Game Code, the California legislature authorizes CFGC to issue state water bottom leases for marine aquaculture on state-owned tide and submerged lands. CDFG administers such leases. Leases are granted for up to a 25-year period and are subject to renewal if the lessees remain "actively engaged" in aquaculture. Currently, commercial marine aquaculture is limited to oysters, abalone, clams, mussels, algae, kelp, scallops, and finfish.

The tide and submerged lands within Drakes Estero were conveyed by the State of California to the United States in 1965 and do not constitute state-owned tide or submerged lands for the purposes of state water bottom leasing. In the conveyance statute, the state retained certain mineral rights in the submerged

lands, but the state did not retain the right to issue aquaculture leases. The state also retained, on behalf of the people, the right to fish. However, as explained earlier in this chapter, the right to fish does not encompass commercial aquaculture like that practiced by DBOC.

Although the leasing provisions of the Fish and Game Code do not apply to DBOC, other provisions of the code do apply. These include provisions related to stocking of aquatic organisms (sections 15200-15202), brood stock acquisition (sections 15300-15301), disease control (sections 15500-15516), aquaculture registration for all operators (sections 15100-15105), and the importation of aquatic animals (sections 15600-15605). CDFG coordinates disease and health certification for shellfish with other agencies. Section 124 of PL 111-88 does not relieve DBOC of its obligations to comply with these state law requirements.

## California Marine Life Protection Act

This state law directs the reevaluation and redesign of California's system of marine protected areas (MPAs) to increase coherence and effectiveness in protecting the state's marine life and habitats, marine ecosystems, and marine natural heritage, as well as to improve recreational, educational, and study opportunities provided by marine ecosystems subject to minimal human disturbance. The establishment of a combination of state marine reserves, state marine conservation areas, and state marine parks helps achieve these goals. The Marine Life Protection Act (MLPA) also requires that the best readily available science be used in the redesign process, as well as the advice and assistance of scientists, resource managers, experts, stakeholders, and members of the public. This process was recently completed for the North Central Coast Study Region, including the Seashore, and resulted in the designation of MPAs within and adjacent to Drakes Estero. Point Reyes Headlands to the west of the project area and Estero de Limantour to the southeast have been designated as state marine reserves where the take of all living marine resources is prohibited. Drakes Estero is identified as a state marine conservation area where take of all living marine resources is prohibited, except for (1) recreational take of clams and (2) commercial aquaculture of shellfish pursuant to a valid state water bottom lease and permit. The Fish and Game Code definition of take is "hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture, or kill." This is slightly different than the definition used by the MMPA (see the section entitled "Marine Mammal Protection Act"). Due to the proximity of the proposed action to the MPAs, the MLPA was considered during preparation of this EIS.

Section 124 of PL 111-88 does not relieve DBOC of its obligations to comply with the California Marine Life Protection Act.

## California Health and Safety Code and Other State Requirements

Shellfish cultivated under the provisions of an aquaculture registration may only be grown, processed, and marketed for human consumption under the California Health and Safety Code and other California statutes and regulations, including the California Shellfish Law (California Health and Safety Code sections 28500-28519.5) and Shellfish Regulations (California Code Regulations 17 sections 7706–7761). Section 124 of PL 111-88 does not relieve DBOC of its obligations to comply with these state law requirements. The public health code requirements are monitored and enforced by the California Department of Public Health.

# RELEVANT FEDERAL EXECUTIVE ORDERS

## Executive Order 11990: Protection of Wetlands

This executive order directs federal agencies to avoid, to the extent possible, the long-term and short-term adverse impacts associated with the destruction or modification of wetlands, and to avoid direct or indirect support of new construction in wetlands wherever there is a practicable alternative. A fundamental element of this executive order is the adoption of a "no net loss of wetlands" goal, which the NPS wetlands policy was derived from. In addition, the NPS will strive to achieve a longer-term goal of net gain of wetlands Service-wide (NPS 2006d).

## Executive Order 11988: Floodplain Management

This executive order directs federal agencies to avoid, to the extent possible, the long-term and short-term adverse impacts associated with the occupancy and modification of floodplains, and to avoid direct or indirect support of floodplain development wherever there is a practicable alternative.

## Executive Order 13112: Invasive Species

This executive order directs federal agencies to avoid, to the extent possible, authorizing, funding, or carrying out actions that it believes are likely to cause or promote the introduction or spread of invasive species.

## Executive Order 13158: Marine Protected Areas

This executive order directs federal agencies to take appropriate actions to enhance or expand protection of existing Marine Protected Areas (MPAs) and establish or recommend, as appropriate, new MPAs. On April 23, 2009, NOAA published in the Federal Register the initial list of national system MPAs. A total of 225 sites were designated, including Point Reyes National Park [Seashore], which includes Drakes Estero (NOAA 2009). Since then, an additional 72 sites have been listed as part of the national system MPA, including the Drakes Estero State Marine Conservation Area (NOAA 2011b).

## Executive Order 13186: Responsibilities of Federal Agencies to Protect Migratory Birds

This executive order directs executive departments and agencies to take certain actions to further implement the MBTA.

## Executive Order 12898: General Actions to Address Environmental Justice in Minority Populations and Low-income Populations

This executive order requires all federal agencies to identify and address the disproportionately high and/or adverse human health or environmental impacts of their programs and policies on minorities and low-income populations and communities (EPA 1994).

# RELATIONSHIP TO OTHER PLANS AND DOCUMENTS

## Point Reyes National Seashore, General Management Plan (1980)

The primary purpose of a GMP is to provide vision for a park that will guide how the park's lands and waters are managed over a 15- to 20-year period. The most recent GMP for the Seashore was completed in 1980 (NPS 1980). Because resource management needs and goals evolve, this document is outdated, and the Seashore is in the process of developing a new GMP. Nevertheless, the 1980 plan provides some general background guidance applicable to actions considered in this EIS.

