United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DRAKES BAY OYSTER COMPANY, *et al.*,<br><br>        Plaintiffs,<br><br>    vs.<br><br>KENNETH L. SALAZAR, in his official capacity as Secretary, U.S. Department of the Interior, *et al.*,<br><br>        Defendants. | Case No.: 12-cv-06134-YGR<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiffs Drakes Bay Oyster Company (the "Company") and Kevin Lunny ("Lunny" and collectively, "Plaintiffs") initiated this action requesting that the Court declare void and unlawful the November 29, 2012 Memorandum of Decision of Defendant Kenneth L. Salazar, Secretary of the U.S. Department of the Interior ("Secretary"), in which he decided not to grant Plaintiffs a permit to allow for the continued operation of their oyster farm ("Decision"). Plaintiffs further ask the Court to order the Secretary to direct the National Park Service ("NPS" or "Park Service") to issue the Company a ten-year special use permit, and to enjoin the enforcement of the Decision thereby allowing the Company to continue operating until the Court decides the merits of the lawsuit.

Plaintiffs filed their Motion for Preliminary Injunction on December 21, 2012. (Dkt. No. 32.) Defendants filed their Opposition to Plaintiffs' Motion for Preliminary Injunction on January 9, 2013. (Dkt. No. 64.) On January 16, 2013, Plaintiffs filed their Reply in Support of Motion for Preliminary

United States District Court
Northern District of California

1 Injunction ("Reply").  (Dkt. No. 79.)[1]  Defendants thereafter filed an Errata and Corrected Opposition

2 to Plaintiffs' Motion for Preliminary Injunction.  (Dkt. No. 84.)   The Court held oral argument on

3 January 25, 2013.  (Dkt. No. 85.)

4 　　Having carefully considered the papers, evidence, and oral arguments submitted, as well as the

5 pleadings in this action, and for the reasons set forth below, the Court **DENIES** Plaintiffs' Motion for

6 Preliminary Injunction.  As a threshold issue, the Court must have subject matter jurisdiction over

7 Plaintiffs' claims.  The Court finds it does not have jurisdiction to review the Secretary's Decision.

8 Moreover, even if Plaintiffs' claims could be construed to give this Court jurisdiction, based upon the

9 record presented, Plaintiffs have not demonstrated a likelihood of success on the merits of the claims

10 nor that the balancing of the equities favors injunctive relief.

11 **I.    BACKGROUND**

12 　　**A.    STATUTORY BACKGROUND**

13 　　In 1962, Congress created the Point Reyes National Seashore ("Seashore"), and placed it

14 under the administrative authority of the Secretary of the Interior.  Pub. L. No. 87-657, 76 Stat. 538,

15 (codified at 16 U.S.C. §§ 459c *et. seq.*) (1962).  The Seashore's 1962 enabling legislation recognized

16 a pastoral zone in the Seashore where existing ranches and dairy farms could continue to operate.

17 Pub. L. No. 87-657 § 4, 76 Stat. 538, 540.

18 　　Two years later, Congress passed the Wilderness Act, which directed the Secretary of the

19 Interior to identify the suitability of certain national park acreage for wilderness designation.  16

20 U.S.C. § 1132(c).  Under the Wilderness Act of 1964, Congress "established a National Wilderness

21 Preservation System to be composed of federally owned areas designated by Congress as 'wilderness

22 areas,'" to "be administered for the use and enjoyment of the American people in such manner as will

23 leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the

24 protection of these areas, the preservation of their wilderness character, and for the gathering and

25 _____

26 [1] Environmental Action Committee of West Marin, National Parks Conservation Association, Natural Resources Defense Council, and Save Our Seashore (collectively, "Proposed Intervenors") filed a Motion to Intervene in this action.  (Dkt. No. 11-1.)  Proposed Intervenors filed a proposed opposition to Plaintiffs'

27 Motion.  The Court has issued herewith its Order Denying Motion to Intervene (Dkt. No. 11); and Denying Plaintiffs' Administrative Motion to Strike (Dkt. No. 83).  For the reasons set forth therein, the Court has

28 treated Proposed Intervenors' opposition brief as an amicus brief and permitted Plaintiffs to file their proposed reply.

dissemination of information regarding their use and enjoyment as wilderness." 16 U.S.C. § 1131(a). The Wilderness Act proscribes commercial enterprises in the wilderness. 16 U.S.C. § 1133(c) ("Except as specifically provided for in this chapter, and *subject to existing private rights*, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter . . .") (emphasis supplied.)

In 1976, Congress enacted the Point Reyes Wilderness Act, designating 25,370 acres of the Seashore as "wilderness" under the Wilderness Act of 1964 and 8,003 acres, including Drakes Estero, as "potential wilderness." Pub. L. No. 94-544, 90 Stat. 2515 (1976); *see also* Pub. L. No. 94-567, 90 Stat. 2692 (1976). The House Committee Report accompanying Pub. L. No. 94-544 states the following regarding the potential wilderness additions:

> As is well established, it is the intention that those lands and waters designated as potential wilderness additions will be essentially managed as wilderness, to the extent possible, with efforts to steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status.

H.R. Rep. No. 94-1680 at 3, reprinted in 1976 U.S.C.C.A.N. 5593, 5595. The legislative history of Public Law No. 94-544 indicates that Congress considered designating Drakes Estero and surrounding areas as "wilderness," but did not do so. The Department of the Interior, in a report to the House accompanying Public Law No. 94-544, noted that Drakes Estero could not be designated as "wilderness" so long as the existing commercial oyster farming operations, as well as California's reserved fishing rights on the State tidelands in the area, remained in place. H.R. Rep. No. 94-1680, 6 (1976) reprinted in 1976 U.S.C.C.A.N. 5593, 5597. Further Congressional guidance in Public Law No. 94-567 provided that lands and waters designated as "potential wilderness" would become designated wilderness "upon publication in the Federal Register of a notice by the Secretary of the Interior that all uses thereon prohibited by the Wilderness Act have ceased. . . ." Pub. L. No. 94–567, 90 Stat 2692 (1976).

Two years later, Congress passed a further enabling act ("1978 Act") that gave the Secretary of the Interior the authority to lease federally-owned "agricultural land" within the Seashore in perpetuity, defining "agricultural land" as "lands which were in regular use for . . . agricultural, ranching, or dairying purposes as of May 1, 1978." Pub. L. No. 95-625 § 318, codified at 16 U.S.C. §

United States District Court
Northern District of California

3

United States District Court
Northern District of California

459c-5(b).  At that time, Congress recognized certain "non-conforming" uses, including oyster farming.  *See* S. Rep. No. 94-1357, at 3 (1976) ("National Park Service wilderness proposals have embodied the concept of 'potential wilderness addition' as a category of lands which are essentially of wilderness character, but retain sufficient non-conforming structures, activities, uses or private rights so as to preclude immediate wilderness classification.  It is intended that such lands will automatically be designated as wilderness by the Secretary by publication of notice to that effect in the Federal Register when the non-conforming structures, activities, uses or private rights are terminated."); *see also* H.R. Rep. No. 94-1680 (1976) at 6, reprinted in 1976 U.S.C.C.A.N. 5593, 5597.

Relevant here, in 2009, Congress enacted appropriations legislation entitled the Department of the Interior, Environment, and Related Agencies Appropriations Act, 2010.  Pub. L. No. 111-88 § 124, 123 Stat. 2904, 2932 (2009).  As part of this Appropriations Act, Section 124 provided in full:

> **Prior to the expiration on November 30, 2012** of the Drake's Bay Oyster Company's Reservation of Use and Occupancy and associated special use permit (''existing authorization'') within Drake's Estero at Point Reyes National Seashore, **notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit with the same terms and conditions as the existing authorization**, except as provided herein, **for a period of 10 years** from November 30, 2012: *Provided*, That such extended authorization is subject to annual payments to the United States based on the fair market value of the use of the Federal property for the duration of such renewal. The Secretary shall take into consideration recommendations of the National Academy of Sciences Report pertaining to shellfish mariculture in Point Reyes National Seashore before modifying any terms and conditions of the extended authorization.  Nothing in this section shall be construed to have any application to any location other than Point Reyes National Seashore; nor shall anything in this section be cited as precedent for management of any potential wilderness outside the Seashore.

Pub. L. No. 111-88, § 124, 123 Stat. 2904, 2932 (2009) ("Section 124") (emphasis supplied).[2]  As referenced therein, in 2009, the National Academy of Sciences ("NAS") had published a 179-page

---

[2] The House version of the bill would have made issuance of the special use permit for an additional ten years mandatory—*i.e.*, the House's version read that "the Secretary of the Interior shall extend the existing authorization . . . ."  H.R. 2996, 111th Cong. § 120(a) (as reported in Senate, July 7, 2009).  The Senate rejected that language and the appropriations bill ultimately included the language "is authorized to issue," rather than the House's mandatory language.  The House Conference Report acknowledged that the change to the language "provid[ed] the Secretary discretion to issue a special use permit to Drake's Bay Oyster Company. . . ."  155 Cong. Rec. H11871, H11900 (daily ed. October 28, 2009).

