MELINDA L. HAAG (CSBN 132612)
United States Attorney
ALEX TSE (CSBN 152348)
Chief, Civil Division
MICHAEL T. PYLE (CSBN 172954)
Assistant United States Attorney
SAM HIRSCH
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
STEPHEN M. MACFARLANE (N.Y. Bar No. 2456440)
Senior Attorney, U.S. Department of Justice
Environment and Natural Resources Division
501 "I" Street, Suite 9-700
Sacramento, CA 95814-2322
Tel: (916) 930-2204/Fax: (916) 930-2210
Email: Stephen.Macfarlane@usdoj.gov
JOSEPH T. MATHEWS (Colo. Bar No. 42865)
Trial Attorney, U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Tel: (202) 305-0432/Fax: (202) 305-0506
Email: joseph.mathews@usdoj.gov
E. BARRETT ATWOOD (Cal. Bar No. 291181)
Trial Attorney, U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
301 Howard Street, Suite 1050
San Francisco, CA 94105
Tel: (415) 744-6480/Fax: (415) 744-6476
Email: barrett.atwood@usdoj.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DRAKES BAY OYSTER COMPANY *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>S.M.R. JEWELL, in her official capacity as Secretary of the Interior, *et al*.<br><br>Defendants. | Case No. 12-cv-06134 YGR/DMR<br><br>**STIPULATED REQUEST FOR APPROVAL OF SETTLEMENT AGREEMENT AND ENTRY OF CONSENT DECREE; [~~PROPOSED~~] FINDINGS OF FACT AND CONCLUSIONS OF LAW THEREON.**<br>FINAL JUDGMENT, ORDER AND DECREE.<br>Court:  Hon. Yvonne Gonzalez Rogers, Courtroom 1 – 4th Floor |

Plaintiffs Drakes Bay Oyster Company and Kevin Lunny ("Plaintiffs") and Defendants S.M.R. Jewell, in her official capacity as Secretary of the Interior, *et al.* ("Defendants") (collectively, "the Parties"), through undersigned counsel, state as follows:

**I.    RECITALS**

A.    Whereas Plaintiffs and Defendants have been engaged in settlement discussions and have reached a final resolution of all of Plaintiffs' claims in the above-captioned case as set forth in the accompanying Settlement Agreement and [Proposed] Consent Decree ("Settlement"), filed concurrently herewith and attached as Exhibit 1 to this Stipulation.

B.    Whereas the Settlement has been approved by Plaintiffs and Defendants.

C.    Whereas the Parties intend, and respectfully request, that the Court enter the Settlement as a Consent Decree as set forth in the Settlement.

D.    Whereas the Court may enter the Settlement as a Consent Decree if the Consent Decree is fair, reasonable, and equitable, and does not violate the law or public policy.

Therefore, the Parties respectfully present this Stipulated Request for Approval of Settlement and Entry of Consent Decree and [Proposed] Findings of Fact and Conclusions of Law Thereon.

**II.    STIPULATED [PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW RE: SETTLEMENT AGREEMENT AND
CONSENT DECREE**

The Parties hereby stipulate and respectfully request that the Court find as follows:

**A.    BACKGROUND**

1.    The Court has presided over this case since it was originally filed in December 2012 and is familiar with the facts and claims at issue.  The Court previously summarized the statutory and factual background of this case in its order denying Plaintiffs' motion for preliminary injunction.  *Drakes Bay Oyster Co. v. Salazar*, 921 F. Supp. 2d 972, 976-83 (N.D. Cal. 2013) (*Drakes Bay I*), *aff'd sub nom. Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) (*Drakes Bay II*), *cert. den'd* 134 S. Ct. 2877 (2014).

2.    Following the issuance of the mandate by the Ninth Circuit, the Parties entered into settlement negotiations.  Counsel for Plaintiffs and Defendants advised the Court that they were engaged in settlement discussions at a July 7, 2014, case management conference. *See ECF*

Stipulated Request for Approval of Settlement Agreement and Consent Decree; [~~Proposed~~] Findings of Fact and Conclusions of Law Thereon.  Case No. 12-cv-06134-YGR/DMR                    1]

#136.  The Court referred the case to the Hon. Donna M. Ryu, United States Magistrate-Judge, to conduct a settlement conference. *Id.*; *see also* ECF #137 (Notice of Settlement Conference and Settlement Conference Order).  On August 6, 2014, the Court approved a stipulated confidentiality order proposed by the Parties, to assist them in their discussions. ECF #148. Judge Ryu held settlement conferences on August 8, August 11, and August 19, 2014, in which counsel for the Plaintiffs and Defendants participated. *See* ECF ## 151, 152, 153.

3.     On September 30, 2014, the Parties, through their counsel, executed the Settlement.  The Settlement recites that counsel for Plaintiffs was authorized to enter into the Consent Decree on behalf of Plaintiffs DBOC and Kevin Lunny.  The Settlement further recites that counsel for Defendants has been authorized to enter into the Consent Decree on behalf of the United States.

**B.     STANDARDS FOR APPROVING A CONSENT DECREE**

4.     The Court may approve a consent decree when the decree is "'fair, reasonable and equitable and does not violate the law or public policy.'" *Turtle Island Restoration Network v. United States Dep't of Commerce,* 672 F.3d 1160, 1165 (9th Cir. 2012) (*quoting Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990)).  In determining whether a consent decree is fair, the Court considers both procedural and substantive fairness, including whether the decree is the product of good-faith, arms-length negotiations and is equitable. *Turtle Island Restoration Network v. United States Dep't of Commerce*, 834 F. Supp. 2d 1004, 1016-17 (D. Haw. 2011), *aff'd* 672 F.3d 1160 (9th Cir. 2012); *United States v. Chevron*, 380 F. Supp. 2d 1104, 1110-11 (N.D. Cal. 2005).  A consent decree that is the product of good faith, arms-length bargaining is "presumptively valid."  *United States v. Oregon,* 913 F.2d 576, 581 (9th Cir. 1990). With respect to substantive fairness, the Court's task is not to determine whether the settlement is "ideal" or one the court might have fashioned. *Chevron*, 380 F. Supp. 2d at 1111 (citing *United States v. Cannons Eng'ing Corp.*, 899 F.2d 79, 84 (1st Cir. 1990).  Rather, "the court's approval is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *United States v. Oregon*, 913 F.2d at 581 (internal quotations omitted).  "In addition, because it is a form of judgment, a consent decree must conform to applicable laws." *Id.* at 580.  In making

Stipulated Request for Approval of Settlement Agreement and Entry of Consent Decree; [Proposed] Findings of Fact and Conclusions of Law Thereon. Case No. 12-cv-06134-YGR/DMR

these determinations, the Court's familiarity with the lawsuit "can be an important factor" in determining whether a hearing is necessary before approving a consent decree. *Id.* at 582.

### C.   THE CONSENT DECREE IS FAIR AND EQUITABLE.

5.       The Settlement is the product of good-faith negotiations, reflects the advice of experienced counsel for Plaintiffs and Defendants, and takes into account the possible risks involved in litigation if the Settlement were not approved.  This litigation has been hard fought all the way to the United States Supreme Court.  Plaintiffs vigorously pursued the claims in their amended complaint, and settlement negotiations did not begin until after the Supreme Court denied Plaintiffs' petition for writ of *certiorari* on June 30, 2014.  The Parties conducted arms-length settlement negotiations, including intensive discussions between August 8 and August 19, 2014, which were presided over by Magistrate-Judge Ryu.  The Settlement reached reflects a reasonable compromise that considers both Plaintiffs' prospects for success on the merits and the time it would take to reach a final judgment on the merits, including any claims that might have been brought through further amendment of the pleadings. *See, e.g.,* ECF# 113 (Joint Case Management Statement filed Sept. 16, 2013).   Thus, the Settlement is procedurally fair.

6.       The Settlement is also equitable and comports with substantive fairness for reasons which include the following:

a.       It provides DBOC and Mr. Lunny with a reasonable period of time to wind down shellfish harvesting from Drakes Estero to recover DBOC's economic investment in shellfish planted before the Secretary of the Interior's ("Secretary") November 29, 2012, decision, consistent with Plaintiffs' contention that the permit issued to DBOC by Defendants in 2008 allows the company a reasonable time to remove valuable property after the expiration of the permit.  Thus, the Settlement allows DBOC to harvest shellfish and sell them away from Point Reyes National Seashore ("Point Reyes") up to midnight on December 31, 2014.  The Settlement allows DBOC to continue to use specified onshore facilities to remove and process shellfish for sale away from Point Reyes; Plaintiffs closed DBOC's retail and canning operations on July 31, 2014.  During the period between the execution of the Settlement and December 31, 2014, the Settlement requires Plaintiffs to remove and dispose of all other shellfish from areas of cultivation

Stipulated Request for Approval of Settlement Agreement and Entry of Consent Decree; [Proposed] Findings of Fact and Conclusions of Law Thereon. Case No. 12-cv-06134-YGR/DMR

3

in Drakes Estero according to an enforceable timetable.  Plaintiffs are also required under the Settlement to vacate oyster racks in Drakes Estero on an enforceable schedule.  However, the National Park Service ("Park Service") agrees in the Settlement to undertake the removal of oyster racks from Drakes Estero, as well as all onshore and offshore property related to shellfish cultivation remaining after December 31, 2014, at the Park Service's sole expense and cost.  The Settlement requires Plaintiffs' shellfish removal operations in Point Reyes to cease by December 31, 2014, and requires DBOC to permanently close its operations in Drakes Estero at that time.

b.      The Settlement allows the Park Service to immediately begin the removal of specified onshore property not associated with shellfish removal, and to initiate oyster rack removal and clean-up operations in Drakes Estero upon entry of the Settlement as a consent decree, thereby advancing the Park Service's goal of expeditiously transitioning Drakes Estero to management as a marine wilderness.  The Settlement allows the Park Service's removal and clean-up operations to occur concurrently with DBOC's removal of shellfish from Drakes Estero. The Parties agree to provide each other information and to communicate about each other's activities.

c.      The Settlement terminates the litigation in this case and avoids future litigation.  Plaintiffs dismiss all claims in their amended complaint with prejudice; waive and release all claims or causes of action for damages or equitable relief based on the alleged harms or violations relating to the United States' management, oversight, or administration of Point Reyes and/or Drakes Estero; and further warrant and represent that they will not bring or cause to be brought any other action or suit related to the claims asserted, or that could have been asserted, in the above-captioned case.  Defendants covenant not to sue or take administrative action against Plaintiffs for actions occurring prior to the execution of the Settlement, including trespass, ejectment, unpaid rent, claims predicated upon DBOC's commercial shellfish operations, and claims predicated on breaches or violations of the 2008 Special Use Permit issued to DBOC and Mr. Lunny.  The Settlement is the result of a compromise and involves no admission of liability or wrongdoing on the part of any party.

Stipulated Request for Approval of Settlement Agreement and Entry of Consent Decree; [Proposed] Findings of Fact and Conclusions of Law Thereon. Case No. 12-cv-06134-YGR/DMR

4

d.      The Park Service will extend federal relocation benefits to all qualified employees of DBOC who live on-site.  Regardless of whether employees who reside on-site qualify for federal relocation benefits, they may continue to live on-site for not less than 90 days following the closure of DBOC on December 31, 2014.  The Park Service will continue to provide those employees residing on-site with power, drinking water, and septic services meeting health and safety requirements.

e.      The entry of the Settlement as a consent decree will provide the Parties with potential assistance from the Court in the event disputes arise over compliance with the terms of the Settlement.  Because DBOC will permanently close its Point Reyes operations on December 31, 2014, the potential need for Court assistance will be of limited duration.