The GMP divides the Seashore into separate land management zones, with an emphasis on natural resource protection. Management objectives are defined for each zone that clearly convey the direction for resource preservation and visitor use. Approximately two-thirds of the Seashore's acreage is assigned to the natural zone, which includes subzones of wilderness and research reserves (marine life preservation areas established to protect and study aquatic wildlife). The majority of Drakes Estero falls within the wilderness classification through its congressionally designated potential wilderness status. Additional lands within the Seashore have been classified into four special use zones, including "pastoral lands," "radio range station," "oyster farm," and "lands not to be acquired." The onshore property used as part of the commercial shellfish operation is designated as the "oyster farm" subzone consisting of 5 acres on the upper end of Drakes Estero. Additionally, lease boundaries are delineated in Drakes Estero where oysters are cultivated and harvested. Overall, the plan limits the development zone used for roads and parking, administration facilities, and minor facilities.

The 1980 GMP contains several natural resource objectives that have influenced management of the resources within the Seashore and at Drakes Estero and that will guide the analysis in this EIS. These objectives include:

- To protect marine mammals, threatened and endangered species, and other sensitive natural resources found within the Seashore
- To preserve and manage as wilderness those lands so designated under PL 94-567 and to also manage as wilderness to the extent possible those tide and submerged lands designated as potential wilderness
- To monitor and improve maricultural operations, in particular the oyster mariculture operation in Drakes Estero, in cooperation with the California Department of Fish and Game
- To enhance knowledge and expertise of the ecosystem management through research and experimental programs (NPS 1980)

With its mandate to care for and administer these lands in a way that safeguards their natural character, and knowing that the RUO for the onshore portion of the oyster operation did not expire for another 32 years (until 2012), the NPS's decision to monitor and improve the oyster operation in a manner consistent with NPS mandates was an appropriate goal for the anticipated lifespan of the GMP. Rehabilitation of existing structures, improvements to the drainage system and leach fields, and the addition of screening fences were all undertaken. Monitoring activities have been conducted within Drakes Estero relative to various marine species to identify habitat areas and current trends.

## Environmental Assessment Johnson Oyster Company

In 1998, an EA was prepared by NPS to bring JOC into compliance with federal, state, and Marin County regulations (NPS 1998a). The EA was prepared to allow JOC to address an unpermitted discharge into Drakes Estero from a failed JOC septic system. Consistent with the 1980 GMP, which envisioned that NPS would monitor and improve the commercial shellfish operation in a manner consistent with then-existing NPS mandates during the anticipated lifespan of the GMP, and because of the need to address this unpermitted discharge, the NPS worked with JOC and Marin County to permit upgrades to the septic system. JOC also proposed the construction of a new oyster processing plant and the replacement and rehabilitation of several additional structures and infrastructure, including the seed plant, stringing plant, garage, and septic system. NPS approved these actions in a Finding of No Significant Impact (FONSI) dated August 11, 1998 (NPS 1998b). The FONSI also included an annual processing/production limit of 700,000 pounds (oyster weight) to ensure that the new facilities would not create additional growth (and any new negative impacts) in overall oyster production in the estuary (NPS 1998b). The only actions that JOC completed were removal of some mobile homes from the site and installation of a single leach field, which corrected the unpermitted discharge.

While some progress was made by JOC in bringing facilities into compliance, there were still numerous California Coastal Act, county building code, and NPS permit violations left unresolved (Caywood and Hagen 2011). In 2003, CCC issued a Cease and Desist Order (No. CCC-03-CD-12) to JOC that required the removal of some unpermitted development from the property, improvement of the wastewater system, and the submittal of a coastal development permit application for after-the-fact authorization for other unpermitted development (CCC 2003). Due to these unresolved violations, in September 2003 NPS revoked authority for the construction and replacement activities that had been authorized by the 1998 EA and FONSI (NPS 2003c[iv]).

Actions considered in the 1998 NEPA process that had not been completed prior to the NPS's revocation of the FONSI in 2003 are being reviewed in this EIS in accordance with existing NPS policies and procedures.

## Statement of Principles

In April 2008, in conjunction with the SUP, DBOC and NPS agreed to a statement of principles that outlined procedures to be followed in the event that a NEPA document need to be prepared for proposed activities associated with the remaining 4-year term of the RUO. As indicated by the statement of principles, DBOC was to prepare a "description of their operations for NEPA evaluation" and that NPS would consider

this description in developing the purpose and need for the NEPA document and alternatives to be considered. The statement of principles was executed prior to the enactment of section 124 and prior to the Secretary's decision to conduct a NEPA evaluation of the possible issuance of a permit under section 124. NPS and DBOC have agreed to apply the statement of principles to this EIS to the extent that it is applicable. The statement of principles highlights good faith efforts from both parties to share information and provide timely responses. The statement of principles can be found in appendix C.

## Point Reyes National Seashore Comprehensive Interpretive Plan

The *Point Reyes National Seashore Comprehensive Interpretive Plan* (NPS 2003b) presents primary park-wide themes, visitor experience goals, existing interpretive conditions, and future interpretive programs. Interpretive and educational services, including personal services, interpretive media, and partnerships that work to support the delivery of interpretive and educational programs are coordinated with the comprehensive interpretive plan.

## Point Reyes National Seashore Strategic Plan

*The Point Reyes National Seashore Strategic Plan for 2005–2008* (NPS 2004e) contains mission statements and long-term goals for the Seashore. Annual plans and implementation strategies have been established for each of the 5-year goals.

## Point Reyes National Seashore Resource Management Plan

The resource management plan for the Seashore was updated in December 1999. The plan presents an inventory and description of natural and cultural resources, describes and evaluates the current resources management program, and prescribes an action program based on legislative mandates, NPS policies, and provisions of related planning documents. The resource management objectives are broadly summed up in the vision statement for the Seashore, as illustrated in this excerpt:

> Point Reyes National Seashore will be a model of environmental stewardship—a coastal sanctuary where all park staff and the public are actively involved in the common goal of maintaining, protecting, restoring, and preserving the natural and cultural integrity of the park. We will enhance stewardship through research and monitoring programs. We will use this knowledge to promote the natural vitality of a healthy ecosystem, with a resource management program that supports the native species and natural biologic and geologic processes, which occur here. Threatened, endangered, and specially protected species will be given particular attention to ensure they are perpetuated for future generations.