4

United States District Court
Northern District of California

1    report in 2009 entitled *Shellfish Mariculture in Drakes Estero, Point Reyes National Seashore,*

2    *California*.  (Declaration of Ryan Waterman in Support of Motion for Preliminary Injunction

3    ("Waterman Decl.") (Dkt. No. 42), Attachment 4a to Ex. 1 (Dkt. No. 42-2 ["2009 NAS Report"]).)

### B.    FACTUAL BACKGROUND

5    Oyster farming in Drakes Estero began in the 1930s.  (Declaration of Kevin Lunny in Support

6    of Motion for Preliminary Injunction ("Lunny Decl.") ¶ 88 (Dkt. No. 38); *see also* Lunny Decl., Ex. 1

7    (Grant Deed) at ECF pp. 35–39 (Dkt. No. 38-1).)  As early as 1934, the California Fish and Game

8    Department began leasing the right to cultivate oysters in the waters of Drakes Estero and Estero de

9    Limantour in Marin County.  The Johnson Oyster Company, owned by Charles Johnson ("Johnson"),

10   operated an oyster farm on the shores of Drakes Estero beginning in 1954.  (Grant Deed at ECF p.

11   35.)  The current-day Drakes Bay Oyster Company operates on a parcel of land which Johnson sold to

12   the United States in 1972 for $79,200.00.  (*Id.* at ECF p. 4.)  The Grant Deed describes the parcel as

13   "contain[ing] 5 acres, more or less," of beach and onshore property adjacent to Drakes Estero.  (*Id.*;

14   Declaration of Barbara Goodyear in Support of Federal Defendants' Opposition to Plaintiffs' Motion

15   for Preliminary Injunction ("Goodyear Decl.") (Dkt. No. 65), Ex. 8 at ECF p. 3 (Dkt. No. 71-4).)

16   The Grant Deed contained a reservation of use and occupancy ("Reservation") pertinent here,

17   which reads in full:

18       THE GRANTOR RESERVES only the following rights and interests in the
         hereinabove described property: a reservation of the use and occupancy for a period
19       of forty (40) years in accordance with the terms of the Offer to Sell Real Property,
         assigned Contract No. CX800032073, signed by the GRANTOR on October 13,
20       1972, accepted on October 16, 1972, and on file with the National Park Service.

21

22   (Lunny Decl., Ex. 1 at ECF p. 4; Goodyear Decl., Ex. 8 at ECF p. 3.)  The Reservation allowed

23   Johnson to continue his oyster operations until November 30, 2012.  (Lunny Decl., Ex. 1 at ECF p. 8

24   (Grant Deed filed on November 30, 1972); Goodyear Decl., Ex. 8 at ECF p. 7.)  The United States

25   and Johnson agreed that "[u]pon expiration of the reserved term, a special use permit may be issued

26   for the continued occupancy of the property for the herein described purposes . . . [and a]ny permit for

27   continued use will be issued in accordance with the National Park Service regulations in effect at the

28   time the reservation expires."  (Lunny Decl., Ex. 1 at ECF p. 19; Goodyear Decl., Ex. 8 at ECF p.18.)

1  The agreement also provided that upon expiration of the Reservation term, or any extension by

2  permit, the Johnson Oyster Company was responsible to remove all structures and improvements on

3  the property within 90 days.  (Lunny Decl., Ex. 1 at ECF p. 19; Goodyear Decl., Ex. 8 at ECF p.18.)

4      Thirty-two years later, on December 17, 2004, Lunny entered into an Asset Purchase

5  Agreement with the Johnson Oyster Company wherein Lunny agreed to pay a purchase price of

6  $260,000 "at the Closing" which was to occur at a later "mutually convenient" date.  (Goodyear Decl.,

7  Ex. 23 (Dkt. 72-8) ["Asset Purchase Agreement"]; *see* Lunny Decl. ¶¶ 2 & 5.)  The parties agreed that

8  during the "period between the execution of this Agreement and the Closing," Lunny would have

9  "full access to all premises, properties, personnel, books, records . . . , contracts, and documents of or

10  pertaining to the Acquired Assets" which were defined as "rights under any Lease or Permit required

11  to conduct the Seller's business" and specifically included "that certain Reservation of Possession

12  Lease dated 10/12/1972, entered into by Seller and the National Park Service."  (Asset Purchase

13  Agreement ¶¶ 1, 5, 5(e) & Ex. B.)

14      On January 25, 2005, the Park Service provided Lunny a letter ("January 2005 Letter")

15  attaching a copy of a memorandum (dated February 26, 2004 ["2004 Memorandum"]) from the

16  Department of the Interior's San Francisco Field Solicitor to the Superintendent of the Seashore so

17  that "[b]efore [Lunny] closed escrow on the purchase," the Park Service could "make sure [he] had a

18  copy for [his] review."  (Goodyear Decl., Exs. 14 & 24 (Dkt. Nos. 71-10 & 72-9).)  The January 2005

19  Letter indicates that the Park Service had met with Lunny during the prior week.[3]

20      The attached 2004 Memorandum detailed the legal history of the Seashore area and specified

21  the Park Service's own view of its policy mandates:

22      The Park Service's Management Policies clearly state that the Park Service must
23      make decisions regarding the management of potential wilderness even though some
        activities may temporarily detract from its wilderness character.  The Park Service is
24      to manage potential wilderness as wilderness to the extent that existing non-

25  _____

26  [3] The record includes evidence that in January 2005, Lunny stated he "had been informed by [the Park Service]
   of its decision not to extend operating rights past 2012, and that he had a 'business plan' to recoup his
   investment within the remaining seven years of operating rights."  (Declaration of Gordon Bennett ("Bennett")
27  (Dkt. No. 11-2) ¶ 6, submitted in support of Motion to Intervene.)  While, in an apparent attempt to undermine
   Bennett's credibility, Lunny submitted a supplemental declaration but does not deny making that January 2005
28  statement.  (Declaration of Kevin Lunny in Support of Plaintiffs' Opposition to Environmental Action
   Committee of West Marin, *et al.*'s Motion to Intervene (Dkt. No. 41-7) ¶¶ 7–11 & Ex. 1.)

United States District Court
Northern District of California

6

> confirming conditions allow.  The Park Service is also required to actively seek to remove from potential wilderness the temporary, non-conforming conditions that preclude wilderness designation.  6.3.1 Wilderness Resource Management, General Policy.

(*Id.* at Exs. 14 & 24.)  The 2004 Memorandum concluded that "the Park Service is mandated by the Wilderness Act, the Point Reyes Wilderness Act and its Management Policies to convert potential wilderness, i.e., the Johnson Oyster Company tract and the adjoining Estero, to wilderness status as soon as the non[-]conforming use can be eliminated."  (Goodyear Decl., Ex. 14 at 3; *id.*, Ex. 24 at 4.)[4]

Two months later, on March 28, 2005, the Superintendent again wrote "to reiterate our guidance to you regarding the transfer of the Johnson Oyster Company site to your family [and] . . . to ensure clarity and to avoid any misunderstanding."  (Goodyear Decl., Ex. 25 (Dkt. No. 72-10).)  Among other things, the letter stated that "[r]egarding the 2012 expiration date and the potential wilderness designation, based on our legal review, no new permits will be issued after that date." (*Id.* at 2.)

In April 2008, the Company and the Park Service executed a Special Use Permit ("2008 SUP") that authorized the Company to conduct its operations on additional area adjacent to the Reservation area for purposes of: processing shellfish, providing an interpretive area for visitors, operating of well and pump areas for water supply, and maintaining of a sewage pipeline and sewage leachfield to service the Company's facilities.  (Goodyear Decl., Ex. 26.)  The 2008 SUP had an expiration date of November 30, 2012, which coincided with the expiration date of the Reservation. (*Id.*)

According to Lunny, in early July 2010 and pursuant to Section 124, the Company sent letters to the Secretary to apply for a ten-year special use permit to continue farm operations at the site after the expiration of the Reservation ("New SUP").  (Lunny Decl. ¶ 14; *see also* Waterman Decl.,

---

[4] With Plaintiffs' Reply, Lunny claims in his rebuttal declaration that when the Company purchased the farm in December 2004, he had no knowledge that the Park Service would not allow the farm to continue after 2012, or that the Solicitor's Opinion stated that it would not issue a new special use permit at the end of the Reservation term.  (Rebuttal Declaration of Kevin Lunny in Support of Motion for Preliminary Injunction ("Lunny Rebuttal Decl.") (Dkt. No. 80) ¶ 64.)  However, Lunny's first declaration suggests otherwise: "In 2005, Superintendant Don Neubacher informed me that he did not intend to issue a Special Use Permit (SUP) to [the Company] at the end of the [Reservation] on November 30, 2012, due to the 1976 wilderness laws that designated Drakes Estero as potential wilderness." (Lunny Decl. ¶ 10.)  Lunny does not dispute receipt of the letters from 2005 referenced herein, and the record is silent as to the closing date of the purchase.