**D.      THE CONSENT DECREE IS REASONABLE**

7.      The reasonableness inquiry focuses on whether a consent decree is confined to the dispute between the parties and accomplishes its purported goal.  *Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 71 (D.D.C. 2004); *Turtle Island*, 834 F. Supp. 2d at 1018.  Here, the Settlement resolves Plaintiffs' challenge to the Secretary's decision not to issue a new, ten-year special use permit that would have allowed DBOC to continue commercial shellfish operations in Drakes Estero.  Plaintiffs' prior federal authorizations to conduct shellfish operations having expired at the end of November 2012, the Settlement affords Plaintiffs a reasonable period of time to complete the wind-down of removal of their personal property, including shellfish, from Drakes Estero and adjacent onshore land.  The Settlement does not affect Mr. Lunny's continued use of G Ranch and does not prevent Mr. Lunny from conducting commercial shellfish operations outside of Point Reyes.  The Settlement facilitates the Park Service's objective of managing Drakes Estero as a marine wilderness through (1) the permanent closure of DBOC facilities and operations in Drakes Estero and adjacent onshore land on December 31, 2014; and (2) Plaintiffs' relinquishment of all asserted rights to conduct commercial shellfish operations in Point Reyes and their covenant not to operate or accept an authorization to operate a commercial shellfish operation in Drakes Estero except according to the terms of the Settlement.  Thus, the Settlement is reasonable.

Stipulated Request for Approval of Settlement Agreement and Entry of Consent Decree; [Proposed] Findings of Fact and Conclusions of Law Thereon. Case No. 12-cv-06134-YGR/DMR

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E.     THE CONSENT DECREE DOES NOT VIOLATE LAW OR PUBLIC POLICY**

8.     The Settlement does not violate any law, including but not limited to the Wilderness Act.  16 U.S.C. § 1131 et seq.  As noted above, the Settlement requires the permanent closure of DBOC's Point Reyes operations as of midnight December 31, 2014.  By providing for removal of DBOC's farmed shellfish, including shellfish too small to be sold commercially, the Settlement Agreement protects public health and furthers the Park Service's management goals for Drakes Estero.  On December 4, 2012, the Park Service published a Federal Register Notice announcing the change in status of Drakes Estero from potential wilderness to wilderness. *Drakes Bay I,* 921 F. Supp. 2d at 982.

9.     The Settlement is consistent with the strong public policy favoring the settlement of litigation, including through the use of consent decrees in appropriate circumstances. *Cannons Eng'ing*, 899 F.2d at 84; *Securities and Exchange Comm'n v. Randolph,* 736 F.2d 525, 528 (9th Cir. 1984). The Settlement here does not violate public policy.

**F.     CONCLUSIONS OF LAW**

For the foregoing reasons, the accompanying Settlement is fair, reasonable, and equitable, and does not violate the law or public policy.  The parties respectfully request that the Court approve the Settlement and enter the Consent Decree as the final Order, Judgment, and Decree in the above-captioned case.

Respectfully submitted this 6th day of October, 2014.

MELINDA HAAG
United States Attorney

MICHAEL T. PYLE
Assistant United States Attorney

SAM HIRSCH
Acting Assistant Attorney General

By:_/s/ Stephen M. Macfarlane
STEPHEN M. MACFARLANE (N.Y. Bar No. 2456440)
Senior Attorney
JOSEPH T. MATHEWS (Colo. Bar No. 42865)
E. BARRETT ATWOOD (Cal. Bar No. 291181)
Trial Attorneys

Stipulated Request for Approval of Settlement Agreement and Entry of Consent Decree; [Proposed] Findings of Fact and Conclusions of Law Thereon. Case No. 12-cv-06134-YGR/DMR

6

Attorneys for Defendants

BRISCOE IVESTER & BAZEL LLP


By: /s/ Lawrence S. Bazel (per authorization 10/06/2014)
LAWRENCE S. BAZEL (CA Bar No. 114641)
PETER PROWS (CA Bar No. 257819)

Attorneys for Plaintiffs

## [~~PROPOSED~~] ORDER

THE COURT APPROVES THE TERMS OF THE STIPULATION AND ADOPTS THE FINDINGS OF FACT AND CONCLUSIONS OF LAW SET FORTH THEREIN.

The Court will enter the accompanying Settlement Agreement and [Proposed] Consent Decree as a final Judgment, Order, and Decree in this case.

IT IS SO ORDERED.


DATED: October 8, 2014          _____
                               YVONNE GONZALEZ ROGERS
                               UNITED STATES DISTRICT JUDGE

Stipulated Request for Approval of Settlement Agreement and Entry of Consent Decree; [~~Propose~~d] Findings of Fact and Conclusions of Law Thereon. Case No. 12-cv-06134-YGR/DMR

7

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on October 6, 2014, I electronically filed the "Stipulated Request for Approval of Settlement Agreement and Entry of Consent Decree; [Proposed] Findings of Fact and Conclusions of Law Thereon" and "Settlement Agreement and [Proposed] Consent Decree" with the Clerk of the Court using the ECF system, which automatically will send email notification to the attorneys of record.

/s/  Stephen M. Macfarlane
STEPHEN M. MACFARLANE

Stipulated Request for Approval of Settlement Agreement and Entry of Consent Decree; [Proposed] Findings of Fact and Conclusions of Law Thereon. Case No. 12-cv-06134-YGR/DMR

8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1

# Settlement Agreement and

# [Proposed] Consent Decree

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| DRAKES BAY OYSTER COMPANY, *et al.*, ) | Case No: 3:12-cv-06134-YGR |
| ) | |
| Plaintiffs, ) | **Settlement Agreement and** |
| ) | **[Proposed] Consent Decree** |
| v. ) | |
| ) | |
| S.M.R. JEWELL, in her official capacity as ) | |
| Secretary, U.S. Department of the Interior, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## SETTLEMENT AGREEMENT AND [PROPOSED] CONSENT DECREE

For the purpose of settling and resolving the disputes that have arisen between and among them without there being any trial or adjudication of any issue of law or fact, and without constituting an admission of liability on the part of any party, and for no other purpose, Plaintiffs Drakes Bay Oyster Company ("DBOC") and Kevin Lunny (collectively, "Plaintiffs") and Defendants S.M.R. Jewell, acting in her official capacity as Secretary of the Interior, United States Department of the Interior, United States National Park Service ("NPS") , and Jonathan Jarvis, acting in his official capacity as Director of the National Park Service (collectively, "Defendants") recite and agree to the following:

## RECITALS

(1)     In 1962, the United States Congress ("Congress") authorized the Point Reyes National Seashore ("Point Reyes") as a unit of the United States National Park System.  Act of Sept. 13, 1962, Pub. L. No. 87-657, 76 Stat. 538, 538.  Drakes Estero constitutes nearly 2,500 acres of Point Reyes.

(2)     In 2008, NPS issued a Special Use Permit ("2008 SUP"), attached as Exhibit 1, to DBOC.

(3)     On December 3, 2012, Plaintiffs filed this action for declaratory and injunctive relief against Defendants.

(4)     On December 21, 2012, Plaintiffs filed their first amended complaint for declaratory and injunctive relief.

(5)     On July 31, 2014, DBOC terminated its retail and cannery operations at the onshore property adjacent to Drakes Estero.  Plaintiffs have removed mobile trailers, shellfish

bags, tubes, spacers, wires, and oyster shells from that location, and Defendants are not requesting that Plaintiffs remove any additional property from that onshore location.

(6)     Defendants represent that the NPS remains committed to providing relocation benefits to qualified employees and their families who live on the onshore property adjacent to Drakes Estero, and will be working with their legal representatives, such as Legal Aid of Marin, or directly with those employees that do not have representation.

(7)     Moreover, the Parties recognize, and by entering this Settlement Agreement and [Proposed] Consent Decree ("Consent Decree") this Court finds, that this Consent Decree has been negotiated by the Parties in good faith, will avoid litigation between the Parties, and is fair, reasonable, and in the public interest.

## CONSENT DECREE

Therefore, with the consent of the Parties, it is hereby ADJUDGED, ORDERED, and DECREED as follows:

1.     **Retention of Jurisdiction.** Plaintiffs and Defendants (individually, a "Party;" collectively, the "Parties") intend that this Consent Decree shall be approved by this Court and entered as a Consent Decree.  The Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. § 1331, and the Parties.  The Court shall retain exclusive jurisdiction over this Consent Decree for the purpose of resolving disputes arising under this Consent Decree, entering orders modifying this Consent Decree, or effectuating or enforcing compliance with the terms of this Consent Decree.  The Parties agree that this Court shall have exclusive jurisdiction to hear and resolve any disputes between the Parties over the implementation of the terms of this Consent Decree.  Venue lies in this District pursuant to 28 U.S.C. § 1391 because a Defendant is an officer of or employee of the United States and the violations alleged in the First Amended Complaint are alleged to have occurred, and Plaintiffs conduct business, in this District.  For purposes of this Consent Decree, or any action to enforce this Consent Decree, the Parties consent to the Court's jurisdiction and to venue in this District.

2.     **Applicability.**

a.   The obligations of this Consent Decree apply to and are binding upon the Defendants, and upon Plaintiffs and any assigns, corporate successors, or other entities or persons otherwise bound by law.  If at any time before midnight on December 31, 2014, DBOC assigns or transfers any right or obligation under this Consent Decree to any third party, Plaintiffs shall provide assignee or transferee with a copy of this Consent Decree no later than the date the assignment or transfer becomes effective, and shall within 2 days after the date the assignment or transfer becomes effective provide Defendants with notice of the assignment or transfer.

b.   Plaintiffs and Defendants shall provide a copy of this Consent Decree to all their respective officers, managers, and agents whose duties might reasonably include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree.

Plaintiffs and Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

c.  In any action to enforce this Consent Decree, Plaintiffs and Defendants shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

3.  **Terms of Agreement and Compliance Requirements.**  The Parties have entered into settlement negotiations designed to amicably resolve this dispute, and any future disputes, between the Parties regarding commercial shellfish operations in Drakes Estero, and have agreed to settle these disputes by entering into this agreement, with each Party to bear its own costs, attorney fees, and litigation expenses:

a.  **Identification of Oyster Racks and Initial Removal of Onshore Property.**  Immediately upon the Parties' execution of this Settlement Agreement and [Proposed] Consent Decree, and without requiring the Court's entry of this Consent Decree, the Parties agree that:

  i.  Plaintiffs shall provide a map or aerial photograph to NPS showing the location of all oyster racks in the Estero, and identifying dilapidated or currently unused oyster racks and related offshore operational infrastructure (including anchors, lines, buoys and floating equipment) DBOC has used in its operations; and

  ii.  NPS may remove all setting tanks, the structure known as the "punching shed," the structure known as the "stringing shed," and/or DBOC's office warehouse; and that NPS shall provide Plaintiffs with a minimum of 24 hours advance notice by telephone or electronic email according to the provisions set forth in Paragraph 14 (Notice and Correspondence) before undertaking any such removal action.