> To acknowledge the historic, cultural, and ethnic diversity of the area, resources such as the Point Reyes Lighthouse and other maritime sites and structures, Coast Miwok sites, and cultural landscapes embodied in the historic ranches will be preserved. . . . Point Reyes will be a place where you can visit and experience nature in peaceful solitude as it has existed for thousands of years. (NPS 1999b)

**USFWS and NMFS Federally Listed Species Recovery Plans**

Section 4 of the ESA requires USFWS and NMFS to develop and implement recovery plans for threatened and endangered species, unless such plans would not promote conservation of the species. Recovery plans are guidance documents intended to delineate reasonable actions that are believed to be required to recover and/or protect listed species. As such, according to the ESA, the recovery plans must at a minimum provide a description of site-specific management actions necessary to achieve recovery of a species; objective, measurable criteria which, once met, would result in a determination that the species be removed from the list; and estimates of the time and cost required to achieve the plan's goal (NMFS 2010d). In addition, section 4 of the ESA requires USFWS and NMFS to conduct status reviews of each listed species at least once every 5 years (called "5-year review"). The purpose of the 5-year review is to evaluate whether or not a species status has changed since it was listed or since the last 5-year review.

Generally, USFWS manages land and freshwater species, whereas NMFS manages marine and anadromous (i.e., migrating between ocean and freshwater) species. USFWS has recovery plans for Myrtle's silverspot butterfly (USFWS 1998), California red-legged frog (USFWS 2002b), leatherback turtle (NMFS and USFWS 1998), western snowy plover (USFWS 2007), and California least tern (USFWS 1985b). USFWS 5-year reviews are available or in progress for all of these species.

NMFS recovery planning follows NMFS interim recovery planning guidance, which was established in July 2006. This guidance, in addition to status reviews conducted by NMFS, has led to several recent recovery documents for salmon and steelhead species in multiple regions. Recovery of the central California coast Coho salmon is outlined in the draft central California coast Coho salmon recovery plan (NMFS 2010b), which is in the approval process. Recovery of the central California coast Steelhead is described in the *Federal Recovery Outline for the Distinct Population Segment of Central California Coast Steelhead* (NMFS 2011e). This is a NMFS pre-planning document to facilitate development of a draft recovery plan.

# ENDNOTES

i. CSLC 2007, Letter from Executive Officer, California State Lands Commission, to Alliance for Local Sustainable Agriculture, on July 26, 2007, regarding a review of the state land conveyances and jurisdictions.

> "We have reviewed land conveyances made by the Office of the Surveyor General and the Legislature as they pertain to the tide and submerged lands of the Estero and have concluded that they have conveyed out all of the State's real property interest except the mineral estate. This leaves the Commission with no jurisdiction over the bed of the Estero and precludes us from taking any action.

ii. CDFG 2007b, Letter from Director, California Department of Fish and Game, to Superintendent Point Reyes National Seashore, May 15, 2007, regarding Drakes Bay Oyster Company lease status.

> "Consistent with article 1, section 25 of the California Constitution, this conveyance carried a reservation of the right to fish in the waters overlying these lands. Although the right to fish extends to both commercial and sports fishing, it does not extend to aquaculture operations. Regardless if its purpose is commercial or recreational, fishing involves the take of public trust resources and is therefore distinct from aquaculture, which is an agricultural activity involving the cultivation and harvest of private property."

iii. CSLC 2007, Letter from Executive Officer, California State Lands Commission, to Alliance for Local Sustainable Agriculture, on July 26, 2007, regarding a review of the state land conveyances and jurisdictions.

> "Secondly, we have taken a look at the constitutional 'right to fish' reserved in the 1965 legislative grant. It is our belief that this reservation addresses fishing in the sense of taking or capturing fish and that it does not deal with aquaculture which comes under the jurisdiction of the Department of Fish and Game. It [is] also apparent that the right to fish is not an absolute one and that it is susceptible to reasonable regulation."

iv. DOI 2012a, Letter (with attachments) from Field Solicitor to California Fish and Game Commission Executive Director on May 21, 2012.

> "The issue of the State of California's authority to issue aquaculture leases for the water bottoms in Drakes Estero has been addressed by the Department of Fish and Game's Office of General Counsel, by the Executive Officer of the State Lands Commission, and by the Attorney General's Office. All three have reached the same conclusion: that the "right to fish" under the public trust doctrine does not extend to aquaculture or to the leasing of water bottoms in Drakes Estero.
>
> As explained in the March 25, 2008 letter from the Department of Fish and Game (Department), the cultivated products of an aquaculture operation are private property. By contrast, the public's right to fish under the public trust extends only to public resources, such as wild fish and mollusks. Because the shellfish cultivated by DBOC are private property, the public trust doctrine does not authorize the issuance of a state lease for DBOC's private commercial aquaculture operation."

v. CDFG 2007b, Letter from Director, California Department of Fish and Game, to Superintendent Point Reyes National Seashore, May 15, 2007, regarding Drakes Bay Oyster Company lease status.

> "For these reasons, we believe the mariculture operation in Drakes Estero is properly within the primary management authority of the PRNS, not the department (CDFG)."

vi. CDFG 2008a, Letter from, California Department of Fish and Game Acting Director, to Honorable Jared Huffman, Assembly Member, March 25, 2008, regarding CDFG position on Drakes Bay Oyster Farm.

> "Since both the 1972 grant reservation and the 2004 state water bottom lease renewal require compliance with all rules and regulations of the National Park Service, the Department concluded the "Primary management authority" for the oyster farm lies with the PRNS."

vii CDFG 2011f, Letter (with attachments) from California Department of Fish and Game to Point Reyes National Seashore on December 22, regarding CDFG's comments on National Park Service Draft Environmental Impact Statement for Drakes Bay Oyster Company Special Use Permit.