United States District Court
Northern District of California

1   Attachment 1 to Ex. 1 at ECF pp. 11–19 (Dkt. No. 42-1).)  In September of 2010, Park Service staff

2   met with Lunny to discuss the National Environmental Policy Act ("NEPA") process and the "process

3   and path forward until [the] existing [2008] SUP expires."  (Lunny Decl. ¶ 15, Ex. 7 (Dkt. No. 39-2).)

4   In October 2010, the Interior Department, through the Park Service, formally began the NEPA

5   process to analyze the environmental impacts of Plaintiffs' request.  *See* 75 Fed. Reg. 65,373 (Oct. 22,

6   2010) ("Pursuant to [NEPA], the National Park Service is preparing an Environmental Impact

7   Statement (EIS) for the Drakes Bay Oyster Company Special Use Permit[.] . . . Pursuant to [Section

8   124], the Secretary of the Interior has the discretionary authority to issue a special use permit for a

9   period of 10 years to Drakes Bay Oyster Company . . . .").  The Federal Register notice does not

10  reference any statutory guidelines against which the Secretary's review of the permit under Section

11  124 should be evaluated.

12       In September 2011, the Park Service released a Draft Environmental Impact Statement ("Draft

13  EIS" or "DEIS") for public comment.  (Lunny Decl., Ex. 9; *see also* cross-reference in the Final

14  Environmental Impact Statement ["Final EIS" or "FEIS"], Goodyear Decl., Ex. 3 (Dkt. No. 66-2  at

15  ECF p. 16).)  The Company submitted comments critical of the DEIS, and a Data Quality Complaint.

16  (Lunny Decl. ¶¶ 17, 27 & Ex. 14.)

17       In December 2011, Congress directed NAS to assess the Draft EIS.  H.R. Rep. No. 112-331, at

18  1057 (2011) (Conf. Rep.).  In August 2012, NAS released its report entitled *Scientific Review of the*

19  *Draft Environmental Impact Statement Drakes Bay Oyster Company Special Use Permit*, which

20  Lunny alleges "was highly critical of the DEIS" and determined many of its conclusions were

21  "uncertain, exaggerated, or based on insufficient information."  (First Amended Complaint for

22  Declaratory and Injunctive Relief ("FAC") ¶¶ 89–90 (Dkt. No. 44); Lunny Decl., Ex. 11.)

23       By letter dated September 17, 2012, Plaintiffs' counsel sent the Secretary a letter encouraging

24  him to make his "decision without the benefit of a Final Environmental Impact Statement" arguing

25  that "Section 124 repeal[ed] conflicting statutes, such as NEPA."  (Waterman Decl., Ex. 1 (Dkt. No.

26  42-1 ["Plaintiffs' 9/17/12 Letter"]).)  Plaintiffs reiterated their position on November 1, 2012:

27

28

United States District Court
Northern District of California

> [W]hat effect does the NPS's failure to provide you with a legally adequate FEIS have on your discretion under Public Law 111-88, § 124 (Section 124)? In fact, none, because Section 124 includes a "general repealing clause" that allows you to override conflicting provisions in other laws—including NEPA—to issue the [New] SUP.

(Proposed Intervenors' Request for Judicial Notice in Support of Opposition to Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 63); Declaration of George M. Torgun in Support of Proposed Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction, Ex. 2 (Dkt. No. 63-1) ["Plaintiffs' 11/1/12 Letter"].)[5]

On November 20, 2012, the Park Service released the Final EIS. (Goodyear Decl., Ex. 3 (Dkt. Nos. 66–70); Lunny Decl., Ex. 12.) The FEIS stated the Secretary's position that the "notwithstanding" clause in Section 124 rendered NEPA analysis unnecessary to his Decision, but that "the Department has determined that it is helpful to generally follow the procedures of NEPA." (Goodyear Decl., Ex. 3 at ECF p. 34 (Dkt. No. 66-2).)[6]

On November 29, 2012, Secretary Salazar issued the Memorandum of Decision at issue here to the Director of the National Park Service and "directed the National Park Service (NPS) to allow the [Company's] permit to expire at the end of its current term." (Goodyear Decl., Ex. 1 (Dkt. No. 65-1).) At the outset, the Decision identified two law and policy rationales: (i) the United States purchased the property with a reservation of use which expired on November 30, 2012 and explicitly advised the Company in 2004 when it purchased the business that an additional permit would not be issued; and (ii) the Company's continued operation "would violate the policies of NPS concerning commercial use . . . within potential or designated wilderness."[7] (Decision at 1.) In reaching his

---

[5] The Court has been asked to take judicial notice of this document as part of the administrative record in this Administrative Procedure Act litigation. Plaintiffs did not object to the request for judicial notice, but instead argued in their reply to Proposed Intervenors' opposition that the letter is entirely consistent with their position in litigation. (*See* Dkt. No. 83-1 at 3.) Plaintiffs do not object to the authenticity of the letter, nor did they raise this at oral argument. As such, the Court **GRANTS** the request for judicial notice of Plaintiffs' 11/1/12 Letter.

[6] The Draft EIS had also reinforced this point: "Although the Secretary's authority under Section 124 is 'notwithstanding any other provision of law,' the Department has determined that it is appropriate to prepare an EIS and otherwise follow the procedures of NEPA." (Lunny Decl., Ex. 9 at ECF p. 9.)

[7] As a result, the Secretary further directed the Park Service to: (1) "[n]otify [the Company] that both the Reservation . . . and [2008 SUP] held by [it] expire according to their terms on November 30, 2012"; (2) "[a]llow [the Company] a period of 90 days . . . to remove its personal property . . . and to meet its

9

1    Decision, the Secretary "personally traveled to Point Reyes National Seashore, visited [the Company],

2    met with a wide variety of interested parties on all sides of this issue, and considered many letters,

3    scientific reports, and other documents."  (*Id.* at 2.)  The Secretary next referenced the enactment of

4    Section 124 and the Parks Service's initiation of an environmental impact statement "to analyze the

5    environmental impacts associated with various alternatives related to a decision to permit or not to

6    permit [the Company's] continued operations."  (*Id.* at 4.)  In his Decision, the Secretary stated that

7    "SEC. 124 does not require me (or the NPS) to prepare a DEIS or an [*sic*] FEIS or otherwise to comply

8    with [NEPA] or any other law."  (*Id.*)  Rather, he used the NEPA process to "inform the decision"

9    even though NEPA, like Section 124 itself, did "not dictate a result or constrain [his] discretion in this

10    matter.  (*Id.* at 4–5.)

11        Additionally, the Secretary readily admitted that the "scientific methodology employed by the

12    NPS . . . generated much controversy and ha[s] been the subject of several reports."  (Decision at 5.)

13    Further, while there was "scientific uncertainty and a lack of consensus in the record regarding the

14    precise nature and scope of the impacts [of] [the Company's] operations," the Secretary's position

15    was that the draft and final impact study did support the premise that "removal of [the Company's]

16    commercial operations in the estero would result in long-term beneficial impacts to the estero's

17    natural environment."  (*Id.*)  The Secretary further revealed that he had given "great weight" to the

18    "public policy inherent in the 1976 act of Congress that identified Drakes Estero as potential

19    wilderness" and to "Congress's direction to 'steadily continue to remove all obstacles to the eventual

20    conversion of these lands and waters to wilderness status.'"  (*Id.* at 5, 7.)

21        On the same day, November 29, 2012, the Park Service notified the Company and Lunny of

22    the Secretary's Decision.  (Goodyear Decl., Ex. 2 (Dkt. No. 65-2).)  Among other things, the Park

23    Service directed the closure of the Company's operations but authorized limited commercial

24    activities, as specified by the letter, until February 28, 2013.  Plaintiffs were also informed that they

25    had 90 days to vacate and surrender the property, remove all personal property, and repair any damage

26    resulting from removal.  (*Id.*)

27

28    obligations to vacate and restore all areas covered by the [Reservation] and [2008 SUP]"; and (3) "[e]ffectuate
the conversion of Drakes Estero from potential to designated wilderness."  (Decision at 1–2.)

1      On December 4, 2012, the Park Service published a notice in the Federal Register announcing

2 the change in status of Drakes Estero from potential wilderness to designated wilderness.  77 Fed.