b.  **Concurrent Activities for Plaintiffs' Removal of Shellfish and Defendants' Removal of Offshore Property.**  Immediately upon the Court's entry of this Consent Decree, the Parties agree that:

  i.  Plaintiffs shall provide an updated map or aerial photograph to NPS identifying dilapidated or currently unused oyster racks and offshore operational infrastructure, and NPS may immediately commence actions to dismantle and/or remove such items and any items previously identified pursuant to Paragraph 3(a);

  ii.  NPS shall have access to all oyster racks and operational infrastructure in Drakes Estero for purposes of inspection and information-gathering and Plaintiffs shall cooperate with NPS regarding reasonable requests for information regarding the location of oyster racks, offshore operational infrastructure, and/or other information relevant to NPS's activities made

pursuant to this Paragraph to remove items from, or to clean up, the Estero;

iii.   Every month until December 31, 2014, Plaintiffs shall notify NPS of Plaintiffs' progress in removing shellfish from the Estero that month, and which oyster racks previously in use have been vacated or are no longer in use. Of the 95 oyster racks believed to be present in Drakes Estero as of the date of the Parties' execution of this Settlement Agreement and [Proposed] Consent Decree, Plaintiffs shall vacate one quarter of such oyster racks every month, with the first quarter due to be vacated by September 30, 2014.  As oyster racks and any offshore operational infrastructure are vacated or no longer used by Plaintiffs pursuant to this Paragraph 3(b), NPS may commence any actions to dismantle and/or remove such items;

iv.   Consistent with applicable law, NPS may commence, in Drakes Estero, surveys, information-gathering, and/or the removal of marine debris and invasive species.  Unless otherwise agreed to in writing by the Parties, said "marine debris" excludes Hazardous Materials as defined by paragraph 1(h) of the 2008 SUP;

v.   Plaintiffs shall remove bags of manila clams lacking harvestable manila clams from areas under cultivation in Drakes Estero (without regard to year of planting) by October 1, 2014.  Not later than November 1, 2014, Plaintiffs shall remove all oysters under cultivation that they planted in Drakes Estero after November 30, 2012.  On a monthly basis, Plaintiffs shall provide inventories or reports on the quantities of oysters and manila clams removed from the Estero.  All manila clams and oysters removed during this time shall be transported outside the boundaries of Point Reyes and may be disposed of according to applicable law;

vi.   Plaintiffs shall remove shellfish under cultivation that they planted in Drakes Estero prior to November 30, 2012, and may continue to do so until midnight on December 31, 2014.  All such shellfish removed during this time shall be transported outside the boundaries of Point Reyes and may be sold.  Before midnight on December 31, 2014, Defendants shall not remove any harvestable shellfish from areas under cultivation that Plaintiffs may be able to sell.  During this time, no shellfish that were not present in Point Reyes prior to June 30, 2014, may be planted, seeded, or placed in Drakes Estero; however, pacific oysters placed in Drakes Estero prior to November 30, 2012, and which are currently on strings or tubes, may be placed in bags for beach hardening prior to removal from Drakes Estero;

vii.   The foregoing activities in this Paragraph 3(b) may proceed concurrently, and each Party shall use its best efforts to avoid impeding or interfering with these activities taken by the other Party; and

viii. Not later than midnight on December 31, 2014, Plaintiffs shall permanently cease all shellfish removal activities in, and shall vacate, Drakes Estero and the adjacent onshore areas previously occupied by DBOC.  Nothing in this Consent Decree shall prevent Plaintiff Kevin Lunny or any shareholder, director, officer, manager, agent, or employee of DBOC, current or former, from exercising any right or privilege related to Point Reyes that he or she may have as a member of the public or, except as provided in Paragraph 3(h), in association with any group or entity other than Plaintiffs.

c.     **Additional Conditions and Authorizations for Plaintiffs' Shellfish Removal Activities.**  The Parties agree that Plaintiffs' shellfish removal activities pursuant to Paragraph 3(b) are subject to the following additional conditions and authorizations:

i. Plaintiffs' onshore activities shall be limited to those facilities, equipment, and activities reasonably necessary to accomplish the purpose of removing shellfish from Drakes Estero in approximately the same manner in which Plaintiffs have been harvesting shellfish to date; and

ii. The onshore facilities and equipment Plaintiffs may use to remove shellfish include but are not limited to the dock, conveyor belt, washing system, walk-in refrigerator, pneumatic system, onsite power, and the running water, bathrooms, septic system, telephone, and management space in the oyster shack.  Defendants shall not remove these facilities and equipment before midnight on December 31, 2014.  Nothing in this Paragraph shall limit the Defendants' right to remove the onshore property identified in Paragraph 3(a).

iii. Not later than the date specified in Paragraph 3(b)(viii), Plaintiffs may remove any personal property used for the removal of shellfish as provided in Paragraphs 3(b) and 3(c).

iv. Nothing in this Consent Decree is intended to preclude Plaintiffs, while removing shellfish in accordance with Paragraphs 3(b) and 3(c), from taking samples, and otherwise complying with requirements of the California Department of Public Health, the Food and Drug Administration, and any other agency with jurisdiction over the safety and quality of oysters and clams that may be consumed by the public.

d.     **Defendants' Additional Removal Activities and Plaintiffs' Relinquishment of Related Obligations and Rights.**  The Parties agree that:

i. As specified in Paragraphs 3(a) and (b), Defendants may remove and dispose of any property, valuable or otherwise, remaining on the onshore property or adjacent to or in the waters of Drakes Estero, including but not limited to oyster racks, shellfish, and apparatus or facilities not used to

remove shellfish. After December 31, 2014, Defendants may remove all remaining offshore and onshore property. Defendants will undertake such removal and disposal actions at their sole expense and cost, will not seek reimbursement for said costs from Plaintiffs, and will exercise their discretion as to the timing of the removal of said property and its disposal. Plaintiffs agree to relinquish and will not assert any claims, whether administrative, in law, or in equity, relating to the removal or disposal of said property;

ii. Except as provided in this Consent Decree, Plaintiffs shall have no obligation to remove, and after December 31, 2014, will have no authority to remove, any onshore or offshore structures or apparatus, oyster racks, shellfish, equipment used for growing or harvesting shellfish, shells, trash, dirt, or *Didemnum* or other biological material in or from Drakes Estero or the onshore area adjacent to Drakes Estero. Except as provided in this Consent Decree, Plaintiffs shall have no obligation to grade, re-vegetate, sample, or analyze, and after December 31, 2014, will have no authority to, grade, re-vegetate, sample, or analyze any land or water in or from Drakes Estero or the onshore area adjacent to Drakes Estero; and

iii. After the Parties' execution of this Settlement Agreement and [Proposed] Consent Decree, or at some other time as the Parties may agree in writing, NPS will transmit to the California Coastal Commission a letter referencing the foregoing terms of this Paragraph 3(d) and expressing NPS's intent to undertake the removal of facilities set forth herein.

e.     **Plaintiffs' Covenant Not to Conduct Certain Activities within Point Reyes.** Immediately upon the Parties' execution of this Settlement Agreement and [Proposed] Consent Decree, and without requiring the Court's entry of this Consent Decree, the Parties agree that:

i. Plaintiffs shall not conduct retail sales or canning on lands or waters within Point Reyes; and

ii. No shellfish shall be transferred to any customer, retail or wholesale, within Point Reyes.

f.     **Plaintiffs' Cessation of, and Relinquishment of Right to, Remove Shellfish.** Immediately upon the Court's entry of this Consent Decree, Plaintiffs, and any of their assigns and corporate successors, shall relinquish any and all asserted right to conduct commercial shellfish operations in Point Reyes, and further covenant not to operate, and not to accept an authorization to operate, a commercial shellfish operation in Drakes Estero except as provided in this Consent Decree. Not later than midnight on December 31, 2014, Plaintiffs shall permanently cease shellfish removal in Drakes Estero, and vacate Drakes Estero and the adjacent onshore area previously occupied by DBOC. This vacating and

relinquishment includes any claim by DBOC, its assigns or corporate successors, to any property, tangible or otherwise, remaining in Point Reyes.

**g.      Full Settlement; Plaintiffs' Waiver, Release, and Covenant Not to Sue; and Defendants' Covenant Not to Sue.** This Consent Decree constitutes a complete and final settlement and is in full satisfaction of all claims asserted, or that could be asserted, by Plaintiffs against Defendants in this action or in any federal court, state court, or administrative agency. Upon the entry of this Consent Decree, the Parties agree that:

    i.   This Consent Decree shall constitute a stipulation of dismissal with prejudice of all claims alleged in Plaintiffs' First Amended Complaint, which include but are not limited to (1) violations of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"); (2) violation of the Data Quality Act ("DQA") and the APA; (3) violations of the APA and Section 124 of the Department of the Interior, Environment and Related Agencies Appropriations Act for Fiscal Year 2010 (Pub. L. No. 111-88); (4) violations of the Due Process Clause of the Fifth Amendment to the U.S. Constitution; (5) violations of the Takings Clause of the Fifth Amendment to the U.S. Constitution; and (6) alleged unlawful interference with agency functions.

    ii.   Plaintiffs further waive, release, and covenant not to sue in any administrative or judicial forum on any and all claims, causes of action, obligations, and/or liabilities of any kind or nature whatsoever, known or unknown, regardless of legal theory, for any damages or any equitable or specific relief, that are based on the alleged harms or violations occurring before the entry of this Consent Decree and that relate to the United States' management, oversight, or administration of Point Reyes and/or Drakes Estero, including but not limited to the property upon which DBOC operates;

    iii.   California Civil Code Section 1542 provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." Plaintiffs having been apprised of the statutory language of Civil Code Section 1542 by their attorney(s), and fully understanding the same, nevertheless elect to waive the benefits of any and all rights they may have pursuant to the provision of that statute and any similar provision of federal law. Plaintiffs understand that, if the facts concerning Plaintiffs' alleged injuries and any alleged liability of the United States for damages pertaining thereto are found hereinafter to be other than or different from the facts now believed by them to be true, the Consent Decree shall be and remain effective notwithstanding such material difference;

iv. For the claims specifically identified in this Paragraph 3(g)(iv), Defendants covenant not to sue or take administrative action against Plaintiffs or any of their shareholders, directors, officers, employees, agents, corporate successors, or assigns, arising from actions occurring prior to the Parties' execution of the Settlement Agreement and [Proposed] Consent Decree. These specific claims are: (1) trespass; (2) ejectment; (3) unpaid rent; (4) claims predicated on sound created by DBOC's commercial shellfish operations; (5) claims predicated on breaches or violations of the 2008 SUP or National Park Service regulations with regard to 2008 SUP paragraph 2 (General Conditions), paragraph 3 (Use of Premises), paragraph 4 (Special Permit Conditions), paragraph 6 (Constructions of Improvements or Alterations), paragraph 7 (Treatment of Refuse), paragraph 8 (Pesticide or Herbicide Use), paragraph 9 (Fire Prevention and Suppression), paragraph 10 (Excavation, Site and Ground Disturbance), paragraph 11 (Nonpoint Source Pollution), paragraph 12 (Tree and Vegetation Removal), paragraph 13 (Wildlife Protection), paragraph 15 (Insurance), paragraph 18 with respect to Rents (excluding Taxes and Assessments), paragraph 19 (Cyclic Maintenance), paragraph 20 (Compliance with Applicable Laws: NEPA, NHPA), paragraph 22 (Penalty), paragraph 23 (Surrender and Vacate the Premises, Restoration), Exhibit C (Drakes Estero Aquaculture and Harbor Seal Protection Protocol), manila clams, oysters, *Didemnum*, eelgrass, harbor seals, and/or marine debris (as defined in Paragraph 3(b)(iv)); (6) taking action within Point Reyes without a permit or other authorization required by NPS regulations; and/or (7) violations of the National Park Service Organic Act, the Point Reyes National Seashore Act, or the Wilderness Act;

v. For the claims specifically identified in this Paragraph 3(g)(v), Defendants covenant not to sue or take administrative action against Plaintiffs or any of their shareholders, directors, officers, employees, agents, corporate successors, or assigns, arising from actions occurring after the Parties' execution of the Settlement Agreement and [Proposed] Consent Decree and before midnight on December 31, 2014. These specific claims are: (1) trespass; (2) ejectment; (3) unpaid rent; (4) claims predicated on sound created by DBOC's activities under Paragraph 3(a), (b), and (c); and/or (5) claims predicated on the presence of manila clams, oysters, or *Didemnum* in Point Reyes;

vi. Defendants covenant not to sue Plaintiffs for claims predicated on breaches or violation of the 2008 SUP paragraph 16 (Indemnity) for any claims that arise for events occurring after December 31, 2014;

vii. Notwithstanding any provision of this Consent Decree, nothing in this Decree releases any Party from any liability arising under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*

h.     **Commitment to Effectuate Settlement.**  Within 7 business days of the Parties' execution of this Settlement Agreement and [Proposed] Consent Decree, the Parties shall jointly move the Court for the entry of this Consent Decree.  The Parties agree that Plaintiffs shall not bring, join in, or financially support any other party in bringing or joining in any judicial or administrative proceeding that concerns the Secretary's memorandum, and/or NPS's written notification, dated November 29, 2012, and/or any actions contemplated by Paragraphs 3(a), 3(b), and/or 3(d).  Nothing in this provision shall prevent the Parties from seeking judicial modification or enforcement of this Consent Decree in accordance with the terms of the Consent Decree.