> "DFG, page 7, Paragraph 2: The CDFG manages 16 shellfish leases held by 8 such operators."

viii CDFG 2011f, Letter (with attachments) from California Department of Fish and Game to Point Reyes National Seashore on December 22, regarding CDFG's comments on National Park Service Draft Environmental Impact Statement for Drakes Bay Oyster Company Special Use Permit.

> "DFG, page 7, Paragraph 3 1st sentence: Does this number include DBOC? If not, there are 9 operations (11 including DBOC). The 19 operations are not all on granted or private tidelands. The rest are private land-based facilities."

ix. CDFG 2007b, Letter from Director, California Department of Fish and Game, to Superintendent Point Reyes National Seashore, May 15, 2007, regarding Drakes Bay Oyster Company lease status.

> "For these reasons, we believe the mariculture operation in Drakes Estero is properly within the primary management authority of the PRNS, not the department (CDFG)."

x. CDFG 2008a, Letter from, California Department of Fish and Game Acting Director, to Honorable Jared Huffman, Assembly Member, March 25, 2008, regarding CDFG position on Drakes Bay Oyster Farm.

> "Since both the 1972 grant reservation and the 2004 state water bottom lease renewal require compliance with all rules and regulations of the National Park Service, the Department concluded the "Primary management authority" for the oyster farm lies with the PRNS."

xi. DOI 2012a, Letter (with attachments) from Field Solicitor to California Fish and Game Commission Executive Director on May 21, 2012.

> "The issue of the State of California's authority to issue aquaculture leases for the water bottoms in Drakes Estero has been addressed by the Department of Fish and Game's Office of General Counsel, by the Executive Officer of the State Lands Commission, and by the Attorney General's Office. All three have reached the same conclusion: that the "right to fish" under the public trust doctrine does not extend to aquaculture or to the leasing of water bottoms in Drakes Estero.
>
> As explained in the March 25, 2008 letter from the Department of Fish and Game (Department), the cultivated products of an aquaculture operation are private property. By contrast, the public's right to fish under the public trust extends only to public resources, such as wild fish and mollusks. Because the shellfish cultivated by DBOC are private property, the public trust doctrine does not authorize the issuance of a state lease for DBOC's private commercial aquaculture operation."

xii. CSLC 2007, Letter from Executive Officer, California State Lands Commission, to Alliance for Local Sustainable Agriculture, on July 26, 2007, regarding a review of the state land conveyances and jurisdictions.

> "Secondly, we have taken a look at the constitutional 'right to fish' reserved in the 1965 legislative grant. It is our belief that this reservation addresses fishing in the sense of taking or capturing fish and that it does not deal with aquaculture which comes under the jurisdiction of the Department of

Fish and Game. It [is] also apparent that the right to fish is not an absolute one and that it is susceptible to reasonable regulation."

xiii. DOI 2012a, Letter (with attachments) from Field Solicitor to California Fish and Game Commission Executive Director on May 21, 2012.

"The issue of the State of California's authority to issue aquaculture leases for the water bottoms in Drakes Estero has been addressed by the Department of Fish and Game's Office of General Counsel, by the Executive Officer of the State Lands Commission, and by the Attorney General's Office. All three have reached the same conclusion: that the "right to fish" under the public trust doctrine does not extend to aquaculture or to the leasing of water bottoms in Drakes Estero.

As explained in the March 25, 2008 letter from the Department of Fish and Game (Department), the cultivated products of an aquaculture operation are private property. By contrast, the public's right to fish under the public trust extends only to public resources, such as wild fish and mollusks. Because the shellfish cultivated by DBOC are private property, the public trust doctrine does not authorize the issuance of a state lease for DBOC's private commercial aquaculture operation.

We would also like to address the Commission's leasing authority under Fish and Game Code Sections 15400 *et. seq.* These provisions authorize the Commission to lease state water bottoms for aquaculture operations. In 1965, the California Legislature conveyed all of the tide and submerged lands in Drakes Estero to the United States. The only interests reserved by the Legislature were the right to fish (discussed above) and certain mineral rights. As indicated

xiv. Studdert 1993, Letter from Johnsons Oyster Company Legal Council to Director, California Department of Fish and Game, on August 6, 1993, regarding Water Bottom Allotment Lease No. M-438-01 Johnson Oyster Company.

"Johnson Oyster Company would like to start culturing Manila Clams on the captioned lease [Lease No. M-438-01] in Drakes Estero. Accordingly, please consider this a request to add that species, Manila clams (*Venerupis japonica),* to the other species specified at page 4 of the captioned allotment [Lease No. M-438-01] at the top of the page."

xv. NPS 2003c, Letter from Point Reyes National Seashore Superintendent to Johnson Oyster Company on September 17.

"Finally, we must ensure you realize that you do not have authority or permission to construct any new facilities on the reservation lands or other lands authorized under permits. Regarding any new facilities that were authorized by the completion of the Johnson Oyster Replacement and Rehabilitation Environmental Assessment in 1998, the NPS revokes any authority for construction and replacement activities."

xvi. CDFG 2004a, Letter from California Department of Fish and Game to Johnson's Oyster Company, February 2, 2004 regarding application to extend JOC Mariculture Leases M-438-01 and M-438-02.

"2) Lease term- The maximum lease renewal term allowed by the Commission is 25-years. You have expressed the desire to renew your lease for the 25-year maximum allowed by the Commission. However, The Department would require that a federal/National Park Service (NPS) lease be in effect concurrently with the state water bottom lease. Based on information from Don Neubacher, Superintendent, Point Reyes National Seashore, your existing federal lease [RUO] will terminate in 2012. At that time the leased land will revert to wilderness designation and your non-conforming use will not be permitted thereafter. The Department will want language in the lease that limits the lease renewal term to a 25-year maximum, or until the expiration of the federal lease."

xvii. NPS 2004c, Letter from Superintendent, Point Reyes National Seashore to Director, California Department of Fish and Game, March 15, 2004, regarding legal opinions from the DOI Solicitor's Office about the aquaculture activities of Tom Johnson in Drakes Estero.