3 Reg.  71826 (Dec. 4, 2012).

4      C.    CLAIMS IN THIS LITIGATION

5      Plaintiffs filed suit to have the Secretary's Decision not only declared "null and void" and "set

6 aside," but, among other relief, to "Order [the] Secretary . . . to issue [the Company] a [New] SUP,"

7 or alternatively, "to vacate the decision . . . with instructions to make a new decision."  (FAC ¶¶ 25–

8 26 & Requested Relief ¶¶ 1–4.)   The legal basis for the requested relief includes Count 1 for

9 Violations of NEPA and the Administrative Procedure Act ("APA"), alleging that "Plaintiffs'

10 interests, including their environmental concerns, fall within the zone of interested protected by

11 NEPA" and the FEIS did not comply with the requirements set forth in the Code of Federal

12 Regulations.  (FAC ¶¶ 143–155.)  Plaintiffs further allege that the Secretary's interpretation of Section

13 124 "as relieving him of his NEPA . . . obligations" was "arbitrary and capricious."  (*Id.* ¶ 158.)

14 Count 2 alleges Violation of the Data Quality Act and the APA by failing "to correct the FEIS to

15 reflect the proposed corrections outlined" in their Data Quality Act complaint.  (*Id.* ¶¶ 164–169.)

16 Count 3 alleges Violation of the APA and Section 124 by authorizing the Park Service to publish a

17 notice in the Federal Register converting Drakes Estero from "potential wilderness" to "wilderness,"

18 failing to consider the NAS reports, and denying the New SUP in contravention to the "plain

19 language" of Section 124."  (*Id.* ¶¶ 170–175.)[8]  However, the FAC concedes that the Secretary's

20 Decision was based on his "application of some federal laws, such as the 1965 Wilderness Act and the

21 1976 Point Reyes Wilderness Act."  (*Id.* ¶ 173; *see also* ¶ 181 ("the Secretary's decision was made in

22 reliance upon an arbitrary and capricious interpretation of the 1976 Point Reyes Wilderness Act, the

23 1972 Grant Deed and [Reservation] held by [the Company] . . . ").)

24      Based upon the allegations in the First Amended Complaint, Plaintiffs filed the instant motion

25 for a preliminary injunction.

26

27 ───────────────

28 [8] Counts Four and Five allege Fifth Amendment violations in light of the issues referenced above (FAC ¶¶ 176–185) and Count Six alleges Unlawful Interference with Agency Functions (*id.* ¶¶ 186–190).

United States District Court
Northern District of California

**II.    STANDARDS APPLICABLE TO THIS MOTION**

Federal courts exercise limited jurisdiction, possessing only that power authorized by Article III of the United States Constitution and statutes enacted by Congress pursuant thereto. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). Courts are presumptively without jurisdiction until it is established by the party asserting it. *Id.* Thus, the Court must always look first to questions of jurisdiction before proceeding to the merits of a dispute.

Assuming jurisdiction is established, a party seeking a preliminary injunction bears the burden of establishing four separate factors: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) showing the balance of the equities tips in its favor; and (4) the injunction is in the public interest. *Winter v. Natural Resources Defense Council Inc.*, 555 U.S. 7, 20 (2008).

**III.    JUSTICIABILITY**

The Court first addresses the threshold issue of whether jurisdiction exists. Defendants advance two alternative theories for the proposition that the Court lacks jurisdiction, each of which the Court addresses in turn. *First*, does "agency action" include a failure to act to issue a special use permit? *Second*, if so, does the action here fall within the exception set forth in 5 U.S.C section 701(a)(2) of the APA exempting from judicial review any agency action which is "committed to agency discretion by law"? The Court finds that, generally, courts do have jurisdiction to review an agency's *in*action, or failure to act, on a permit. However, where, as here, Congress has authorized the Secretary to act (or not act) on a specific, discrete circumstance with discretion, that particular act falls within the exception established under Section 701(a)(2) and judicial review is precluded. On this basis, the Court declines to exercise jurisdiction. The Court explains its analysis on each theory below, but first discusses the statutory framework of the APA.

**A.    THE APA FRAMEWORK**

Chapter 7 of Title 5 of the United States Code, popularly known as the Administrative Procedure Act or APA (5 U.S.C. §§ 701–706 ("Sections 701–706")), confers jurisdiction upon courts to review the claim of "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." Section 702

United States District Court
Northern District of California

(entitled "Right of review").  Unless a statute provides a private right of action, courts may only review "**final agency action** for which there is no other adequate remedy."  Section 704 (entitled "Actions reviewable") (emphasis supplied); *see Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 61–62 (2004).   In this context, to the extent agency action is reviewable, "[t]he reviewing court" is charged with deciding "all relevant questions of law [and] interpret[ing] constitutional and statutory provisions."  Section 706 (entitled "Scope of review").  Section 706 mandates the court to "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency actions, findings, and conclusions found to be -- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Sections 706(1), 706(2)(A).  The section does not permit the reviewing court to make the policy decisions nor to instruct an agency to make a particular discretionary choice.  *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) ("The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts.").

Notwithstanding the foregoing, a carve-out exists in Section 701(a) which specifies that the "chapter applies . . . *except* to the extent that -- (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."[9]  Section 701 (entitled "Application; definitions") (emphasis supplied).  The facial inconsistency between this section which, on the one hand, prohibits judicial review of actions "committed to agency discretion" under Section 701(a)(2), and on the other hand, a court's authority to review agency actions under an "abuse of discretion" standard—as set forth in Section 706(2)(A)—has caused much confusion, and is explained in Section III.C. *infra*.  Here, because Plaintiffs do not have a private right of action, the APA is the only basis upon which jurisdiction can exist.

**B.    FIRST GROUND: AN AGENCY'S FAILURE TO ACT MAY CONFER JURISDICTION**

The Secretary urges that his Decision to allow the Reservation to expire by its own terms and not to issue a New SUP is not "agency action" and is therefore outside of the APA's scope of review.  Plaintiffs urge the Court to consider the effect of the Decision, rather than its form, in determining whether the Decision is reviewable.  Plaintiffs also note the Decision included an affirmative order to

---

[9] Neither party suggests Section 701(a)(1) applies here.

wind down the Company's operations and on that basis could be considered "action."  (Reply at 2.)
The Court finds that, in general, a decision not to issue a special use permit constitutes "agency
action" under the APA.

First, the plain language of the APA supports this construction.  "Agency action" is defined in
the APA as including "the whole or a part of an agency rule, order, license, sanction, relief, or the
equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13) ("Section 551(13)"), cross-
referenced by Section 701(b)(2).  As noted therein, an agency action is defined both in affirmative
terms (a rule, order, license, sanction, relief, or the equivalent thereof) and in negative terms (the
denial of the same or the failure to act on the same).  Although a "special use permit" is not
specifically listed, the included term "license" is further defined in Section 551(8) as including "the
whole or a part of an agency permit . . . or other form of permission."  Thus, action relating to the
failure to issue a permit falls within the explicit terms of the APA generally.

Second, caselaw is in accord.  In *Her Majesty the Queen in Right of Ontario v. U.S.
Environmental Protection Agency*, the court addressed the justiciability of whether the EPA had "any
present obligation to take action under section 115 of the Clean Air Act" and affirmatively to "set in
motion section 115's international pollution abatement procedures."  912 F.2d 1525, 1527 (D.C. Cir.
1990). There, the controversy centered on whether *letters declining* to take action based upon the
EPA's interpretation of section 115 could be deemed "final agency action" subject to review.  *Id.* at
1530–31.  The court held that the issue was reviewable because the letters were "'sufficiently final to
demand compliance with its announced position.'"  *Id.* at 1531 (internal citations omitted).
Jurisdiction would not have existed if the letters had communicated a tentative position.  Where
decisions are not final, "judicial intervention may 'den[y] the agency an opportunity to correct its own
mistakes and to apply its expertise . . . lead[ing] to piecemeal review which at the least is inefficient
and . . . might prove to have been unnecessary."  *Id.* (citing *FTC v. Standard Oil Co. of California*,
449 U.S. 232, 242 (1980)) (first alteration in original).  Here, the Decision communicates a final
position—no doubt remains as to the Secretary's Decision to allow the Reservation to expire and not
issue the New SUP.

Defendants' reliance on *Norton v. Southern Utah Wilderness Alliance ("Norton")* on this specific proposition is misplaced and does not compel a different result. 542 U.S. 55 (2004). While the Supreme Court did not find jurisdiction in *Norton*, it did not hold that an agency's failure to act on a request for a permit was not reviewable. Rather, the Court held the allegations of the agency's failures to act did not relate to specific, discrete actions and therefore, on that basis, were not reviewable.[10] The Court began with the basic premise that judicial review under the APA "insist[s] upon an 'agency action.'" *Id.* at 62. Congress defined "agency action" to include an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Section 551(13). With respect to a "failure to act," the Court held that it was "properly understood as a failure to take an *agency action*-that is, a failure to take one of the agency actions (including their equivalents) earlier defined in [Section] 551(13)" or, put differently, the failure to take limited, discrete action. *Norton*, 542 U.S. at 62–63.[11] Thus, the Supreme Court found that the action at issue must concern "discrete" conduct and not "broad programmatic attack[s]." *Id.* at 64 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U. S. 871 (1990)).[12] On that particular basis, the Court held that the alleged failures to act were not subject to review under the APA. *Id.* at 68–71.[13]

---

[10] Respondents in that case alleged the Bureau: (i) violated its non-impairment obligation under the Wilderness Act by allowing degradation in certain wilderness study areas; (ii) failed to implement provisions of its own land use plans relating to off-road vehicles, and (iii) failed to determine whether a supplemental NEPA study should be undertaken in that regard. *Norton*, 542 U.S. at 60–61.