i.     **No Limitation on Applicable Federal Authority and Notice Requirements**.  Nothing in this Settlement Agreement and [Proposed] Consent Decree, regardless whether the Court has entered the Consent Decree, shall limit the authority of Defendants to inspect, oversee, or administer Point Reyes, including DBOC's activities therein, pursuant to federal law, except that Plaintiffs may enforce the terms of this Consent Decree.  The Parties, however, agree that, prior to midnight on December 31, 2014:

   i.    NPS shall provide Plaintiffs 24 hours' advance notice, by e-mail, of any removal of onshore infrastructure;

   ii.   NPS shall provide Plaintiffs 24 hours' advance notice, by e-mail, of the use of boats by NPS or its agents in Drakes Estero;

   iii.  NPS shall provide Plaintiffs seven days' advance notice, by e-mail, of removal of oyster racks;

   iv.   Such notices included in this Paragraph 3(i) shall include the expected location and extent of the NPS activity; Any notice requirements of this Paragraph shall be sent to the persons identified in Paragraph 14 (Notice and Correspondence);

   v.    In response to the notices provided by Defendants under this Paragraph 3(i), Plaintiffs shall promptly inform Defendants whether Plaintiffs expect to be working in the same location.

j.     **Onsite Residents.**  Except as may be necessary to protect public health or welfare in an emergency, the Parties agree that NPS will take no action to disturb the occupancy of DBOC employees and their families currently residing in housing located on the onshore property adjacent to Drakes Estero.  This limitation shall remain in effect through December 31, 2014, and for not less than 90 days thereafter.  The Parties shall work together to transfer to Defendants the provision of power, water, and septic services currently provided by Plaintiffs to residents living on the onshore property adjacent to Drakes Estero.  This transfer shall occur by November 15, 2014.  Defendants represent that the NPS remains committed to providing these residents power, drinking water, and septic services

that meet public health and safety requirements.  Nothing in this Paragraph shall limit Defendants' authority to address unlawful activity occurring onsite.

k.      **No Effect on G Ranch.**  Nothing in this Consent Decree, regardless whether the Consent Decree has been entered by the Court, shall affect the terms of the Letter of Authorization issued for the G Ranch by NPS on December 23, 2013.

4.      **Approval and Effective Date.**  This Settlement Agreement and [Proposed] Consent Decree has been approved by the designated representative of the Attorney General of the United States, and by DBOC and Kevin Lunny.  Except as explicitly stated otherwise herein, the terms of this Consent Decree shall become effective upon the Court's entry of this Consent Decree.

5.      **Settlement without Admission of Liability or Wrongdoing.**  This Consent Decree is the result of compromise and settlement between the Parties.  It is not an admission of liability or wrongdoing by any Party, and it shall not be utilized for or admissible as precedent, evidence, or argument in any other proceeding, except as may be necessary to ensure compliance with or to carry out its terms and conditions.  This Consent Decree shall not constitute an admission or evidence of any fact, wrongdoing, misconduct, or liability on the part of the Plaintiffs or the United States, including, without limitation, the Secretary, the NPS, its officers, or any other person affiliated with it, or an interpretation of any applicable provision of law.

6.      **Use of Agreement.**  This Consent Decree is for the purpose of settling the above-described disputes, and for no other.  Accordingly, this Consent Decree shall not bind the Parties, nor shall it be cited or otherwise referred to, in any proceedings, whether judicial, legislative, or administrative in nature, in which the Parties or counsel for the Parties have or may acquire an interest, except as is necessary in an action to modify or enforce this Consent Decree in accordance with the terms of this Consent Decree.

7.      **Plaintiffs' Representations.**  Plaintiffs warrant and represent that they will not bring, or cause to be brought, or will file in or submit to any other court or administrative agency, any other action or suit against the United States, its officers or agencies related to the claims advanced in this action.  Plaintiffs further warrant and represent that they have made no assignment or transfer of all or any part of their rights arising out of or relating to the claims asserted, or that could be asserted, in this action.  Plaintiffs further warrant and represent that they have not otherwise assigned or transferred, whether by contract, operation of law, or otherwise, the corporate interests of DBOC since the filing of this lawsuit.

8.      **Force Majeure.**  The Parties recognize that the Defendants' performance under this Consent Decree is subject to fiscal and procurement laws and regulations of the United States which include, but are not limited to, the Antideficiency Act, 31 U.S.C. § 1341, *et seq.*  A force majeure event may arise, due to circumstances outside the reasonable control of Defendants, that could delay compliance with the obligations set forth in this Consent Decree.  Such force majeure events include, but are not limited to, a government shutdown, such as occurred in 2013, or catastrophic environmental events requiring immediate and/or time-consuming response by the United States.  Should a delay occur due to a force majeure event,

any resulting failure of Defendants to fulfill any obligations set forth herein shall not constitute a failure to comply with the terms of this Consent Decree, and any deadlines so affected shall be extended one day for each day of delay attributable to such force majeure event. As soon as possible under such circumstances, Defendants will provide Plaintiffs with notice invoking the relief provided for under this Paragraph 8, along with an explanation of the Defendants' basis for invoking this relief. Defendants shall also provide Plaintiffs with reasonable notice of the termination of the force majeure event upon which Defendants invoked this relief.

9.     **Dispute Resolution.**  Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Paragraph 9 shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Before filing any motion to enforce the terms of this Consent Decree, the Parties shall confer about the nature of the alleged breach and how it might informally be resolved. The dispute shall be considered to have arisen when a Party provides notice by telephone or electronic mail pursuant to Paragraph 14 (Notice and Correspondence). If the Parties do not resolve their dispute, any Party may seek appropriate judicial relief from this Court; provided, however, that the Party raising the dispute simultaneously provides written notice to the other Parties pursuant to Paragraph 14 (Notice and Correspondence).

10.     **Applicable Law.**  This Consent Decree shall be governed by and construed under the laws of the United States.

11.     **Entire Agreement.**  This document constitutes a complete integration of the Consent Decree between the Parties and supersedes any and all prior oral or written representations, understandings or agreements among or between them. No modification to this Consent Decree shall be valid unless written and executed by all Parties; and, to the extent required by law, approved by the Court.

12.     **Mutual Drafting.**  The Parties agree that this Consent Decree was jointly drafted by them. Accordingly, the Parties agree that any and all rules of construction that ambiguity is construed against the drafting Party shall be inapplicable in any dispute concerning the terms, meaning, or interpretation of this Consent Decree.

13.     **No Third Party Beneficiaries.**  This Consent Decree is binding upon and shall inure to the benefit of DBOC, Mr. Lunny, and Defendants. This Consent Decree is not intended to and shall not be interpreted in a manner so as to confer rights on persons or entities who are not Parties hereto, or to create intended or expected third party status on any such non-party.

14.     **Notice and Correspondence.**  Unless explicitly provided otherwise herein, any notice, including correspondence, required with respect to this Consent Decree, shall be in writing and sent by U.S. Mail, Federal Express, or courier, and in addition by e-mail, as follows.

Notice to Plaintiffs shall be sent to:

Lawrence S. Bazel and Peter S. Prows
Briscoe Ivester & Bazel LLP
155 Sansome St, 7th Floor
San Francisco CA 94104

415 402 2700
lbazel@briscoelaw.net
pprows@briscoelaw.net

Drakes Bay Oyster Company and Kevin Lunny
P.O. Box 730
Nicasio CA 94946
kevin@drakesbayoyster.com

Notice to Defendants shall be sent to:

Cicely Muldoon, Superintendent
Point Reyes National Seashore
1 Bear Valley Road
Point Reyes Station, CA 94956
415-464-5101
Cicely_Muldoon@nps.gov

Barbara Goodyear
Field Solicitor
U.S. Department of the Interior
Solicitor's Office
333 Bush Street, Suite 775
San Francisco, CA 94104
415-296-3380
Barbara.Goodyear@sol.doi.gov

Stephen M. Macfarlane
U.S. Department of Justice
Environment and Natural Resources Division
501 I Street, Suite 9-700
Sacramento, CA 95814
916-930-2204
Stephen.Macfarlane@usdoj.gov

Michael T. Pyle
Assistant United States Attorney
150 Almaden Blvd., Suite 900
San Jose, CA 95113
408-535-5087
Michael.T.Pyle@usdoj.gov

For those notice provisions contained in this Consent Decree which allow for notice to be provided by telephonic or electronic means, such notice shall be provided to Plaintiffs at the telephone numbers and e-mail addresses identified above, and/or to Defendants at the telephone numbers and e-mail addresses identified above.

15.     **Counterparts.**  This Consent Decree may be executed in any number of counterparts, each of which shall be deemed to constitute an original, and all of which, taken together, shall constitute one and the same document.  The execution of one counterpart by any Party shall have the same force and effect as if that Party had signed all other counterparts.

16.     **Consistency with other Law.**  The Parties agree that the specific procedures required and authorizations provided by this Consent Decree, and in particular the provisions of Paragraph 3(b), are not in contravention of NEPA, the APA, the Endangered Species Act, or any other federal or state law or regulation, either substantive or procedural.  No provision of this Consent Decree shall be interpreted as, or constitute a commitment or requirement that Defendants take actions in contravention of NEPA, the APA, the Endangered Species Act, or any other federal or state law or regulation, either substantive or procedural.  Plaintiffs recognize that Defendants have asserted that no provision of this Consent Decree shall be interpreted as, or constitute a commitment or requirement that Defendants obligate or pay funds in violation of the Antideficiency Act, 31 U.S.C. §1341, or any other law or regulation.

17.     **No Restriction of Federal Authority.**  Nothing in this Consent Decree shall be construed to deprive any federal official of the authority to revise, amend, or promulgate regulations.  Nothing in this Consent Decree shall be deemed to limit the authority of the executive branch to make recommendations to Congress on any particular piece of legislation.

18.     **Representative Authority.**  Counsel for Plaintiffs represents that he or she has been and is authorized to enter into this Consent Decree on behalf of DBOC and Mr. Lunny.  Counsel for the Defendants represent that he or she has been and is authorized to enter into this Consent Decree on behalf of the United States.

19.     **Final Judgment.**  Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court under Rules 54 and 58 of the Federal Rules of Civil Procedure.

FOR PLAINTIFFS:

Dated: _30 Sep 2014_

LAWRENCE S. BAZEL
PETER S. PROWS
BRISCOE IVESTER & BAZEL LLP
Counsel for Plaintiffs DRAKES BAY OYSTER
COMPANY and KEVIN LUNNY

/////

/////

/////

FOR DEFENDANTS:

MELINDA L. HAAG
United States Attorney
ALEX TSE
Chief, Civil Division

_____
MICHAEL T. PYLE
Assistant United States Attorney

SAM HIRSCH
Acting Assistant Attorney General
Environment and Natural Resources Division

_____
STEPHEN M. MACFARLANE, Senior Attorney
E. BARRETT ATWOOD, Trial Attorney
JOSEPH T. MATHEWS, Trial Attorney
Environment and Natural Resources Division
United States Department of Justice

## ORDER APPROVING CONSENT DECREE

THE COURT APPROVES THE TERMS OF THIS SETTLEMENT AGREEMENT AND CONSENT DECREE.