"After reading the legal opinions from our Solicitor's Office, we wish to have a meeting with you regarding how to proceed. At this time, we still believe Mr. Johnson will need a permit from the National Park Service to operate in Drakes Estero and additional environmental compliance may be necessary."

xviii. CDFG 2004b, Memorandum from Director, California Department of Fish and Game to Executive Director, California Fish and Game Commission, June 14, 2004 regarding Consent Item 32 on the June 24, 2004 CFGC meeting to extend JOC Mariculture Leases M-438-01 and M-438-02.

"He [Johnson] has also indicated an interest in renewing the leases for the maximum twenty-five (25) year period. The Department supports the renewal of the leases and concurs with the requested twenty-five year renewal period. Johnson Oyster Company has been operating on National Park Service fee land in Point Reyes National Seashore under a 1972 Reservation of Use and Occupancy (Federal Reservation) in which Mr. Johnson, as a condition of his sale to the Park Service, reserved the right to operate an oyster farm for 40 years until 2012. However, there is some uncertainty whether the Federal Reservation will be extended. For this reason, the Department is recommending that the renewed leases be contingent upon there being a Federal Reservation in place."

"The Department recommends approval of the requested lease renewals for a period of twenty-five years, contingent on there being a Federal Reservation for the land use within the Point Reyes National Seashore. The Department recommends the annual rental rate leases take into consideration the financial hardship expressed by Mr. Johnson and be subject to the stipulations discussed above. The Department also recommends that the lease be contingent on Johnson Oyster Company maintaining appropriate Coastal Zone operational practices as specified by the California Coastal Commission and other federal and state regulatory agencies."

xix. NPS 2004d, Letter from Superintendent Point Reyes National Seashore, to the Director, California Department of Fish and Game, June 18, 2004 regarding Consent Item 32 on the June 24, 2004 CFGC meeting to extend JOC Mariculture Leases M-438-01 and M-438-02.

"As we have discussed with representatives from the Department of Fish and Game, the NPS still believes that any activity in the Estero must also be permitted by the NPS. We have also requested clarification on how CEQA requirements are being met by the Department."

xx. DBOC 2011f, Letter from Drakes Bay Oyster Company to Point Reyes National Seashore, March 4, 2011, regarding supplemental scoping information.

"Sales agreement between DBOC and JOC (including information on lease holding interests). Attached, please find a copy of the asset purchase agreement between Johnson Oyster Company and the Lunny Family (Attachment 1-A)."

xxi. DBOC 2008c, Letter from Drakes Bay Oyster Company to California Coastal Commission, November 14, 2008, regarding additional documentation required to comply with Consent Cease and Desist Order No. CCC-07-CD-11.

"Kumamoto oysters have been removed from Drakes Estero. They were in Bed #39. Please see Exhibit 8: Letter from the California Fish and Game."

xxii. CDFG 2008b, Letter from Senior Fish Pathologist, California Department of Fish and Game to Drakes Bay Oyster Company on November 14, regarding Removal of Kumamoto oysters from Home Bay, Drakes Estero.

> "DBOC and DFG staff searched for and removed all bags of Kumamoto oysters present. The bags were confined to a region approximately 10M in diameter. We removed exactly 20 bags, each with approximately 300 oysters per bag."

xxiii. NPS 2009d, Letter from Superintendent, Point Reyes National Seashore, to Commissioner, California Coastal Commission, December 8, 2009, regarding expansion of Manila clams in CDFG Lease No. M-438-01.

> "Our specific concerns follow:  Changes in the current CDFG lease are subject to environmental review and analysis under the National Environmental Policy Act (NEPA), along with the California Environmental Quality Act (CEQA). We believe the expansion of the area from one acre to the entire lease over 1,000 acres where Manila clams can be cultivated is an important change to the current lease and requires environmental review. We also believe that consultation regarding this expansion is required with NOAA Fisheries, California Coastal Commission, Army Corps of Engineers, and US Fish and Wildlife Service. We are concerned about the potential ecological risks that this species may bring to Drakes Estero and native species there. No risk analysis for this species to be introduced has been conducted.

> Potential expansion of Manila clams as an invasive species is a major concern. While Manila clams have been introduced and have spread in other estuaries of California, there is currently no evidence to our knowledge that they escaped or invaded Drakes or Limantour Esteros. The national Academy of Sciences noted in their report Shellfish Mariculture in Drakes Estero (NAS 2009) that "the oysters and clams cultured in Drakes Estero are nonnative species that have some risk of establishing self-sustaining populations (p 5)" and further noted that "continued culture of nonnative oysters and clams poses some risk of their eventual naturalization in Drakes Estero and larval spread to other coastal lagoons…"

xxiv. CFGC 2009, State of California Fish and Game Commission Meeting of December 10, 2009 Consent Calendar.

> "We wish now to correct that error and add Manila clams to lease M-438-01 as originally requested and remove Manila clam from M-438-02."

xxv. NPS 2009e, Letter from Point Reyes National Seashore Superintendent, to Drakes Bay Oyster Company, December 22, 2009, regarding cultivation of Manila clams, site development request, and additional information on Manila clams.

> "…we acknowledge you have received permission from the California Fish and Game Commission to place Manila clams in Lease M-438-01. As stated in your permit (Article 4bvi), you may not implement any modifications to CDFG leases without prior written approval from the National Park Service. Article 4bvi states:

> *Permittee will not introduce species of shellfish beyond those described in the existing leases from the CDFG. Permittee may seek to conform and/or modify these leases with the CDFG. Any modifications approved by the CDFG will be considered by Permitter on a case-by-case basis, and Permittee may not implement any such modifications without the prior written approval of the Permitter.*

> At this time, we would like to request additional information on Manila clam production. Please provide a proposal that includes location and size of growing area, approximate number of bags and clams, seed and history of production, and other details on the production on Manila clams."

xxvii. CCC 2009b, Letter from California Coastal Commission to Drakes Bay Oyster Company on September 16, regarding compliance with Consent Cease and Desist Order CCC-07-CD-11 (Drakes Bay Oyster Company).