[11] *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d. 1093 (D.C. Cir. 1970), on which Plaintiffs relied, is in accord. That case arose after the Department of Agriculture failed to take any action on petitioners' request that it issue certain notices of cancellations related to pesticides. *Id.* at 1095. The Court held that "when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Id.* at 1099. There, the court found that the act at issue "establishe[d] an elaborate procedure by which a registration may be cancelled" and remanded for a statement of reasons or fresh determination. *Id.* at 1095–96, 1100.

[12] The *Norton* Court also addressed the impact of the "failure to act" analysis under a claim based upon Section 706(1) specifically. *Norton*, 542 U.S. at 63–65. For purposes of this Motion, the parties argue that Section 706(1) does not apply. (Opp. at 13; Reply at 3.) However, the affirmative relief requested in the FAC and other portions of Plaintiffs' Reply suggest Plaintiffs believe otherwise. (FAC ¶ 25 (referencing Section 706(1) and "compel[ling] agency action unlawfully withheld") & Requested Relief ¶ 3 ("[o]rder Secretary Salazar . . . to direct NPS to issue to DBOC a 10-year SUP); *see also* Reply at 3 (arguing the definition of "agency action" is satisfied under *Norton*).) The Court notes that a Section 706(1) claim to compel action only allows a court to compel that which an agency is "legally *required*" to do, such as would be achieved historically through writs of mandamus. *Norton*, 542 U.S. at 63. Given Plaintiffs' wholesale failure to make any showing for a

United States District Court
Northern District of California

1    Thus, based upon this analysis, the Court concludes a failure to issue a special use permit may

2    confer jurisdiction.

3    **C.    SECOND GROUND:  EXEMPTION FROM JUDICIAL REVIEW UNDER SECTION 701(a)(2)**

4    Defendants contend that *even if* the Secretary's Decision could be construed as "action,"

5    Section 701(a)(2) of the APA exempts from judicial review any agency action "committed to agency

6    discretion by law."  For the reasons set forth below, the Court agrees that the exclusion applies here.

7    As a starting point, courts have interpreted Subsection 701(a)(2) to exclude from review

8    "agency actions" that fall within one of two categories, either those actions where: (i) a court has no

9    meaningful standard against which to judge the exercise of discretion and therefore no law to apply;

10   or (ii) the agency's action requires a complicated balancing of factors peculiarly within the agency's

11   expertise.  *Ctr. for Policy Analysis on Trade & Health (CPATH) v. Office of U.S. Trade*

12   *Representative*, 540 F.3d 940, 944 (9th Cir. 2008); *see Heckler v. Chaney*, 470 U.S. 821, 830 (1985)

13   ("Congress has not affirmatively precluded review" but review cannot be had "if the statute is drawn

14   so that a court would have no meaningful standard against which to judge the agency's exercise of

15   discretion"—*i.e.*, law commits "decisionmaking to the agency's judgment absolutely").  The Supreme

16   Court has held that construction of Section 701(a)(2) is consistent with Section 706 to the extent that

17   "if no judicially manageable standards are available for judging how and when an agency should

18   exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'"

19   *Heckler*, 470 U.S. at 830.

20

21   mandatory order compelling action under Section 706(1), the Court finds that Plaintiffs concede that they
     would not be successful on the merits in this regard.

22

23   [13] Defendants also rely on *Hells Canyon Preservation Council v. U.S. Forest Servc.*, 593 F.3d 923 (9th Cir.
     2010).  There, the Ninth Circuit addressed, and rejected, plaintiffs' request that the court review the Forest's

24   Service's "ongoing failure to act" by refusing to close a trail in the Hells Canyon Wilderness area to motorized
     use under Section 706(1) of the APA.  *Id.* at 932, 934.  The court affirmed the *Norton* analysis limiting review

25   to discrete actions only, but focused and combined its analysis on the second element required under *Norton*
     that the action being "compelled" also be one the agency is "required to take."  *Id.* at 932–33.  In that case,

26   while plaintiffs' request could be considered "discrete" in a vacuum, the practical effect of plaintiffs' request
     would have required the court to compel the Forest Service to disregard boundaries for the wilderness area

27   established over 30 years prior and substitute it with those which plaintiffs themselves were advocating.  *Id.* at
     932–33.  The court held that the action was framed as an "end run around" Section 706(2) requiring the court to

28   review the Forest Service's boundary determination under an "arbitrary and capricious" standard, which itself
     was a time-barred claim.  *Id.* at 933.

Ninth Circuit authority controls the analysis.  In *Ness Inv. Corp. v. U.S. Dept. of Agriculture, Forest Service*, plaintiffs sued the Forest Service for denying an application for a special use permit. 512 F.2d 706, 711–12 (9th Cir. 1975).  Noting confusion between the provision of the APA *precluding* review of agency action "committed to agency discretion by law" (Section 701(a)(2)) and the provision *permitting* review of agency action found to be "an abuse of discretion" (Section 706(2)(a)), the Ninth Circuit held: "(1) a federal court has jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion involves violation by the agency of constitutional, statutory, regulatory or other legal mandates or restrictions; (2) but a federal court does not have jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion consists only of the making of an informed judgment by the agency."  *Id.* at 712, 715.  The court further held that the statute at issue there authorized the Forest Service to grant or deny the issuance of the special use permit and provided "no statutory restrictions or definitions *prescribing precise qualifications* for permittees."  *Id.* at 715 (emphasis supplied).  As such, the decision was "patently . . . left to the secretary or his delegate to answer . . . [as] [t]he statute is, with respect to the proper recipient of a special use permit, drawn in such broad terms that there is no law to apply."  *Id.*

Plaintiffs contend that *Ness* has been superseded by *KOLA, Inc. v. United States*, 882 F.2d 361 (9th Cir. 1989) wherein the Ninth Circuit did exercise jurisdiction regarding a special use permit.  The Court disagrees with Plaintiffs' reliance on *KOLA*.  Unlike the court in *Ness*, the *KOLA* court had available meaningful standards upon which to evaluate the permit at issue.  In that case, the Forest Service had promulgated "precise qualifications" not existing at the time *Ness* was decided.  *KOLA*, 882 F.3d at 363.  With these guidelines, the Ninth Circuit held that courts, moving forward, could inquire as to whether the Forest Service properly considered the promulgated factors.  *Id.* at 364 (citing *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 813–14 (9th Cir. 1987)). For our purposes here, *KOLA* does not change the circumstances that existed in *Ness*, namely the lack of formal guidelines, nor did it change that fundamental holding.[14]

---

[14] The statute evaluated in *Ness*, 16 U.S.C. section 497, provided broadly that "[t]he Secretary of Agriculture is authorized, under such regulation as he may make and upon such terms and conditions as he may deem proper," to permit specific uses and occupancy of land and prohibited the Secretary from excluding the general public from full enjoyment of the natural forests.  By contrast, the regulations enacted after *Ness*, 36 C.F.R.

United States District Court
Northern District of California

Here, the record demonstrates that Congress afforded the Secretary discretion to make his Decision without sufficient meaningful standards for the Court to review the Decision within the confines of the APA.  First, the Court finds that the Secretary's authority to issue the New SUP stemmed from Section 124.  The express language and legislative history of Section 124 evidence Congress' intent to grant the Secretary complete discretion on the issue of whether to grant the Company the New SUP.  The legislative history reveals that Congress considered, and rejected, a mandate requiring the Secretary to extend the permit.  *See supra* n.2 (rejecting language that the Secretary "shall extend the existing authorization" and instead providing him "discretion to issue a special use permit to Drakes Bay Oyster Company").  Congress did not include any significant restriction: it acknowledged action could occur prior to the expiration of the then-existing Reservation—that is, before November 30, 2012.  Otherwise, it granted authority "notwithstanding any other provision of law."  The authority did not extend to any other permit, company, or "to any location other than Point Reyes National Seashore," nor did it comprise part of any comprehensive statutory scheme with specific requirements.  *See* Section 124.  To the contrary, it was created as part of an appropriations measure for a single permit to a single company at single location under terms previously defined.  The only guidance included was for the Secretary to "take into consideration recommendations of the National Academy of Sciences Report pertaining to shellfish mariculture in the Point Reyes National Seashore *before modifying* any terms and conditions of the extended authorization."  *See* Section 124 (emphasis supplied).