IT IS SO ORDERED.

DATED: _____

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

**Exhibit 1**

**to**

**Settlement Agreement and [Proposed] Consent Decree**

Form 10-114
Rev. Jan. 00

## UNITED STATES DEPARTMENT OF THE INTERIOR
### National Park Service
### Special Use Permit

Name of Use: Aquaculture

Date Permit  Reviewed  2008
               Reviewed  20
               Reviewed  20
               Expires   November 30, 2012

Long Term X
Short Term

Permit # <u>MISC-8530-6000-8002</u>
    Type      Park Code    No. #

**Point Reyes National Seashore**

**Drakes Bay Oyster Company**
**17171 Sir Francis Drake Blvd.**
**Inverness, CA 94937**
**(415) 669-1149**

is hereby authorized for a period ("Term") commencing on <u>April    , 2008</u> ("Commencement Date") and terminating on <u>November 30, 2012</u> ("Expiration Date") to use the following described land, improvements, and waters in the following area:
    the lands and improvements at Drakes Bay Estero at the former Johnson's Oyster Site consisting of approximately 1.1 acres of land and improvements designated as the "SUP Area" on the map attached hereto as Exhibit B ("Drake's Estero Oysters – SUP & ROP"); the waters designated as the "SUP Area" on the map attached hereto as Exhibit A ("Drake's Estero Aquaculture & CDFG Leases:  NPS Resources and SUP Area"); the land designated as the "Well Area" on the map attached hereto as Exhibit D ("Drakes Bay Oyster Company Well Area"); and the land designated as the "Sewage Area" on the map attached hereto as Exhibit E ("Drakes Bay Oyster Company Sewage Area"). Collectively, the areas so designated shall be referred to as the "Premises."  The Premises governed by this Permit do not include the area designated as the ROP Area on the map attached hereto as Exhibit B.
For the purpose(s) of:
    Use of the area designated as the "SUP Area" on the map attached hereto as Exhibit B for the purpose of processing shellfish, the interpretation of shellfish cultivation to the visiting public, and residential purposes reasonably incidental thereto.  Use of the area designated as the "SUP Area" on the map attached hereto as Exhibit A for the purpose of shellfish cultivation.  Use of the area designated as the "Well Area" on the map attached hereto as Exhibit D for the purpose of supplying water for the Drakes Bay Oyster Company facilities using Permittee well, pump, and pipelines.  Use of the area designated as the "Sewage Area" on the map attached hereto as Exhibit E for the purpose of use and maintenance of existing sewage pipeline and sewage leachfield to service the Drakes Bay Oyster Company facilities.  Collectively, the uses set forth in this paragraph shall be referred to as the "Permitted Uses."

Authorizing legislation or other authority (RE – DO-53): 16 U.S.C. 1, 1a-1, 3 & 459c; the Reservation of Use and Occupancy.

NEPA & NHPA Compliance:  NEPA compliance pending
PERFORMANCE BOND:    Required        Not Required  X    Amount:
LIABILITY INSURANCE:    Required  X        Not Required    Amount: As set forth in Article 15 of this Permit.

ISSUANCE of this Permit is subject to the terms, covenants, obligations, and reservations, expressed or implied herein and to the payment to the U.S. Dept. of the Interior, National Park Service of the sum of **$2,800.00** per year, plus an amount to be determined by appraisal for the use of the Sewage Area and the Well Area including water use.

PERMITTEE: _____    Drakes Bay Oyster Co.    4/22/08
               Signature                                   Organization            Date

Authorizing Official: _____    George Turnbull    4/22/08
                   Signature                                 Deputy Regional Director    Date

## CONDITIONS OF THIS PERMIT

1) <u>DEFINITIONS</u>

As used in this Permit, the following terms shall have the following meanings:

a) "Agency" means any agency, department, commission, board, bureau, office or other governmental authority having jurisdiction.

b) "Applicable Laws" includes, without limitation all present and future statutes, regulations, requirements, Environmental Requirements, guidelines, judgments, or orders of any Agency or judicial body, whether now existing or hereafter established, relating to or affecting the Premises or the use or occupancy of the Premises.

c) "Commencement Date" is as defined on the Cover Page of this Permit.

d) "Cyclic Maintenance" means (i) the performance by Permittee of all repairs, maintenance, or replacement-in-kind necessary to maintain the Premises and the existing improvements thereon in good order, condition, and repair; (ii) housekeeping and routine and periodic work scheduled to mitigate wear and deterioration without materially altering the appearance of the Premises; (iii) the repair or replacement-in-kind of broken or worn-out elements, parts or surfaces so as to maintain the existing appearance of the Premises; and (iv) scheduled inspections of all building systems on the Premises.

e) "Default" means Permittee's failure to keep and perform any of the Provisions of this Permit.

f) "Environmental Requirements" means, without limitation, all standards or requirements relating to the protection of human health or the environment such as:

   a. standards or requirements pertaining to the reporting, permitting, management, monitoring, investigation or remediation of emissions, discharges, releases, or threatened emissions, releases or discharges of Hazardous Materials into the air, surface water, groundwater, or land;

   b. standards or requirements relating to the manufacture, handling, treatment, storage, disposal, or transport of Hazardous Materials; and

   c. standards or requirements pertaining to the health and safety of employees or the public.

g) "Expiration Date" is as defined on the Cover Page of this Permit.

h) "Hazardous Materials" means, without limitation, any material or substance, whether solid, liquid, or gaseous in nature,

   a. the presence of which requires reporting, permitting, management, monitoring, investigation or remediation under any Environmental Requirement;

   b. that is or becomes defined as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "hazardous substance," "pollutant," "discharge," "waste," "contaminant," or "toxic contaminant" under any Environmental Requirement, or any above-ground or underground storage containers for the foregoing;

   c. that is toxic, explosive, corrosive, flammable, infectious, radioactive, reactive, carcinogenic, mutagenic, or otherwise hazardous to human health or the environment and is or becomes regulated under any Environmental Requirement;

   d. that contains gasoline, diesel fuel or other petroleum hydrocarbons or derivatives or volatile organic compounds, or is an above-ground or underground storage container for same;

Page 2

e.   that contains polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials or urea formaldehyde foam insulation; or

f.   that contains radon gas.

i)   "Hazardous Materials Occurrence" means any use, generation, treatment, keeping, storage, transport, release, disposal, migration, or discharge of any Hazardous Materials from, on, under or into the Premises or Point Reyes National Seashore ("Point Reyes") that causes any environmental contamination.

j)   "Improvements or Alterations" means any construction that does not fall within the definition of Cyclic Maintenance.

k)   "NPS" means the management officials in charge of the administration and operation of Point Reyes, including the Superintendent or his/her designee(s).

l)   "Park" means, without limitation, all lands, waters and structures within the legislative boundaries of the Point Reyes National Seashore, all natural and cultural resources within such boundaries, and any other property within such boundaries belonging to Point Reyes.  As appropriate given the context, this term also includes the visiting public and/or Point Reyes employees.

m)   "Permit" means this instrument which contains those certain termination and revocation provisions as provided for herein.

n)   "Permitted Uses" is as defined on the Cover Page of this Permit.

o)   "Personal Property" means all furniture, fixtures, equipment, appliances and apparatus placed on the Premises that neither are attached to nor form a part of the Premises.  Personal Property also includes any trailers, modular units, and/or temporary structures owned by Permittee.

p)   "Point Reyes" means Point Reyes National Seashore.

q)   "Premises" is as defined on the Cover Page of this Permit.

r)   "Provision" shall mean any term, agreement, covenant, condition or provision of this Permit or any combination of the foregoing.

s)   "ROP" or "Reservation of Use and Occupancy" means the Reservation of Use and Occupancy purchased by the Permittee in 2005.  In 1972 the United States of America purchased Johnson Oyster Company's property, subject to a Reservation of Use and Occupancy on approximately 1.5 of those acres for a period of forty (40) years.  This Reservation of Use and Occupancy expires on November 30, 2012.

t)   "SUP" means this Permit.

u)   "Term" is as defined on the Cover Page of this Permit.

v)   "Termination Date" means the Expiration Date or such earlier date as this Permit is terminated or revoked pursuant to any Provision of this Permit.

2)   <u>GENERAL CONDITIONS</u>

a)   The Permittee shall exercise this privilege subject to the supervision of the Superintendent, and shall comply with all Applicable Laws.

b)   Permit and Approvals – Except as otherwise provided in this Permit, Permittee shall be responsible for obtaining, at its sole cost and expense, all necessary permits, approvals or other authorizations relating to Permittee's use and occupancy of the Premises.

Page 3

c) Damages - The Permittee shall pay the United States for any damage resulting from this use which would not reasonably be inherent in the use which the Permittee is authorized to make of the land and areas described in this Permit.

d) Benefit - Neither Members of, nor Delegates to Congress, or Resident Commissioners shall be admitted to any share or part of this Permit or derive, either directly or indirectly any pecuniary benefits to arise therefrom: Provided, however, that nothing herein contained shall be construed to extend to any incorporated company if the Permit be for the benefit of such corporation.

e) Assignment and Subletting - This Permit may not be transferred or assigned without the consent of the Permitter, in writing. Permittee shall not sublet the Premises or any part thereof or any property thereon, nor grant any interest, privilege or license whatsoever in connection with this Permit without the prior written approval of the Permitter.

f) Revocation - This Permit may be terminated upon Default or at the discretion of the Permitter.

g) The Permittee is prohibited from giving false information; to do so will be considered a breach of conditions and be grounds for revocation [Re: 36 CFR 2.32(4)]

3) <u>USE OF PREMISES</u>

a) Permittee is authorized to use the Premises only for the Permitted Uses.

b) Permittee shall not engage in any activity that may be dangerous or harmful to persons, property, or the Park; that constitutes or results in waste or unreasonable annoyance (including, without limitation, signage and the use of loudspeakers or sound or light apparatus that could disturb park visitors and wildlife outside the Premises); that in any manner causes or results in a nuisance; or that is of a nature that it involves a substantial hazard, such as the manufacture or use of explosives, chemicals or products that may explode.

c) The Parties hereby acknowledge and agree that Permittee's covenant that the Premises shall be used as set forth in this Article 3 is material consideration for Permitter's agreement to enter into this Permit. The Parties further acknowledge and agree that any violation of said covenant shall constitute a Default under this Permit and that Permitter may inspect the premises at any time.

d) This Permit is subject to the right of the NPS to establish trails and other improvements and betterments over, upon, or through the Premises and further to the use by travelers and others of such established or existing roads and trails. The Permittee understands that occasional park visitors are authorized to walk, use non-motorized watercraft, or hike in the various areas included in this Permit even though no trails are formally established.

e) Permitter reserves the right for Permitter, its employees, contractors and agents to enter and to permit any Agency to enter upon the Premises for the purposes of inspection, inventory or when otherwise deemed appropriate by the Permitter for the protection of the interests of Permitter, including Permitter's interests in any natural or cultural resources located on, in or under the Premises.

f) Permitter reserves the right at any time to close to travel any of its lands, to erect and maintain gates at any point thereon, to regulate or prevent traffic of any kind thereon, to prescribe the methods of such established or existing roads and to maintain complete dominion over the same; provided, however, that at all times during the Term, Permitter shall provide Permittee and Permittee's invitees with reasonable access to the Premises subject only to interruptions caused by necessary maintenance or administrative operations or by matters beyond Permitter's control.

g) Permittee hereby waives any claim for damages for any injury, inconvenience to or interference with Permittee's use and occupancy of the Premises, any loss of occupancy or quiet enjoyment of the Premises, or any other loss occasioned by Permitter's exercise of its rights under this Article 3 except to the extent that the damages, expenses, claims or suits result from the willful misconduct or gross negligence of Permitter, its employees, contractors or agents; provided, further, that Permitter shall be liable only to the extent such claims are allowed

Page 4

under the Federal Tort Claims Act.

h) Members of the general public visiting the Drakes Bay Oyster Company operation may park in the adjacent NPS parking area and walk over to the SUP or ROP areas.

i) While Permittee is permitted to use and operate motorized watercraft in Drakes Estero for the purpose of conducting daily business operations, which can include occasional inspections required by Agencies, no other use of Permittee's motorized watercraft is authorized. No motorized watercraft may enter the designated wilderness boundary (See "Existing Wilderness" on map attached hereto as Exhibit A). To protect water quality in the Estero, any additional or replacement boat motors obtained by Permittee must be four stroke motors.

j) Due to a lack of adequate parking space and restroom facilities for the public, barbecuing is not permitted in the Special Use Permit Area. To comply with this paragraph, Permittee will not encourage barbecuing in the SUP Area. Picnic tables will be provided by the NPS at the adjacent parking area.

k) Unauthorized discharge into the estuary is prohibited. This prohibition includes any discharge from processing facilities. Notwithstanding the foregoing, discharge of oyster wash water from dock and from hatchery operations is allowed if authorized by relevant Agencies.

l) In order to ensure public health and safety, Permittee will ensure that Permittee and Permittee's officers, agents, employees, and contractors comply with Applicable Laws regarding pets, including the NPS regulation at 36 C.F.R. § 2.15.

m) In order to ensure public health and safety, Permittee shall allow all appropriate Federal, State and/ or County agencies; including the United States Department of Health and Human Services, the State of California Department of Health Services and Marin County Community Development Agency Environmental Health Services, to conduct inspections on a routine basis.