> "I am writing concerning compliance with the Coastal Commission's Consent Cease and Desist Order No. CCC-07-CD-11 (the Order), which was issued to Drakes Bay Oyster Company (DBOC) on December 12, 2007. As you know, the Order contains a number of terms and conditions, and it has come to our attention that you are out of compliance with one or more of these terms and conditions, as described below.
>
> Although the circumstances underlying the Fish and Game Commission's decision regarding the Johnson Oyster Company's request in 1993 are unclear, it is apparent that you had the opportunity to legally modify DFG lease Oyster Allotment Number M438-01 several years ago. Despite declining to carry out this legal change you have undertaken the cultivation of Manila clams in DFG Oyster Allotment Number M438-01, an area specified in the DFG lease which 'is for the sole purpose of cultivating Pacific oyster (Crassostrea gigas), and European flat oyster (Ostrea edulis).'. . . However, until this matter is resolved, you are out of compliance with Sections 3.2.8, 3.2.11, and 7.0 of the Order."

xxviii. NPS 2009c, Letter from Acting Pacific West Regional Director, to Drakes Bay Oyster Company, December 4, 2009, notice of violation related to placement of Manila clams in harbor seal exclusion area.

> "We have tried to reach you several times about bags with clams and/or oysters and other materials which have been placed in the Harbor Seal Protection Area of Drakes Estero and outside the permitted area. We have attached relevant maps from the Special Use Permit as well as a geographic referenced photograph regarding the violation (See attachments).
>
> This letter serves as a notice of violation by Drakes Bay Oyster Company (DBOC)."

xxix. CCC 2009a, Letter from California Coastal Commission to Drakes Bay Oyster Company, regarding Compliance with Consent Cease and Desist Order CCC-07-CD-11 (Drakes Bay Oyster Company). Dated December 7, 2009. Notice of violation related to placement of Manila clams in harbor seal exclusion area.

> "In a letter dated September 16, 2009, we indicated that you were out of compliance with Sections 3.2.8 and 3.2.11 of the Consent Order. Section 3.2.8 of the Consent Order requires that cultivation of Manila clams shall only occur in the "cultivation area" defined in Section 3.2.11 of the Consent Order. Section 3.2.11 of the Consent Order requires that all cultivation shall be confined to areas which are currently identified in the Department of Fish and Game (DFG) Mariculture Lease numbers M-438-01 and M-438-02. We further indicated that the Commission staff had confirmed that Manila clams were currently being cultivated outside the designated one-acre shellfish aquaculture lease specified in the DGF Mariculture Lease Number M438-02, in violation of the Consent Order."

xxx. DBOC 2009a, Letter from Drakes Bay Oyster Company to California Coastal Commission, December 21, 2009, regarding Manila clam lease transfer coordinate mistake.

> "Removing the bags was a simple three hour task of lifting the bags up off the sandbar and hand carrying them to the two barges that were attached to the boat."

xxxi. DBOC 2009b, Letter from Drakes Bay Oyster Company to California Coastal Commission, October 5, 2009, regarding Coastal Development Permit Application No. 2-06-003.

> "Drakes Bay Oyster Company (DBOC) has reduced the scope of development proposed for the site. The new project description is broken into four categories:…"

xxxii. DBOC 2010f, Letter from Drakes Bay Oyster Company to California Coastal Commission, March 16, 2010, regarding response to CCC letter dated March 9, 2010, with answers and clarifications.

> "We have also revised our project description and it is attached to this letter. We will provide you an update on the revisions to the NPS special use permit when an update is available."

xxxiii. DBOC 2010m, Letter from Drakes Bay Oyster Company to Point Reyes National Seashore, July 22, 2010, regarding DBOC request to modify boundaries of CDFG lease and to cultivate Olympia oysters and purple-hinged rock scallops in CDFG Lease M-438-01.

> "We have also requested authorization from CDFG to cultivate Olympia oysters and Purple Hinged Rock Scallops within Lease No. M-438-01. Both species are indigenous to Drakes Estero and can be found today under natural conditions. In fact, Purple Hinges Rock Scallops are already authorized for cultivation within Lease No. M-438-02. No new culture methods will be required to cultivate Olympia oysters or Rock Scallops. Nor will there be any expansion in production, as the Olympia oysters and Rock Scallops will displace Pacific oysters currently under cultivation."

xxxiv. DBOC 2010n, Letter (with attachments) from Drakes Bay Oyster Company to Point Reyes National Seashore Superintendent on November 24, regarding Drakes Bay Oyster Company comments on National Park Service scoping letter for Special Use Permit Environmental Impact Statement..

> "Attachment B: Proposed Project Description Drakes Bay Oyster Company Special Use Permit."

xxxv. DBOC 2011c, Letter from Drakes Bay Oyster Company to Point Reyes National Seashore, March 4, 2011, regarding request to cultivate native species and supporting information.

> "DBOC has hoped to add native species to its State water bottom lease for several years. There are a number of reasons that have contributed to our desire to add these natives….. Since the Pacific oyster was introduced to the West Coast, the Olympia oyster, a traditional food for our community, is all but lost. The fabulous Purple Hinged Rock Scallop, another local, traditional food, is not cultured anywhere in California. For these reasons, we have been studying and researching these two species for five years with the hope of replacing some of our non-native Pacific oyster culture with these native species."

xxxvi. DBOC 2011e, Letter from Drakes Bay Oyster Company to Point Reyes National Seashore, March 15, 2011, regarding lease boundary adjustment.