Plaintiffs argue that Section 124's "notwithstanding any other provision of law" language does not confer complete discretion, but rather, operates unilaterally.  More precisely, Plaintiffs argue that the Secretary was only authorized *to issue* the permit "notwithstanding any other provision of law," but the same did not apply for a denial.  (Reply at 5; Mot. at 15.)  Plaintiffs' reliance on *In re Glacier Bay*, 944 F.2d 577, 582 (9th Cir. 1991) for this proposition is meritless.  That case simply holds that a court must look carefully at Congressional intent—nothing more.  The Court agrees that when

sections 251.54–251.56, included a detailed proposal process for special use permits requiring specific information about the applicant and proposed uses and a response.  It also stated that an authorized officer (i) "will" perform certain assessments and make specific determinations, and (ii) may deny such applications if certain determinations were made.  Plaintiffs have failed to establish that any similar applicable regulations exist here.

evaluating the limits of a "notwithstanding any other provision of law" phrase, courts must look to the entire statutory context. *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1168 (9th Cir. 2007) (notwithstanding clause must "tak[e] into account the whole of the statutory context in which it appears") (internal citation omitted).

Here, the statutory context affords complete discretion. Discretion, by its very nature, affords the Secretary myriad outcomes. Plaintiffs have failed to provide any evidence of Congressional intent to the contrary.

Second, Section 124 provides the Court with "no meaningful standard" for the Court to apply in reviewing the Decision not to issue a New SUP, and thus, the Court has no basis upon which to review adequately the Decision. *Ctr. for Policy Analysis on Trade & Health (CPATH)*, 540 F.3d at 944–45; *Heckler*, 470 U.S. at 830. Even Plaintiffs, who contend Defendants were not excused "from complying with laws they would otherwise be required to obey," cannot identify the precise requirements against which the Court should review the matter. In their Reply, Plaintiffs refer to 36 C.F.R. sections 1.6 ("Section 1.6") and 5.3 ("Section 5.3")[15] as "regulations providing standards governing permit decisions." But, unlike the regulations promulgated post-*Ness*, the referenced provisions govern permit decisions generally and are not enacted as part of a statutory scheme under Section 124. Plaintiffs vaguely state in their Motion that Section 1.6(d) required the Secretary to provide a "written finding" of the basis for denial, including any adverse impact to the generic factors specified in subsection 1.6(a) noted below. [16] (Mot. at 16.) However, Plaintiffs never identify how

---

[15] Section 5.3 merely states that a permit must be obtained before engaging in a business in a park area: "[e]ngaging in or soliciting any business in park areas, except in accordance with the provisions of a permit, contract, or other written agreement with the United States, except as such may be specifically authorized under special regulations applicable to a park area, is prohibited." Plaintiffs do not establish how this regulation provides any standard by which to review the Secretary's decision.

[16] Section 1.6(a) provides generally that: "[w]hen authorized by regulations set forth in this chapter, the superintendent may issue a permit to authorize an otherwise prohibited or restricted activity or impose a public use limit. The activity authorized by a permit shall be consistent with applicable legislation, Federal regulations and administrative policies, and based upon a determination that public health and safety, environmental or scenic values, natural or cultural resources, scientific research, implementation of management responsibilities, proper allocation and use of facilities, or the avoidance of conflict among visitor use activities will not be adversely impacted."

United States District Court
Northern District of California

the Secretary's Decision was deficient, nor does their Requested Relief in the FAC seek written clarification of his Decision. *See* Section 1.6(d).

Third, Plaintiffs' own conduct confirms that the plain meaning of Section 124 provided the Secretary with discretion. *Twice* Plaintiffs urged the Secretary to act without reference to a Final EIS because it no longer had any bearing on the issue: "Section 124 includes a 'general repealing clause' that allows you to override conflicting provisions in other laws—including NEPA—to issue the [New] SUP." (Plaintiffs' 11/1/12 Letter at 2.)  Moreover, Plaintiffs declared that "Section 124 permits you [the Secretary] to grant [the Company] a 10 year SUP even though NPS cannot provide a legally adequate Final EIS by November 30, 2012." (Plaintiffs' 9/17/12 Letter at 3.)

Fourth, the mere existence of NEPA does not change the analysis.  At least three circuits have found that "NEPA cannot be used to make indirectly reviewable a discretionary decision not to take an enforcement action where the decision itself is not reviewable under the APA or the substantive statute.  'No agency could meet its NEPA obligations if it had to prepare an environmental impact statement every time the agency had power to act but did not do so.'" *Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 102–03 (1st Cir. 2012) (quoting *Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1246 (D.C. Cir. 1980); *accord Greater Yellowstone Coal. v. Tidwell,* 572 F.3d 1115, 1123 (10th Cir. 2009).).

Finally, while never addressing adequately the issue of "meaningful standards," Plaintiffs argue that the Court should address four alleged misinterpretations of law.  Namely, that Defendants misinterpreted: (1) the 1976 Point Reyes Wilderness Act by concluding that granting the New SUP under Section 124 would violate the act; (2) the 1978 Act by not construing it broadly enough to cover oyster farming; (3) the 1976 Act as evidencing an intent to convert Point Reyes National Seashore to wilderness; and (4) the applicability of NEPA.  (Mot. at 12–15.)  None of these are specific to the standards for *issuing* the New SUP itself under Section 124, and consequently, are not appropriate for judicial review.

As Congress envisioned, unless a court can *meaningfully review* the specific manner in which an agency must act, not dictating therein the conclusion the agency must reach, review under the APA is unavailable.  Here, because Section 124 sought to address one specific special use permit for one

specific business on a specific timeframe, the Secretary was afforded the discretion to decide whether to issue the permit and judicial review is not authorized.

## IV.   AVAILABILITY OF INJUNCTIVE RELIEF

While the Court has found that jurisdiction does not exist, for the reasons set forth *supra*, the Court further finds that, based on this record, injunctive relief would not be available in any event. The Court begins with the premise that a preliminary injunction is an "extraordinary and drastic remedy," and never awarded as of right.  *Munaf v. Geren*, 553 U.S. 674, 689–690 (2008) (internal citations omitted).  Thus, a plaintiff seeking a preliminary injunction bears the burden of establishing four separate factors: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) showing the balance of the equities tips in its favor; and (4) the injunction is in the public interest.  *Winter*, 555 U.S. at 20.  "'[S]erious questions going to the merits' [combined with] a balance of hardships that tips *sharply* towards the plaintiff can support issuance of a preliminary injunction, *so long* as the plaintiff also shows that there is a likelihood of irreparable injury *and* that the injunction is in the public interest."  *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (emphasis supplied).  A "serious question" is one on which the plaintiff "has a fair chance of success on the merits."  *Sierra On-Line, Inc. v. Phoenix Software. Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).  As a result, an injunction serves as "a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  *Winter*, 555 U.S. at 32.  The Court reviews each of the elements required to obtain a preliminary injunction.

### A.   LIKELIHOOD OF SUCCESS ON THE MERITS

If the Court had jurisdiction, Plaintiffs would have to demonstrate the likelihood of success under a Section 706(2) analysis requiring a finding that Secretary's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  *See S.E.C. v. Small Bus. Capital Corp.*, No. 12-CV-03237 EJD, 2012 WL 6584953, at *1 (N.D. Cal. Dec. 17, 2012) ("Procedurally speaking, 'a party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.'" (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir.1994)).  "A decision is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  "In conducting an APA review, the court must determine whether the agency's decision is 'founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment.' 'The [agency's] action . . .  need only be a reasonable, not the best or most reasonable, decision.'" *River Runners for Wilderness*, 593 F.3d at 1070 (internal citations omitted).  As detailed above, Plaintiffs assert multiple causes of action requesting that the Court order the Secretary to issue the special use permit and overturn the Secretary's Decision to deny the issuance of a New SUP to replace the lapsed Reservation.  Based upon this record, the Court does not find that Plaintiffs can show a likelihood of success under a Section 706(2) standard.[17]

First, the Secretary's rationale, though controversial, had a basis in law and policy, showed a "rational connection" between the choices made, and was not "so implausible" that differences in opinion could not account for the result.  The Secretary's Memorandum of Decision identified, in pertinent part, policy considerations upon which he based his decision:

> I gave great weight to matters of public policy, particularly the public policy inherent in the 1976 act of Congress that identified Drakes Estero as potential wilderness.
>
> In enacting that provision, Congress clearly expressed its view that, but for the nonconforming uses, the estero possessed wilderness characteristics and was worthy of wilderness designation.  Congress also clearly expressed its intention that the estero become designated wilderness by operation of law when "all uses thereon prohibited by the Wilderness Act have ceased."  The [Company's] commercial operations currently are the only use of the estero prohibited by the Wilderness Act.  Therefore, [the

---

[17] Plaintiffs also claim that Defendants failed to comply with 36 C.F.R. section 1.5 by filing a false notice announcing the closure of the Company.  Plaintiffs have not shown how the notice can be held patently false, where the Defendants merely announced the legal termination of the Company's right to operate, and Public Law No. 94-567 provided that a notice in the Federal Register would be sufficient to change a designation from potential wilderness to wilderness.  *See id.* §§ 1(k) & 3 ("All lands which represent potential wilderness additions, upon publication in the Federal Register of a notice by the Secretary of the Interior that all uses thereon prohibited by the Wilderness Act have ceased, shall thereby be designated wilderness.").  The notice is not "false" simply because the Company had not vacated the property.