4) SPECIAL PERMIT CONDITIONS

a) If Permittee and Permitter disagree about an issue related to this Permit, they will first make a good faith effort to resolve such issue at the Park level. If they are unable to resolve the issue at the Park level, Permittee may request a review of the issue by the Regional Director.

b) Based upon the findings of an independent science review and/or NEPA compliance, Permitter reserves its right to modify the provisions of this Article 4. Permitter further reserves its right to incorporate new mitigation provisions based upon the findings of an independent science review.

   i) Production of all shellfish species shall be capped at the "current production level" as determined under the California Coastal Commission Consent Order No. CCC-07-CD-04.

   ii) No additional aquaculture racks and/or cultivation infrastructure will be constructed without the prior approval of the Permitter. Operation, repair, and maintenance of infrastructure currently being used for oyster cultivation is permitted.

   iii) Permittee and Permitter acknowledge the importance of eelgrass within the ecology of the estuary. Permittee will not place bags for shellfish production onto eelgrass.

   iv) Within sixty (60) days following the signing of this interim Permit, Permittee will submit for National Park Service approval a boating operations plan, which will indicate dedicated navigation routes, chosen to minimize impacts to eelgrass beds when accessing aquaculture racks and/or cultivation equipment.

   v) To minimize the chances of introducing invasive species or pathological microorganisms to Drake's Estero, Permittee will only import shellfish in the form of larvae and seed. Within 30 days of the Commencement Date, Permittee shall produce sufficient evidence, for the review and approval of the Permitter, that larvae and seed from outside sources have been certified by the California Department of Fish and Game ("CDFG")

to be free of pathogens.  If the Permitter determines that the documentation is insufficient, Permittee shall cease from importing larvae within 30 days of receiving notification of the determination from the Permitter.

vi) Permittee will not introduce species of shellfish beyond those described in the existing leases from the CDFG.  Permittee may seek to conform and/or modify these leases with the CDFG.  Any modifications approved by CDFG will be considered by Permitter on a case-by-case basis, and Permittee may not implement any such modifications without the prior written approval of the Permitter.

vii) Permittee must avoid disturbance to marine mammals and marine mammal haul-out sites. The Marine Mammal Protection Act, 16 U.S.C. 1361 et seq., includes a prohibition against any act of pursuit, torment or annoyance that has the potential to injure or disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering.  The National Oceanic and Atmospheric Administration (NOAA) recommends maintaining a distance of at least 100 yards to avoid disturbance to seals.  Permittee will maintain a distance of at least 100 yards from hauled out seals throughout the year.  Permitter will monitor marine mammal populations in Drakes Estero.  In addition, during the pupping harbor seal closure period, March 1-June 30, the designated wilderness area (outside of Permit area) is closed to all boats. Permittee will follow "Drakes Estero Aquaculture and Harbor Seal Protection Protocol" attached hereto as Exhibit C.  If required by CDHS, watercraft may use the Main Channel identified in Exhibit C during the pupping harbor seal closure period only to access CDHS's sentinel monitoring station for marine biotoxins.  Boats shall be operated at low speed, near the eastern shore, to minimize chance of disturbance to harbor seals.  No other use of the Main Channel is authorized during the pupping harbor seal closure period.

c) Permittee's agreement to the provisions of this Permit does not waive Permittee's ability to take contrary positions with regard to similar provisions with other Agencies.

5) ACCEPTANCE OF PREMISES

a) Prior to entering into this Permit, Permittee has made a thorough, independent examination of the Premises and all matters relevant to Permittee's decision to enter into this Permit, and Permittee is thoroughly familiar with all aspects of the Premises and is satisfied that they are in an acceptable condition and meet Permittee's needs, provided that Permittee and Permitter acknowledge that certain repairs are necessary to comply with Applicable Laws.  Permittee will make such repairs at its sole cost and expense in compliance with Applicable Laws.

b) Permittee expressly agrees to use and occupy the Premises and all improvements thereon in their existing "AS IS" condition "WITH ALL FAULTS" and acknowledges that in entering into this Permit, Permittee does not rely on, and Permitter does not make, any express or implied representations or warranties as to any matters including, without limitation, the suitability of the soil or subsoil; any characteristics of the Premises or improvements thereon; the suitability of the Premises for the approved use; the economic feasibility of Permittee's use and occupancy of the Premises; title to the Premises; the presence of Hazardous Materials in, on, under or in the vicinity of the Premises; or any other matter.  Permittee has satisfied itself as to such suitability and other pertinent matters by Permittee's own inquiries and tests into all matters relevant to determining whether to enter into this Permit and Permittee hereby accepts the Premises.

6) CONSTRUCTION OF IMPROVEMENTS OR ALTERATIONS

a) Permittee may only make those Improvements or Alterations to the Premises that relate to Permittee's use of the Premises as specified in Article 3, "Use of the Premises."

b) Permittee shall not undertake any Improvements or Alterations to the Premises (including installation of temporary equipment or facilities) without the prior written approval of Permitter.

c) As a prerequisite to obtaining approval for Improvements or Alterations, Permittee, at Permittee's sole cost and expense, shall submit design plans and any other relevant data for Permitter's approval.

d) Construction of Improvements or Alterations by Permittee shall be performed in accordance with all Applicable

Laws, including but not limited to general planning, building, and environmental laws and approved design plans and shall be undertaken and completed at Permittee's sole cost and expense.

e) Permittee shall, upon request, furnish Permitter with a true and correct copy of any contract, and any modification or amendment thereof, with Permittee's contractors, architects, or any other consultants, engaged in connection with this Permit.

f) Any Improvements or Alterations undertaken by Permittee shall be performed in a good and workmanlike manner and with materials of a quality and standard acceptable to Permitter. Permittee shall also construct, install and maintain equipment and any construction facilities on the Premises in a safe and orderly manner.

g) Permittee shall not construct any Improvements or Alterations outside the boundaries of the Premises.

h) Permitter in its discretion is entitled to have on the Premises at any time during the construction of Improvements or Alterations an inspector or representative who shall be entitled to observe all aspects of the construction on the Premises.

i) All lumber utilized at the site will be processed in compliance with current laws and regulations regarding wood treatments. This includes lumber utilized in assembly and repair of aquaculture racks.

j) As set forth in Article 17, title to any Improvements or Alterations to the Premises shall be and remain solely in the Permitter.

7) TREATMENT OF REFUSE

a) Refuse shall be promptly removed from within the boundaries of Point Reyes National Seashore and shall be disposed of in accordance with Applicable Laws.

b) Permittee will make best efforts to remove debris associated with aquaculture production operations including wood from racks, plastic spacers, unused shellfish bags, shellfish shells, and any other associated items.

8) PESTICIDE AND HERBICIDE USE

a) The National Park Service utilizes Integrated Pest Management ("IPM") to treat pest and vegetation problems. The goal of IPM is to use the least-toxic, effective methods of controlling pests and vegetation. Except for normal household purposes, Permittee shall not use any pesticides that do not comply with the IPM program. To this end, Permittee shall submit in writing to Permitter, a request for the use of pesticide(s) or herbicide(s) and shall not use any pesticide(s) or herbicide(s) until Permittee has received an express written authorization therefor from Permitter.

b) Permittee shall manage, treat, generate, handle, store and dispose of all pesticides and herbicides in accordance with Applicable Laws, including reporting requirements.

9) FIRE PREVENTION AND SUPPRESION

a) Permittee and its employees, agents, and contractors shall, in Permittee's use and occupancy of the Premises, take all reasonable precautions to prevent forest, brush, grass, and structural fires and shall, if safety permits, assist the Permitter in extinguishing such fires on the Premises.

10) EXCAVATION, SITE AND GROUND DISTURBANCE

a) Permittee shall not cut, remove or alter any timber or any other landscape feature; conduct any mining or drilling operations; remove any sand, gravel or similar substances from the ground or watercourse; commit waste of any kind; or in any manner change the contour or condition of the Premises without the prior written approval of the Permitter. Except in emergencies, Permittee shall submit requests to conduct such activities in writing to the Permitter not less than sixty (60) days in advance of the proposed commencement date of any such activities.

b) If approval of activities referenced above in Section10(a) is granted, Permittee shall abide by all the terms and conditions of the approval, including provisions pertaining to archaeological resources.

c) No soil disturbance of any kind may occur in the vicinity of a known archeological site, without the presence of an NPS archeological monitor.

11) NONPOINT SOURCE POLLUTION

a) The Permittee shall comply with all Applicable Laws regarding non-point source pollution (including the protection of beneficial uses of waters as designated by the State of California).  Further, Permittee's use and occupancy of the Premises shall be designed to minimize, to the greatest extent feasible, non-point source pollution within National Park Service boundaries or on adjacent lands.

b) Except as set forth in Section 3(k) of this Permit, no discharge into the estuary is permitted. This prohibition includes any discharge from processing facilities.

12) TREE AND VEGETATION REMOVAL

a) The Permittee may not remove tree(s) or vegetation unless expressly approved in writing by the Permitter.  The Permittee shall provide specific plans to the Permitter for desired tree(s) and vegetation removal during the annual meeting or in writing during the Term of this Permit.

b) Removal of non-native invasive vegetation such as non-native thistles, trimming and vegetation removal around structures is permissible.

13) WILDLIFE PROTECTION

a) Wildlife is an integral part of Point Reyes National Seashore and must be managed in accordance with all Applicable Laws, including but not limited to NPS laws, regulations, and policies.

b) Permittee shall not engage in any activity that purposely causes harm or destroys any wildlife. Conversely, Permittee shall not engage in any activity that purposely supports or increases populations of non-native or invasive animal species, except for the cultivation of the shellfish species authorized by this Permit.

c) On a case by case basis, the Permitter will evaluate incidences of depredation caused by Permittee and choose a course of action.  The nature of the course of action will be determined by the extent and frequency of the damage, the wildlife species, and park-wide management objectives.