> "DBOC has systematically sought to resolve many JOC administrative problems since January of 2005. One by one, DBOC has corrected concerns of the Point Reyes National Seashore (PRNS), the California Coastal Commission (CCC), the California Department of Public Health (CDPH), the US Public Health Service (PHS), the Food and Drug Administration (FDA), the County of Marin and the CDFG. This lease line error represents only one more administrative problem needing correction. Over the past two years, DBOC has worked with CDFG to address this particular issue. CDFG required DBOC to …determine exactly where the lease boundary line was drawn and to propose a solution so that the 5 racks on Bed 6 would be properly located within the lease, as originally intended….solution is to move the lease line to the location that it was originally intended to be so that the 5 racks in Bed 6 are also within the lease."

xxxvii. DBOC 2011g, Letter from Drakes Bay Oyster Company to Point Reyes National Seashore, March 5, 2011, regarding alternate building design (Eco Design Alternative).

> "DBOC would like to respectfully request that another building design be considered as an alternative in the EIS. In 2009, DBOC worked together with Eco Design Collaborative (EDC) on a more environmentally friendly building concept (attachment a) that would serve the same overall

purposes. This EDC design incorporates renewable energy use as well as other green building principles. The design limits the construction to one building, removes the need for the stringing shed in the intertidal area, allows a larger setback from the water's edge for the new hatchery, raises it above potential sea level rise and includes only one pier to access the Estero. The EDC design would also improve the visitor experience and interpretive opportunities by allowing the public to view every step of the shellfish process, from seed production to shucking and packing. EDC included a comparative review of existing conditions, the building proposal chosen in the 1998 NEPA process and the 2009 EDC concept (attachment b). The concept drawings do not show any worker housing except a manager's residence. Worker housing may be incorporated into the design in the future."

xxxviii. CCC 2010a, Letter from Coastal Program Analyst, California Coastal Commission to Acting Superintendent, Point Reyes National Seashore on March 30, regarding Coastal Development Permit Application for Drakes Bay Oyster Company.

"The Coastal Commission's regulations require an applicant to provide evidence of land owner approval to complete a coastal development permit application. In this case, since the land owner is the NPS, we would appreciate your review of DBOC's current proposed project to identify those proposed project elements authorized by DBOC's Special Use Permit or any other approval granted to DBOC by the NPS."

xxxix. DBOC 2011a, Letter from Drakes Bay Oyster Company to permitting agencies on April 4, regarding Drakes Bay Oyster Farm Emergency Repair Project Description. Document described plans for emergency repairs and included diagrams.

xl. DBOC 2011b, Letter from Drakes Bay Oyster Company to permitting agencies on March 25, regarding Emergency Repair Permit Applications for Damages Caused by the March 19 & 20, 2011 Wind Storm. Document described plans for emergency repairs and included diagrams.

xli.CCC 2012a, Letter from California Coastal Commission to Drakes Bay Oyster Company on February 1, regarding Compliance with the Coastal Act and with Consent Cease and Desist Order CCC-07-CD-11 (Drakes Bay Oyster Company).

"As you know, the Coastal Act contains many enforcement remedies for Coastal Act violations, and we have attempted to avoid the need to invoke them, by offering to discuss with you an amicable resolution of these violations of the Consent Order. Therefore, please submit by February 29, 2012 a written response to the concerns raised in my letter of September 29, 2011: 1) discharge of marine debris into Drakes Estero and onto nearby coastal beaches, especially in the form of abandoned, discarded, or fugitive plastic aquaculture materials, and 2) motorized vessel transit in the lateral sandbar channel near the mouth of the Estero during the seasonal restriction period established for harbor seal pupping sites in this area. In this letter, please describe in detail specifically how and when you intend to resolve these alleged violations of the Coastal Act and the Order, including a proposal for resolution of the outstanding stipulated penalties for failure to comply with the Order."

xlii. DBOC 2012a, Letter from Drakes Bay Oyster Company (with attachments) to the California Coastal Commission on February 17, regarding CDP Application Number 2-06-003.

xliii. DBOC 2012c, Letter from Drakes Bay Oyster Company to Superintendent, Point Reyes National Seashore on May 7, regarding Coastal Development Permit Application No: 2-06-003.

"In a meeting at the California Coastal Commission office in San Francisco on March 5, 2012, CCC and DBOC reached an agreement that DBOC would limit its current CDP application to the existing activities. In keeping with that process, DBOC has removed all new development from its

application to the CCC. DBOC will apply to CCC for a CDP amendment in the future, as necessary, prior to future development."

xliv. DBOC 2012b, Letter (with attachments) from Drakes Bay Oyster Company to Superintendent Cicely Muldoon, Point Reyes National Seashore on June 5, regarding responses to April 2012 questions.

"Drakes Bay Oyster Company (DBOC) received the Point Reyes National Seashore (PRNS) letter dated April 6, 2012 requesting additional information from DBOC for use in the dEIS process. This response letter, together with its attachments, will provide the requested information."

xlv. CCC 2012b, Letter from California Coastal Commission to Kevin Lunny, Drakes Bay Oyster Company on July 30, 2012, regarding compliance within the Coastal Act and Consent Cease and Desist Order CCC-07-CD-11.

"Commission staff received a copy of the letter DBOC sent to Superintendent Muldoon on May 7,2012, regarding DBOC's CDP application. The Commission permit staff are evaluating the information provided in the letter and will be responding to you in a separate letter, in order to clarify our understanding of the March 5th meeting we held with you (which differs from the characterization of this meeting that was provided in your letter) and to request additional information regarding the proposed amendments and modifications to DBOC's CDP application that you also describe in your letter. However, because your May 7, 2012 letter to Superintendent Muldoon also discusses development activities that DBOCF has pursued without benefit of a CDP, we would also like to provide a brief response to this aspect of your letter here.