United States District Court
Northern District of California

Company's] commercial operations are the only use preventing the conversion of Drakes Estero to designated wilderness.

(Decision at 5–6.)

Second, the Secretary did not violate the private right of use which had existed for 40 years but considered the explicit terms of the conveyance from the Johnson Oyster Company to the United States and the subsequent purchase by the Company:

Since the [Reservation] and [2008] SUP allowing [the Company's] commercial operations in the estero will expire by their own terms, after November 30, 2012, [the Company] no longer will have legal authorization to conduct those operations, and approximately 1,363 acres can become designated wilderness.

(*Id.* at 6.)  The Secretary further articulated that the Superintendent of the Point Reyes National Seashore informed the Company in early 2005 that the Park Service did not intend to issue any new permit beyond the expiration in 2012.  (*Id.* at 3–4.)

Third, the Secretary explicitly recognized the "debate" and "scientific uncertainty" regarding the impact of the Company's operations on "wilderness resources, visitor experience and recreation, socioeconomic resources and NPS operations."  (*Id.* at 5.)  While noting that both the Draft EIS and the Final EIS suggested that the removal of the Company's business operations would have a beneficial impact on the environment, the Secretary emphasized his Decision was "based on the incompatibility of commercial activities in the wilderness and not on the data that was asserted to be flawed."  (Decision at 5 n.5.)  He determined that the uncertainties regarding the impact were "not material to the legal and policy factors that provide the central basis for [his] decision."  (*Id.* at 5.)[18]

Third, Plaintiffs strain credulity to argue that the Secretary's interpretation of Section 124 to afford discretion and not require compliance with NEPA is "arbitrary and capricious" when they themselves made the urged the same interpretation—not once, but twice.

Plaintiffs have argued that the rationale in the Secretary's Memorandum is faulty, but none of their arguments demonstrate why the Court should ignore the Secretary's explicit declaration of the policy considerations for his Decision.  As discussed above, Section 124 contains no factors or considerations upon which the Secretary was to base his Decision, other than to consider the 2009

---

[18] The Court notes the 2009 NAS Report not only affirmed the same uncertainty, but cautioned that the associated costs to resolve the debate could be significant.  (2009 NAS Report (Dkt. No. 42-2) at ECF p. 101 ("there is no scientific answer to the question of whether to extend the [Reservation] for shellfish farming").)

NAS Report in the event of a modification.  Given the content in the Secretary's Decision, the Court would have to find that his consideration of the goals of the Wilderness Act was not legally proper or was in contravention to the law.  Further, the Court would be forced to ignore Congress' statement that "those lands and waters designated as potential wilderness additions [were to] be essentially managed as wilderness, to the extent possible, with efforts to steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status."  H.R. Rep. No. 1680, H.R. REP. 94-1680, 3, 1976 U.S.C.C.A.N. 5593, 5595.  Even a plain meaning interpretation of the phrase "potential wilderness" suggests on its face the appropriateness of full wilderness as the ultimate goal.

Finally, the Court notes that Plaintiffs have emphasized throughout their briefs Defendants' alleged commission and admission of "scientific misconduct."  At best, the record before the Court is mixed with competing expert declarations, does not warrant injunctive relief, and cannot be resolved at this stage.  Despite the Secretary's express statement that his Decision was not based on flawed data in the Final EIS, Plaintiffs assume that he did rely on false statements and did not ensure that all previously identified misconduct had been corrected.  (Mot. at 18.)  However, even the NAS itself recognized that policy considerations, not science, controlled the ultimate Decision:

> After evaluating the limited scientific literature on Drakes Estero . . . , there is a lack of strong scientific evidence that shellfish farming has major adverse ecological effects on Drakes Estero at the current . . . [levels of production and operational practices.] . . . Importantly from a management perspective, lack of evidence of major adverse effects is not the same as proof of no adverse effects nor is it a guarantee that such effects will not manifest in the future.  A more definitive understanding of the adverse or beneficial effects cannot be readily or inexpensively obtained[.] . . .

> *The ultimate decision* to permit or prohibit a particular activity, such as shellfish farming, in a particular location, such as Drakes Estero, necessarily requires *value judgments* and tradeoffs that *can be informed, but not resolved, by science*. . . . Because stakeholders may reasonably assign different levels of priority or importance to these effects and outcomes, there is no scientific answer to the question of whether to extend the [Reservation] for shellfish farming.  Like other zoning and land use questions, *this issue will be resolved by policymakers charged with weighing the conflicting views and priorities of society as part of the decision-making process.*

(2009 NAS Report at ECF pp. 100–101 (emphasis supplied).)

For all these reasons, the Court finds that even if jurisdiction existed, Plaintiffs cannot establish that the Secretary's refusal to issue the New SUP was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law such that they would ultimately be successful on the merits of their claim.

### B.   IRREPARABLE HARM

The Court next considers whether the party seeking such interim relief is likely to suffer irreparable harm if an injunction does not issue prior to trial on the merits. *Winter,* 555 U.S. at 20. Generally, the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray,* 415 U.S. 61, 90 (1974) (internal citation and quotations omitted). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Id.* "[A]lthough some injuries may usually be irreparable and thus a likelihood of irreparable injury easily shown, the plaintiff must still make that showing on the facts of his case and cannot rely on a presumption to do it for him." *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,* 654 F.3d 989, 998 (9th Cir. 2011) (citing *Winter* and *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388 (2006)).

Plaintiffs argue that they will suffer irreparable harm in the absence of a preliminary injunction because their oyster crop will be destroyed by premature removal of oysters from Drakes Estero, future crops will be destroyed due to inability to undertake regular planting activities and sustain the normal oyster growth cycle, and the business itself will be destroyed by requiring the Company to remove its equipment and lay off its workers. Plaintiffs further argue that injury to their business, including loss of business good will, customers, and reputation, constitute irreparable harm. Finally, Plaintiffs contend that, in the absence of interim relief, they will lose a unique, irreplaceable interest in real property.

Ordinarily, lost revenue does not establish irreparable harm. *Los Angeles Memorial Coliseum Comm'n v. NFL,* 634 F.2d 1197, 1202 (9th Cir. 1980). Similarly, courts have denied injunctive relief where the facts disclose that loss of business goodwill can be remedied by money damages. *See id.* at 1202 (evidence of loss of revenue, property value, and goodwill did not establish irreparable harm); *see also OG Int'l, Ltd. v. Ubisoft Entm't,* C 11-04980 CRB, 2011 WL 5079552, at *10 (N.D. Cal. Oct.

1   26, 2012) (finding in trademark action that customers and business goodwill "at least in theory may be

2   compensated by damages" and therefore weigh against a claim of irreparable harm).

3          More often, however, courts find that intangible business-related injury, such as loss of

4   customers and business goodwill can be difficult to valuate and *may*, in some instances, constitute

5   irreparable harm.  *See Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597,

6   603 (9th Cir. 1991) (injury to goodwill and ongoing marketing efforts established irreparable harm);

7   *Stuhlberg Int'l Sales Co., Inc. v John D. Brush and Co., Inc.,* 240 F.3d 832, 841 (9th Cir. 2001) (loss

8   of goodwill resulting from failure to fill customer orders would result in irreparable harm).  Indeed,

9   the Ninth Circuit has stated that "[t]he threat of being driven out of business is sufficient to establish

10  irreparable harm."  *American Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470,

11  1474 (9th Cir. 1985).  Evidence of such a threat must be adequate and must be causally connected to

12  the alleged wrongdoing.  For example, in *American Passage Media,* the court held that evidence of

13  past losses and forecasts of future losses, standing alone, were insufficient to show that the company

14  was "threatened with extinction."  *Id.* at 1474; *Goldie's Bookstore, Inc. v. Superior Court of State of*

15  *Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) (evidence of loss of goodwill and customers was speculative

16  and did not support injunctive relief).

17         Loss of an interest in real property may also be considered irreparable harm since the unique

18  nature of real property makes a damages remedy inadequate.  *See, e.g., Park Village Apartment*

19  *Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011), *cert. denied,* 132 S.

20  Ct. 756 (2011) (in action under federal housing law, affirming grant of preliminary injunction to stop

21  eviction from apartment complex); *Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840

22  F.2d 653, 661 (9th Cir. 1988) (affirming injunction to prevent foreclosure on orchard property).

23  Nevertheless, expenses arising out of the loss of real property rights do not automatically establish

24  irreparable harm.  *See Goldie's Bookstore*, 739 F.2d at 471 (in action challenging statute denying stay

25  of eviction from premises upon expiration of lease, damages sustained as a result of having to remove

26  business from premises was mere financial injury and would not constitute irreparable harm).