14) HAZARDOUS MATERIALS; ENVIRONMENTAL HEALTH AND SAFETY

a) In connection with this Permit, Permittee, its officers, agents, employees and contractors, shall not use, generate, sell, treat, keep, or store any Hazardous Materials on, about, under or into the Premises or elsewhere in Point Reyes except in compliance with all Applicable Laws and as approved in writing by Permitter.  However, Permittee shall not be obligated to obtain Permitter's approval to use, keep, or generate Hazardous Materials as necessary for the normal operation or maintenance of vehicles or for standard household cleaners.  Permittee agrees to be responsible for timely acquisition of any permit(s) required for its Hazardous Materials-related activities, and shall provide to the Permitter, upon request, inventories of all such Hazardous Materials and any supporting documentation, including but not limited to material safety data sheets, uniform waste manifest forms, and/or any other pertinent permits.

b) Permittee, its officers, agents, employees and contractors, shall not release, discharge or dispose of any Hazardous Materials from, on, about, under or into the Premises or elsewhere in Point Reyes, except as authorized by Applicable Laws.

c) If Permittee knows of or reasonably suspects or receives notice or other communication concerning any past,

ongoing, or potential violation of Environmental Requirements in connection with the Premises or Permittee's activities, Permittee shall immediately inform Permitter and shall provide copies of any relevant documents to Permitter.  Receipt of such information and documentation shall not be deemed to create any obligation on the part of the Permitter to defend or otherwise respond to any such notification.

d)   If any Hazardous Materials Occurrence is caused by, arises from, or is exacerbated by the activities authorized under this Permit or by the use of the Premises by Permittee, its officers, agents, employees or contractors, Permittee shall promptly take all actions at its sole cost and expense as are required to comply with Applicable Laws and to allow the Premises and any other affected property to be used free of any use restriction that could be imposed under Applicable Laws; provided that, except in cases of emergency, Permitter's approval of such actions shall first be obtained.

e)   The Permitter shall have the right, but not the duty, at all reasonable times and, except in the case of emergency, following at least twenty-four (24) hours advance notice to Permittee, to enter and to permit any Agency, public or private utilities and other entities and persons to enter upon the Premises, as may be necessary as determined by the Permitter in its sole discretion, to conduct inspections of the Premises, including invasive tests, to determine whether Permittee is complying with all Applicable Laws and to investigate the existence of any Hazardous Materials in, on or under the Premises.  The Permitter shall have the right, but not the duty, to retain independent professional consultants to enter the Premises to conduct such inspections and to review any final report prepared by or for Permittee concerning such compliance.  Upon Permittee's request, the Permitter will make available to Permittee copies of all final reports and written data obtained by the Permitter from such tests and investigations. Permittee shall have no claim for any injury or inconvenience to or interference with Permittee's use of the Premises or any other loss occasioned by inspections under this Section 14(e).  Notwithstanding the foregoing, neither Permittee nor Permitter shall be required to provide a report under this Section 14(e) if such report is protected by attorney-client privilege.

f)   Should Permittee, its officers, agents, employees or contractors, fail to perform or observe any of the obligations or agreements pertaining to Hazardous Materials or Environmental Requirements for a period of thirty (30) days (or such longer period of time as is reasonably required) after notice, then Permitter shall have the right, but not the duty, without limitation of any other rights of Permitter under this Permit, personally or through its agents, consultants or contractors to enter the Premises and perform the same.  Permittee agrees to reimburse Permitter for the costs thereof and to indemnify Permitter as provided for in this Permit.

g)   Permittee understands and acknowledges that the Premises may contain asbestos and lead-based paint.  If Permittee performs any Improvements or Alterations, Permittee shall comply with all Environmental Requirements related to asbestos and lead-based paint and shall solely bear all costs associated therewith.  Nothing in this Permit shall be construed to require Permittee to remove asbestos or lead-based paint unless Environmental Requirements require such removal.

h)   Permittee shall indemnify, defend, save and hold Permitter, its employees, successors, agents and assigns, harmless from and against, and reimburse Permitter for, any and all claims, demands, damages, injuries, losses, penalties, fines, costs, liabilities, causes of action, judgments, and expenses, including without limitation, consultant fees and expert fees, that arise during or after the Term as a result of any violation of any Environmental Requirement in connection with this Permit or any Hazardous Materials Occurrence in connection with this Permit.

i)   The provisions of this Article 14 shall survive any termination or revocation of this Permit.  Article 15 (Insurance) of this Permit shall not limit in any way Permittee's or Permitter's obligations under this Article 14.

15) INSURANCE

a)   Permittee shall purchase the types and amounts of insurance described herein before the Commencement Date of this Permit unless otherwise specified.  At the time such insurance coverage is purchased, Permittee shall provide Permitter with a statement of Permittee insurance describing the insurance coverage in effect and a Certificate of Insurance covering each policy in effect as evidence of compliance with this Permit.  Permittee shall also provide the Permitter thirty (30) days advance written notice of any material change in the Permittee's

insurance program hereunder.  Permitter shall not be responsible for any omissions or inadequacies in insurance coverage or amounts in the event such coverage or amounts prove to be inadequate or otherwise insufficient for any reason whatsoever.

b)  From time to time, as conditions in the insurance industry warrant, the Permitter reserves the right to revise the minimum insurance limits required in this Permit.

c)  All insurance policies required by this Permit shall specify that the insurance company shall have no right of subrogation against the United States, except for claims arising solely from the negligence of the United States or its employees, or shall provide that the United States is named as an additional insured.

d)  All insurance policies required herein shall contain a loss payable clause approved by the Permitter which requires insurance proceeds to be paid directly to the Permittee without requiring endorsement by the United States.  Insurance proceeds covering any loss of the Premises but not used to replace such losses shall be promptly paid by Permittee to Permitter.  The use of insurance proceeds for the repair, restoration or replacement of the Premises shall not give any ownership interest therein to Permitter.

e)  Property Insurance:  At a minimum, the Permittee shall be required to purchase Basic Form Actual Cash Value (replacement cost less depreciation) insurance coverage for all residence on the Premises.  Within thirty days of issuance of the Permit, the Permittee shall submit a report from a reputable insurance company which provides a full range of options for insurance coverage on all nonresidential structures on the Premises.  Within thirty days of receipt of this report, the Permitter, in its sole discretion, will review and specify the type and level of insurance coverage which shall be required. The Permitter will provide the Permittee written notification of insurance requirements and the Permittee shall be required to have the specified level(s) of insurance in place within thirty days of such notification.  The cost of the insurance will be deducted from the appraised fair market value for the Premises; this adjustment and the insurance requirements will be addressed in an amendment to the Permit.  Permittee shall, in the event of damage or destruction in whole or in part to the Premises, use all proceeds from the above described insurance policies to repair, restore, replace or remove those buildings, structures, equipment, furnishings, betterments or improvements determined by the Permitter, in Permitter's sole discretion, to be necessary to satisfactorily discharge the Permittee's obligations under this Permit.

f)  Public Liability:  The Permittee shall provide Comprehensive General Liability insurance against claims arising from or associated with Permittee's use and occupancy of the Premises.  Such insurance shall be in the amount commensurate with the degree of risk and the scope and size of such use and occupancy, but in any event, the limits of such insurance shall not be less than $1,000,000.00 per occurrence covering both bodily injury and property damage.  If claims reduce available insurance below the required per occurrence limits, the Permittee shall obtain additional insurance to restore the required limits.  An umbrella or excess liability policy, in addition to a Comprehensive General Liability Policy, may be used to achieve the required limits.

g)  Permittee shall also obtain the following additional coverage:

 i)  Automobile Liability – To cover all owned, non-owned, and hired vehicles in the amount of $300,000.00.

 ii)  Workers' Compensation – The amount shall be in accordance with that which is required by the State of California.

16) INDEMNITY

a)  In addition to the indemnification contained in Article 14, Permittee shall indemnify, defend, save and hold Permitter, its employees, successors, agents and assigns, harmless from and against, and reimburse Permitter for, any and all claims, demands, damages, injuries, losses, penalties, fines, costs, liabilities, causes of action, judgments and expenses and the like incurred in connection with or arising in any way out of this Permit; the use or occupancy of the Premises by Permittee or its officers, agents, employees, or contractors; the design, construction, maintenance, or condition of any Improvements or Alterations; or any accident or occurrence on the Premises or elsewhere arising out of the use or occupancy of the Premises by Permittee or its officers, agents, employees, or contractors.  Permittee's obligations hereunder shall include, but not be limited to, the burden and

expense of defending all claims, suits and administrative proceedings (with counsel reasonably approved by Permitter), even if such claims, suits or proceedings are groundless, false or fraudulent, and conducting all negotiations of any description, and paying and discharging, when and as the same become due, any and all judgments, penalties or other sums due against the United States.

b) Permitter agrees to cooperate, to the extent allowed by law, in the submission of claims pursuant to the Federal Tort Claims Act against the United States by third parties for personal injuries or property damage resulting from the negligent act or omission of any employee of the United States in the course of his or her employment.

c) This Article 16 shall survive any termination or revocation of this Permit. The provisions of Article 15 (Insurance) of this Permit shall not limit in any way Permittee's obligations under this Article 16.

17) PROPERTY INTEREST

a) This Permit shall vest in Permittee no property interest in the Premises or in the improvements thereon. Title to real property and improvements thereon, including any Improvements or Alterations constructed by Permittee, shall be and remain solely in Permitter. Except as provided in Paragraph 3(g), Permittee shall have no claim for any compensation or damages for the Premises, the improvements thereon, or any Improvements or Alterations constructed by the Permittee.

b) Nothing in this Permit shall give or be deemed to give Permittee an independent right to grant easements or other rights-of-way over, under, on, or through the Premises.

c) Permitter hereby retains the sole and exclusive right to oil, gas, hydrocarbons, and other minerals (of whatsoever character) in, on, or under the Premises.

18) RENTS, TAXES AND ASSESSMENTS

a) The annual rental rate for this Permit shall be established by Permitter and is set forth on the Cover Page of this Permit.

b) The annual rent under this Permit is payable in advance on a semi-annual basis. Therefore, Permittee hereby agrees to pay fifty percent of the annual rate on or before November with the remaining fifty percent payable on or before May of each year during the Term.

c) Permittee shall pay the proper Agency, when and as the same become due and payable, all taxes, assessments, and similar charges which, at any time during the Term of this Permit, are levied or assessed against the Premises.

d) Rents due hereunder shall be paid without assertion of any counterclaim, setoff, deduction or defense and without abatement, suspension, deferment or reduction.

19) CYCLIC MAINTENANCE

a) Permittee shall perform all Cyclic Maintenance in accordance with the Provisions of this Permit and at Permittee's sole cost and expense. Permittee is responsible for the maintenance of all fences, buildings, and other improvements upon the Premises. All improvements and facilities used and occupied by Permittee shall at all times be protected and maintained in a safe, sanitary and sightly condition.

b) Specific maintenance requirements may be negotiated with Permittee each year as outlined in Article 21 (Annual Meeting).

c) Docks and Fences shall be maintained in good condition and shall be timely repaired in conformance with Applicable Laws. Abandoned fences and other decrepit improvements shall be removed from the Premises and shall be disposed of outside the Park or as directed by Permitter after review and approval by the NPS Historian.

d) New lighting under Permittee's control of the Premises shall be redesigned to protect and preserve the night sky/darkness and minimize light pollution in Drakes Estero.

e) Parking areas shall be maintained in a safe condition and no new roads or truck trails shall be established without prior written permission of the Permitter. The main entrance road from Sir Francis Drake Boulevard to the SUP Area will be maintained by the NPS. The Park will respond in a timely manner to Permittee and/or visitor complaints regarding the condition of the main entrance road. Notwithstanding the foregoing, Permitter may enter into a road maintenance contract with Permittee.

f) Existing water reservoirs shall be maintained in a safe and secure condition to prevent washouts and erosion and no new reservoirs shall be constructed or established without prior written approval of the Permitter.

g) Permittee shall maintain the water, well, pump and all pipelines within the Premises. Permittee shall replace or repair any damage or loss of the water system within the Premises.

h) Permittee shall maintain the sewage pipeline and sewage leachfield in the "Sewage Area."

i) Permittee shall be responsible for removing slash buildup around fences or other facilities within the Premises so as to prevent fire and egress hazards. Permittee shall also be responsible for removing litter and trash from the Premises.