Despite any misunderstandings DBOC might have had about the requirements for CDPs due to previous experience with ranch repairs, as you have been informed in our many letters to you, including the Notices of Violation and the Notices of Intent to proceed to an order heading, any development in the coastal zone portion of Point Reyes National Seashore requires a CDP from the Commission unless otherwise exempt from permit requirements. While there are some types of exempt development, DBOC should not assume without verification from Commission staff that a development activity falls into this category."

xlvi. CCC 2012e, Letter from Executive Director, California Coastal Commission to Drakes Bay Oyster Company on October 24, regarding Notice of Intent to Commence Cease and Desist and Restoration Order Proceedings.

"The purpose of this communication is to notify you of my intent, as the Executive Director of the Commission, to commence proceedings for issuance of cease and desist and restoration orders to address unpermitted development as well as development inconsistent with the Johnson Order and the 2007 Order (collectively 'the Orders') through a formal enforcement action, either through a cons.ent or regular order proceeding, and to continue the process of discussions that my staff and you have already begun."

xlvii. DBOC 2012b, Letter (with attachments) from Drakes Bay Oyster Company to Superintendent, Point Reyes National Seashore on June 5, 2012,regarding DBOC responses to the National Park Service's April 2012 questions.

"DBOC requests that all financial information remain confidential."

xlviii. DOI 2012b, Letter (with attachments) from Scientific Integrity Officer to Group Manager, Integrated Water Resources, Atkins North America, Inc. on April 19, regarding Dr. Christopher Clark's review of the soundscapes section of the Draft EIS.

"Questions for Dr. Clark

1. Please review the data provided by ENVIRON and provide your opinion as to whether the ENVIRON measurements provide sound and reasonable information regarding the acoustic environment at Drakes Bay including whether the data was collected using appropriate techniques

and whether any additional information would benefit NPS in addressing the ENVIRON data in the Final EIS (e.g., measuremei1t protocols, weather conditions, operation condition of equipment).

2. Based solely on your interpretation of the scientific information related to acoustics, are there different values and/or references for acoustics measurements (other than those in the DEIS) that appear credible and should be addressed in the Final EIS?

3. Does new attention on the sources of the data in Table 3.3, the ENVIRONS data, or any additional or different values or references for measurements identified in response to question 2 alter your review of the DEIS chapter on acoustics? If so, what is your current assessment of the discussion of soundscapes in the DEIS?"

xlix. DBOC 2012b, Letter (with attachments) from Drakes Bay Oyster Company to Superintendent, Point Reyes National Seashore on June 5, regarding DBOC responses to the National Park Service's April 2012 questions.

"Approximately 40% of DBOC income is from onsite retail sales, 40% is sold directly to local market and restaurants – all delivered by DBOC directly, 18% is sold to Tomales Bay shellfish growers, and 2% is sold through a wholesale seafood distributor based in San Francisco."

l DBOC 2011i, Correspondence ID 52043, Letter from Drakes Bay Oyster Company to Point Reyes National Seashore Superintendent on December 9, 2011 regarding Drakes Bay Oyster Company's comments on National Park Service Draft Environmental Impact Statement for Special Use Permit. Attachment: Comments on Drakes Bay Oyster Company Special Use Permit Environmental Impact Statement Point Reyes National Seashore, prepared by ENVIRON International Corporation.

"All 22 workers at DBOC, who would lose their jobs if DBOC operates were cease, are of Hispanic or Latino ethnicity, and most also fall into the category of low-income."

li. CCC 2012a, Letter from California Coastal Commission to Drakes Bay Oyster Company on February 1, regarding Compliance with the Coastal Act and with Consent Cease and Desist Order CCC-07-CD-11 (Drakes Bay Oyster Company).

"As you know, the Coastal Act contains many enforcement remedies for Coastal Act violations, and we have attempted to avoid the need to invoke them, by offering to discuss with you an amicable resolution of these violations of the Consent Order. Therefore, please submit by February 29, 2012 a written response to the concerns raised in my letter of September 29, 2011: 1) discharge of marine debris into Drakes Estero and onto nearby coastal beaches, especially in the form of abandoned, discarded, or fugitive plastic aquaculture materials, and 2) motorized vessel transit in the lateral sandbar channel near the mouth of the Estero during the seasonal restriction period established for harbor seal pupping sites in this area. In this letter, please describe in detail specifically how and when you intend to resolve these alleged violations of the Coastal Act and the Order, including a proposal for resolution of the outstanding stipulated penalties for failure to comply with the Order."

lii. DBOC 2012a, Letter from Drakes Bay Oyster Company (with attachments) to the California Coastal Commission on February 17, regarding CDP Application Number 2-06-003.

liii. DBOC 2012c, Letter from Drakes Bay Oyster Company to Superintendent, Point Reyes National Seashore on May 7, regarding Coastal Development Permit Application No: 2-06-003.

"In a meeting at the California Coastal Commission office in San Francisco on March 5, 2012, CCC and DBOC reached an agreement that DBOC would limit its current CDP application to the existing activities. In keeping with that process, DBOC has removed all new development from its

application to the CCC. DBOC will apply to CCC for a CDP amendment in the future, as necessary, prior to future development."

liv. CCC 2012e, Letter from Executive Director, California Coastal Commission to Drakes Bay Oyster Company on October 24, regarding Notice of Intent to Commence Cease and Desist and Restoration Order Proceedings.

"The purpose of this communication is to notify you of my intent, as the Executive Director of the Commission, to commence proceedings for issuance of cease and desist and restoration orders to address unpermitted development as well as development inconsistent with the Johnson Order and the 2007 Order (collectively 'the Orders') through a formal enforcement action, either through a consent or regular order proceeding, and to continue the process of discussions that my staff and you have already begun."

lv. NPS 2003c, Letter from Point Reyes National Seashore Superintendent to Johnson Oyster Company on September 17.

"Finally, we must ensure you realize that you do not have authority or permission to construct any new facilities on the reservation lands or other lands authorized under permits. Regarding any new facilities that were authorized by the completion of the Johnson Oyster Replacement and Rehabilitation Environmental Assessment in 1998, the NPS revokes any authority for construction and replacement activities."

This page intentionally left blank.