27         In the present case, Plaintiffs' claimed loss of current and future oyster crops would generally

28  be compensable by money damages.  Indeed, Plaintiffs' evidence on these points consists mainly of

United States District Court
Northern District of California

detailing the monetary value of the lost crops. (Lunny Decl. ¶¶ 32–44.) Plaintiffs have not offered evidence or argument indicating that they could not, "at a later date, in the ordinary course of litigation" recover money damages for such losses.[19] Plaintiffs also detail the cost, effort and difficulty of removing the oyster racks and other personal property from the site, ultimately arguing that it is economically and logistically infeasible to do so in the time required. (Lunny Decl. ¶¶ 46–68.) However, the expense and difficulty of removing the trappings of the business here, while inconvenient, are generally a matter of money lost rather than irreparable harm. Moreover, Plaintiffs fail to address why expense and difficulty, in and of themselves, are reasons that support an injunction pending an entire litigation.

More difficult to valuate, however, is the damage to the business itself. Plaintiffs offer evidence that they will face a gap in production down the line if they are unable to plant oyster and clam "seed" now. (Lunny Decl. ¶43.) They indicate that the immediate shutdown, along with the later gap in production, would prevent them from effectively resuming operations, destroying their business. (*See* Lunny Decl. ¶¶ 42–44, 69.) Likewise, the loss of Plaintiffs' rights with respect to the real property itself is not otherwise remediable. These injuries support a finding that irreparable harm is likely.

The Secretary argues that whatever irreparable harm is shown here should be weighed against the fact that the Company has known since it acquired the Reservation that the right to continue operations expired on November 30, 2012, with no guarantee of an additional special use permit. They argue the irreparable harm of which the Company complains was a foreseeable consequence of its acquisition of Johnson's assets in 2004 and not the result of some new action by the Secretary or the Park Service. The Secretary's arguments are more a reflection of his view of the merits or balancing of the equities than evidence affecting the existence of irreparable harm.

In sum, the Court finds that Plaintiffs have made a sufficient showing of irreparably harm in the absence of injunctive relief.

---

[19] The Court notes, however, that Plaintiffs have not sought an award of money damages in their First Amended Complaint, nor is it clear that money damages could eventually be awarded here. *See generally* 5 U.S.C. § 702 (APA waives sovereign immunity for relief other than money damages); 28 U.S.C. § 2680(a) (Federal Tort Claim Act exempts claims based upon discretionary functions).

C.       BALANCE OF EQUITIES AND CONSIDERATION OF THE PUBLIC INTEREST

In deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief . . . pay[ing] particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (internal citations and quotations omitted).  "The assignment of weight to particular harms is a matter for district courts to decide."  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010).

Plaintiffs argue that the balance of equities favors them because Defendants will not be harmed by maintaining the status quo and allowing an oyster farm that has been operating for nearly eighty years to continue, while Plaintiffs will suffer the total destruction of their business.  Plaintiffs further contend that, because Defendants did not act to prevent the transfer of the Reservation to the Company in 2004, no evidence of any exigency in removing the oyster farm exists now.  Although Plaintiffs never explain how the Secretary could have so acted given the express Reservation in the Grant Deed and Defendants' determination that they were not required to approve the sale from Johnson to the Company.

Looking more broadly, Plaintiffs argue that the public interest favors an injunction in three ways: (1) it maintains the status quo and would avoid loss of jobs and housing for the Company's employees and their families; (2) an injunction would avoid the adverse impacts to water quality and the ecosystem associated with removing the oysters and equipment of the oyster farm[20]; and (3) the public benefits from maintaining a local landmark, a major oyster supplier, and the last oyster cannery in California.

Defendants counter that the equities do not favor injunctive relief.  Defendants maintain that achievement of full wilderness status for Drakes Estero has been an express goal Congress defined for more than 36 years, and should not be delayed further, especially where the purchase of the property expressly envisioned a *terminable* reservation of use.  They argue Plaintiffs have been permitted to carry on a non-conforming use for many years and were on notice of the impending expiration prior to

---

[20] (*See* Declaration of Scott Luchessa in Support of Motion for Preliminary Injunction ¶¶ 7–19 (Dkt. No. 34); Declaration of Richard Steffel in Support of Motion for Preliminary Injunction ¶¶ 6–12 (Dkt. No. 37); Declaration of Robert Abbott in Support of Motion for Preliminary Injunction ¶¶ 5–13 (Dkt. No. 48); Rebuttal Declaration of Scott Luchessa in Support of Motion for Preliminary Injunction ¶ 20 (Dkt. No. 79-2).)

United States District Court
Northern District of California

United States District Court
Northern District of California

their purchase in 2005.  The Proposed Interveners also offered declarations regarding their own constituents' public interest in eliminating the non-conforming use.  Congress' long-standing legislation and goals for the area indicate a strong public interest in bringing the land to wilderness status and thus the highest protection afforded to federal lands.  *Cf. Motor Vessels Theresa Ann v. Kreps*, 548 F.2d 1382, 1382–83 (9th Cir. 1977) (balancing of harms was an abuse of discretion where court weighed severe economic hardship to the tuna fishing industry imposed by the operation of the Marine Mammal Protection Act but failed to consider the public interests reflected in passage of the Act).

The Secretary further argues that the public interest favors closing down the Company without further delay because the oyster farm has negative environmental consequences such as providing a habitat for invasive and non-native species, with adverse effects on native ecosystems.  (Declaration of Brannon Ketcham in Support of Federal Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Ketcham Decl.") ¶¶ 15, 18 (Dkt. No. 64-2).)  The Secretary acknowledges that the noise associated with the removal of the oyster racks will create short-term impacts. (Declaration of Dr. Kurt M. Fristrup in Support of Federal Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ¶¶ 3–7 (Dkt. No. 64-3); Ketcham Decl. ¶ 38.)  However, he argues that those short-term negative impacts will be minor and offset by the benefits of full wilderness protection.

Finally, given that the decision is one in equity, Defendants urge the Court to consider that the California Coastal Commission has issued cease and desist orders to the Company for alleged violations including the cultivation of Manila clams in harbor seal protected areas, boat transit in restricted areas, and unpermitted discharge of marine debris.  (Declaration of Cicely Muldoon in Support of Federal Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ¶ 28 (Dkt. No. 64-1); Goodyear Decl., ¶ 35 & Ex. 34.)

In balancing the equities, the Court, on the one hand, recognizes that Plaintiffs will suffer significant costs including the unfortunate impacts on the Company's employees and their families from loss of their jobs and their living quarters on the oyster farm.  The close of any business frequently brings hardship.  The Court weighs this consideration against Plaintiffs' ability and/or own

United States District Court
Northern District of California

failure to conduct due diligence prior to its purchase from Johnson, their knowledge of the Park Services' intention to allow the Reservation to lapse in November 2012, and the Company's failure to prepare for the same.   Plaintiffs claimed at oral argument that they had "every reason to hope" for a New SUP but the record does not reflect that their hope was based upon any assurances by the decisionmakers themselves.

On the other hand, the Court weighs Congress' long-standing intention to manage lands in the public trust in a manner that will "steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status" as an important consideration, as is the obligation to protect express property rights.  H.R. Rep. No. 1680, H.R. REP. 94-1680, 3, 1976 U.S.C.C.A.N. 5593, 5595.  Further, the record lacks evidence that Defendants misled Plaintiffs to believe that a New SUP would be issued.  To the contrary, Defendants acted affirmatively to warn the Lunnys at the outset of their intention to allow the Reservation to lapse without a New SUP and reiterated this position over time.  The Lunnys' refusal to hear the message weighs against them.

Ideally, the Secretary's final decision would have been made more promptly, and the political debate aired in a way not to increase acrimony among the interested parties.  However, the Court is not in a position, on this record, to evaluate the reasons driving timing.  Nor can the Court determine, on the record before it, that the adverse environmental consequences of denying an injunction and allowing the removal of the Company's personal property from the site weigh more strongly than the environmental consequences of enjoining that removal.  Finally, the Court has no basis upon which to weigh the relative public interest in access to local oysters with the public's interest in unencumbered wilderness.

On balance, and combining the requirement of both the equities and the public interest more broadly, the Court does not find these elements weigh in favor of granting a preliminary injunction.

**V.   CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction is **DENIED** on the grounds that: (i) the Court lacks jurisdiction under Section 701(a)(2) of the APA to provide any meaningful review of Section 124, given its discretionary character; and (ii) even if it did, Plaintiffs cannot satisfy all four elements necessary to obtain preliminary injunctive relief.

This Order terminates Dkt. No. 32.

**IT IS SO ORDERED.**

Dated:  February 4, 2013

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**