20) COMPLIANCE WITH APPLICABLE LAWS; NEPA, NHPA

a) General Compliance: As provided for in this Permit, Permittee at its sole cost and expense shall promptly comply with all Applicable Laws as required by law. Permittee shall immediately notify Permitter of any notices received by or on behalf of Permittee regarding any alleged or actual violation(s) of or non-compliance with Applicable Laws. Permittee shall, at its sole cost and expense, promptly remediate or correct any violation(s) of Applicable Laws.

b) National Environmental Policy Act and National Historic Preservation Act: Where activities undertaken by Permittee relate to the preparation of compliance documents pursuant to the National Environmental Policy Act ("NEPA") or the National Historic Preservation Act ("NHPA"), Permittee shall supply all necessary information to Permitter and any Agency in a timely manner. Permitter will pay for the preparation of NEPA or NHPA documents. If there is litigation regarding NEPA or NHPA compliance, it will not trigger the indemnification requirements of Article 16.

21) ANNUAL MEETING

a) The Parties shall meet annually each year during the Term of this Permit for the purposes of discussing and resolving issues of mutual concern and ensuring that Permittee is complying with the Provisions of this Permit..

22) PENALTY

a) At the option of the Permitter, Permitter may, in lieu of voiding and terminating this Permit, assess a penalty of $50.00 per day for any failure by Permittee to keep and perform any of the Provisions of this Permit. In such case, Permittee shall be given notice in writing of a grace period (of from one to thirty days) to remedy the situation before a penalty will be assessed. Payment of any penalty under this provision shall not excuse Permittee from curing the Default. This provision shall not be construed as preventing Permitter from issuing citations or initiating enforcement proceedings under Applicable Laws.

23) SURRENDER AND VACATE THE PREMISES, RESTORATION

a) At the conclusion of Permittee's authorization to use the Premises for the Permitted Uses, Permittee shall surrender and vacate the Premises, remove Permittee's Personal Property therefrom, and repair any damage

resulting from such removal.  Subject to the approval of the Permitter, Permittee shall also return the Premises to as good order and condition (subject to ordinary wear and tear and damage that is not caused directly or indirectly by Permittee) as that existing upon the Effective Date.

b) All Permittee's Personal Property shall remain the property of Permittee.  However, if after the conclusion of Permittee's authorization to use the Premises for the Permitted Uses, Permittee shall fail satisfactorily to remove Permittee's Personal Property and so repair the Premises, then, at the Permitter's sole option, after notice to Permittee, Permittee's Personal Property, shall either become the property of the Permitter without compensation therefore, or the Permitter may cause it to be removed and the Premises to be repaired at the expense of Permittee, and no claim for damages against Permitter, its employees, agents or contractors shall be created or made on account of such removal or repair work.

24) <u>LIMITATION ON EFFECT OF APPROVALS</u>

a) All rights of Permitter to review, comment upon, approve, inspect or take any other action with respect to the use and occupancy of the Premises by Permittee, or any other matter, are expressly for the benefit of Permitter and no other party.  No review, comment, approval or inspection, right or exercise of any right to perform Permitter's obligations, or similar action required or permitted by, of, or to Permitter under this Permit, or actions or omissions of Permitter's employees, contractors, or other agents, or other circumstances shall give or be deemed to give Permitter any liability, responsibility or obligation for, in connection with, or with respect to the operation of the Premises, nor shall any such approval, actions, information or circumstances relieve or be deemed to relieve Permittee of its obligations and responsibilities for the use and occupancy of the Premises as set forth in this Permit.

25) <u>WAIVER NOT CONTINUING</u>

a) The waiver of any Default, whether such waiver be expressed or implied, shall not be construed as a continuing waiver, or a wavier of or consent to any subsequent or prior breach of the same or any other provision of this Permit.  No waiver of any Default shall affect or alter this Permit, but each and every Provision of this Permit shall continue in full force and effect with respect to any other then existing or subsequent Default.

26) <u>LIENS</u>

a) Permittee shall have no power to do any act or to make any contract that may create or be the foundation for any lien, mortgage or other encumbrance upon the reversion, fee interest or other estate of the Permitter or of any interest of the Permitter in the Premises.  If any such lien shall anytime be filed against the Premises or any portion thereof, Permittee shall cause the Permitter to be discharged from the lien.

27) <u>HOLDING OVER</u>

a) This Permit shall terminate upon the Termination Date and any holding over by Permittee after the Termination Date shall not constitute a renewal of this Permit or give Permittee any rights under this Permit or in or to the Premises.

28) <u>NOTICES</u>

a) Any notice or other communication required or permitted under this Permit shall be in writing and shall be delivered by hand or certified mail with return receipt requested.  Notices and other communications shall be addressed as follows:

If to Permitter:

Superintendent
Point Reyes National Seashore
Point Reyes Station, CA 94956

If to Permittee:

Mr. Kevin Lunny
Drakes Bay Oyster Company
17171 Sir Francis Drake
Inverness, CA 94937

29) <u>NO PARTNERSHIP OR JOINT VENTURE</u>

a) Permitter is not for any purpose a partner or joint venturer of Permittee in the development or operation of the Premises or in any business conducted on the Premises. Permitter shall not under any circumstances be responsible or obligated for any losses or liabilities of Permittee.

30) <u>ANTI-DEFICIENCY ACT</u>

a) Permittee and Permitter agree that nothing contained in this Permit shall be construed as binding Permitter to expend, in any fiscal year, any sum in excess of the appropriation made by Congress for that fiscal year in furtherance of the subject matter of this Permit, or to involve Permitter in any contract or other obligation for the future expenditure of money in excess of such appropriations.

31) <u>COMPLIANCE WITH EQUAL OPPORTUNITY LAWS</u>

a) Permittee agrees that in undertaking all activities pursuant to this Permit, Permittee will comply with all Applicable Laws relating to non-discrimination.

32) <u>ENTIRE AGREEMENT AND AMENDMENT</u>

a) This instrument, together with the exhibits hereto, all of which are incorporated in this Permit by reference, constitutes the entire agreement between Permitter and Permittee with respect to the subject matter of this Permit and supersedes all prior offers, negotiations, oral and written.  This Permit may not be amended or modified in any respect whatsoever except by an instrument in writing signed by Permitter and Permittee.

33) <u>NO PAYMENTS BY PERMITTER</u>

a) Under no circumstances or conditions, whether now existing or hereafter arising, and whether or not beyond the present contemplation of the Parties, shall Permitter be expected or required to make any payment of any kind whatsoever with respect to the Premises or be under any obligation or liability except as expressly set forth in this Permit.

34) <u>NO THIRD PARTY BENEFICIARIES</u>

a) Except as expressly set forth in this Permit, this Permit shall not be deemed to confer upon any person or entity, other than the parties to this Permit as expressly set forth in this Permit, any third party beneficiary status, any right to enforce any Provision of this Permit, or any other right or interest.

35) <u>NO PREFERENTIAL RENEWAL AND RELOCATION ASSISTANCE</u>

a) Permittee hereby agrees that Permittee is not a concessioner and that the provisions of law regarding National Park Service concessionaires do not apply to Permittee.  No rights shall be acquired by virtue of this Permit entitling Permittee to claim benefits under the Uniform Relocation Assistance and Real Property Acquisition

Policies Act of 1970, Public Law 91-646.

36) <u>SEVERABILITY</u>

   a)  In case any one or more of the provisions of this Permit shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Permit, and this Permit shall be construed as if such invalid, illegal or unenforceable provisions had not been contained in this Permit.

37) <u>EXHIBITS</u>

   a)  Each of the exhibits referenced in this Permit is attached hereto and incorporated herein.

38) <u>TIME OF THE ESSENCE</u>

   a)  Time is hereby expressly declared to be of the essence of this Permit and of each and every Provision of this Permit.

39) <u>HEADINGS</u>

   a)  Article, Section and Subsection headings in this Permit are for convenience only and are not to be construed as a part of this Permit or in any way limiting or amplifying the Provisions of this Permit.

40) <u>PERMIT CONSTRUED AS A WHOLE</u>

   a)  The language in all parts of this Permit shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either Permitter or Permittee.  The Parties acknowledge that each party and its counsel have reviewed this Permit and participated in its drafting and therefore that the rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed or applied in the interpretation of this Permit.

41) <u>MEANING OF TERMS</u>

   a)  Whenever the context so requires, the neuter gender shall include the masculine and the feminine, and the singular shall include the plural and vice versa.

42) <u>FEDERAL LAW</u>

   a)  The laws of the United States shall govern the validity, construction and effect of this Permit.

**LIST OF EXHIBITS**

EXHIBIT A:    Map – Drake's Estero Aquaculture & CDFG Leases:  NPS Resources and SUP Area

EXHIBIT B:    Map – Drake's Estero Oysters – SUP & ROP

EXHIBIT C:    Drakes Estero Aquaculture and Harbor Seal Protection Protocol

EXHIBIT D:    Map – Drakes Bay Oyster Company Well Area

EXHIBIT E:    Map – Drakes Bay Oyster Company Sewage Area

**EXHIBIT A**

Map – Drake's Estero Aquaculture & CDFG Leases:  NPS Resources and SUP Area



Drake's Estero Aquaculture & CDFG Leases

NPS Resources and SUP Area

National Park Service
U.S. Department of the Interior

**Permit Type**
- ROP
- SUP

**Oyster Racks**
- Active
- Dilapidated

- Aquaculture Lease/SUP Area
- Potential Wilderness
- Existing Wilderness

Map Location

**EXHIBIT B**

Map – Drake's Estero Oysters – SUP & ROP



Drake's Estero Oysters - SUP & ROP

National Park Service
Point Reyes National Seashore
Marin County, CA

0   50   100   150   200
Feet

Permit Type
ROP - 1.5 acres
SUP - 1.1 acres

**EXHIBIT C**

Drakes Estero Aquaculture and Harbor Seal Protection Protocol



HARBOR SEAL
PROTECTION AREA

☐ Harbor Seal
Protection Area

**Drakes Estero Aquaculture and
Harbor Seal Protection Protocol**

The following items are mutually agreed to for protection of harbor seals in and adjacent to the Harbor Seal Protection Areas identified in the Map, attached hereto and incorporated herein by reference ("Protocol Map"):

1. During the breeding season, March 1 through June 30, the "Main Channel" and "Lateral Channel" of Drakes Estero will be closed to boat traffic. During the remainder of the year, the Lateral Channel and Main Channel are open to boat traffic outside of the protection zone.

2. During the breeding season, Permittee boats may use the "West Channel" at low speed while maintaining a distance of at least 100 yards from hauled out seals.

3. Throughout the year, all of Permittee's boats, personnel, and any structures and materials owned or used by Permittee shall be prohibited from the harbor seal protection areas identified on the Protocol Map. In addition, all of the Permittee's boats and personnel shall be prohibited from coming within 100 yards of hauled out harbor seals.

**EXHIBIT D**

Map – Drakes Bay Oyster Company Well Area



PR 02-106
JOHNSON OYSTER

JS 4/14/94

1"=100 FT.

Some dimensions approximate

Approximate Locations:
M   Mobile Home
o   Well
C   "Cabin"
Corner of Levee
Permit Area
Fence Remnants

**EXHIBIT E**

Map – Drakes Bay Oyster Company Sewage Area



EXHIBIT
Oyster Farm Leach Field (Approximate Location and Size)

Location Map

National Park Service
Point Reyes National Seashore
Marin County, CA

Oyster Farm Leach Field

0    175    350    525    700 Feet

§

Plot Date: 1/7/08    S:/GIS/projects1/Range/SpecialParkUses/DBOLeachField.mxd